IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC ACQUISITION THREE, INC., and SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

Francis A. Monaco, Esquire and Kevin J. Mangan, Esquire of Walsh Monzack & Monaco, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: John C. Hutchins, Esquire, Daniel E. Rosenfeld, Esquire and Amy Beth Abbott, Esquire of Kirkpatrick & Lockhart L.L.P., Boston, Massachusetts.

Gregory Alan Taylor, Esquire, Stephen E. Jenkins, Esquire, Christopher S. Sontchi, Esquire and Liza H. Meltzer, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendants Shaw Group, Inc. and SWINC Acquisition Three.

Adam G. Landis, Esquire of Landis, Rath & Cobb, L.L.P., Wilmington, Delaware. Counsel for Defendant SWE&C Liquidating Trustee.

MEMORANDUM OPINION

Dated: May 3, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

I. INTRODUCTION

On June 2, 2000, debtor Stone & Webster, Inc. ("debtor")[1] filed a voluntary petition for relief under chapter 11, title 11 of the United States Code. On October 18, 2001, plaintiff Saudi American Bank ("SAMBA") filed an adversary action against defendants Shaw Group, Inc. ("Shaw"), SWINC Acquisition Three, Inc. and SWE&C Liquidating Trustee (collectively "defendants") in the United States Bankruptcy Court for the District of Delaware ("the bankruptcy court"). (D.I. 1)[2] Plaintiff alleged that, under an Asset Purchase Agreement ("the APA"), defendants assumed a debt owed to plaintiff by Stone & Webster Engineering Corporation ("SWEC"), a subsidiary of debtor. (Id.) On June 1, 2004, defendants moved to withdraw the adversary proceeding from the bankruptcy court. (D.I. 75) This court granted the motion on September 13, 2004. (D.I. 88) The court has jurisdiction over actions arising out of chapter 11 of the bankruptcy code pursuant to 28 U.S.C. § 1334(a). Presently before the court are plaintiff's and defendants' motions for summary judgment. (D.I. 29, 47)[3] For the reasons set forth below, the court grants

---

[1] Although there are multiple named debtors, for ease of reference this order shall refer to a single "debtor."

[2] Unless otherwise noted, the docket items (i.e., D.I. __) will be from the bankruptcy court's docket for this case.

[3] There are several motions which are currently pending before the court. While this memorandum opinion will focus on plaintiff's and defendants' cross motions for summary judgment,

plaintiff's motion for summary judgment (D.I. 47) and denies defendants' motion for summary judgment (D.I. 29).

## II.  BACKGROUND

On May 31, 1980, SWEC and Abdullah Said Bugshan & Bros. ("Bugshan"), a Saudi Arabian business enterprise, formed a joint venture called Bugshan Stone & Webster ("BSW") under the laws of Saudi Arabia.  (D.I. 1 at 5)  BSW was owned in equal shares by SWEC and Bugshan.  (Id.)  In the mid 1990s, BSW entered a $130 million contract with Saudi Arabian American Oil Company ("Aramco") to upgrade a large oil refinery at Ras Tanura in Saudi Arabia (the "Ras Tanura Contract").  (D.I. 31 at A-173)  In an attempt to induce plaintiff to grant credit to BSW, Bugshan and SWEC each agreed to issue guaranties to plaintiff for 50% of any loans plaintiff made to BSW.  (D.I. 1, ex. A; D.I. 49 at A95-A96, A125)  On October 11, 1994, SWEC delivered a letter guarantying payment of 50% of all obligations owed to plaintiff by BSW, up to thirty five million dollars (the "Guaranty").  (D.I. 1, ex. A)  In a letter dated July 10, 1997, plaintiff approved a loan for $35 million "to finance mobilization & working capital

---

it will also resolve several other pending motions.  Most notably this order will address:  (1) plaintiff's motion for leave to file an amended complaint (D.I. 8); (2) plaintiff's motion for consolidation or dismissal (D.I. 9); (3) defendants' motion for summary judgment (D.I. 29); (4) plaintiff's motion for summary judgment (D.I. 47); and (5) plaintiff's motion to strike the declaration of James P. Carroll (D.I. 48).  Because debtor Stone & Webster, Inc. has been terminated from the present matter, its motion for summary judgment (D.I. 11) is denied as moot.

requirements of Saudi Aramco Cont[r]act [No.] 65004/00 (IK)."[4] (D.I. 31 at A-168) Unfortunately, BSW ran into difficulties on the Ras Tanura project and was unable to repay plaintiff the outstanding amount of the loan when the project was completed. In late 1998, pursuant to their guaranties, SWEC and Bugshan each agreed to repay one-half of the outstanding Ras Tanura Contract loan at a rate of $650,000 per month (the "Payment Letter"). (D.I. 49 at A67, A127)

By June 2000, debtor was operating its businesses and managing its properties pursuant to 11 U.S.C. §§ 1107(a) and 1108. At the time of debtor's chapter 11 filing, SWEC allegedly owed plaintiff approximately $6 million. (D.I. 49 at A69) On July 6 and 7, 2000, substantially all of debtor's assets were sold to defendant Shaw through an auction sale (the "Auction Sale"). (D.I. 49 at A131-A291)

On July 7 and 12, 2000, a hearing for approval of the Auction Sale (the "Sale Hearing") was conducted.[5] (D.I. 50 at A497-A648) At the Sale Hearing, counsel for debtor represented that debtor had

> sent out a notice of sale . . . that said, essentially, if

---

[4] Contract No. 65004/00 (IK) was BSW's name for the contract to upgrade Aramco's Ras Tanura facility. (D.I. 31 at A-131, A-170)

[5] At the time of the Sale Hearing, the United States District Court for the District of Delaware was hearing bankruptcy cases pursuant to 28 U.S.C. § 1334(a).

3

> you don't see your name on this list, or this schedule of contracts, which is the, what I like to call the excluded contracts, then your contract is being assumed.
>
> . . .
>
> Sometimes, Your Honor, in purchase contracts, schedules are merely informative and not necessarily per se material to the deal. That is not the nature of this agreement. This agreement revolves, in terms of its economics, around three schedules, or let's say two schedules, and whether or not your contract is on one of those two schedules. **And those two schedules are the schedule for rejected contracts and the schedule for completed contracts. If they are not on those schedules, in essence, your contract is an assumed contract, and the economic impact to you as a stakeholder is dependent upon whether you are on those two lists** . . . .

(D.I. 50 at A518-A529) (emphasis added)

On July 13, 2000, an order (the "Sale and Assumption Order") regarding the Auction Sale was entered. (D.I. 49 at A1-A36) In the Sale and Assumption Order, the court stated:

> [A]ll rights and remedies of any non-debtor party or Shaw under any of the Assumed Contracts (the "Rights and Remedies") are fully preserved and shall be enforceable after the Closing against Shaw or the non-debtor party unless such Rights and Remedies are or were expressly waived in a separate agreement or on the record of the Auction.

(D.I. 49 at A18-A19) The court also stated that

> [t]he terms and provisions of the [APA] and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the [debtor], [its] estates, and [its] creditors, Shaw, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in the Assets to be sold to Shaw pursuant to the [APA] . . . .

(D.I. 49 at A26) Finally, the court stated that the APA could not be modified without further order unless "such modification, amendment, or supplement does not have a material adverse effect

4

on the [debtor's] estates." (D.I. 49 at A27)

On July 14, 2000, debtor and defendant Shaw entered into the APA whereby Shaw purchased a substantial portion of debtor's assets and assumed many of its liabilities. (D.I. 50 at A861-A969) On the same date, the court entered an order approving the APA.

Section 2.02 of the APA, titled "Excluded Assets," excludes a number of assets from those being acquired by defendant Shaw. (D.I. 31 at A-240) Subsection (b) defines as "Excluded Assets" all "Completed Contracts" of debtor. Section 1.01 of the APA defines "Completed Contracts" as contracts of debtor, "including those specifically set forth on Schedule 2.02(b), under which substantially all of the contractual work effort of [debtor] has been completed, even if such Contracts have continuing warranty obligations, administrative matters or work related to warranty or other claims[.]" (Id. at A-229) Schedule 2.02(b) does not include any reference to the Guaranty, the Payment Letter, or the underlying Ras Tanura Contract. (Id. at A-306)

Subsection (e) of Section 2.02 of the APA defines as "Excluded Assets" all the "Special Project Claims". (Id. at A-241) Section 1.01 of the APA defines "Special Project Claims" as "any and all claims under the project agreements set forth on Schedule 2.02(e) to the extent not reflected on the March 31

Balance Sheet[.]"[6]  (Id. at A-237)  Schedule 2.02(e) lists the "Ras Tanura, Saudi Arabia, Refinery Upgrade Project" as one of the "Special Project Claims."  (D.I. 50 at A979)  Schedule 2.02(e) also specifically identifies a "Contract for Construction dated as of June 28, 1994 by and between Saudi Arabian Oil Company ("Saudi Aramco") and [BSW] (designated by Saudi Aramco as Contract No. 65004/00)[]" as a "Special Project Claim".  (Id.)  Finally, Schedule 2.02(e) identifies "[o]ne or more potential claims for payment under a series of Letters of Credit issued by [plaintiff] and involving materials supplied under a number of purchase orders issued by [BSW] . . . for materials incorporated into the [Ras Tanura Refinery Upgrade Project]" as "Special Project Claims".  (Id.)

Section 2.03 of the APA states that "[Shaw] shall assume the Assumed Liabilities[]" as of the closing date.  (Id. at A887)  Section 1.01 of the APA defines "Assumed Liabilities" as "all liabilities and obligations of [debtor] set forth on Schedule 2.03 as of the Closing Date . . . ."  (Id. at A872)  Schedule 2.03 is the "List of Assumed Liabilities".  (Id. at A957)  Paragraph three of Schedule 2.03 provides that "[l]iabilities

---

[6] Although the APA defines "Special Project Claims" as any and all claims set forth on Schedule 2.02(e), the Execution Copy of the APA did not include a Schedule 2.02(e).  Rather, Schedule 2.02(e) was added to the APA by debtor and defendant Shaw subsequent to this court's approval of the Execution Copy of the APA.  (D.I. 51 at 42; D.I. 57 at 14 n.3)

under [debtor's] outstanding bank indebtedness, including amounts outstanding and pursuant to existing standby letters of credit[]" are "Assumed Liabilities." (Id.) Section 3.17 of the APA states that Schedule 3.17(a)(ix) is "a true, complete and correct list" of "any bond, indenture, note, loan or credit agreement . . . or other Contract relating to the borrowing of money or to the direct or indirect guarant[y] or assumption of obligations of any other Person for borrowed money." (Id. at A897) Schedule 3.17(a)(ix) lists: (1) a guaranty by BSW to plaintiff (id. at A983); (2) a letter of guaranty dated September 1, 1992 from SWEC to plaintiff regarding BSW securing credit facilities (id. at A984); and (3) a letter of guaranty dated October 19, 1992 whereby SWEC guaranteed plaintiff the repayment of 40 million Saudi Riyals (id.). Defendant Shaw admits that Schedule 3.17(a)(ix) lists a guaranty by SWEC for BSW's borrowing from plaintiff. (D.I. 49 at A91) Defendant Shaw assumes that the guaranty listed on Schedule 3.17(a)(ix) incorporates the Guaranty by which SWEC guaranteed 50% of BSW's obligations to plaintiff up to $35 million. (Id. at A91-A92) Defendant Shaw admits that Schedule 3.17(a)(ix) lists contractual liabilities disclosed to defendant Shaw by debtor. (D.I. 49 at A91)

Section 2.04 of the APA, captioned "Excluded Liabilities," states that "[u]nder no circumstances shall [defendant Shaw] assume or be obligated to pay . . . any of the Excluded

Liabilities, including the following liabilities, which shall be and remain liabilities of [debtor]: . . . (c) liabilities or obligations associated with any Excluded Assets; . . . (e) liabilities or obligations under the Assumed Contracts that are not Assumed Liabilities and liabilities or obligations arising under the Rejected Contracts or the Completed Contracts[.]" (D.I. 31 at A-241)

On July 18, 2001, the court entered an order establishing a cure claim procedure. (D.I. 49 at A293-A307) The cure claim procedure defined "cure claims" as "any and all liquidated monetary claims[7] arising or accruing on or before July 14, 2000 under the Assumed Contracts and actually known by the non-[debtor] party to an Assumed Contract." (Id. at A294) The cure claim procedure also required debtor to file a list of all Assumed Contracts and an amended list of all Excluded Contracts. (Id. at A305) According to the cure claim procedure, a cure claim had to be filed by August 25, 2000. (Id. at A299)

On July 21, 2000, debtor filed an Assumed Contract List, an Excluded Contract List, and an Amended Excluded Contract List. (D.I. 50 at A649-A660) Neither the Guaranty nor the Payment

---

[7] "Liquidated monetary claims" relate to "money due and owing or allegedly due and owing by the [debtor] under the Assumed Contracts, but does not include any claims by the non-[debtor] party for any defective work (whether latent or otherwise) by the [debtor] or [its] subcontractors or under any warranty provisions of the Assumed Contract." (D.I. 49 at A294-A295)

Letter was included on any of those lists. On August 4, 2000, debtor filed a Second Amended Excluded Contract List, and a Second Amended Assumed Contract List. (D.I. 50 at A661-A668) The Second Amended Assumed Contract List includes a contract with Aramco Services Co. and two contracts with plaintiff. (D.I. 50 at A666, A668)

On August 24, 2000, plaintiff filed a statement of cure claim against SWEC, alleging that SWEC owed outstanding financial obligations to plaintiff. (D.I. 49 at A52-A85) Plaintiff attached the Guaranty and the Payment Letter as exhibits to its cure claim. (Id. at A56, A67) Defendant Shaw failed to pay or contest plaintiff's cure claim.

On December 28, 2000, the court entered an order approving a letter agreement, dated December 27, 2000, which confirmed the terms of the APA. (D.I. 50 at A857-A860) Pursuant to this letter agreement and order, certain additional projects were to be treated as Completed Contracts under the APA and Schedule 2.02(b). (D.I. 50 at A670) Neither the Guaranty nor the Payment Letter were added to the list of Completed Contracts. (Id.) Debtor also stated that the additional completed contracts "constitute the only completed contracts or substantially completed contracts of which [debtor has] actual knowledge as not being listed on Schedule 2.02(b) to the Disclosure Schedules (collectively with Schedule 2.02(b), the 'Completed Contracts

9

List')." (Id.) Neither the letter agreement nor the order sought to amend the Schedule of Rejected Contracts.

On August 1, 2001, debtor commenced a preference action against plaintiff to avoid and recover certain preferential transfers, to disallow plaintiff's claims, to estimate plaintiff's claims at $0, and to reduce plaintiff's claims to an amount reflected on the debtor's books and records (the "Preference Action"). Plaintiff filed its answer and affirmative defenses on October 18, 2001.

On August 1, 2002, plaintiff commenced the instant adversary proceeding. (D.I. 1) Plaintiff's complaint alleged that, under the APA, defendant Shaw assumed the $6,728,529 debt owed to plaintiff by SWEC. In the alternative, plaintiff claimed that "[u]nless [defendant] Shaw assume[d] its obligation to pay [plaintiff] . . . SWEC is obligated to pay [plaintiff] . . . ." (D.I. 1 at 12)

On January 2, 2002, defendants filed an answer to plaintiff's adversary proceeding complaint. (D.I. 5) Plaintiff filed a motion for leave to file an amended complaint on January 7, 2002.[8] (D.I. 8) That same day, plaintiff filed a motion seeking to consolidate the Preference Action and the instant

---

[8] The court denies plaintiff's motion for leave to file an amended complaint (D.I. 8), as amending the complaint will further delay this case, which lingered in the bankruptcy court for several years before it was withdrawn to this court.

10

litigation.[9] (D.I. 9) On August 13, 2002, defendant Shaw filed a motion for summary judgment.[10] (D.I. 29) On October 18, 2002, plaintiff filed its motion for summary judgment. (D.I. 47)

**III. STANDARD OF REVIEW**

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of

---

[9] The court denies plaintiff's motion to consolidate. (D.I. 9) Federal Rule of Civil Procedure 42(a) provides this court with authority to consolidate "actions involving a common question of law or fact . . . pending before the court." Decisions to consolidate cases are at the discretion of the district court, but often courts balance considerations of efficiency, expense and fairness. See United States v. Dentsply Int'l, Inc., 190 F.R.D. 140, 142-43 (D. Del. 1999). Because the Preference Action and this litigation stem from different factual circumstances, consolidation is not appropriate.
     The court also denies plaintiff's motion to dismiss the preference action (D.I. 9), as the preference action is not pending in this court.

[10] The court grants plaintiff's motion to strike the declaration of James P. Carroll submitted in support of defendants' motion for summary judgment. (D.I. 48)

11

proof on the disputed issue is correct." <u>Horowitz v. Fed. Kemper Life Assurance Co.</u>, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." <u>Pa. Coal Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

IV.  DISCUSSION[11]

Construction of contract language is a question of law. See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992).  The primary consideration in interpreting a contract is to "attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted."  See Comrie v. Enterasys Networks, Inc., 837 A.2d 1, 13 (Del. Ch. 2003).  In ascertaining intent, Delaware courts adhere to the "objective" theory of contracts. See Haft v. Haft, 671 A.2d 413, 417 (Del. Ch. 1995).  Under this approach, a contract's "construction should be that which would be understood by an objective reasonable third party."  R.E. Haight & Assocs. v. W.B. Venables & Sons, Inc., C.A. No. 94C-11-023, 1996 WL 658969, at *3 (Del. Super. Oct. 30, 1996) (quoting Demetree v. Commonwealth Trust Co., No. 14354, 1996 WL 494910, at *4 (Del. Ch. Aug. 27, 1996)).  Thus,

> [w]here parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party.  An inquiry into the subjective unexpressed intent or understanding of the individual parties [to the contract] is neither necessary nor appropriate where the words of the

---

[11] In the case at bar, plaintiff asserts that defendant Shaw assumed a debt owed to plaintiff by SWEC through operation of the Guaranty and Payment Letter.  Because there is no dispute that plaintiff has standing to enforce these contracts if they were assumed by defendant Shaw pursuant to the Sale and Assumption Order and Sections 2.03 and 3.17 of the APA, there can be no dispute that plaintiff has standing to bring the issue for resolution before this court.

13

>contract are sufficiently clear to prevent reasonable
>persons from disagreeing as to their meaning.

Demetree, 1996 WL 494910, at *4 (citations omitted); accord Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."). The court, therefore, must determine whether the contractual language in dispute, when read in the context of the entire contract, is ambiguous.

Ambiguity exists only when a contractual provision is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Rhone-Poulenc, 616 A.2d at 1196; accord SI Mgmt. L.P. v. Wininger, 707 A.2d 37, 42 (Del. 1998). Contractual language "is not rendered ambiguous simply because the parties do not agree upon its proper construction." Id.; see also City Investing Co. Liquidating Trust v. Cont'l Cas. Co., 624 A.2d 1191, 1198 (Del. 1993) (finding contract language is not ambiguous "simply because the parties in litigation differ concerning its meaning."). However, inconsistent contractual provisions may create ambiguity in a contract. Fraternal Order of Police v. City of Fairmont, 468 S.E.2d 712, 717 (W. Va. 1996) ("Contract language usually is considered ambiguous where an agreement's terms are inconsistent

14

on their face . . . ."); Weber v. Tillman, 913 P.2d 84, 96 (Kan. 1996) ("To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."); Franklin v. White Egret Condo., Inc., 358 So. 2d 1084 (Fla. Dist. Ct. App. 1977), aff'd, 379 So. 2d 346 (Fla. 1979) (finding "two sections [of a disputed contract] are inconsistent, and inherently ambiguous."). When a contract is ambiguous, it raises "factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties." Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1230 (Del. 1997). If "the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide." In re Columbia Gas Sys., 50 F.3d 233 (3d Cir. 1995).

The question of whether defendant Shaw assumed the Guaranty and Payment Letter must be considered in light of the fundamental premise that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral."[12] Financeamerica Private Brands,

---

[12] Given the very clear case law establishing that a guaranty and the underlying contract are separate contracts, the court rejects defendant Shaw's argument that the contract at issue is the Ras Tanura Contract.

Inc. v. Harvey E. Hall, Inc., 380 A.2d 1377, 1379 (Del. Super. 1977); see also Jones Motor Co. v. Teledyne, Inc., 690 F. Supp. 310, 313 (D. Del. 1988). Therefore, the issue presented by the parties is whether the Guaranty and Payment Letter were unambiguously assumed or rejected under the APA.

The court concludes that the Guaranty and Payment Letter were assumed under the APA. First, neither the Guaranty nor the Payment Letter fall within the definition of an "Excluded Asset" either as a "Completed Contract" or as a "Special Project Claim", as defined in Section 2.02 of the APA and the schedules related thereto. Second, Section 1.01 of the APA defines an "Assumed Contract" as any contract that is not specifically identified as a "Rejected Contract" or a "Completed Contract". Sections 1.01 and 2.03 and Schedule 2.03 of the APA define the scope of "Assumed Liabilities" as including "outstanding bank indebtedness". The record indicates that Schedule 3.17, listing those contracts which relate to such outstanding bank indebtedness as guaranties, includes at least an indirect reference to the Guaranty and Payment Letter. Defendant failed to pay or contest plaintiff's cure claim. Finally, and of great significance, are the representations made to this court by counsel for the debtor, that if contracts were not identified on the schedules listing rejected and completed contracts, then the contract would be deemed an assumed contract.

16

V.   CONCLUSION

For all of these reasons, the court concludes that the Guaranty and Payment Letter are contracts that were assumed by defendant Shaw by operation of the APA and the Sale and Assumption Order.  Therefore, plaintiff's motion for summary judgment shall be granted.  An appropriate order shall issue.