Westlaw.

Not Reported in A.2d
1998 WL 962089 (Del.Super.)
(Cite as: 1998 WL 962089 (Del.Super.))

Page 1

▷
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
HERCULES INCORPORATED, a corporation of the State of Delaware, Plaintiff,
v.
THE AETNA CASUALTY AND SURETY COMPANY, et. al. Defendants.
Nos. 92C-10-105, 90C-FE-195-1-CV.

Sept. 30, 1998.

POST-TRIAL OPINION

SILVERMAN, J.

*1 The jury having reached its verdict, as presented below, the Court prepares to enter judgment in this complex environmental insurance coverage case. First, several legal determinations must be made. This opinion addresses whether Defendants' insurance policies' non-cumulation clauses will be enforced, whether the multi-year polices have annual or policy occurrence limits, whether Hercules is entitled to pre-judgment interest, and if so, when it accrues and at what rate, to what extent Hercules is entitled to defense costs, and whether a setoff for settled parties is required.

The case's background, how Hercules got mired in massive state and federal litigation concerning its Jacksonville, Arkansas herbicide factory, has been discussed previously, at length. [FN1] Similarly, the Court will not attempt to rehash the case's procedural twists and turns over the past eight years.

> FN1. *Hercules, Inc. v. Aetna. Cas. And Sur. Co.*, Del. Super, C.A. Nos. 92C-10-105, Silverman, J. (Jan. 14, 1998) Op. at 205, quoting *United States v. Vertac Chem. Corp.*, E.D. Ark., 489 F.Supp. 870, 873- 880 (1980); 588 F.Supp. 1294, 1295-1296 (1984); 966 F.Supp. 1491, 1494-1495 (1997).

I. Jury's Verdict

Following a trial lasting approximately three and a half months, the jury deliberated for three days. Then, it returned a unanimous verdict, expressed in a special verdict form comprising twelve pages and almost 450 questions. In effect, the verdict emancipates most of the defendant insurers, but leaves three remaining: London Market Insurers (LMI), American Home Assurance Company, and Home Insurance Company.

The jury found that Hercules proved by a preponderance of the evidence that it had been held financially responsible for damages to on-site property, groundwater, Rocky Branch Creek/Bayou Meto, residential areas, and off-site landfills from 1957 through April 1, 1980. [FN2] Despite Hercules' having been held responsible for the damage, according to the jury Hercules' employees could have reasonably foreseen that Hercules operations would substantially contribute to damage to on-site property, only from July 31, 1972 to April 1, 1980. Further, all unexpected unintended property damage was the result of one continuous occurrence.

> FN2. Hercules is liable, with an exception for the Jacksonville Waste Water Treatment Plant from 1957 through July 31, 1964.

With respect to specific happenings, the jury found that the dechlorinator release and recycle liquor spill were sudden, unexpected, and unintended happenings, but they did not substantially contribute to property damage requiring cleanup. Hercules proved which policy periods were implicated for each happening, but only proved a specific date, July 1972, with respect to the recycle liquor spill. Hercules did not prove that there were other sudden, unexpected and unintended events that substantially contributed to property damage requiring cleanup. As discussed below, the jury's finding a continuous occurrence and no damage caused by sudden events is especially significant.

Next, the jury stated that process buildings and structures, process equipment, on-site soils, and in-ground structures were owned by Hercules from December 28, 1961 to August 25, 1976. The Dalapon plant, contents and residues in process vessels, Regina paint building area purchased by Vertac, and excavated residential soils brought to the site were not owned by Hercules during that time.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
1998 WL 962089 (Del.Super.)  
**(Cite as: 1998 WL 962089 (Del.Super.))**

*2 According to the jury, Hercules proved that one hundred percent of the costs associated with above ground OU-1 [FN3] was remedial and not preventative; ninety percent of the soils/in ground structures OU-2 [FN4] was remedial; one hundred percent of the groundwater capital was remedial; and one hundred percent of the groundwater operation and maintenance was remedial. Hercules knew of its liability for $250,000 in damages for on-site soils, groundwater, and off-site areas in July 1984. By October 1985, Hercules knew that its liability had reached two million dollars.

> FN3. OU-1 is defined, in the special verdict form, as "[t]he cleanup of on-site buildings, above-ground tanks and equipment, and other media."
>
> FN4. OU-2 is defined as "[t]he cleanup of soils and in-ground structures at the Jacksonville Plant Site."

Next, the jury found that the "notice of occurrence" North River policy language was not negotiated, and that Hercules provided timely notice of the occurrence at Jacksonville to all defendants. Finally, Hercules proved that it is entitled to declaratory relief for costs incurred from September 30, 1997 and into the future.

### II. Non-cumulation Clause

The parties dispute the insurance policies' non-cumulation clause's interpretation and enforceability. Generally, a non-cumulation clause is an insurance provision stating that if the insured is entitled to recover under the policy, the insured may not recover more than once for the loss. For example, the insured may have several policies for a risk; if that risk becomes reality and damage occurs, the insured may not recover in full from each insurer. Insurers will deduct amounts already paid by other insurers before their policy responds. Sometimes, non-cumulation is referred to as anti-stacking. [FN5]

> FN5. *Uniroyal, Inc. v. Home Ins. Co.*, E.D.N.Y., 707 F.Supp. 1368, 1391 (1988); *Cheseroni v. Nationwide Mut. Ins. Co.*, Del.Super., 402 A.2d 1215 (1979) (granting defendant's motion for summary judgment, the automobile insurance anti-stacking provision, stating that liability limits shall not exceed the highest limit of liability for any one of the vehicles), *aff'd*, Del.Supr., 410 A.2d 1015 (1980).

There are two parts to the non-cumulation clause at issue here. The first paragraph provides that a deduction must be made for any amounts already paid. The second paragraph addresses continued coverage, for damage occurring within the policy period and continuing thereafter. The parties frame the issue as whether the inapplicability of the first, prior insurance, paragraph prevents the non-cumulation clause's enforcement.

#### A.

The non-cumulation clause in Hercules' 1964-1970 policies typically reads:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the assured prior to the inception date hereof the limit of liability stated ... shall be reduced by any amounts due to the assured on account of such loss under such policy.
>
> Subject to the foregoing paragraph and to all other terms and conditions of this policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the Assured for liability in respect of such personal injury or property damage without payment of additional premiums.

Hercules argues that the clause requires reimbursement for all covered Jacksonville damages continuing after 1970. Hercules maintains that the plain language and the fact that the jury found that the damage resulted from one occurrence requires the 1964 to 1970 policies to extend coverage beyond 1970.

*3 Defendants contend that because the first paragraph of the non-cumulation clause does not apply, neither does the second paragraph. The first paragraph, according to Defendants and based on the jury's findings, indisputably does not apply because loss is not covered by any other prior excess policy. The second clause is inapplicable because, *inter alia,* it is "subject to" the first paragraph, which does not apply. If the Court finds that the second paragraph applies, Defendants argue that "at most the provision provides continued coverage for that part of the total damage which occurred between 1964 and 1970 but continued thereafter." Hercules did not meet its burden to prove, however, "what part of the damage continued thereafter," due to indivisible damages. Further, the Court already ordered that modified pro rata allocation requires allocation to all periods where damage occurred. This last alternative argument is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
1998 WL 962089 (Del.Super.)  
(Cite as: 1998 WL 962089 (Del.Super.))

Page 3

Defendants' winner.

### B.

The Third Circuit, in *Air Products & Chemicals, Inc. v. Hartford Accident & Indemnity Co.*, [FN6] enforced a non-cumulation clause, finding that the clause does not preclude, but limits the insurer's liability, based on amounts paid under earlier contracts. [FN7] As Defendants' argue, the District Court of New Jersey upheld a non-cumulation clause in *O-I Brockway Glass Container, Inc. v. Liberty Mutual Insurance Co.*, 1994 WL 910935 [FN8] finding that: "The [n]on-[c]umulation clause in both content and title clearly states that the insured shall not recover more than the per occurrence limit by invoking coverage under several policies for the same occurrence." [FN9] In other words, no cumulation of policy limits for the same occurrence is permitted. [FN10] Brockway explains:

FN6. 3rd Cir., 25 F.3d 177 (1994).

FN7. *Air Products & Chem., Inc.*, 25 F.3d at 181.

FN8. D.N.J., C.A. No. 90-2797, Thompson, C.J. (Feb. 10, 1994) (Mem. and Order).

FN9. *O-I Brockway*, C.A. No. 90-2797 at 3.

FN10. *Id.*

[The insured]'s interpretation of the [n]on-[c]umulation clause is incorrect because it relies on an obtuse reverse-chronology rather than the clear intention of the clause. If one asked a reasonable person whether the [n]on-[c]umulation clause would allow an insured to recover the $250,000 limit under all of the 1975, 1976, 1977, 1978, 1979, 1980, 1981, 1982, and 1983 policies for the same occurrence, the answer most certainly would be "no." [FN11]

FN11. *O-I Brockway*, C.A. No. 90-2797 at 3.

Here, the jury found, and the parties do not dispute, that due to policy exclusions under the pre-1964 policies, there is no applicable prior insurance. For example, Hercules did not meet its burden to prove an exception to the policies' pollution exclusions. [FN12] As a result, the non-cumulation clause's first paragraph is inapplicable.

FN12. *DuPont v. Admiral Ins. Co.*, Del.Super., 711 A.2d 45, 53-54 (1995).

As presented, the second part of the clause is "[s]ubject to the foregoing paragraph and to all other terms and conditions of this policy...." The second paragraph acts as an "all sums" provision. *DuPont v. Admiral Insurance Co.*, [FN13] explaining a similar, "all sums" argument in a continuous damage environmental insurance coverage case, looks to *Owens-Illinois, Inc. v. United Insurance Co.*, [FN14] which "found it to be 'intuitively suspect' that all sums to be assessed because of long-term exposure to asbestos could have been established in any one of the policy years. The court instead noted undoubtedly some damage occurred in each year." [FN15] In this case, of course, the jury has found in fact that continuous damage occurred.

FN13. Del.Super., C.A. No. 89C-AU-99, Steele, V.C. (Oct. 27, 1995) (Mem.Op.).

FN14. N.J.Supr., 650 A.2d 974, 988-89 (1994).

FN15. *DuPont*, C.A. No. 89C-AU-99 at 14-15.

*4 Hercules reads the non-cumulation clause properly, except that under the rule of the case, allocation is modified pro rata based on time on the risk. [FN16] An all sums provision is not consistent with modified pro rata allocation. While the Court will not revisit the allocation issue, it is important to keep in mind that modified pro rata allocation ensures logical and fair coverage for continuous damage:

FN16. *Hercules*, C.A. Nos. 92C-10-105 at 34, *following DuPont*, C.A. No. 89C-AU-99 at 15.

Joint and several liability can not be applied to gradual damage, because to do so would require a presumption that all damage occurred in one policy period. Defendants are liable in proportion to the time period their policies covered the risk. [FN17]

FN17. *Hercules*, C.A. Nos. 92C-10-105 at 34.

To require only those policies effective from 1964-1970 to pay for all damages incurred later would be unfair and inconsistent with modified pro rata allocation and the jury's factual findings. One court explained, when faced with similar environmental

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1998 WL 962089 (Del.Super.)
(Cite as: 1998 WL 962089 (Del.Super.))

Page 4

insurance coverage litigation:

> [A]nother question to be addressed is whether the "other insurance" and "non cumulation of liability" clauses can be enforced. We find that it would be illogical to enforce one insurer's clause in a situation involving "continuous occurrence" which theoretically could be looked at as a separate occurrence for the purpose of each policy which has been assessed a pro rata damage allocation. We find that the "other insurance" clauses cannot be applied because each excess insurer is only paying a pro rata portion of the total damages attributable to this "continuing occurrence." To apply the "prior insurance" and "noncumulation of liability" clauses would give the insurers a double credit and would deprive the insured of the full value of its premium. Additionally, we note that the enforcement of the clauses would be inequitable because no excess insurer is concurrently liable with any other and application of the clauses would make the other insurers liable for damages occurring outside of their policy periods. [FN18]

FN18. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, Ill.App., 670 N.E.2d 740, 750 (1996).

In conclusion on this point, when the two paragraphs are read in conjunction, the first paragraph merely prevents multiple recovery by Hercules. Apart from that, it has no effect on paragraph two. Modified pro rata allocation, however, implicitly prevents paragraph two's applying for Hercules' benefit.

C.
Self-Retention Under Modified Pro Rata Allocation

An additional holding flows from the above. Hercules maintains a two million dollar self-retention, which is like a deductible, and which should be spread from 1964-1970. Hercules concedes that any recovery must be offset by its self-retention. Hercules, however, insists that its self-retention only applies once, and not repeatedly.

The remaining Defendants break formation on this self-retention issue. Defendant LMI argues that there is "one self-insured retention [divided by] the remainder over the 24 years in which the jury found property damage took place." In contrast, Defendant American Home argues that Hercules must pay the self-insured retention for every implicated policy year. In other words, more than one self-insured retention applies. Specifically:

> *5 A contrary interpretation would undo the bargain between Hercules and its insurers, and would ignore the precise language of the American Home policy, which requires no payment until $12 million in underlying limits are exhausted for each of the two years for which American Home provides coverage.

In fact, American Home's bargain is not so clear. The two year policy is excess of twelve million dollars, and arguably does not respond until that level is reached. The Court, however, again does not need to parse the policies because of this case's allocation rule.

*DuPont,* in effect, addresses this situation:

> [I]mplicit in the concept of the modified pro rata allocation is a concurrent reduction in the deductible for which DuPont would be liable. This method of allocation cannot be used to defeat coverage paid for by DuPont. Consequently, if an insurer will be held liable for one-tenth of the clean-up costs, the deductible will be reduced commensurate with the fraction of liability. [FN19]

FN19. *DuPont,* C.A. No. 89C-AU-99 at 16.

Considering the Court's applying modified pro rata allocation here, implementing the self-retention as American Home argues would cost Hercules, improperly, and bestow a windfall on American Home. As long as modified pro rata allocation applies to the insurance pay out, it applies to the self-retention. In short, Hercules' recovery is offset once by its two million dollar self-retention, spread over time.

III. Occurrence Per Policy

The next question is whether Hercules is entitled to the policy limits only once per multi-year policy, or once a year for each year the policy covers. The policies cover "occurrences," which are accidents or happenings or continuous exposure to conditions that unexpectedly and unintentionally cause damage. If the policies are annual, there is one limit per occurrence per year. On the other hand, if the policies are multi-year, there is only one limit per occurrence per [multi-year] policy.

A.

Hercules contends that the 1964-1970 policies have annual occurrence limits, "collectively of $150 million or $25 million per occurrence for each of the six annual policy periods." The multi-year policies, according to Hercules, should be treated as a series of single year policies based on many factors:

  (1) annual premiums;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 5
1998 WL 962089 (Del.Super.)
(Cite as: 1998 WL 962089 (Del.Super.))

(2) annual changes in LMI's syndicate and company participation on the coverage;
(3) annual changes in the names subscribing to Hercules policies;
(4) annual resignings that required Hercules to submit new underwriting data;
(5) annual right of LMI to cancel coverage;
(6) annual aggregate limits; and
(7) annual nature of the multi-year policies based on the testimony of LMI underwriters who actually underwrote Hercules policies.

Hercules argues:

The Limit of Liability section makes clear that LMI's limit of liability with respect to certain types of coverage contained a cap or an aggregate limit for each annual policy period of the face amount of the policy of $10 million above the $2 million self-retention.

*6 Specifically, the Limits of Liability section states that there are aggregate limits for certain types of coverage "for each *annual* period: or "in any *one* policy year." (emphasis added).

In response, Defendant LMI argues that the "limits of the 1964-70 policies unambiguously provide only one limit per occurrence, not one limit per occurrence per year." [FN20] Hercules bargained for and is entitled to one limit for the one occurrence per policy period. LMI points out that Hercules was insured by some policies with annual limits, such as the 1973 to 1977 North River first-layer excess policy. Those annual limits could have been written into these policies, but were not.

　　FN20. Policy D1065/5068 states: "The period of Insurance [is] from 15th December, 1964 to 31st July, 1970...."

On this point, Defendants again break formation. Defendant American Home Assurance Company argues that its liability limits are annual limits, based on: the "policy year" provision, the fact that premiums and underwriting packages were due each year, and the annual re-signing requirement. Also, insurance participation changed from year to year. With this, American Home adds that "for each policy year which is implicated, Hercules remains responsible for the self-insured retention in that year." Of course, the Court just addressed this latter point.

B.

As stated, the jury found one occurrence. The contracts plainly state that an occurrence is covered up to the policy limits. For multi-year policies, the insured can recover for one occurrence. Despite Hercules' litany, there is no annual occurrence provision in its policies. In fact, as Defendant LMI points out, the policy "unambiguously states that the policy 'period' is December 15, 1964 to July 31, 1970." Hercules cites no case law where "implicit" annual occurrence limits were read into a policy. The Court will not read them into the policies here.

The determination that a per occurrence limit applies to the multi-year policy period, and not just one policy year, is supported by considerable case law. *CSX Transportation, Inc. v. Commercial Union Insurance Co.* [FN21] holds that the plain language required an occurrence per policy period, not per year, limit. [FN22] This is despite CSX's paying a comparable premium for three one-year contracts as for one three year contract. [FN23] A similar result was reached in *Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co.,* [FN24] which affirms the finding that numerous claimants' injuries resulting from a defective product arose from a single occurrence so that a single occurrence limit per multi-year policy period applied. [FN25]

　　FN21. D.C.Cir., 82 F.3d 478 (1996).

　　FN22. *CSX Transp., Inc.,* 82 F.3d at 483.

　　FN23. *Id. See also, Society of Roman Catholic Church v. Interstate Fire & Cas. Co.,* 5th Cir., 26 F.3d 1359 (1994); *Uniroyal, Inc. v.. Home Ins. Co.,* E.D.N.Y., 707 F.Supp. 1368 (1988).

　　FN24. N.J.Super., 609 A.2d 440 (1992), *cert denied,* N.J.Supr., 634 A.2d 528 (1993).

　　FN25. *Diamond Shamrock Chem. Co.,* 609 A.2d 440.

The policy's plain language provides that coverage applies on a per policy basis. As such, Hercules may recover only once per multi-year policy. Hercules could have contracted for annual limit provisions, but it did not.

IV. Pre-judgment Interest

The parties dispute whether Hercules is entitled to pre-judgment interest, and if so, when it accrues and at what rate. Hercules contends that interest is due from May 31, 1986, when its two million dollar self-retention was surpassed. Defendants argue that interest has not accrued at all, and that a May 1986 accrual date would have barred the September 1992

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
1998 WL 962089 (Del.Super.)  
**(Cite as: 1998 WL 962089 (Del.Super.))**

Page 6

action.

### A.

*7 The 1964-1970 policies contain "Loss Payable" clauses:

> The Assured shall make a definite claim for any loss for which Underwriters may be liable under the policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and Underwriters. If any subsequent payments shall be made by the Assured on account of the same occurrence, additional claims shall be made similarly from time to time. Such losses shall be due and payable with thirty (30) days after they are respectively claimed and proven in conformity with this policy.

Hercules asserts that pre-judgment interest is due as a matter of right in this breach of contract case. The interest accrues when payment was due under the policies, which is the date when Defendants should have made payments. Hercules maintains, and the jury found, that timely notice was provided to all Defendants, and also that Hercules' liability exceeded Hercules' two million dollar self-retention. Hercules first exceeded the two million dollar mark on May 31, 1986. Hercules explains:

> From that point forward, the three defendants providing coverage in the 1964-1970 period were obligated to pay Hercules defense costs and the damages incurred by Hercules to third parties with respect to the Jacksonville, Arkansas trial site as the damages reached their respective layers of coverage.
> Defendants made no effort to pay any part of Hercules' covered claims. Defendants should not benefit from their delay. Further, Hercules concludes that under 6 Del. C. § 2301(a), the interest rate is fixed at the accrual date and remains constant.

Defendants again respond with alternative arguments. First, Hercules is estopped from asserting that Defendants' breach of contract occurred on May 31, 1986, because that would mean the three year statute of limitations would have barred the suit. Also, to avoid summary judgment based on a statute of limitations defense, Hercules previously argued that "the statute of limitations on an insurance claim that is contractual in nature does not begin to run until the insurance company has denied the claim and so informed the policyholder." Hercules may not now assert a contrary position.

Second, Hercules did not comply with the loss payable clause that requires a definite claim for reimbursement. More specifically, Defendants contend that while Hercules submitted letters containing remediation costs, the letters were not tantamount to a demand for covered expenditures. The "demands" did not contain definite amounts, and they contained costs that are not covered under the policies.

Third, Hercules incorrectly computed pre-judgment interest. Interest, if awarded, should be set "30 days after [Hercules] submitted proof," and should not be set at 11.5%. The rate should be calculated distinctly for each separate demand that was made. Finally, "Hercules' interest computation is riddled with errors."

*8 Defendant American Home argues that interest is not due because the jury did not find a breach. Further, American Home's coverage did not attach until the full underlying limits were exhausted. Finally, Hercules did not demand a sum certain.

### B.

It is clear that Delaware allows pre-judgment interest as a matter of right. [FN26] Pre-judgment interest is calculated from the date payment was due. [FN27] The purpose of pre-judgment interest is to compensate plaintiffs for losses suffered as a result of their inability to use the money awarded during the time that it was not available. [FN28] Where the underlying obligation upon which damages are based arises *ex contractu*, the Delaware Supreme Court has held that the court should look to the contract itself to determine when the right to pre-judgment interest should begin to accrue." [FN29]

> FN26. *Citadel Holding Corp. v. Roven*, Del.Supr., 603 A.2d 818, 826 (1992).
>
> FN27. *Id.*
>
> FN28. *Universal City Studios, Inc. v. Francis I. DuPont & Co.*, Del.Supr., 334 A.2d 216, 222 (1975).
>
> FN29. *American Gen. Corp. v. Continental Airlines Corp.*, Del. Ch., 622 A.2d 1, 13 (1992), aff'd, Del.Supr., 602 A.2d 856, citing *Citadel*, 603 A.2d at 826.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
1998 WL 962089 (Del.Super.)  
(Cite as: 1998 WL 962089 (Del.Super.))

Page 7

*Citadel Holding Corp. v. Roven* reversed the finding that a savings and loan director was not entitled to pre-judgment interest under an indemnification agreement. [FN30] Citadel sued its director in federal court for insider trading. In turn, the director sued Citadel for indemnification and reimbursement under contract. The Court found that pre-judgment interest was due from the date of demand. [FN31] "By this, we mean the date when [the director] specified the amount of reimbursement demanded and produced his written promise to repay." [FN32] Interest is due when the plaintiff suffers its loss. [FN33] This is true "regardless of the fact that the precise amount [is] determined later...." [FN34]

FN30. *Citadel*, 603 A.2d at 826.

FN31. *Id.*

FN32. *Id.* n. 10.

FN33. *Rollins Environmental Svs., Inc. v. WSW Indus., Inc.*, Del.Super., 426 A.2d 1363, 1368 (1980).

FN34. *Id.*

Pre-judgment interest, according to 6 Del. C. § 2301(a), is calculated as follows:
  Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due;....
  The rate is fixed at the date interest liability begins:
  Interest is generally viewed as one continuing liability which merely accumulates with the passage of time. If it is to be viewed as a series of increments running from successive intervals of time, it should be described with reference to commencement and terminal dates. The use of the language "time from which interest is due" appears to refer to the commencement of the running of interest and appears to treat interest as a continuing liability from its time of commencement and not as a series of increments. I do not find that the statute [§ 2301] contemplates that interest be segmented. Accordingly, the rate of interest is calculated according to the Federal Reserve discount rate as of the date of commencement of interest liability and it remains fixed at that rate. [FN35]

FN35. *Rollins Environmental Svs., Inc.*, 426 A.2d at 1367-68. See *McNally v. Nationwide Ins. Co.*, 3rd Cir., 815 F.2d 254, 269-70 (1987) (finding that § 2301 interest rates are fixed).

C.

There are two elements that must be established before awarding pre-judgment interest. First, Hercules must have incurred costs and paid. Obviously, Hercules is not entitled to pre-judgment interest on money it had not yet paid. Second, Hercules must have demanded indemnification from Defendants. [FN36] The policy language requires Hercules to make a definite demand "for any loss for which Underwriters may be liable under the policy ..." within twelve months of its paying an amount greater than its self-retention, or where a final judgment or written agreement makes Hercules' liability final. As presented above, the jury found that Hercules first knew that its legal liability for damages to "on-site soils, groundwater, and off-site areas for which Hercules now seeks coverage" would exceed two million dollars in October 1985. Further, the jury found that Hercules timely notified all Defendants.

FN36. *Citadel*, 603 A.2d at 826.

*9 The jury did not provide a date when Hercules paid an amount greater than two million dollars, although Hercules argues that date is May 31, 1986. At that point, Defendants had notice of potential liability as a result of numerous lawsuits brought by private individuals as well as the government. The evidence shows that Hercules consistently corresponded with Defendants with respect to its potential, and building liability.

The parties agreed, in a pretrial stipulation, that in March 1980, Hercules notified its broker, Johnson & Higgins of Delaware, that Hercules was the named defendant in the Environmental Protection Agency (EPA) and Arkansas actions. [FN37] Johnson & Higgins gave LMI and North River notice of the EPA actions in July 1984. Hercules notified all Defendants of the 1992 EPA action on April 14, 1992. [FN38] With respect to private actions against Hercules, LMI was notified on January 16, 1984 of *Borchert*, [FN39] on July 15, 1985 of *Bridges*, [FN40] on January 28, 1987 of *O'Dell*, [FN41] on July 20, 1987 of *Keister*, [FN42] and on November 6, 1989 of *Vertac*. [FN43]

FN37. *United States v. Vertac Chem. Corp.*, E.D. Ark., 756 F.Supp. 1215 (1991), aff'd, 8th Cir., *U.S. v. Hercules, Inc.* 961 F .2d 796 (1992); *Arkansas Dept. of Pollution Control and Ecology v. Vertac Chem. Corp.*, E.D. Ark., 756 F.Supp. 1215 (1991), aff'd,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 17

Not Reported in A.2d  
1998 WL 962089 (Del.Super.)  
(Cite as: 1998 WL 962089 (Del.Super.))

Page 8

8th Cir., U.S. v. Hercules, Inc., 961 F.2d 796 (1992).

FN38. United States v. Vertac Chem. Corp., E.D. Ark., C.A. No. LRC-92-157.

FN39. Borchert v. Vertac Chem. Corp., E.D. Ark., C.A. No. LR-C-83-299.

FN40. Bridges v. Hercules, Inc., E.D. Ark., C.A. No. LR-C-85-458.

FN41. O'Dell v. Hercules, Inc., E.D. Ark., 687 F.Supp. 450 (1988), aff'd, 8th Cir., 904 F.2d 1194 (1990).

FN42. Keister v. Dow Chem. Co., E.D. Ark., 723 F.Supp. 117 (1989).

FN43. Vertac Chem. Corp. v. Hercules, Inc., E.D. Ark., C.A. No. LR-C-89-857.

Defendants argue that an actual "demand" was never made. Certainly, Hercules was informing Defendants of potential liability based on their insurer-insured relationship, but it is not clear that a demand was made or if so, when it was made. There is ambiguity with Defendants' potential liability. Normally, to make Hercules whole, pre-judgment interest, in a case like this, would be a function of Hercules' out of pocket payments' reaching a certain level. In this case, however, it is not clear at what point the requisite level was reached. That being the case, pre-judgment interest begins with filing the complaint. At that point, Defendants undeniably knew that Hercules was making a claim and Defendants undeniably decided not to pay.

Interestingly, Defendants LMI and American Home were held accountable for millions of dollars of pre-judgment interest in another, similar environmental insurance coverage litigation. [FN44] Rohm held:

FN44. Rohm and Haas Co. v. Continental Cas. Co., Penn. CCP, Nov. Term No. 3449, Jaffee, J. (Dec. 8, 1997) (Op.).

This Court finds that Rohm and Haas is entitled to pre-judgment interest based on a breach of contract theory. Under Pennsylvania law, it is well established that pre-judgment interest is awardable as a matter of right in contract cases. The basic premise underlying the award of pre-judgment interest centers on the fact that the breaching party has deprived the injured party of the use of money that was rightfully due and owing.

Even though a case is prosecuted as a declaratory judgment action, pre-judgment interest can be awarded when it is clear that the insurance contract has been breached. [FN45]

FN45. Id. at 45-46.

D.

Defendants set forth the relevant statute of limitations:

No action based on a promise ... shall be brought after the expiration of [three] years from the accruing of the cause of such action. [FN46]

FN46. 10 Del. C. § 8106.

The cause of action, for pre-judgment interest purposes, accrued on May 31, 1986, according to Hercules. This litigation, however, was filed in September 1992, over three years past the "breach." Hercules attempts to distinguish the accrual dates, arguing that payment was due in 1986, but the breach did not occur until at least September 1989. Hercules cites Ripson v. Beaver Blacktop, Inc., [FN47] for the proposition that the payment due date is not necessarily the same as the breach date.

FN47. Del.Super., C.A. No. 83C-AU-128, Poppiti, J. (April 6, (1988) (Mem.Op.), aff'd, Del.Supr., 567 A.2d 418 (1989).

*10 In Ripson, plaintiff brought a breach of contract action against a subcontractor. Plaintiff sought pre-judgment interest. The Court held that there was insufficient evidence to determine when plaintiff's entitlement to payment was due. [FN48] The Court concluded:

FN48. Ripson, C.A. No. 83C-AU-128 at 21.

In the absence of proof sufficient to ascertain, with some reasonable degree of certainty, when payment was due the plaintiff, I am satisfied that the date the amended complaint was filed in this court ... is the date on which pre-judgment interest should begin to accrue. [FN49]

FN49. Ripson, C.A. No. 83C-AU-128 at 22.

Another court, when confronted with the issue of pre-judgment interest's accrual, held that interest begins from the underlying cause of action's accrual. [FN50] In Sample, a client who wished to bring a negligence action, was barred because his attorney

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1998 WL 962089 (Del.Super.)
(Cite as: 1998 WL 962089 (Del.Super.))

Page 9

missed the statute of limitations. The client recovered in legal malpractice. The Court reversed a pre-judgment award calculated from plaintiff's physical injury, instead of from the date when his malpractice case accrued. *Sample* explained:

> FN50. *Sample v. Freeman,* Tx.App., 873 S.W.2d 470 (1994).

The purpose of pre-judgment interest is to compensate the injured party for the loss of use of money. It cannot run before the cause of action accrues. [FN51]

> FN51. *Id.* at 477.

Here, Hercules cannot choose 1986 for the "failure to pay" date for pre-judgment interest purposes but not breach purposes. The failure to pay is equivalent to breach, in this case.

American Home explains that its policy:
> [H]as limits of $0.975 million part of $7.5 million excess of $10 million for the five-month period July 31, 1968 through December 31, 1968, and $1.254 million part of $7.5 million excess of $10 million for the seven-month period January 1, 1969 through July 31, 1969 and the following annual period August 1, 1969 through July 31, 1970. The American Home policy sits above and follows form to the ... London policy.

The Court is satisfied that American Home was implicated in September 1992, based on Hercules' liability level as well as unequivocal notice.

Based on the above, Defendants are responsible for prejudgment interest, calculated on a modified pro rata basis. The interest rate, once set, remains fixed. Considering that a majority of the expenses are excluded under the policies, Defendants will pay interest only for covered costs, consistent with the Court's prior rulings as well as the jury's findings.

### V. Defense Costs

Next, the Court must determine the defense costs to which Hercules is entitled. The parties agree that Hercules is entitled to some defense costs, but they dispute whether Hercules is entitled to all defense costs, or only defense costs spent on covered damage. For example, the Court determined that preventative measure costs are not covered under the policies. [FN52] As a result, Defendants maintain that defense costs related to preventative measures are not recoverable.

> FN52. *Hercules,* C.A. Nos. 92C-10-105 at 16-17.

#### A.

Hercules seeks all defense costs relating to the "one covered occurrence" at Jacksonville. This argument is based on the 1964-1970 policies' "Ultimate Net Loss" clause that requires payment for the total sum that Hercules became obligated to pay as a consequence of any covered occurrence. Specifically:

> *11 The term "Ultimate Net Loss" shall mean the total sum which the Assured ... become[s] obligated to pay by reason of ... property damage liability claims ..., either through adjudication or compromise, and shall also include ... all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for ... lawyers ... and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder excluding only the salaries of the Assured's or of any underlying insurer's permanent employees.

Hercules states that the plain meaning of this clause, and the jury's finding one occurrence, require Defendants to pay all defense costs. Defendants could have written apportionment of defense costs into the contracts, but they did not. Next, Hercules argues that Defendants have to pay all costs because they did not satisfy their burden to prove which defense costs relate solely to the defense of non-covered claims.

Defendants contend that they only must pay for defense costs resulting from a covered occurrence. The defense costs "can and should be apportioned between covered and non-covered expenses." Defendants explain:

> Hercules has estimated that the Jacksonville site represents an expense of approximately $150 million. Examples of what the Court has already ruled or the jury special verdict form has eliminated as potentially covered costs include the following: Incineration of drummed waste--$64 million; Operable Unit 1 indemnification costs--$9.9 million; Operable Unit 2 indemnification costs-- $2.1 million; Maintenance and construction of the French Drain, slurry wall and leachate collection system--approximately $2 million. Thus, the total amount of indemnification (as opposed to defense costs) Hercules seeks for a site estimated to cost Hercules $150 million is only about $17.8 million. Yet Hercules wishes defendants to pay 100 percent of the related defense and investigation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 10
1998 WL 962089 (Del.Super.)
**(Cite as: 1998 WL 962089 (Del.Super.))**

costs.

Hercules is wrong, according to Defendants, because the policies' ultimate net loss provision applies to costs that are "paid as a consequence of any occurrence covered hereunder." Two-thirds of the defense costs, classified under legal and investigative costs ($13.9 million), and Hercules engineering/environmental management ($1.46 million), are related to non-covered damages. Defendants suggest:

> [I]t would be most fair and equitable to adopt what Hercules itself presented to the Court and the trier of fact as a reasonable basis for allocation between covered and non-covered components of cost ... one-third of Hercules total legal costs where the legal costs are for both non-covered and covered occurrences.

B.

"Contract language that is clear and unambiguous should be given its ordinary and usual meaning." [FN53] Defense costs for "any occurrence covered hereunder" is not ambiguous, so its plain meaning will be applied. The jury found one occurrence. The Court has ruled on what expenses are covered under the policies. Consequently, Hercules is not entitled to defense costs for non-covered occurrences, based on the plain meaning of the policies' Ultimate Net Loss provision. [FN54]

> FN53. *Hercules, Inc.*, C.A. Nos. 92C-10-105 at 6, quoting *Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, Del.Supr., 616 A.2d 1192, 1195 (1992).
>
> FN54. See *Schwartz & Assoc., Inc. v. Continental Cas. Co.*, Mo.App., 705 S.W.2d 494 (1985).

*12 The analysis goes further. A portion of the defense costs were incurred, simultaneously, for covered and non-covered costs. Defendants correctly state that "[w]hile an insurer may bear the entire cost of defense when there is no reasonable means of pro-rating the costs between covered and non-covered items, these considerations do not apply where defense costs can be readily apportioned." [FN55] Defendants refer to *Insurance Co. of North America v. Forty-Eight Insulations, Inc.,* [FN56] an asbestos insurance coverage case, which placed the burden on defendants to show coverage where damages were cumulative. [FN57] That authority explains that "[t]he different insurance companies will pro-rate defense costs among themselves." [FN58]

> FN55. See *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 6th Cir., 633 F.2d 1212, 1224-25, clarified, 657 F.2d 814, 816 (1981), cert. denied, 454 U.S. 1109; *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 5th Cir., 1 F.3d 365 (1993).
>
> FN56. *Insurance Co. of North America*, 633 F.2d 1212.
>
> FN57. *Id.* at 1225 n. 27.
>
> FN58. *Id.* at 1225.

Delaware has not directly addressed pro rata allocation between insurers of covered costs, in this context. [FN59] The Supreme Court of Utah, in *Sharon Steel Corp. v. Aetna Casualty and Surety Co.,* [FN60] when presented with similar environmental insurance coverage litigation, held that defense costs are to be equitably apportioned, including apportionment to the insured for the period that it went uninsured. [FN61] *Sharon* echoes Justice Walsh's equitable concerns. *Sharon* explains that "[i]n general, when apportioning defense costs among insurers, courts 'apply equitable principles ... unless express policy language decrees the method of apportionment." ' [FN62] *Sharon* allocated damages by time on the risk for continuous damage, and apportioned the defense costs taking into account the policies' limits. [FN63] Further:

> FN59. Justice Walsh commented on apportioning defense costs in an automobile insurance litigation. *Universal Underwriters Ins. Co. v. Travelers Ins. Co.*, Del.Supr., 669 A.2d 45 (1995). Defense costs were shared equally by primary and excess insurers. *Id.* at 49. The Court, when presented with a pro rata allocation argument by insurers, held that the argument was waived because not presented below, but that "this approach has much to commend it because of its equitable underpinnings...." *Id.*
>
> FN60. Utah Supr., 931 P.2d 127 (1997).
>
> FN61. *Sharon Steel* Corp., 931 P.2d at 140.
>
> FN62. *Id.*
>
> FN63. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1998 WL 962089 (Del.Super.)
(Cite as: 1998 WL 962089 (Del.Super.))

Page 11

[A]ny allocation of defense costs should take into account the policy limits of each insurer. We thus conclude that in continuing injury cases, such as the instant case, where multiple policies are triggered for consecutive injuries, multiplying those policy limits by the years of coverage results in a more equitable allocation than proration based on policy limits alone.
This approach was deemed better than other jurisdictions' approaches, including apportioning damages based on equal shares, premiums paid, or losses. [FN64]

> FN64. *Sharon Steel Corp.*, 931 P.2d at 140, n. 19. Specifically:
> Methods used by other jurisdictions include apportionment based on equal shares, apportionment based upon the premiums paid, *Insurance Co. v. Employers Liab. Assur. Corp.*, S.D. Cal., 163 F.Supp. 143, 147, 151 (1958), or apportionment using a "maximum loss" method, *Mission Ins. Co. v. Allendale Mut. Ins. Co.*, Wash.Supr., 626 P.2d 505, 507-08 (1981).
> Defense costs were also awarded and apportioned in *Rohm and Haas Co. v. Continental Cas. Co.*, Penn. CCP, Nov. Term No. 3449, Jaffee, J. (Dec. 8, 1997) (Op.).

Where Hercules' covered and non-covered defense costs are indistinguishable, the costs are to be treated as covered; Defendants have not proved which costs are not covered. The covered defense costs will be apportioned, consistent with damage apportionment, by a modified pro rata scheme. The allocation, like in *Sharon*, will consider the policies' limits, and Hercules' modified self-retention.

### VI. Setoff for Settlements

The polices' "Other Insurance" clause, as Defendants have presented, requires a setoff for settled policies:

> If other valid and collectible Insurance with any other insurer is available to the Assured covering a loss also covered by this policy, other than insurance that is excess of the Insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance.

*13 Defendants claim that they are entitled to a setoff equivalent to the policy limits of the underlying, settling insurers, or in the alternative, the actual settlement amounts. As Defendants explain, *J.J. White, Inc. v. Metropolitan Merchandise Mart*,

[FN65] dictates that Hercules only is entitled to compensation that would put it in the same position if the contract had been performed. The amount Hercules received from settling parties should be subtracted from the amount still due.

> FN65. Del.Super., 107 A.2d 892, 894 (1954); See also *Nationwide Mut. Auto Ins. Co. v. Peebles*, Del.Supr., 688 A.2d 1374 (1997) (affirming computation of underinsured motorist coverage by setting off money received by tortfeasor against bodily injury damages).

Hercules counters that no setoff is required "because the 'Other Insurance' clause only allows Defendants to seek contribution against other insurers and only applies to other insurance covering the same loss." Further, the clause only applies to other insurance "covering a loss also covered" by the 1964-1970 policies, and there is no such other insurance.

As discussed, Hercules can not receive a double recovery. A setoff, however, is not called for under these facts. There are no settlements with respect to 1964 to 1970 policies. Specifically, Hercules insists, "[a]ll of Hercules settlements were with insurers that sold policies to Hercules containing pollution exclusions and covering policy periods outside the 1964-1970 period." Entitlement to a setoff is a function of the policy language. Here, language states that no setoff is required for settling parties who paid for non-covered costs. As a result, defendants may not deduct settlements from the judgment. If Defendants have a principled basis to question whether, in fact, any settlement covers a 1964-1970 policy, the Court will allow limited discovery, under seal.

### VII. Conclusion

In conclusion, the non-cumulation clauses are not applicable, and multi-year policies have a policy, not annual, occurrence limit. Further, Hercules is entitled to pre-judgment interest as of filing, at a fixed rate pursuant to 6 Del. C. § 2301, and calculated under modified pro rata allocation. Hercules will receive all defense costs for covered occurrences, also under modified pro rata allocation, except for any costs Defendants proved were excluded. Finally, there will be no setoff for settled parties.

At this point, the Court is optimistic that the parties can agree to a form of judgment order. If further guidance would be helpful, the parties shall advise the Court.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1998 WL 962089 (Del.Super.)
**(Cite as: 1998 WL 962089 (Del.Super.))**

Page 12

The Court's complete willingness to address other matters is not an invitation to reargument. For example, the Court generally is committed to a modified pro rata approach, and its implications.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.