**Westlaw.**

Not Reported in A.2d                                                                                           Page 1
1994 WL 465535 (Del.Super.)
(Cite as: 1994 WL 465535 (Del.Super.))

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.
Abraham J. SALAMAN, Plaintiff,
v.
NATIONAL MEDIA CORP., Defendant.
No. C.A. 92C-01-161.

Submitted: April 25, 1994.
Decided: July 22, 1994.

*Upon Consideration of Plaintiff's Application for Pre-judgment Interest, Post-judgment Interest, Attorneys' Fees and Costs--GRANTED.*

David A. Jenkins, Joanne M. Shalk, Patricia A. Garthwaite, Smith, Katzenstein & Furlow, Wilmington, for plaintiff.

Matthew B. Lehr, William M. Lafferty, Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant.

MEMORANDUM OPINION

DEL PESCO, Judge.

*1 Plaintiff Abraham J. Salaman has filed an application with this Court for interest and attorneys' fees. [FN1] In his application, plaintiff requests pre-judgment interest on the jury's award of attorneys' fees and expenses; attorneys' fees in this action through the conclusion of trial; and post-judgment interest on all portions of the judgment except pre-judgment interest. I will address each of these requests *seriatim*.

> FN1. The relevant facts and procedural history are set forth in this Court's opinion filed simultaneously herewith. *See Salaman v. National Media Corp.*, Del.Super., C.A. No. 92C-01-161, Del Pesco, J. (July 22, 1994) Mem.Op. Therefore, I will not repeat that information in this opinion.

*I. Pre-Judgment Interest*

On December 19, 1991, following the filing of the federal actions against him, Salaman entered into a letter agreement with his attorneys concerning the payment of his legal fees. In that agreement, in consideration for his attorneys' continued representation, Salaman agreed to pay interest at the rate of 8% per annum on any bill which is not paid within 30 days after submission.

Delaware law is well settled that pre-judgment interest on compensatory damages is awarded as a matter of right and is not subject to judicial discretion. *Citadel Holding Corp. v. Roven*, Del.Supr., 603 A.2d 818, 826 (1992) citing *Moskowitz v. Mayor & Council of Wilmington*, Del.Supr., 391 A.2d 209, 210 (1978). Pursuant to Delaware law, pre-judgment interest is computed from the date payment of the underlying obligation is due. *Roven*, 603 A.2d at 826. Where, as here, the obligation arises out of a contract, the Court must look to the contract to determine when interest should begin to accrue. *Id. citing Watkins v. Beatrice Companies, Inc.*, Del.Supr., 560 A.2d 1016, 1020 (1989). According to the December 19, 1991 letter agreement between Salaman and his attorneys, interest at the rate of 8% per annum is due on each unpaid invoice which has not been paid within 30 days of the date of that invoice. Salaman's calculation of pre-judgment interest, pursuant to the terms of this letter agreement, totals $51,615.90.

National Media does not contest that plaintiff is entitled to pre-judgment interest in this action, nor does it contest the calculation of that interest. However, National Media suggests, in their opposition to both pre-judgment and post-judgment interest, that such interest is conditioned upon the outcome of any appeal in this case. *See Hughes v. Jardel Co., Inc.*, Del.Super., C.A. No. 82C-JL-38, Martin, J. (June 8, 1987) Slip Op. at 2. With respect to prejudgment interest, the fact that there may be an appeal does not effect the Court's authority to enter the award. If it is ultimately determined that Salaman must repay some or all of the advances, then National Media would be entitled to the same right to payment of interest on those amounts. *See Roven*, 603 A.2d at 826. Therefore, I award Salaman pre-judgment interest in the amount of $51,615.90.

*II. Post-judgment Interest*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1994 WL 465535 (Del.Super.)
(Cite as: 1994 WL 465535 (Del.Super.))

Page 2

Salaman seeks post-judgment interest from March 10, 1994, the date judgment was entered, on both the compensatory and punitive damage portions of the judgment.

Relying on the *Hughes* case, National Media argues that Salaman's entitlement to post-judgment interest should be conditioned on the outcome of the appeal in this case. *Hughes*, Mem.Op. at 3. The *Hughes* case addressed the issue of whether post-judgment interest is proper where both parties have appealed the lower court's judgment. The Court held that the judgment creditor was entitled to post-judgment interest regardless of the posture of the parties subsequent to the entry of judgment. *Id.* The Court went on to state that "[t]he judgment creditor's entitlement to the award attaches upon entry of the judgment and becomes conditioned on the outcome of the appeal." *Id.* In a footnote the Court clarified its statement regarding "being conditioned on the outcome of the appeal," by noting that "[o]bviously if the judgment is reversed on appeal, the former judgment creditor's entitlement to interest is eliminated." *Id.*, n. 1. Therefore, while it is true that the ultimate determination of the appeal in this case may effect whether Salaman is entitled to retain the interest, there is no question that, in the meantime, Salaman is entitled to post-judgment interest from the time of the judgment. If this were not the case, judgment debtors would simply be able to retain the judgment creditor's money to finance their own appeals. *See Id.*

*2 National Media also contends that, in the event this Court grants its motion for a remittitur, post-judgment interest should not begin to accrue on the punitive damage award until the date such award is accepted. *See Stewart v. Storm's Shoes, Inc.*, Del.Supr., 426 A.2d 839, 841 (1981). Because I have denied all of defendant's motions, including the motion for remittitur, in *Salaman v. National Media Corp.*, Del.Super., C.A. No. 92C-01- 161, Del Pesco, J. (July 22, 1994) filed simultaneous herewith, National Media's argument is moot.

The analysis used to determine the appropriate rate for post-judgment interest is different from that used to determine pre-judgment interest. Post-judgment interest is controlled by 6 *Del.C.* § 2301 which specifies that "the legal rate of interest shall be 5% over the Federal Reserve discount rate...." 6 *Del.C.* § 2301. On March 10, 1994, the date of this Court's judgment, the Federal Reserve discount rate was 3%; accordingly, the post-judgment interest rate applicable to the jury's awards for compensatory and punitive damages is 8%. Salaman is also entitled to post-judgment interest on the amount of attorneys' fees and expenses which I have awarded pursuant to the rationale and calculations set forth below. *See Roven*, 603 A.2d at 826.

### III. Attorneys' Fees and Expenses

Article V, Section 1.7.2 of the National Media bylaws in effect at the time Salaman left the company require National Media to pay all costs and expenses, including attorneys' fees, incurred by Salaman, as long as there is no specific judicial finding that the suit was frivolous. Section 1.7.2 states:

> Whether or not the court or arbitrators shall determine that the Executive is entitled to payment of the Indemnification Amount or has to return the payment of Expenses or otherwise finds against the Executive, the Company shall within thirty (30) days after written request therefore (and submission of reasonable evidence of the nature and amount thereof), and unless there is a specific judicial finding that the Executive's suit or arbitration was frivolous, pay all costs and expenses (including attorneys' fees and disbursements) incurred by the Executive in connection with such adjudication or arbitration (including, but not limited to, any appellate proceedings).

Salaman argues that because this Court has previously determined that the National Media bylaws cannot be unilaterally rescinded by the National Media Board, *Salaman v. National Media Corp.*, Del.Super., C.A. No. 92C-01-161, Del Pesco, J. (Oct. 8, 1992) Op. at 11-12, this obligation is in full force and; accordingly, Salaman requests payment of these fees and expenses pursuant to this section.

Pursuant to Section 1.7.2 of the bylaws, Salaman has provided evidence of the nature and amount of his costs and expenses. Specifically, Salaman has provided this Court with itemized and summarized bills from three sources. First are the bills from the law firm of Hangley Connolly Epstein Chicco Foxman & Ewing ("Hangley Connolly") which total $68,305.50 in legal fees and $2,673.00 in expenses for a grand total of $70,978.50. Second is one bill totalling $10,670.00 in fees payable to Benjamin J. Lerner, Esquire. Finally, there are bills from the law firm of Smith, Katzenstein & Furlow ("Smith, Katzenstein") which total $89,444.00 in legal fees and $8,055.87 in expenses for a grand total of $97,499.87 payable to Smith, Katzenstein. Thus the grand total owed to all three sources for which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 3
1994 WL 465535 (Del.Super.)
**(Cite as: 1994 WL 465535 (Del.Super.))**

Salaman is seeking recovery is $179,148.37.

**\*3** National Media does not dispute the reasonableness of the attorneys' services. Therefore, it is not necessary for this Court to review that issue.

National Media does contend; however, that Salaman is not entitled to recover any costs or attorneys' fees with respect to the action instituted in the Court of Chancery. While it is true that Salaman initially instituted his Delaware action in the Court of Chancery, which dismissed the complaint for lack of subject matter jurisdiction, I do not find that the institution of that action was sufficiently frivolous to prevent reimbursement. This Court has previously defined "frivolous" to mean "completely lacking in merit." *Hitchens v. Cannon & Cannon, Inc.,* Del.Super., C.A. No. 86C-MR-4, Bifferato, J. (Dec. 22, 1987). Salaman's complaint in the Court of Chancery sought a mandatory preliminary injunction requiring National Media to pay Salaman for amounts allegedly past due and to enjoin National Media from further violations of the Company's advancement bylaw. I find it to have been a reasonable tactical decision on the part of Salaman's counsel to institute the action in the Court of Chancery, since an equitable remedy, if available, would have accomplished the goal Salaman sought. Furthermore, Delaware Courts do not second-guess counsel's judgment on tactical decisions, even when, in retrospect, their decisions prove to have been incorrect. The Delaware Supreme Court addressed this issue in the *Roven* case when it allowed indemnification for costs incurred in pursuing affirmative defenses and counterclaims which were later stricken. The Court stated:

> As a tactical matter, the assertion of such defenses may be justified even if later found to be without merit and there was no determination in the federal action that such defenses were asserted in bad faith. *Roven,* 603 A.2d at 824.

There is no evidence that Salaman sought equitable relief in the Court of Chancery for an improper reason, or for any other reason that would evidence bad faith. The institution of the complaint in the Court of Chancery was not frivolous, nor was it without merit. Therefore, I find that Salaman is entitled to reimbursement for the costs associated with the action in the Court of Chancery, prior to its being transferred to this Court.

National Media also contends that a number of the expenses for which Salaman was billed, for example photocopying, travel, and research, are improper expenses for which to seek reimbursement. It argues that a prevailing party may recover only those expenditures which are "necessarily incurred in the assertion of his rights in court," *Donovan v. Delaware Water and Air Resources Commission,* Del.Supr., 358 A.2d 717, 723 (1976), which the Delaware Courts have found does not include a number of billable costs. *See Re v. Gannett* (Dec. 22, 1989) at 3 (Fees paid court reporters for the Court's copy of transcripts of depositions shall not be taxable costs unless introduced into evidence); *Ripsom v. Beaver Blacktop* at 3, (The cost of photocopies of exhibits and other documents is not recoverable; neither is the cost of automated research costs).

**\*4** National Media's argument has no relevance to the case *sub judice*. In the case at hand, a valid, unambiguous contract existed which required National Media to "pay all costs and expenses (including attorneys' fees and disbursements)" incurred by Salaman. The bylaws do not limit reimbursement to those expenditures which are "necessarily incurred in the assertion of his rights in court." *Donovan,* 358 A.2d at 723. It is settled Delaware law that if a corporate bylaw is unambiguous, the Court shall not attempt to interpret it or search for the parties' intent behind the bylaw. *Hibbert v. Hollywood Park, Inc.,* Del.Supr., 457 A.2d 339. Therefore, I find the the expenses which include the cost of photocopying; travel costs; mail and courier expenses; the cost of automated research; manual research expenses; and costs associated with the testimony of Ms. Donio, as set forth by Salaman in the bills previously referenced, to be reasonable. Accordingly, I find that Salaman is entitled to $179,148.37 in attorneys' fees and costs for this action.

In conclusion, I find that Salaman is entitled to pre-judgment interest in the amount of $51,615.90. I also find that Salaman is entitled to post-judgment interest at the rate of 8% per annum on the punitive award and the award of attorneys' fees and costs, as of March 10, 1994. Finally, I find that Salaman is entitled to reimbursement of his attorneys' fees and costs which total $179,148.37.

IT IS SO ORDERED.

1994 WL 465535 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00834-SLR    Document 20-3    Filed 05/18/2005    Page 5 of 10

Westlaw

Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
(Cite as: 2003 WL 21753752 (Del.Ch.))

Page 1

C
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Michael F. TAYLOR, Petitioner,
v.
AMERICAN SPECIALTY RETAILING GROUP, INC., a Delaware corporation, Respondent.
No. Civ.A. 19239.

Submitted May 16, 2003.
Decided July 25, 2003.

Robert J. Katzenstein, Smith Katzenstein & Furlow LLP, Wilmington, Delaware; Patrick C. Hall, Troy, Michigan, for Petitioner.

M. Duncan Grant, Joseph S. Naylor, Pepper Hamilton LLP, Wilmington, Delaware, for Respondent.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 This is an appraisal action, pursuant to 8 Del. C. § 262, filed as a result of a merger that cashed-out the petitioner's shares and shares of one other stockholder, at a price of $2,200 per share. Both parties presented expert testimony regarding the fair value of the shares held by the petitioner as of the merger date. Neither expert was fully persuasive, and, accordingly, the court must exercise its own independent judgment as to the value of the petitioner's shares. After considering the totality of the evidence presented, the court concludes that the fair value of the petitioner's shares, as of the effective date of the merger, was $9,079.43 per share or a total of $181,588.60.

II.

A. *Background*

Respondent American Specialty Retailing Group, Inc. and its subsidiary, Dunham's Athleisure Corporation, both Delaware corporations (collectively "Dunham's"), operate a retail sporting goods chain, with 116 stores in 12 states. Dunham's is in the top ten in sales for sporting goods retailers in the United States. As of October 15, 2001, Dunham's had 3,000 shares of Class A common stock outstanding.

The petitioner, Michael Taylor, is a former employee of Dunham's. He purchased 20 shares of Dunham's Class A common stock during his employment. His entitlement to appraisal arises out of an October 15, 2001 merger (the "Merger Date") that eliminated his interest in Dunham's. The parties stipulated that Taylor timely filed his Petition for Appraisal, and has timely perfected his rights to appraisal. It is also stipulated that Taylor is entitled to the payment of fair value for his shares pursuant to 8 Del. C. § 262.

B. *The Experts*

Taylor's trial expert was Andrew P. Wilkinson, a principal at the Lefko Group. Wilkinson has worked as a financial analyst, with an emphasis on business valuations, at the Lefko Group since 1988. He earned an M.B.A. in finance from the University of Michigan, and has taught advanced business valuation classes to a master's degree program at Walsh College in Troy, Michigan. Wilkinson is also a chartered financial analyst and an accredited senior appraiser in business valuation through the American Society of Appraisers. He is a member of various professional societies and organizations, and has testified in approximately 20 to 25 trials as an expert witness.

Wilkinson testified that his company was initially retained by Taylor to do a planning or feasibility analysis involving a rough estimate of Dunham's value as of January 2001. His company was thereafter asked to prepare a complete valuation of Dunham's as of the Merger Date. Wilkinson testified that, in order to prepare his October 15, 2001 valuation, he reviewed information provided by Dunham's and also conducted independent research. [FN1] He concluded that Dunham's had a total equity value of $44 million as of the Merger Date.

> FN1. Wilkinson reviewed, among other things, Dunham's financial statements, tax returns, fixed asset listings, lease summaries, monthly financial income statements, departmental sales data, publicly available documents such as SEC filings, web pages for different companies, industry association

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
**(Cite as: 2003 WL 21753752 (Del.Ch.))**

Page 2

data, and general information on the retail sporting goods industry.

Dunham's expert witness was Michael Kern, a managing director at Stout Risius Ross. Stout Risius Ross has employed Kern for the past seven years, and during the course of that period, Kern has been involved with over 550 business valuations. His main area of specialty relates to valuations for companies with annual revenues in the range of $25 million to $1 billion, primarily in the pet supplies industry, clothing industry and the grocery industry. Before he appeared in this action, he has testified only twice, either in court or in arbitration proceedings.

*2 Kern testified that he originally valued Dunham's as of January 31, 2001, and at that time he concluded that Dunham's total equity value as of January 31, 2001 was $6.6 million. Kern later updated his valuation as of the Merger Date and testified at trial that Dunham's equity value had not increased since his January 31, 2001 valuation, so that, as of the Merger Date, Dunham's total equity value continued to be no greater than $6.6 million.

C. *The Valuation Methods Used*

The experts for the parties used essentially the same valuation methods to value Dunham's stock. Both experts utilized: (1) the discounted cash flow approach ("DCF"); (2) the comparable/guideline companies approach; and (3) the transaction based approach. Both experts used essentially the same "comparable companies" in their analyses, and both used the same "transaction" in applying the transaction-based approach. [FN2]

> FN2. Dunham's expert also analyzed a second "transaction" involving its own stock that Taylor's expert did not. For the reasons discussed in Section IV(C)(1) *infra,* this second "transaction" does little to establish the value of Taylor's shares.

Wilkinson valued Dunham's as of the Merger Date at $44 million or $14,666.67 per share, and the value of the 20 shares held by Taylor at $293,333. Kern valued Dunham's as of the Merger Date at $6.6 million, or $2,200 per share, and the value of the 20 shares held by Taylor at $44,000.

III.

Under 8 *Del. C.* § 262, Taylor is entitled to his *pro rata* share of the fair value of Dunham's common stock as of the Merger Date. [FN3] Moreover, Section 262(h) requires this court to calculate the going concern value "exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation," [FN4] "In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of the evidence." [FN5] If neither party satisfies its burden, however, the court must then use its own independent judgment to determine fair value. [FN6]

> FN3. *Gray v. Cytokine Pharmasciences, Inc.,* 2002 WL 853549, at *6 (Del. Ch. Apr. 25, 2002).
>
> FN4. 8 *Del. C.* § 262(h).
>
> FN5. *M.G. Bancorporation, Inc. v. LeBeau,* 737 A.2d 513, 520 (Del.1999) (citation omitted).
>
> FN6. *See Gonsalves v. Straight Arrow Publishers,* 701 A.2d 357, 361 (Del.1997) (noting this court's responsibility to "independently determine the value of the shares that are the subject of the appraisal action"); *Cooper v. Pabst Brewing Co.,* 1993 WL 208763, at *8 (Del. Ch. June 8, 1993) (noting that in cases where "none of the parties establish [ ] a value that is persuasive, the Court must make a determination based upon its own analysis").

IV.

As an initial matter, neither expert has fully satisfied its burden of persuasion regarding its respective valuation of Dunham's, though Wilkinson's valuation is more credible. Both experts make certain meritorious observations and assumptions, while other observations and assumptions lack relevance or credibility. Significantly, Kern's valuation lacks credibility because, although he was retained by Dunham's, he ignored a contemporaneous set of projections prepared by Dunham's management, choosing instead to rely on far more pessimistic assumptions of Dunham's future prospects that he prepared on his own. Moreover, the court is persuaded that Kern's valuation conclusion is strikingly low. For example, Kern's total equity value of $6.6 million is lower than Dunham's trailing 12-month pre-tax income, and only approximately 65% of its trailing 12-month operating income. [FN7] Thus, using Wilkinson's valuation as a baseline, the court will analyze each of the three valuation methods utilized by both experts and come to its own

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
(Cite as: 2003 WL 21753752 (Del.Ch.))

Page 3

independent judgment for proper valuation of Dunham's.

> FN7. The court understands that these comparisons are, in some sense, "apples to oranges." For example, were Dunham's faced with a mounting debt load (which it was not) or with decreasing growth prospects (which it was not) then such a valuation may in fact be reasonable. Nonetheless in the absence of any convincing explanation (and none was given by Kern), these comparisons are strongly suggestive of a gross undervaluation by Kern. In this connection, the court notes that Marshall Sosne, Dunham's Chief Financial Officer (who is himself a stockholder of the surviving entity) refused to endorse Kern's valuation. Trial Tr. at 167-68.

A. *The Discounted Cash Flow Approach*

*3 The court begins its DCF analysis by accepting the basic framework of Wilkinson's model and then considering objections to that analysis that have been lodged by Dunham's. Wilkinson explained that a DCF analysis involves projecting operating cash flows for an extended period, determining a terminal value upon sale at the end of the period, and then discounting those values at a set rate to determine the net present value for 100% of Dunham's common stock. Dunham's does not object to this theoretical framework for valuation.

1. *Projected Revenue Growth*

Dunham's first objection to Wilkinson's valuation relates to his projected revenue growth for the company, which Dunham's argues places too much emphasis on its atypical success during the winter of 2000. Kern and Marshal Sosne, Dunham's Chief Financial Officer, testified about the allegedly unusual winter of 2000 and how it led to increased sales that should be treated as a one-time occurrence rather than a sign of increasing long-term sales growth potential. This is so, the argument goes, because of the combination of an extremely cold winter and tremendous sales of scooters, which were peaking in popularity in the Midwest at the time. Those circumstances led directly to abnormally high sales figures for both scooters and all winter-related items, including skis and accessories, boots, and brand name outerwear.

When Wilkinson prepared his projections, he did discount the winter 2000 sales. He just did not discount them as much as Dunham's would have liked. Wilkinson explained that in making the appropriate revenue projections, one examines the company's history, its position within the industry, prospects for the industry and the economy in general, and how the company has grown compared to past expectations. Wilkinson projected results for the four-month period ended January 31, 2002. He also projected revenues through January 31, 2005. Wilkinson projected revenues for the fiscal year ended January 31, 2005 to be $249,000,103 based on an assumed revenue growth rate of 3.5% for fiscal years 2003, 2004, and 2005. [FN8] Finally he determined that the terminal value sales growth rate should be 3%. In contrast, sales for November and December 2000 grew by 15% compared to the same period in 1999.

> FN8. Dunham's fiscal years end on January 31. For example, fiscal year 2002 covers the period from February 1, 2001 through January 31, 2002.

Kern's DCF analysis instead projected 2.5% revenue growth for fiscal 2002 and 2% growth thereafter. Kern's projections in this regard are highly suspect for a variety of reasons. First, Kern stated that he considered the overall industry growth rate of 1% to 2%, but conceded this growth rate included not only large chain stores (like Dunham's), but also one-store mom-and-pop sporting good retailers, and that larger retailers like Dunham's were growing at substantially higher rates than smaller ones. [FN9]

> FN9. Dunham's continually portrays itself as a minor player in the retail sporting goods industry, maintaining that it operates "small sporting goods stores" in "small- to medium-sized markets" to avoid competing with "big box national stores." Resp. Br. at 3. In reality, Dunham's is in the top ten in sales for retail sporting goods chains in the United States with 116 stores in 12 states, with many in larger markets. Trial Tr, at 48.

Second, Kern characterizes sales in November and December 2000 as a one-time event, and argues that it was unreasonable for Wilkinson to make revenue projections based on the assumption that such factors would persist. This is so, the argument goes, because the Midwest experienced an unusually cold winter, which led to higher than expected sales of skis and related equipment and apparel. To buttress this argument, Dunham's claims that, during the period

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280  
(Cite as: 2003 WL 21753752 (Del.Ch.))

Page 4

between the Christmas season of 2000 and the Merger Date, it "returned to its historical pattern of growth," thereby "undercutting Mr. Wilkinson's theory that fiscal year 2001, [was] a benchmark." [FN10] This is an incorrect assertion, however. For example, Dunham's average monthly revenues grew at 5% for the eight-month period from February 2001 through September 2001. [FN11] In addition, there has been no evidence provided, scientific or otherwise, that demonstrates the conditions the Midwest experienced during winter 2000 will not repeat itself. Moreover, all of the other major companies in the retail sporting goods industry, including southern climate-based entities, experienced growth during this period and were experiencing substantial growth into 2002 as well. [FN12]

    FN10. Resp. Br. at 19.

    FN11. Pet. Trial Ex. 1, Sch. B-4.

    FN12. *See* Pet. Trial Ex. 1, Sch. G-1.

*4 Finally, and most significantly, Kern's revenue growth rate analysis is suspect because he neglected to consider Dunham's management's own financial projections, which called for 9.7% annual revenue growth through 2007. [FN13] These projections were provided to Fleet Capital, Dunham's lender, for the purpose of extending a credit facility for an additional five years and increasing the line available from $42 million to $55 million. These projections were, according to Sosne, formulated in October 2001, *the very month of the merger*. Sosne testified they were prepared with the full authority and approval of management and were submitted in good faith. Considering management's own projections regarding revenue growth, Wilkinson's 3.5% growth rate for revenue is far more reasonable than Kern's 2% growth rate.

    FN13. Pet. Trial Ex. 7.

2. *Estimates Of Operating Income As A Percentage Of Revenue*

Dunham's second objection to Wilkinson's valuation is that Wilkinson allegedly erred in his estimates of Dunham's operating income as a percentage of its revenue ("Operating Margins"). Wilkinson's valuation assumes that Dunham's Operating Margins would likely range from 4.3% to 5.1% in the years following the Merger Date. This estimate, according to Kern, is erroneously high because it ignores the fact that on a historical basis Dunham's Operating Margins had never been higher than 2.6% until fiscal year 2001, and that even in that year its Operating Margin was only 3.2%. Although this argument has some merit, Kern's projections in this regard are flawed as well.

Kern would have this court believe that in the face of continuously increasing Operating Margins from 1998 through 2001, Dunham's was somehow headed for a major reversal of fortune and would only experience Operating Margins of 3.2% for 2002 and eventually decline to 2.1% in 2006 and beyond. [FN14] There is no evidence to indicate that such a decrease in Operating Margins is looming. Rather, the evidence tends to show that Operating Margins were improving with time, albeit at a slower pace than Wilkinson projected. The court finds that management's own projections in this regard are the most persuasive. The projections that Dunham's provided to Fleet Capital the same month the merger occurred demonstrate that management believed that Operating Margins were improving over time. Management projected Operating Margins as 3.4% for 2002, 3.3% for 2003, 3.4% for 2004, 3.6% for 2005, and 3.8% for 2006 and 2007. [FN15] These projections appear both reasonable and in line with the upward trend for Dunham's Operating Margins, and, as such, the court will rely upon them.

    FN14. *See* Resp. Trial Ex. 21, Ex. E.

    FN15. Pet. Trial Ex. 7.

3. *Adjustments To Account For Working Capital And Impending Capital Expenditures*

Dunham's third objection to Wilkinson's DCF analysis relates to supposedly impending capital expenditures that were necessary and known at the time of his valuation. In particular, Dunham's first complains that Wilkinson failed to reduce his DCF analysis to account for its impending $4 million purchase of new cash registers for its stores. Dunham's then complains that Wilkinson failed to make an adjustment for increased working capital requirements, which it would need in order to grow revenues in the future. There are easy answers to both these complaints.

*5 First, there was simply no reliable evidence establishing the need for, and imminence of, a $4 million expenditure for new cash registers at Dunham's stores. Kern testified his consideration of this anticipated expenditure was a significant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280  
(Cite as: 2003 WL 21753752 (Del.Ch.))

Page 5

difference between his DCF analysis and Wilkinson's. Kern, however, failed to independently verify how much this alleged expenditure would cost or whether it was even necessary. He also testified that he was not provided any written documentation relative to this alleged anticipated expenditure. Instead he simply accepted management's word at face value about such an expenditure. For these reasons, the court is persuaded that Wilkinson's decision not to account for a $4 million capital expenditure for cash register purchases was appropriate.

Second, Wilkinson did account for additional working capital and capital expenditure requirements. This was accomplished by assuming that those needs would be financed. Given that Dunham's has plenty of borrowing power, Wilkinson's interest expense provision in his projection included an interest provision to handle an additional $10 million in capital expenditures and working capital provisions.

4. *Size-Risk Premium*

One of the requirements for a DCF analysis is to select the appropriate discount and capitalization rates based on market risk. The capitalization rate is used to determine the terminal value for a company. The discount rate is used to reduce values from future years to present value. As a practical matter, the lower the capitalization and discount rates, the higher the terminal value and present value will be.

One of the key elements in calculating capitalization and discount rates is a modifier that takes into account the risk associated with the company based on its size. This modifier is typically referred to as a "Size-Risk Premium." At trial, both experts testified that they selected their Size-Risk Premium based on charts from Ibbotson Associates' 2001 yearbook. Ibbotson Associates is a well-recognized organization that provides, among other things, data for valuation premiums that should be applied to various companies.

The first part of the chart at issue breaks companies down into sequential deciles 1 through 10, with 1 representing companies with the largest market capitalization and 10 the smallest, and then provides the relevant Size-Risk Premium for each size. [FN16] Ibbotson then divides decile 10 into two halves, with the first half (decile 10a) applicable to the larger companies within decile 10 and the second half (decile 10b) the smaller ones. [FN17] The Ibbotson Associates yearbook explains that the largest company within decile 10b is Vlasic Foods International, which has a market capitalization of approximately $48.3 million. Unfortunately, the Ibbotson Associates yearbook does not provide what is the market capitalization of the smallest company in decile 10a. [FN18] This first portion of the chart states, in relevant part, that the Size-Risk Premiums for companies in deciles 9, 10a, and 10b are 1.74%, 2.78%, and 8.42% respectively. [FN19]

FN16. *See* Resp. Trial Ex. 22, Tab 4.

FN17. *See id.*

FN18. Dunham's asserts that "[t]he Ibbotson yearbook clearly states that the capitalization cut-off between deciles 10a and 10b is $48,345,000. That is, all companies with market capitalizations of $48,345,000 or less fall within decile 10b, while companies with market capitalizations greater than $48,345,000 but no greater than $84,521,000 fall within decile 10a" Resp. Br. at 24. This is not what the Ibbotson Associates yearbook says. Rather, it merely provides that the largest company within decile 10b has a market capitalization of $48,345,000 and the company with the largest capitalization within decile 10a has a market capitalization of $84,521,000. There is no indication of whether a company with a market capitalization of less than $48,345,000 may nonetheless fall within decile 10a or even decile 9 given certain characteristics. This is evidenced by Kern's own determination of Dunham's Size-Risk Premium of 3.95%, which was significantly lower than what decile 10b suggests it should be.

FN19. *See* Resp. Trial Ex. 22, Tab 4.

*6 The second portion of the Ibbotson chart consists of three categories that sequentially combine deciles 3 through 10b into broader groupings, each encompassing a three decile band. [FN20] It calls these bands "Mid-Cap, 3- 5," "Low-Cap 6-8," and "Micro-Cap 9-10." Just as with the first part of the chart, the second part provides a relevant Size-Risk Premium for each band, essentially averaging the statistics for the three deciles encompassed within that group. For example, the second portion of the chart states in relevant part that the Size-Risk Premium for companies in the Micro-Cap 9-10 is 2.62%. This is the Size-Risk Premium Wilkinson

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.