Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
(Cite as: 2003 WL 21753752 (Del.Ch.))

Page 6

utilized in determining his capitalization and discount rate.

FN20. *See id.*

Dunham's disagrees with Wilkinson's use of the more generalized Micro Cap 9-10 category to determine its Size-Risk Premium. Dunham's instead argues that because its equity value (even assuming Wilkinson's $44 million valuation) is below $48,345,000, Wilkinson was obligated to use a Size-Risk Premium of 8.62% pursuant to decile 10b. This argument, however, is belied by Kern's use of a significantly lower Size-Risk Premium in his own projections. Kern's valuation report specifically discusses his choice of Size-Risk Premium to apply. His report provides:

> We estimated the small stock risk premium based on information compiled by Ibbotson as published in its [yearbook]. Based thereon, we estimate a small stock premium of 3.95% based on the historical returns (in excess of the return on the S & P 500 Index) of companies that are comparable in size to Dunham's. [FN21]

FN21. Pet. Trial Ex. 21 at 54.

The court finds this reasoning persuasive and adopts it. Wilkinson inappropriately used a risk size premium of 2.62%, which was based on essentially an average of deciles 9, 10a, and 10b. Dunham's does not share similar characteristics with companies in decile 9. A more accurate Size-Risk Premium should fall within the range of deciles 10a and 10b. A Size-Risk Premium of 3.95% is closer to decile 10a than it is to decile 10b, but this is an appropriate weighting because Dunham's shares more risk characteristics with companies in decile 10a than it does with companies in decile 10b. This is because companies falling within decile 10b include many start-up ventures that receive public funding and are inherently riskier.

*5. The Court's DCF Valuation*

The court begins by accepting Wilkinson's basic framework, and then adjusts his projections and valuation based on the valid objections advanced by Dunham's. By accepting management's accounts of projected Operating Margins, Wilkinson's projected free cash flow for Dunham's becomes $1,400,900 for the four months ended January 31, 2002, $3,768,100 for fiscal year 2003, $4,099,200 for fiscal year 2004, and $4,609,100 for fiscal year 2005. Using a Size-Risk Premium of 3.95% increases Wilkinson's

terminal value capitalization rate from 15% to 16.35%, thus reducing the terminal value of Dunham's to $29,035,500. Moreover, a 3.95% Size-Risk Premium increases Wilkinson's discount rate to 19.35%, which leads to a present value factor of 97.09% for the four months ended January 31, 2002, 81.35% for fiscal year 2003, 68.16% for fiscal year 2004, 57.11% for fiscal year 2005, and 55.45% for the terminal value. This all results in a DCF for 100% of Dunham's value of $25,953,200.

B. *The Comparable/Guideline Companies Approach*

*7 The comparable company approach involves reviewing publicly traded competitors or participants in the same market or industry, generating relevant multiples from public pricing data of the comparable companies and applying those multiples to Dunham's in order to arrive at a value. Wilkinson looked at comparable publicly traded companies in the sporting goods industry with ascertained market values to determine those companies' multiples of market value of invested capital ("MVIC") to EBITDA. [FN22] Specifically, Wilkinson selected Sports Authority, Inc., Gart Sports Company, Sports Chalet, Inc., and Hibbett Sporting Goods, Inc. as publicly traded sporting goods companies that were comparable to Dunham's. The four companies selected offer a wide spectrum of store type, geographic location, capital structure, number of stores, financial performance, and other factors. These four companies summarize the risks facing a similar privately held entity very well.

FN22. EBITDA is a company's earnings before interest, taxes, depreciation and amortization.

Wilkinson averaged the multiples of MVIC to EBITDA of the comparable companies as of the Merger Date. He then reduced that average, which was 5.77, by 10% to reach his proposed EBITDA multiple of 5.2. Next, Wilkinson multiplied his 5.2 figure by Dunham's unadjusted EBITDA of approximately $10.3 million for the trailing twelve-month period ending September 25, 2001, to obtain a total capital value estimate of approximately $53.8 million. Subtracting from that figure $14.4 million, representing Dunham's interest-bearing debt as of January 31, 2001, Wilkinson stated that his MVIC analysis suggested a total equity value of $39.4 million as of the Merger Date. [FN23] The court starts with this figure and will next address each of Dunham's objections to it. [FN24]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
(Cite as: 2003 WL 21753752 (Del.Ch.))

FN23. Wilkinson also conducted a price-to-earnings analysis and a price-to-book-value analysis, which suggested equity values of $48.6 million and $36.3 million, respectively. Neither of these valuations has a significant degree of relevance, however. Price-to-earnings ratio is not a reliable indicator of Dunham's value because such a ratio does not take into account differences in companies' ratio of debt capital to MVIC. Moreover, price-to-book value ratio is not a reliable indicator of Dunham's value because it is well established that use of book value in valuation methodologies is generally not recommended. *See Paskill v. Alcoma Corp., 747 A.2d 549, 554 (Del.2000)* (noting that it is inappropriate to rely solely on a net asset value methodology because it does not represent the value of the corporation as a going concern); Shannon P. Pratt *et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 230-33 (4th ed.2000) ("book value is not a recommended business valuation method ... [and] "it is generally inappropriate to estimate a business valuation based solely on accounting book value").

FN24. In this Opinion, the court does not address whether its comparable companies analysis should be adjusted upward to reflect an inherent minority discount. The petitioner's expert made no such adjustment because he assumed it would be roughly offset by a marketability discount related to Dunham's status as a privately held company. *See* Trial Tr. at 298-99.

### 1. The Correct Interest-Bearing Debt Figure

Wilkinson used the incorrect interest-bearing debt figure in reducing his total capital value to equity value under his guideline companies analysis. He used Dunham's interest-bearing debt figure as of January 31, 2001, which was $14.4 million, despite the fact that he was valuing Dunham's as of October 15, 2001. At the end of September 2001, which is the time closest to the Merger Date for which there is a debt figure available, Dunham's interest-bearing debt was $22.5 million. This has a direct dollar-for-dollar effect on Wilkinson's valuation, and results in that valuation, based on a guideline companies analysis, being $8.1 million greater than it should be.

The petitioner has two responses to this argument.

First, he argues that Kern did not make a similar reduction to his analysis and instead used the $14.4 million interest-bearing debt figure. This argument is not persuasive because Kern (however erroneously) valued Dunham's as of January 31, 2001, when Dunham's interest-bearing debt figure actually was $14.4 million. Rather than conducting a new valuation analysis as of the Merger Date, Kern merely looked at key factors that could affect value, and how they had changed during the intervening period of time. He concluded (again, however erroneously) that Dunham's value as of the Merger Date was no greater than it had been as of January 31, 2001. Had Kern performed a new valuation as of the Merger Date, he would have been required to include the full interest-bearing debt figure of $22.5 million to arrive at a correct equity value for Dunham's.

*8 The petitioner's second response is that because Dunham's finances short-term inventory needs through its line of credit, as the Christmas season approaches financed inventory purchases grow, leading to an abnormally high interest-bearing debt figure in its financial statements. Therefore, the argument goes, upon review of Dunham's normalized debt level, it may not be necessary to consider this run-up of interest-bearing debt in a valuation calculation. This argument, however, does not withstand scrutiny. Wilkinson's methodology gives the petitioner the benefit of increased prospects for future revenue and earnings associated with the then-upcoming Christmas season, while at the same time effectively relieving him from his obligation to offset those prospects through the debt incurred in obtaining the increased inventories necessary to create the revenue and earnings in the first place. For these reasons, the court agrees that Wilkinson should have considered the full $22.5 million interest-bearing debt figure in his guideline companies analysis.

### 2. One-Time Gains

Wilkinson failed to adjust Dunham's EBITDA for a one-time non-recurring gain of $550,000, relating to the August 2001 buyout of Dunham's store lease in Janesville, Wisconsin. Although this one-time gain was not expressly identified as such in Dunham's financial statements, John Palmer, Dunham's general counsel, testified at trial that the buyout of the Janesville lease was "not typical." [FN25] Palmer further testified that during the five years preceding the Merger Date, no other leases were bought out. [FN26]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
(Cite as: 2003 WL 21753752 (Del.Ch.))

Page 8

FN25. Trial Tr. at 287.

FN26. *See id.*

The petitioner focuses on the fact that the Janesville buyout was not expressly identified as a non-recurring gain in Dunham's financial statements. [FN27] Because of this omission, the petitioner argues that the court should not consider that transaction to have been non-recurring. [FN28] The only evidence adduced at trial (which was Palmer's testimony), however, demonstrates that the Janesville buyout actually was a one-time, non-recurring transaction. There are many reasons why an auditor might not have required Dunham's to identify the gain as non-recurring in the financial statements. For example, the Janesville buyout may not have been a material event for financial statement purposes, despite the fact that it is plainly material for the very different purposes involved in valuing a company. Accordingly, the court will reduce Wilkinson's EBITDA calculation by $550,000.

FN27. *See* Pet. Br. at 29.

FN28. *See id.*

3. *The Correct EBITDA Multiple*

As previously mentioned, Kern and Wilkinson essentially agree on the appropriate comparable companies for the purposes of a guideline companies analysis. Wilkinson selected his 5.2 multiple by averaging the EBITDA multiples of the comparable companies as of the Merger Date, and then reducing that average by 10%. Kern, on the other hand, discounted 48% from the average guideline company multiple.

One of the basic principles of employing the guideline companies approach is that the chosen guideline companies should not be selected if they are dissimilar to the subject company. [FN29] Those not similar are not used. There may be some differences between comparable companies-they may make significantly more in earnings or have a significantly higher book value. The key is that the figures gleaned from a guideline company analysis are in fact multiples, which summarize how the investing public values one dollar of earnings in a given industry. [FN30] That is why these multiples are transferable. They summarize the risks facing, in this instance, large, regional sporting goods retailers very well.

FN29. *See, e.g.,* Pratt, *supra* note 23, at 230-33.

FN30. *See id.*

*9 Dunham's criticizes Wilkinson's guideline companies analysis because Wilkinson did not subjectively select what he thought to be appropriate multiples from the comparable companies and instead "merely averaged" the EBITDA multiples of the companies. [FN31] After selecting appropriate comparable companies, however, objectively averaging those companies' multiples is the next step in the analysis. [FN32] Only after establishing the average multiples for guideline companies does one adjust that average to account for relative risk and relative growth prospects of the subject company compared with the guideline companies. [FN33] This is exactly what Wilkinson did in his analysis when he discounted the average multiples for the guideline companies by 10% before applying that multiple to Dunham's. [FN34] Wilkinson chose a 10% discount to account for risks and costs such as floatation costs to Dunham's if it were to go public and its lower profitability levels relative to the guideline companies chosen. [FN35] He did not discount the multiples by more than 10% because Dunham's was growing, in terms of profitability, at a faster rate than many of the comparable companies. [FN36]

FN31. Resp. Br. at 13.

FN32. *See, e.g.,* Pratt, *supra* note 23, at 244 (stating that "[t]he harmonic mean is used to give equal weight to each guideline company in summarizing ratios that have ... [MVIC] in the numerator").

FN33. *See id.* at 244-45.

FN34. Delaware case law supports the practice of calculating a weighted average and increasing or decreasing the resulting multiple to reflect the superiority or inferiority of the subject company. *See Bell v. Kirby Lumber Corp.,* 413 A.2d 137, 146 (Del.1980) (approving use of higher than average price/earnings ratio because "Kirby was among the higher quality companies in the field"); *Boyer v. Wilmington Building Materials, Inc.,* 754 A.2d 881, 904 (Del. Ch.1999) (discounting derived multiples by 25% "[t]o account for the peculiar, negative characteristics" of the subject company); *Matter of Appraisal of Shell Oil Co.,* 1990

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
(Cite as: 2003 WL 21753752 (Del.Ch.))

WL 201390, at *23 (Dec. 11, 1990) (finding that "Shell was a superior company to most of those studied by Morgan Stanley and should have been priced above the median" of comparables).

FN35. Trial Tr. at 51-52.

FN36. *Id.* at 129.

Dunham's stated in its brief that in using the guideline company analysis, Kern determined that the guideline companies were trading from 3.1 to 11 times adjusted normalized EBITDA and that Kern chose a multiple of 3.0 for Dunham's, which was "slightly smaller" than the multiple of any comparable company because Dunham's was "less profitable" with "lower growth expectations." [FN37] What Dunham's failed to mention, however, is that Kern discounted 48% from the average guideline company multiple. Kern also could not explain why Dunham's had lower growth expectations than other guideline companies. Essentially, he disregarded the multiples. [FN38] In choosing a drastically reduced multiple, Kern demonstrated that he believes the guideline companies are not truly comparable to Dunham's, which undermines his entire analysis.

FN37. Resp. Br. at 7.

FN38. *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 2003 WL 21639071, at *14 & n. 31 (Del. Ch. July 8, 2002) (discussing the dangers of significantly deviating from the mean or median of guideline companies' multiples because the analysis becomes too biased and subjective).

For all these reasons, the court concludes that Wilkinson chose the correct discount to apply to the average guideline company multiple, and the court will use a multiple of 5.2 to determine Dunham's MVIC.

4. *The Court's Comparable/Guideline Companies Valuation*

The court begins by accepting Wilkinson's basic framework, and then adjusts his valuation based on the valid objections advanced by Dunham's. Reducing Dunham's EBITDA by $550,000 to account for the one-time gain from the Janesville lease buyout leads to an EBITDA figure of $9,812,200. Applying Wilkinson's 5.2 multiple to Dunham's adjusted EBITDA results in a total value of Dunham's invested capital of $51,023,400. Reducing that value by $22,500,000, Dunham's interest-bearing debt as of October 15, 2001 (rather than January 31, 2001) ends in an equity valuation for Dunham's of $28,523,400.

C. *The Transaction Approach*

1. *The Prudential Transaction Does Not Provide A "Reliable Benchmark" For Measuring Dunham's Value*

*10 In March 1999, a special-purpose entity comprised primarily of Dunham's officers bought all Dunham's outstanding redeemable preferred stock and Class B common stock for $4 million from The Prudential Insurance Company of America and one of its subsidiaries (collectively, the "Prudential Transaction"). At the time of the Prudential Transaction, there were accrued but unpaid dividends on the preferred stock approximating $20 million.

Dunham's argues that at the time of the Prudential Transaction, Dunham's common stock was worth nothing, because:

> [g]iven the fact that the Prudential entities were owed some $20 million in preferred dividends, but agreed to forego their right to seek payment of that amount, and given the fact that such dividends would have to be paid before common equity could be paid in a bankruptcy context, Prudential's decision to accept only $4 million for its interest in [Dunham's] demonstrates that when the Prudential Transaction occurred, the common equity had no material value.... Accordingly, the only fair conclusion that may be reached from the Prudential Transaction is that [Dunham]'s total equity value implied by the Prudential Transaction was equal to the purchase price of $4 million. [FN39]

FN39. Resp. Br. at 9.

The problem with this argument is that the Prudential Transaction was not truly an arm's-length deal. Sosne testified that Prudential was frustrated with its inability to get liquidity out of Dunham's for its investment. [FN40] Prudential was apparently willing to take whatever management was willing to offer for the Class B and preferred stock. [FN41]

FN40. Trial Tr. at 158.

FN41. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
(Cite as: 2003 WL 21753752 (Del.Ch.))

Page 10

If the Prudential Transaction has significance with respect to Dunham's value as of the Merger Date, it is this; retiring the debt essentially transformed Dunham's into an entirely new company. Once members of management succeeded in purchasing the Class B and preferred shares and retiring this debt, growth was explosive and all of the financial information provided by Dunham's support this. Operating income had gone from $3.4 million in fiscal year 1999 to $9.6 million in fiscal year 2002, and net income had risen from $456,000 in fiscal year 1999 to $4.4 million for the twelve months ended September 25, 2001. Moreover, as discussed above, Dunham's own projections suggest that it expected such growth to continue well into the foreseeable future.

### 2. The Gart/Oshman's Transaction

On February 22, 2001, Gart Sports Company announced it was acquiring Oshman's Sporting Goods, Inc. for $84 million in cash and company stock (the "Gart/Oshman's Transaction"). The merger ultimately closed on June 7, 2001, and its value had increased to $99 million. Both parties agree that the Gart/Oshman's Transaction is a valid transaction to use as a basis for valuing Dunham's. That being said, the parties (and their experts) differ dramatically about what the Gart/Oshman's Transaction implies with respect to Dunham's value.

Wilkinson analyzed the data surrounding the Gart/Oshman's Transaction and concluded that it produced a MVIC to EBITDA multiple of 5.17. This multiple was arrived at by reducing Oshman's EBITDA by approximately $7 million, which Wilkinson believed was necessary because Oshman's 1999 income statement listed that value as a negative number under the heading "Other Operating Expense." There is no evidence regarding what this number relates to. Moreover, it seems unlikely that it is a one-time negative expenditure, because Oshman's three previous years' income statements also had negative numbers listed as "Other Operating Expenses," and the relevant figure for 1998 was in the $6 million range.

*11 In contrast, Kern originally found that the Gart/Oshman's Transaction yielded a MVIC to EBITDA multiple of 4.7. After final terms of the deal were announced, Kern reduced that multiple to 3.7 times Oshman's EBITDA. To arrive at this figure, Kern used the EBITDA figure from Oshman's financial statements for the year ended February 3, 2001, despite the fact that the merger closed on June 7, 2001.

There is virtually no consistency in the analyses performed by the two experts regarding the Gart/Oshman's Transaction, and there is little discussion in either of the experts' reports related to the Gart/Oshman's Transaction. Neither Wilkinson nor Kern actually provide enough evidence for the court to make a determination about either's credibility on this subject. Neither report's appendices attempts to justify the ultimate conclusions regarding that Transaction. As such, the court concludes that neither report satisfies the burden of proof on this issue, and the court will not consider the Oshman's/Gart Transaction in its analysis.

### D. The Value Of Taylor's Shares

The court's DCF analysis yields a value for 100% of Dunham's stock of $25,953,200. The court's guideline companies analysis indicates a value of $28,523,400. These two values are reasonably close (the guideline companies valuation is approximately 9.9% higher than the DCF valuation), and the court believes that the average of these two values is the most accurate value for 100% of Dunham's stock. [FN42] Therefore, the court concludes that the total value for 100% of Dunham's stock is $27,238,300.

> FN42. Compare *Gotham Partners, L.P.,* 2003 WL 21639071, at *18 & n. 44 (valuing a company using the average of four valuations, where those valuations diverged by more than 173%).

As of the Dunham's merger date, Dunham's had 3,000 shares of common stock outstanding. Applying the court's valuation for 100% of Dunham's stock, each share of Dunham's stock is worth $9,079.43. Petitioner Taylor owned 20 shares of Dunham's common stock, and, accordingly, the value of his shares is $181,588.60.

### E. Taylor Is Entitled To Compound Interest On The Fair Value Of His Shares

8 Del. C. § 262(h) provides that in appraising a stockholder's shares:

the Court shall appraise the shares, determining their fair value ... together with a *fair rate of interest,* if any, to be paid upon the amount determined to be fair value.... In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
**(Cite as: 2003 WL 21753752 (Del.Ch.))**

Page 11

the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding. [FN43]

> FN43. 8 *Del. C.* § 262(h) (emphasis added).

Moreover, 8 *Del. C.* § 262(i) provides "[t]he Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. *Interest may be simple or compound as the Court may direct."* [FN44] These two sections read together "demonstrate that an interest award necessarily has two components-a rate of interest and a form of interest. The court must determine both parts in fashioning an interest award that is fair to the dissenting stockholder as well as to the surviving corporation." [FN45]

> FN44. 8 *Del. C.* § 262(i) (emphasis added).

> FN45. *Gonsalves v. Straight Arrow Publishers, Inc.,* 2002 WL 31057465, at *9 (Del. Ch. Sept. 10, 2002).

*12 Regarding the rate of interest, "[e]ach party bears the burden of proving the appropriate rate under the circumstances." [FN46] In this case, however, neither side submitted evidence concerning the appropriate rate of interest. Thus, the court looks to the legal rate of interest for guidance, because "[t]he legal interest rate serves as a useful default rate when the parties have inadequately developed the record in the issue." [FN47] The legal rate of interest, defined by 6 *Del. C.* § 2301, is 5% over the Federal Reserve discount rate. The Federal Reserve discount rate on October 15, 2001 was 2%. Therefore, the applicable rate of interest is 7%.

> FN46. *Grimes v. Vitalink Communications,* 1997 WL 538676, at *1 (Del. Ch. Aug. 26, 1997).

> FN47. *Chang's Holdings, S.A. v. Universal Chemical & Coatings, Inc .,* 1994 WL 681091, at *2-*3 (Del. Ch. Nov. 22 1994); *Ryan v. Tad's Enters., Inc.,* 709 A.2d 682, 705 (Del. Ch.1996), *aff'd,* 693 A.2d 1082 (Del.1997).

Taylor requests that interest on his appraisal award be compounded. The court agrees that Taylor should be entitled to compound interest on his award. This court has discretion when deciding whether to award compound or simple interest in appraisal cases.

[FN48] Although the Supreme Court has noted its concern over the "developing standard practice" of awarding compound interest in appraisal cases, it still only requires that the Court of Chancery base an award of compound interest on sound and articulated reasoning. [FN49]

> FN48. *See Gonsalves v. Straight Arrow Publishers, Inc.,* 1999 WL 87280, at *4 (Del. Jan. 5, 1999) ("We emphasize again that the Court of Chancery has broad discretion under the appraisal statute to award either simple or compound interest").

> FN49. *Id.* ("the [appraisal] statute provides discretion to choose [simple or compound interest] on a case-by-case basis, but requires explanation for the choice").

An award of compound interest is generally the form of interest most likely to fulfill the purposes of Delaware's appraisal statute. [FN50] This is so because the award of interest pursuant to 8 *Del. C.* § 262(h) supports two goals: first, the award compensates the petitioner for the loss of the use of the fair value of his or her shares during the pendency of the proceeding; and second, the award forces the corporation to disgorge any benefits it obtained from the use of the fair value of the petitioner's shares during the pendency of the proceeding. [FN51]

> FN50. *See Gonsalves,* 2002 WL 31057465, at *10 (citing *Onti, Inc. v. Integra Bank,* 751 A.2d 904, 926-29 (Del. Ch.1999)).

> FN51. *Gilbert v. MPM Enterprises, Inc.,* 709 A.2d 663, 674 (Del. Ch.1997) (citing *Grimes,* 1997 WL 538676, at *9).

An award of simple interest does not satisfy the first goal of Section 262(h) because "[i]t is simply not credible in today's financial markets that a person sophisticated enough to perfect his or her appraisal rights would be unsophisticated enough to make an investment at simple interest." [FN52] Moreover, an award of simple interest does not satisfy the second goal of Section 262(h) because "[a]s for the defendant company in an appraisal action, it is even harder to imagine a corporation today that would seek simple interest on the funds it holds.... Nor is it conceivable that [the defendant company's] lenders were providing ... capital at simple rates of interest." [FN53] Thus, awarding simple interest "would not force the defendant company to disgorge the full benefit it received from having use of the plaintiff's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                Page 12
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
(Cite as: 2003 WL 21753752 (Del.Ch.))

funds." [FN54]

> FN52. *Onti, Inc.*, 751 A.2d at 926.

> FN53. *Id.* at 926-27 (footnote omitted).

> FN54. *Gonsalves,* 2002 WL 31057465, at
> *10.

There is nothing presently in the record before the
court that would cause it to diverge from the general
principle that compound interest should be awarded
in appraisal cases. For example, there is nothing in
the record from which the court could conclude that
the length of this litigation was the result of any
intentional delay on the part of Taylor. The court
concludes, therefore, that the evidence supports a
finding that compound interest is the most
appropriate form of interest award for these parties.

*13 The final issue to resolve is the rate of
compounding for the court's interest award. There is
support for the conclusion that the compounding
should occur at a monthly or even daily rate. [FN55]
Because the court has chosen to apply the legal rate
of interest, however, the appropriate compounding
rate is quarterly. This is due to the fact that the legal
rate of interest most nearly resembles a return on a
bond, which typically compounds quarterly. [FN56]

> FN55. *See Onti, Inc.*, 751 A.2d at 927 & n.
> 93.

> FN56. *See Borruso v. Communications
> Telesystems,* 753 A.2d 451, 461 (Del.
> Ch.1999).

F. *Taylor Is Not Entitled To Recover Costs For His
Expert*

The petitioner has requested that Dunham's
reimburse him for both his court costs and
Wilkinson's expert witness fees incurred as a result of
his testifying at trial. Dunham's has conceded that it
has an obligation to pay court costs. [FN57] The only
issue, therefore, is whether Dunham's should have to
reimburse Taylor for Wilkinson's fees. The court
concludes that Dunham's should not have to
reimburse Taylor for such fees.

> FN57. Resp. Reply Br. at 27.

As a general principle, Delaware law does not permit
the shifting of expert witness fees in an appraisal
proceeding. [FN58] Moreover, "[i]n the absence of an

equitable exception, the plaintiff in an appraisal
proceeding should bear the burden of paying its own
expert witnesses...." [FN59] In the current action,
there was nothing presented to the court
demonstrating that such an equitable exception
should apply. There has been no undue delay, no
showing of bad faith, or any other reason to shift the
costs of an expert witness. The petitioner's expert
witness costs were simply to establish the fair value
of his shares. [FN60]

> FN58. *See In re Radiology Assocs., Inc.
> Litig.,* 611 A.2d 485, 501 (Del. Ch.1991)
> (citation omitted) ("as with any appraisal
> proceeding, plaintiff should bear the costs of
> his own expert").

> FN59. *Cede & Co.,* 684 A.2d at 301
> (citation omitted).

> FN60. *See In re Radiology Assocs., Inc.
> Litig.,* 611 A.2d at 501.

The petitioner argues that pursuant to 10 *Del. C.* §
8906 and *Sliwinski v. Duncan,* [FN61] the court may
award, as costs, fees for witnesses testifying as
experts. [FN62] *Sliwinski* involved the application of
Section 8906 in the context of a physician's charges
in a medical malpractice case, and is inconsistent
with the more specific fee shifting provisions of 8
*Del. C.* § 262(j). In addition, Section 8906 has never
been applied in an appraisal case. For all these
reasons, there is no basis for the petitioner's request
that Dunham's pay his expert's fees, and his request
will be denied.

> FN61. 1992 WL 21132 (Del. Jan. 15, 1992).

> FN62. *See* Pet. Br. at 43.

G. *Taylor Is Not Entitled To An Award Of Attorneys'
Fees*

The petitioner requests attorneys' fees for the first
time in his Opening Post Trial Brief. The petitioner
concedes that unless some equitable exception
applies involving egregious misconduct, he should
bear the burden of paying his own attorneys' fees.
[FN63] He submits that such misconduct is present in
this case "based on the bad faith of [Dunham's] which
... was *clearly demonstrated at trial."* [FN64] To
support his bad faith argument, the petitioner
primarily looks to "[t]he indefensibly one sided
valuation offered by [Dunham's] expert witnesses...."
[FN65] This argument fails to satisfy the necessarily

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280
**(Cite as: 2003 WL 21753752 (Del.Ch.))**

Page 13

high burden to shift attorneys' fees.

FN63. *See id.* at 44.

FN64. *Id.* (emphasis in original).

FN65. *Id.*

"[B]ad faith turns on the special facts of the particular case." [FN66] Examples of bad faith include parties misleading the court, altering their testimony, or changing positions. [FN67] None of that occurred here. This case is merely a dispute involving the value of Dunham's stock. Both sides presented experts, neither of which completely satisfied the court, but also neither of which demonstrated bad faith or intentional misconduct. There was nothing unusual about how this appraisal action proceeded. Both parties must pay their own attorneys' fees.

FN66. *Jacobson v. Dryson Acceptance Corp.*, 2002 WL 31521109, at * 16 (Del. Ch. Nov. 1, 2002), *aff'd*, 2003 WL 21381092 (Del. June 13, 2003) (citing *Cantor Fitzgerald L.P. v. Cantor*, 2001 WL 536911, at *4 (Del. Ch. May 11, 2001)).

FN67. *See Jacobson*, 2002 WL 31521109, at *16 (citation omitted).

### V.

*14 For all the foregoing reasons, the court determines that the fair value for each share of Dunham's common stock, as of the date of the merger, was $9,079.43 and, thus, will enter an order awarding the petitioner a total of $181,588.60 plus interest at the legal rate, compounded quarterly. Dunham's is also directed to reimburse the petitioner for all his court costs. The parties are directed to present an order of final judgment in conformity with this opinion within 10 days.

2003 WL 21753752 (Del.Ch.), 29 Del. J. Corp. L. 280

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 38**