1  need to bring people from Saudi Arabia to be deposed and I
2  don't know that we'll be able to even get Visas within 30
3  days under the current circumstances we're pondering.
4        MR. MEEHAN: We'll take them any day in the next
5  six weeks that they're available.
6        THE COURT: We're talking about a one day nonjury
7  trial.
8        MR. MEEHAN: (Nodding yes.) At most.
9        THE COURT: What I was going to say, if I give
10 people a day and then you can work back from that and we get
11 on the phone later and say, judge, you gave us a date but
12 it's not going to be realistic. We can't get the witnesses,
13 we can't do this, we can't do that, and then I can look at
14 the papers that Shaw has presented; but my thought is even
15 if I don't consolidate for trial, I'd soon consolidate for
16 discovery so everybody is on the same page in terms of dis-
17 covery, and people should assume I'll end up consolidating
18 it for trial. We'll get it together in one. It may be one
19 case, it may be two cases. If there are facts people want
20 to educate me on why it doesn't make sense to have them all
21 in one and have them consolidated, I can undo the damage
22 later. And what I was going to say is how about, for
23 example, the week of April 22nd?
24       MR. MEEHAN: That's fine from the Debtors'
25 perspective.

1  THE COURT: Does that sound all right from your
2 perspective?
3  MR. ROSENFELD: Your Honor, I think it's a little
4 aggressive. And I would prefer to put it off one more month
5 off of that date. But if your Honor wants us to work with
6 that date and then talk to the Court, I will do that.
7  THE COURT: May 31, the technical term is
8 remittal. I'm remitting from the bench on May 31, so do you
9 want me to be the trial judge or do you want somebody else
10 to be the trial judge? How about we pick it that way?
11 Judge, we think you're brilliant, but ...
12  MR. ROSENFELD: I think it's more important for
13 us to that we be able to take the necessary discovery than
14 rush to a trial with you.
15  THE COURT: Okay.
16  MR. MEEHAN: Your Honor, if that is going to be
17 the basis, maybe we should talk about the discovery. It's
18 all about they want to depose a bunch of people from Shaw,
19 the Debtors over what the Debtors thought they were agreeing
20 to. The agreement has been laid out. We really went above
21 and beyond normal pleading. We actually briefed this situat-
22 ion in our pleadings, just the complaint and answer, so we
23 could really move this very quickly. We just have an account
24 issue that some person from the bank can probably reserve
25 based on a couple documents, so we don't see it taking that

1  long.

2        THE COURT: Why don't I do an April trial date?
3  It's going to be all Skadden all May for me already.

4        MR. ROSENFELD: Your Honor, the second reason
5  which I haven't mentioned why I am not particularly excited
6  is I have two trials scheduled between now and April. Taking
7  this discovery and doing the other two trials could prove
8  difficult. I recognize Skadden is saying they want a quick
9  date. Having seen the kind of paper I get inundated with
10 them from them on procedural issues, I don't expect the
11 discovery to go particularly smoothly, and as a result, I
12 think we may need a little bit more time than April 22.

13       MR. MEEHAN: There is no reason for that concern,
14 your Honor. None whatsoever.

15       THE COURT: What is going on?

16       MR. MEEHAN: There is no need to get into these
17 things, they're two months late. They gave us documents
18 that came straight out of the court files. We have been very
19 patient. We will be patient. We'll get them anything they
20 need. We don't need 30 days. If we can do it in two, we'll
21 do it in two. We won't stretch it out.

22       THE COURT: I'll set it for trial in April. And
23 how about Tuesday, April 23rd? We have an omnibus on March
24 14. If people want to do a status conference then about this
25 case, we can talk about it and see whether it's on track.

1  And if you are in trial and you can't make it, send somebody
2  from the office, if that is all right, or you can participate
3  by telephone.  That way we will keep it on track.
4         MR. ROSENFELD:  Thank you, your Honor.
5         THE COURT:  I don't mean to make your life more
6  difficult, but from the Debtors' perspective if I schedule a
7  trial in June, I don't know what that means because the case
8  will probably go back to the Bankruptcy Court.  I don't know
9  whether I can commit them to a trial date, so I'd rather not
10 send problems.
11        MR. ROSENFELD:  We'll work with the April 23rd
12 trial date, your Honor.  Thank you.
13        MR. MEEHAN:  What time?
14        THE COURT:  Why don't we plan on starting at
15 10:00 o'clock on Tuesday the 23rd.  And we'll talk on March
16 14th about whether we can get it done in a day, whether we
17 need to add a day, stretch a day, how late we're going to go
18 and people can make arrangements.  Is that all right?
19        MR. ROSENFELD:  Yes.  Thank you, your Honor.
20        MR. MEEHAN:  Thank you.
21        THE COURT:  Great.  And you are excused if you
22 don't want to stick around for the balance.
23        MR. ROSENFELD:  Okay.  Your Honor, at this point,
24 for purposes of just clarification we should move forward
25 with discovery as if it's going to be consolidated, I take

1  it.

2  THE COURT: That is, for the purposes of joint
3  notice of depositions and those types of things, I think it
4  makes sense to build the evidentiary record together with the
5  idea you can use it in either case if it's not going to be
6  consolidated. Is that ...

7  MR. ROSENFELD: Yes, that's what I'm asking.

8  THE COURT: I think it makes sense to do it that
9  way. I still haven't heard the merits of Shaw's objection
10 to it but it makes sense to me to at least start that way and
11 see if I made a mistake in that fashion.

12 MR. ROSENFELD: Thank you, your Honor.

13 MR. MEEHAN: Your Honor, the next matter that
14 is up concerns an action that is in the District Court in
15 Massachusetts -- or, I'm sorry, I guess actually was in the
16 District Court of Massachusetts but the parties had reached
17 an understanding that it would be stayed in Massachusetts to
18 give this Court an opportunity to review the Debtors' request
19 to keep things on ice in Massachusetts until the Court had
20 a chance to see where we were going with the Department of
21 Labor issues. The Court in Massachusetts subsequently
22 dismissed it but the parties' understanding was it would be
23 stayed up there to the earlier of March 1st or two weeks
24 following your Honor having an opportunity to rule upon our
25 complaint and the motion to dismiss that has been brought.

# EXHIBIT I

Page 1

COPY

```
 1         IN THE UNITED STATES BANKRUPTCY COURT
 2              FOR THE DISTRICT OF DELAWARE
 3
 4
 5   In re:                          ) Chapter 11
                                     )
 6   STONE & WEBSTER,                ) Case No.:
     INCORPORATED, et al.,           ) 00-02142(PJM)
 7                                   )
              Debtors                )
 8                                   )
                                     )
 9   SAUDI AMERICAN BANK,            )
                                     )
10            Plaintiff              )
                                     )
                                     ) Adversary
11         - against -               ) Proceeding
                                     )
12   THE SHAW GROUP, INC. and        ) No.: 01-07766
     SWINC ACQUISITION THREE,        )
13   INC. and STONE & WEBSTER        )
     ENGINEERING CORPORATION,        )
14   et al.,                         )
                                     )
15            Defendants             )
     _____)
16
17
18
19
20          VIDEOTAPED DEPOSITION OF
21                GARY GRAPHIA
22
23            Baton Rouge, Louisiana
24                 May 4, 2004
25
```

A 77

Page 2

```
 1              APPEARANCES
 2
 3   REPRESENTING SAUDI AMERICAN BANK:
 4       Daniel E. Rosenfeld, Esq.
         Amy Beth Abbott, Esq.
 5       Kirkpatrick & Lockhart, LLP
         75 State Street
 6       Boston, Massachusetts 02109
 7
 8   REPRESENTING THE SHAW GROUP, INC.:
 9       Stephen E. Jenkins, Esq.
         Ashby & Geddes
10       222 Delaware Avenue
         Post Office Box 1150
11       Wilmington, Delaware 19899
12
13   VIDEOGRAPHER:
14       MICHAEL BOSSIER
15
16   REPORTED BY:
17       JOHN L. HARMONSON, R.P.R.,
         CERTIFIED COURT REPORTER (LA #90006)
18
19
20
21
22
23
24
25
```

Page 3

```
 1            EXAMINATION INDEX
 2                                PAGE
 3   EXAMINATION BY MR. ROSENFELD ..... 8
 4
 5              * * * * *
 6
 7            EXHIBIT INDEX
 8                                PAGE
 9   Exhibit No. 1 ............ 74
10     Asset Purchase Agreement by
11     and among Stone & Webster, Inc.,
12     certain subsidiares of Stone &
13     Webster, Inc. and The Shaw Group,
14     Inc.; July 14, 2000; Bates A861 -
15     A969
16   Exhibit No. 2 ............ 95
17     Motion for Order; Bates A308
18     - A475
19   Exhibit No. 3 ............ 116
20     Court transcript; July 7,
21     2000; Bates A497 - A584
22   Exhibit No. 4(a) .......... 156
23     Assumed Contract List,
24     Volume I of V; Bates A649 - A653
25
```

Page 4

```
 1   Exhibit No. 4(b) ........... 156
 2     Second Amended Assumed
 3     Contracts List, Volume I of V;
 4     Bates A665 - A668
 5   Exhibit No. 5 ............ 169
 6     Court transcript; July 12,
 7     2000; Bates A585 - A648
 8   Exhibit No. 6 ............ 176
 9     December 27, 2000, letter
10     from Stone & Webster to The Shaw
11     Group, with attached documents;
12     Bates A669 - A856
13   Exhibit No. 7 ............ 212
14     Asset Purchase Agreement by
15     and among Stone & Webster, Inc.,
16     certain subsidiaries of Stone &
17     Webster, Inc. and Jacobs
18     Engineering Group, Inc.; May 31,
19     2000; Bates SHAW000010 - 000087
20   Exhibit No. 8 ............ 216
21     Notice of Oral and Video
22     Deposition of The Shaw Group, Inc.
23   Exhibit No. 9 ............ 216
24     Notice of Oral and Video
25     Deposition of Gary Graphia
```

Page 5

```
 1   Exhibit No. 10 ............ 218
 2     The Shaw Group, Inc.'s
 3     Response to Plaintiff's First Set
 4     of Interrogatories; Bates A1022 -
 5     A1033
```

2 (Pages 2 to 5)

LEGALINK BOSTON
(617) 542-0039

Page 186

1  proof of claim, Shaw shall make full payment
2  on or before January 31, 2001, unless
3  otherwise agreed to by Shaw and the
4  claimant."
5       Do you see that?
6   A. Yes.
7   Q. All right. What was meant by
8  "commercially reasonable efforts"?
9   A. You know, my recollection is that
10  there is not a specific time frame in the
11  Bankruptcy Code to resolve cure claims. I
12  think it is -- they use some language in
13  there that is similar that says, you know,
14  you will undertake to pay cure claims within
15  a reasonable period of time. And I think my
16  understanding is that's obviously intended
17  to make sure that we have enough time, being
18  the company that newly acquired these
19  contracts, to make sure that the cure claims
20  are legitimate, that there are no defenses,
21  that the obligations of the party asserting
22  the cure claim in favor of us have been
23  performed, that there aren't any offsets,
24  that the amounts are reasonable, et cetera.
25       And so I think what we tried to do

Page 187

1  was just kind of track what we otherwise
2  felt like we would likely be obligated to do
3  pursuant to the Bankruptcy Code, which is to
4  try to move as quickly as we could with
5  respect to those parties whose contracts we
6  had assumed to ascertain and verify that the
7  cure claims, if any, were correct and to get
8  them resolved.
9       You know, as you can imagine, this
10  was a huge undertaking. There were hundreds
11  if not thousands of contracts. Because of
12  Stone & Webster's bankruptcy, there was a
13  tremendous amount of credibility and
14  goodwill lost among clients. There were a
15  lot of people stood in the position of
16  creditors in the bankruptcy who were there
17  in court on a number of occasions wanting to
18  know what was going to happen with the sums
19  that were due that had been -- you know, had
20  not been paid for six, seven, eight months,
21  whatever. And those were the type of people
22  that we needed to maintain a rapport with as
23  we took this business forward to make sure
24  they would continue to be our suppliers and
25  our subcontractors.

Page 188

1       So my recollection of what we were
2  intending to do here was to let people know
3  that we intended to move and address their
4  concerns regarding proofs of claim and cure
5  claims that were legitimate and that we felt
6  we owed, you know, in a reasonable period of
7  time. And so we set some dates, we set some
8  procedures here that were agreed upon, and
9  moved for approval of the Court.
10   Q. Was it your view that under this
11  particular letter agreement that you were
12  to -- you were agreeing to either pay or --
13  Withdrawn.
14       With respect to provision No. 7 of
15  this letter agreement, was it your
16  understanding that if you contested a
17  particular cure claim, that you had any
18  obligations?
19   MR. JENKINS:
20       Object to the form of the
21  question.
22   THE WITNESS:
23       In what way?
24  EXAMINATION BY MR. ROSENFELD:
25   Q. Any obligations.

Page 189

1   A. If we contested a cure claim, we
2  had any obligation?
3   Q. Yes.
4   A. To whom?
5   Q. To the creditor, to the Creditors
6  Committee, to the debtor.
7   A. I think that we had an obligation
8  to look at those cure claims in due course,
9  and again, in a commercially reasonable
10  manner, and respond to them in some way
11  whether yes, we agreed with them, and if so,
12  get them paid. And if we didn't, if we
13  disagreed with them, file the necessary
14  objections, take whatever steps were
15  necessary to let the other party know that
16  we had an issue with it. And a lot of those
17  we would undertake discussions. We would
18  have discussions with the other side as to
19  why we thought a claim was or wasn't valid,
20  whether the amount was wrong, et cetera.
21  And we took steps that we believed were
22  reasonable to try to address the majority
23  of. I think there are some still
24  outstanding today.
25   Q. Are the ones that are outstanding

48 (Pages 186 to 189)

Page 190

1  contested claims, or are there actually ones
2  that are uncontested that are outstanding?
3      A.  I think that -- No, I don't think
4  that there are any that are uncontested
5  outstanding that I'm aware of.  I think
6  that, as you can imagine in a case of this
7  size, a lot of people file claims out of an
8  abundance of caution to protect their
9  interests.  Those, to my understanding, are
10 fairly easy to do.  It's a very simple form
11 you file and you submit, which people are
12 eager to do when they're owed money, but
13 they're not so eager to go and take the
14 necessary steps to clean up the matter once
15 they've been paid.
16      So I think that a lot of these
17 represent claims which have been paid that
18 simply weren't withdrawn.  They represent
19 claims made by people who thought they had a
20 claim but didn't properly identify what
21 contract it may or may not have been related
22 to and so we're unable to identify whether
23 or not it constitutes an assumed contract.
24 And of course when that happens, the estate
25 takes the position, out of an abundance of

Page 191

1  caution, that "We don't know what it is so
2  it's Shaw's."  We take the counter position
3  that "We don't know what it is and so it's
4  yours."
5      And neither one of us really has
6  an interest in moving that forward if the
7  claimant doesn't have an interest in moving
8  that forward.  And so if the claimant
9  doesn't appear in court and seek to have one
10 or the other held responsible, it sits
11 there.  And I think that -- It's my
12 understanding that's kind of where a handful
13 of claims still remain.  I don't think the
14 amounts are material.
15     Q.  If you look in Paragraph 7, the
16 second full paragraph of Paragraph 7, page
17 A673 on page 5 of this December agreement,
18 it talks about a list that Shaw should
19 provide the debtors, the Creditors Committee
20 and the Equity Committee on or before
21 January 15, 2001, of cure claims and proof
22 of claim that Shaw contends, (1), is a filed
23 cure claim or a filed proof of claim that
24 does not constitute, in whole or in part, an
25 assumed liability, or (2), that the asserted

Page 192

1  amount of any such filed cure claim or any
2  such filed proof of claim is overstated --
3      A.  Yes.
4      Q.  -- the disputed claims, and shall
5  set forth therein the specific basis for
6  such contention.
7      Do you know if Shaw in fact
8  presented such a list to the debtors, the
9  Creditors Committee and the Equity
10 Committee?
11     A.  I assume that we did.  I also know
12 that it's one of SAMBA's contentions that
13 they were not listed among them.
14     Q.  You say you assume that you did.
15 Do you know if you did?
16     A.  I'm not certain that we did.
17     Q.  Okay.  Do you dispute SAMBA's
18 contention that it was never on any such
19 list?
20     A.  I really don't have a position one
21 way or the other because I haven't seen such
22 a list.
23     Q.  So as far as you know, SAMBA's
24 contention is correct, but you haven't
25 looked into it?

Page 193

1      A.  Well, I have not looked into it,
2  and I would not concede that their
3  contention was correct, unfortunately.
4      Q.  Have you done anything to check
5  into whether or not SAMBA's contention is
6  correct?
7      A.  Personally, I have not.
8      Q.  Have you instructed anyone else to
9  do that?
10     A.  I may have discussed it with my
11 counsel.
12     Q.  Do you know specifically what you
13 said to counsel about that?
14     MR. JENKINS:
15         And if you gave instructions to
16 counsel, that would be covered by the
17 privilege.
18     THE WITNESS:
19         I do not recall.  And if I did, I
20 would take the position that that
21 conversation would be privileged,
22 particularly in the context of this
23 litigation.
24 EXAMINATION BY MR. ROSENFELD:
25     Q.  Okay.  So you don't recall --

49 (Pages 190 to 193)

# EXHIBIT J

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - x
                            :
In re:                      : Chapter 11
                            :
STONE & WEBSTER, INCORPORATED,: Case No. 00-02142 (PJW)
et al.,                     :
                            : Jointly Administered
            Debtors.        :
                            :
- - - - - - - - - - - - - - x Related Document: 4240
```

**ORDER UNDER FED. R. BANKR. P. 9019 APPROVING SETTLEMENT WITH SAUDI AMERICAN BANK**

Upon consideration of the Debtors' motion for an Order under Fed. R. Bankr. P. 9019 approving settlement with Saudi American Bank (the "Motion")[1]; and the Court having reviewed the Motion and having determined that granting the relief requested is in the best interests of the Debtors, their estates, and creditors and is a proper exercise of the Debtors' business judgment; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due

---

[1] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Motion.

deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. The Motion is GRANTED.

2. Pursuant to Fed. R. Bankr. P. 9019, the Settlement Agreement annexed as Exhibit A to this Order is approved.

3. Any objections to the Motion are hereby overruled in their entirety.

4. The Debtors are authorized to execute any documents necessary or desirable to consummate the Settlement Agreement.

5. Neither this Order nor the Settlement Agreement has any effect with respect to SAMBA's action against Shaw in connection with SAMBA's Cure Claim in Adversary Proceeding No. 01-7766 or any of the claims or causes of action asserted therein, or on any claims or causes of action asserted by either the Debtors or SAMBA in the action commenced by the Debtors against Saudi Arabian Oil Company (Adversary Proceeding No. 02-03963-PJW), the Motion by SAMBA to Intervene therein, or SAMBA's proposed Complaint in Intervention, relating to a certain contract between BSW and Saudi Arabian Oil Company (Contract No.

2

65004/00) and a related Assignment of Contract Proceeds from BSW to SAMBA.

6.  Any money returned to the Debtors by SAMBA pursuant to numbered paragraph 7 of the Settlement Agreement shall be allocated by the Debtors to SWEC's estate, without prejudice to the rights of any party in interest with respect to the substantive consolidation of the Debtors' estates.

Dated:  Wilmington, Delaware
        June 12, 2003

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　Honorable Peter J. Walsh
　　　　　　　　　　　　　　　　Chief United States Bankruptcy Judge

3

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement"), entered into as of May __, 2003 by and between Stone & Webster Engineering Corporation ("SWEC"), Stone & Webster, Incorporated ("SWINC") and their affiliated debtors and debtors-in-possession in jointly-administered bankruptcy cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 00-2142 (collectively, the "Debtors"), and Saudi American Bank ("SAMBA," and collectively with the Debtors, the "Parties").

### WITNESSETH THAT:

WHEREAS on or about May 31, 1980, SWEC and Abdullah Said Bugshan & Brothers ("AB&B") formed Bugshan S & W Company Limited ("BSW"), a Saudi Arabian limited liability company, to engage in an engineering and construction business in Saudi Arabia; and

WHEREAS BSW applied to SAMBA for loans and other credit facilities; and

WHEREAS to induce SAMBA to extend credit to BSW, on or about October 11, 1994, SWEC executed and delivered to SAMBA a guarantee of fifty percent of BSW's obligations to SAMBA (the "Guaranty"); and

WHEREAS in 1995, SAMBA granted BSW a $35 Million credit facility and thereafter made loans to BSW under said credit facility; and

WHEREAS in 1998, SAMBA renewed its grant of a $35 Million credit facility to BSW; and

WHEREAS at the beginning of 1999, SWEC and AB&B agreed to a repayment schedule memorialized in a letter to SAMBA dated December 22, 1998 (the "Payment Letter"); and

WHEREAS on or about June 2, 2000, the Debtors filed voluntary bankruptcy petitions in the Bankruptcy Court for reorganization relief under Chapter 11 of Title 11 of the United States Code; and

WHEREAS on or about August 24, 2000, SAMBA filed Proof of Claim No. 3014 (the "Proof of Claim") and Statement of Cure Claim No. 22220169 (some of the documents of which were initially erroneously designated as no. 3194) (the "Cure Claim"), with the Cure Claim including claims based explicitly on SWEC's alleged liability under the Guaranty, and the Proof of Claim including a contingent claim against SWEC in the event that neither The Shaw Group Inc. nor SWINC Acquisition Three, Inc. (collectively, "Shaw") was determined to have assumed liability for paying the Cure Claim; and

WHEREAS on August 1, 2001, Debtors initiated Adversary Proceeding No. 01-1120 (the "Preference Action") by filing a complaint against SAMBA which, as amended by an Amended Complaint filed on January 23, 2003, included causes of action to avoid and recover alleged preferential transfers, to disallow the Proof of Claim, to recover alleged fraudulent conveyances, to avoid allegedly improper setoffs, to estimate SAMBA's claims at

BO3-811785 v7 0506830-0901

A 84

zero and to reduce SAMBA's claims to an amount reflected on Debtors' books and records, and to recover damages for SAMBA's alleged violations of the automatic stay; and

WHEREAS SAMBA filed an answer denying material allegations in the Preference Action, asserting affirmative defenses and admitting to having filed the Cure Claim in the amount of $6,872,979.00 for alleged liabilities of SWEC which SAMBA has asserted have been assumed and should be paid by Shaw, and further asserting that in the event said liabilities have not assumed by Shaw, they are liabilities of SWEC; and

WHEREAS a trial of the Preference Action was scheduled to commence on May 14, 2003; and

WHEREAS the Parties have agreed to settle the disputes involved in the Preference Action and SAMBA's contingent claims against SWEC as set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the Parties agree as follows:

1. SWEC shall make a one-time cash payment of One Million Dollars ($1,000,000) to SAMBA, such payment to be made within five days after entry of a final and non-appealable order approving this Agreement.

2. SAMBA will have an allowed general, unsecured claim in the amount of Two Million Five Hundred Thousand ($2,500,000.00) against SWEC.

3. Promptly upon approval of this Settlement Agreement, the Parties shall file a stipulation with the Bankruptcy Court dismissing the Preference Action in its entirety with prejudice and without the award of attorney's fees or costs.

4. Except for the rights and obligations expressly provided or reserved hereunder, the Debtors, for themselves and their predecessors, successors, assigns, parents, subsidiaries, affiliates, insurers, heirs, officers (including but not limited to James P. Carroll), directors, partners, employees, agents and attorneys, hereby release, remise and forever discharge SAMBA and all of its predecessors, successors, assigns, parents, subsidiaries, affiliates, insurers, heirs, officers, directors, partners, employees, agents and attorneys from any and all claims, causes of action, damages, liabilities, demands, rights and losses of whatever nature, whether arising from contract, tort or otherwise and whether in law or equity, whether known or unknown, asserted or unasserted, that any of the Debtors ever had, now has or may have for acts, events or occurrences prior to the date of this Agreement relating in any way to the Proof of Claim or any claims that were or could have been asserted in the Preference Action, including without limitation preference, fraudulent conveyance, improper setoff and other claims.

5. Except for the rights and obligations expressly provided or reserved hereunder SAMBA, for itself and its predecessors, successors, assigns, parents, subsidiaries, affiliates, insurers, heirs, officers, directors, partners, employees, agents and attorneys, hereby releases, remises and forever discharges the Debtors, their predecessors, parents, subsidiaries, affiliates, insurers, heirs, officers (including but not limited to James P. Carroll), directors, partners, employees, agents and attorneys from any and all claims and causes of action, damages, liabilities, demands, rights and losses of whatever nature, including but not limited to contract or tort, law or equity, and whether

known or unknown, asserted or unasserted, that SAMBA ever had, now has or may have, for acts, events or occurrences prior to the date of this Agreement based upon the Proof of Claim, the Cure Claim, the Payment Letter, or the Guarantee, or that were or could have been asserted by SAMBA in the Proof of Claim or the Cure Claim. Notwithstanding the foregoing sentence, SAMBA does not release its claims, causes of action, damages, liabilities, demands, rights and losses under the Guaranty, the Payment Letter and the Cure Claim as against Shaw only, including but not limited to those claims and liabilities SAMBA asserts have been assumed and are payable by Shaw as set forth in the Complaint filed by SAMBA against Shaw in Adversary Proceeding No. 01-07766; provided, however, that (a) in no event shall the Debtors or any of them have any liability to SAMBA whatsoever related to the Proof of Claim, the Cure Claim, the Guarantee, or the Payment Letter, regardless of whether SAMBA recovers against Shaw on account of such liability, except as provided in numbered paragraphs one and two above, and (b) the release set forth in the first sentence of this paragraph 5 does not affect or apply to any claims or causes of action asserted by either the Debtors or SAMBA in the action commenced by the Debtors against Saudi Arabian Oil Company (Adversary Proceeding No. 02-03963-PJW), the Motion by SAMBA to intervene therein or its proposed Complaint in Intervention, relating to a certain contract between BSW and Saudi Arabian Oil Company (Contract No. 65004/00) and a related Assignment of Contract Proceeds by BSW to SAMBA, provided further that in no event shall SAMBA be entitled to receive more than the total of the principal of its loans to BSW, commissions and interest thereon, and the costs and expenses, including reasonable attorney fees, of protecting and enforcing its rights with respect to such loans and the Guaranty.

6. The Debtors shall prepare and file a motion (the "Motion") for approval by the Bankruptcy Court of this Agreement in sufficient time that the Motion may be considered by the Bankruptcy Court at the June 12, 2003 omnibus hearing. The Debtors will attach to the Motion a proposed order indicating (a) that neither this Agreement nor the Bankruptcy Court's approval hereof is intended to have and that neither of them will have, any effect with respect to SAMBA's action against Shaw in connection with SAMBA's Cure Claim in Adversary Proceeding No. 01-07766, or any of the claims or causes of action asserted therein, or on any claims or causes of action asserted by either the Debtors or SAMBA in the action commenced by the Debtors against Saudi Arabian Oil Company (Adversary Proceeding No. 02-03963-PJW), the Motion by SAMBA to Intervene therein or its proposed Complaint in Intervention, relating to a certain contract between BSW and Saudi Arabian Oil Company (Contract No. 65004/00) and a related Assignment of Contract Proceeds from BSW to SAMBA, and (b) that all of the terms and conditions of this Agreement are approved by the Bankruptcy Court.

7. The Debtors understand that SAMBA will credit the $1,000,000 cash payment referenced in numbered paragraph 1 hereof first against its attorneys' fees, then commissions and interest. SAMBA agrees that if it recovers payment from Shaw in an amount in excess of $3,000,000, SAMBA's allowed claim against SWEC, as set forth in numbered paragraph 2 hereof, will be reduced dollar-for-dollar by the amount of such recovery in excess of $3,000,000. SAMBA agrees that if it has received any distribution on its allowed claim of $2,500,000 and its claim is thereafter reduced because it has recovered against Shaw in excess of $3,000,000, then SAMBA will promptly refund to the Debtors that portion of the distribution that pertains to the amount of the reduction in SAMBA's claim pursuant to the preceding sentence, but in no event will SAMBA have to repay any portion of the $1,000,000 cash payment to be made by the Debtors, regardless of how much money SAMBA may recover from Shaw.

-3-

8. Nothing in this Agreement shall obligate the debtors to alter their position that SAMBA does not have a valid claim against Shaw, but the Debtors will comply fully and promptly with their discovery duties, if any, to provide access to witnesses and documentary discovery to both parties in SAMBA's action against Shaw (Adversary Proceeding No. 01-07766), and shall not provide information or assistance to either SAMBA or Shaw without notice and full disclosure of such actions to the other, except that the Debtor may, in the ordinary course of discussions between the Debtors and Shaw, make incidental disclosures of general or of non-material information to Shaw that would not be of interest to SAMBA.

9. This Agreement effects the settlement of disputes and potential claims that are denied and contested, and nothing contained herein shall be construed as an admission by the Parties of any fault, wrongdoing, or liability whatsoever.

10. This Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of Delaware. Any dispute over or effort to enforce this Agreement shall be filed in the Bankruptcy Court. The Parties consent to jurisdiction and venue in said court for the resolution of any dispute over, or effort to enforce, this Agreement. If any Party to this Agreement brings an action to resolve a dispute over, or to enforce its rights hereunder, the prevailing Party shall be entitled to recover its costs and expenses, including court costs and reasonable attorneys' fees and expenses, incurred in connection with the lawsuit.

11. This Agreement was negotiated at arm's length with all Parties receiving advice from independent legal counsel. The drafting and negotiation of this Agreement has been done by each of the Parties and/or their legal counsel, and the language herein shall not be construed for or against any of the Parties.

12. This Agreement is the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements and discussions. This Agreement may be amended only by an agreement in writing, signed by the Parties hereto.

13. This Agreement may be executed in counterparts, and when each Party has signed and delivered at least one counterpart, each counterpart shall be deemed an original, and, when taken together with other signed counterparts, shall constitute one agreement, which shall be binding upon and effective as to all Parties.

14. This Agreement is subject to the entry of a final and non-appealable order of the Bankruptcy Court in Chapter 11 Case No. 00-2142 (PJW), authorizing Debtors to enter into, and otherwise approving, this Agreement.

15. This Agreement shall be deemed null and void and of no force or effect if an order approving it is not entered by the Bankruptcy Court by June 15, 2003 (unless the parties mutually agree in writing to extend said deadline), and if this Agreement is

-4-

...ed, or voided for failure to comply with said deadline (as it may be extended by mutual agreement), Adversary Proceeding No. 01-1120 shall be reinstated to the calendar of the Court at the earliest available date.

STONE & WEBSTER, INCORPORATED

By: _____
James P. Carroll
President & Chief Restructuring Officer
Stone & Webster, Incorporated
Debtor-in-Possession
[...] Street, 5th Floor
Boston, MA 02109

SAUDI AMERICAN BANK

By: _____
Chahdan Jebeyli, General Counsel
Saudi American Bank
Old Airport Street
P.O. Box 833
Riyahd 11421
SAUDI ARABIA

-5-

A 88

MAY.23'2003 16:52 617-778-7383          STONE & WEBSTER                    #2987 P.001/001

nullified or voided for failure to comply with said deadline (as it may be extended by such mutual agreement), Adversary Proceeding No. 01-1120 shall be reinstated to the trial calendar of the Court at the earliest available date.

STONE & WEBSTER, INCORPORATED              SAUDI AMERICAN BANK
et al.

By: /s/ James P. Carroll                    By: _____
James P. Carroll                            Chahdan Jebeyli, General Counsel
President & Chief Restructuring Officer     Saudi American Bank
Stone & Webster, Incorporated               Old Airport Street
Debtor-In-Possession                        P.O. Box 833
45 Milk Street, 5th Floor                   Riyadh 11421
Boston, MA 02109                            SAUDI ARABIA

-5-

A 89