IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INCORPORATED | ) | Case No. 00-02142 (PJW) |
| et al., | ) | Jointly Administered |
| | ) | Adv. No. 01-7766 (PJW) |
| Debtors | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | 1:04-cv-00834-SLR |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE SHAW GROUP INC., SWINC | ) | |
| ACQUISTION THREE, INC., and | ) | |
| STONE & WEBSTER ENGINEERING | ) | |
| CORPORATION, et al., | ) | |
| Defendants | ) | |

**OPENING BRIEF IN SUPPORT OF SAUDI AMERICAN BANK'S
MOTION FOR ASSESSMENT OF DAMAGES**

**Monzack & Monaco, P.A.**
Francis A. Monaco, Jr. (#2078)
Kevin Mangan (#3810)
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
(302) 656-8163


**Kirkpatrick & Lockhart Nicholson Graham LLP**
John C. Hutchins (BBO #246060)
Daniel E. Rosenfeld (BBO #560226)
Amy B. Abbott (BBO #648072)
75 State Street
Boston, MA 02109
(617) 261-3100


Dated: May 18, 2005

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................1

II.     NATURE AND STAGE OF THE PROCEEDING ...........................................1

    A.     Nature of the Proceeding .........................................................1

    B.     Stage of the Proceeding ...........................................................3

III.    SUMMARY OF THE ARGUMENT ..............................................................3

IV.     STATEMENT OF FACTS .........................................................................6

    A.     SAMBA's Loan to BS&W .........................................................6

    B.     Procedural History and the Interrelated Adversary Proceedings ...........8

        1.     The Preference Action .................................................8

        2.     The Recovery Action ...................................................9

        3.     Consolidation of Adversary Proceedings .........................10

        4.     Shaw's Failure to Pay or Contest SAMBA's Cure Claim.........11

        5.     Settlement of the Preference Action .................................12

        6.     Saudi Aramco Action ..................................................13

V.      ARGUMENT............................................................................................15

    A.     SAMBA is Entitled to Pre-Judgment Interest on its Judgment as a Matter of Right ....................................................................................15

    B.     Under the Terms of the Guaranty and Credit Agreement, SAMBA is Entitled to Reimbursement for its Attorneys' Fees, Costs and Other Expenses.................18

        1.     SAMBA's Request for Attorneys' Fees, Costs and Expenses is Reasonable. ..............................................................20

    C.     SAMBA is Entitled to Post-Judgment Interest on its Judgment ...........22

VI.     CONCLUSION.........................................................................................23

# TABLE OF AUTHORITIES[1]

## STATE CASES

*Bickford v. Smithson*, C.A. No. 2002-05-187, 2003 WL 22931394
(Del. Com. Pl. Nov. 20, 2003)…………………………………………...........18, 21

*Citadel Holding Corp. v. Roven*, 603 A.2d 818 (Del. 1992)……………………………...........16

*Comrie v. Enterasys Networks, Inc.*, No. 19254, 2004 WL 936505
(Del. Ch. Apr. 27, 2004)…………………………………………………………………19

*General Motors Corp. v. Cox*, 304 A.2d 55 (Del. 1973)……………..………………………21

*Hercules Inc. v. Aetna Casualty and Surety Co.*, Nos. 92C-10-105, 90C-FE-195-1-CV,
1998 WL 962089 (Del. Super. Sep. 30, 1998)……………..……………………...…….16

*Salaman v. National Media Corp.*, No. C.A. 92C-01-161, 1994 WL 465535
(Del. Super. July 22, 1994)………………………………………………...........16, 19

*Taylor v. American Specialty Retailing Group*, No. Civ. A 19239, 2003 WL 21753752
(Del. Ch. July 25, 2003)……………………………………………………………………16

## FEDERAL CASE

*U.S. v. Star Brite Construction Co.*, 848 F. Supp. 1161 (D. Del. 1994)………..……………16, 22

---

[1]  Copies of the unpublished cases cited herein are submitted herewith in the Appendix to Saudi American Bank's Opening Brief in Support of Motion for Assessment of Damages, Exhibit A at A1-A3.

## I.    __INTRODUCTION__

Plaintiff Saudi American Bank ("SAMBA") hereby submits the following memorandum in support of its Motion for Assessment of Damages.  As more fully set forth below, SAMBA is entitled to pre-judgment interest on the outstanding principal of $6,725,000 ("Initial Judgment"), all of its expenses, attorneys' fees and costs, and post-judgment interest.  First, it is undisputed that the outstanding principal is in the amount of $6,725,000.  Second, as a matter of contract right, SAMBA is entitled to pre-judgment interest at the prevailing Delaware legal rate of 11%.[2] Third, SAMBA is entitled to all of the expenses, including attorneys' fees, court costs, and all other fees and expenses it incurred in protecting and enforcing its rights under the Stone & Webster Engineering Corporation ("SWEC") Guaranty, in the full amount of $1,985.663.56, less the $1,000,000 previously recovered from SWEC in the Preference Action, resulting in net expenses of $985,663.56.  Fourth, SAMBA is entitled to post-judgment interest on the Entire Judgment[3] at a rate of 3.33% beginning on May 5, 2005 until the date of full payment.

## II.    __NATURE AND STAGE OF THE PROCEEDING__

### A.    __Nature of the Proceeding__

Prior to and throughout this litigation, it was undisputed that SAMBA provided financing to Bugshan Stone & Webster[4] ("BS&W"), a Saudi Arabian affiliate of SWEC, one of the Debtors in the jointly administered bankruptcy proceeding, that SWEC guaranteed payment of fifty

---

[2]  As described more fully below, this figure is derived from the Federal Reserve discount rate as of May 31, 2000 of 6.0%, plus 5%.

[3]  "Entire Judgment" is defined as the outstanding principal in the amount of $6,725,000 plus prejudgment interest from the date of SAMBA's demand under the SWEC Guaranty to the date judgment was entered by this Court, plus the expenses, including travel expenses, attorneys' fees, court costs, and all other fees and expenses SAMBA incurred in obtaining or enforcing its rights under the SWEC Guaranty.

[4]  BS&W is a joint venture formed under the laws of Saudi Arabia by SWEC and Abdullah Said Bugshan & Brothers.

percent of BS&W's obligations to SAMBA up to $35,000,000, and that the Shaw Group, Inc. ("Shaw") and SWINC Acquisition Three, Inc. ("SWINC") assumed obligations of SWEC in connection with their purchase of the assets of the Debtors at a bankruptcy auction in July 2000.[5] Despite the acknowledged debt owed to SAMBA, SAMBA was forced to engage in three separate, related pieces of litigation, all in an effort to recover a single debt from both of the sources that SAMBA had procured as security for the debt. If Shaw had accepted responsibility for its assumption of SWEC's liabilities to SAMBA when it emerged as the successful bidder at the auction sale of Debtors' assets in July of 2000, none of the protracted litigation that ensued would have been necessary. Instead, Shaw denied that it assumed the liability of BS&W or SWEC to SAMBA and argued that: SAMBA lacked standing to enforce the terms of the Asset Purchase Agreement ("APA"), Shaw's understanding of the meaning of the APA with respect to SAMBA's claim should pre-empt the plain meaning of the APA, and since Shaw was not a party to the Credit Agreement or Guaranty, Shaw was not liable for any amounts owed by BS&W or SWEC. As a result, SAMBA was forced to protect its rights in a contentious adversary proceeding filed by the Debtors in which the Debtors sought to recover $1.3 million as preferential transfers and $6.5 million as fraudulent transfers. If Debtors had been successful, it would have resulted in a dollar-for-dollar increase in Shaw's obligation to SAMBA.[6] In addition, SAMBA needed to pursue its right to recover under both of its sources of security.

---

[5] After the hearings for approval of the sale to Shaw, it was stated that Shaw was assuming in excess of Four Hundred Million Dollars ($400,000,000) of liabilities of the Debtors. See Section 1.01 of the APA. During the Sale Hearing, Debtors represented that Shaw increased the assumed liabilities to $525,722,000.

[6] SAMBA filed a motion to amend its complaint against the defendants, but that motion was rendered moot because the Debtors were unsuccessful; in fact, as part of SAMBA's defense of the Preference Action it was able to reduce Shaw's liability because SAMBA collected $1,000,000 from the Debtors which was applied to SAMBA's attorneys' fees.

B.    <u>Stage of the Proceeding</u>

On May 3, 2005, this Court issued a Memorandum Opinion granting SAMBA's motion for summary judgment. <u>See</u> Memorandum Opinion, Exhibit B at A39-A56.[7] Specifically, the Court found that "the Guaranty and Payment Letter are contracts that were assumed by defendant Shaw by operation of the Asset Purchase Agreement and the Sale and Assumption Order." <u>See</u> <u>id.</u> at 17, Exhibit B at A56. On May 4, 2005, judgment was entered in favor of SAMBA and against defendants Shaw, SWINC and SWE&C Liquidating Trustee. The pertinent docket entry indicates that judgment was entered on the docket in favor of SAMBA on May 5, 2005.[8] In accordance with the contractual documents executed by SWEC and BS&W in favor of SAMBA, applicable Orders of the Bankruptcy Court, and applicable law, SAMBA is also entitled to the interest and commissions accrued after May 31, 2000 through the date of the Initial Judgment, plus all expenses incurred by SAMBA in protecting and enforcing its rights, including its attorneys' fees and costs. Thus, SAMBA is seeking an order from the Court assessing the damages incurred by SAMBA in the amount of $11,356,718.46 plus post-judgment interest at a rate of 3.33% beginning on May 5, 2005 until the date of full payment.

III.    <u>SUMMARY OF THE ARGUMENT</u>

(1)    SAMBA is entitled to a judgment consisting of the principal owed under the Guaranty and Payment Letter, pre-judgment interest, expenses including attorneys' fees and costs, and post-judgment interest.

(2)    The principal amount is $6,725,000.

---

[7] All exhibits referenced herein are contained in the Appendix to SAMBA's Opening Brief filed herewith. All references to A1-A128 are to pages in the Appendix filed herewith.

[8] A docket entry suggests judgment entered in the amount of $6,728,549.00, but SAMBA's view is that the principal amount of the Initial Judgment should be $6,725,000 and all interest should be calculated from the date of SAMBA's demand – May 31, 2000.

(3)     SAMBA is entitled to pre-judgment interest on $6,725,000, the loan principal for which SWEC had agreed to be responsible, pursuant to the Guaranty and Payment Letter.

(4)     Such pre-judgment interest should be calculated from SAMBA's date of demand, May 31, 2000.

(5)     While it is beyond dispute that both the Guaranty[9] and the SAMBA/Bugshan Credit Agreement provide that interest is to be paid, neither document explicitly provides the applicable interest rate.

(6)     The interest rate applicable to SWEC's obligations under the Guaranty need not be the same as the rate applicable to BS&W's obligation under the Credit Agreement, a Saudi Arabian contract.  Under circumstances such as these — that is, where the contract before the Court (the Guaranty and Payment Letter) does not specify an interest rate — Delaware law provides that the Delaware legal rate as of the date the liability becomes payable should be applied to determine pre-judgment interest.

(7)     The Delaware legal rate is 5% above the Federal Reserve discount rate; the Federal Reserve discount rate as of May 31, 2000 was 6%.[10]

(8)     SAMBA is entitled to pre-judgment interest under the Guaranty and Payment Letter in the amount of $3,646,054.90.[11]

---

[9]  "[T]he undersigned hereby unconditionally guarantees the punctual payment when due of 50% of all obligations of the Borrower to you now or hereafter existing ("Obligations") together with interest thereon and any and all expenses incurred by you in enforcing your rights under this Guaranty."

[10]  The amount of interest and commission owing to SAMBA on the date Debtors' bankruptcy was filed was calculated at a rate of 9.5% for purposes of the Cure Claim.  In SAMBA's subsequent answers to interrogatories in this action, and as demonstrated in the accompanying Declaration of Arif Usmani, SAMBA's Chief Risk Officer, SAMBA stated that interest should be calculated at an interest rate of 7.375% compounded daily, but in both cases SAMBA was referring to the applicable rate under the BS&W Credit Agreement.

(9)     In the alternative, this Court may assess interest at the rate set forth in SAMBA's interrogatory answers; that is, 7.375%, compounded daily, totaling approximately $2,806,000.00 in pre-judgment interest.

(10)     Where, as here, the payment of the expenses of enforcing a contract, including attorneys' fees and costs, are explicitly provided for in the contract, Delaware courts routinely enforce such provisions.

(11)     Both the SAMBA/Bugshan Credit Agreement and the Guaranty provide that the borrower is to pay "all expenses," incurred by SAMBA in enforcing its rights, including expenses, attorney's fees, court costs, appraisal fees and all other fees and expenses.

(12)     SAMBA is entitled to recover its travel expenses, and its reasonable attorneys' fees and costs, as well as estimated attorney's fees which will be incurred in connection with the preparation of this Motion and supporting documentation, as well as any Reply, less the $1,000,000 in fees and costs already recovered from SWEC in the Preference Action, resulting in net, reimbursable expenses of $985,663.56.

(13)     SAMBA is entitled to post-judgment interest on the Entire Judgment, calculated from May 5, 2005, the date of this Court's entry of SAMBA's Initial Judgment, until the date of payment.

(14)     Such post-judgment interest should be calculated at the statutorily-established rate, as of May 4, 2005, of 3.33%.

(15)     SAMBA is entitled to post-judgment interest on the sum of (a) $6,725,000.00, (b) the accumulated pre-judgment interest of $3,646,054.90, and (c) SAMBA's net expenses of

---

[11]  This is calculated as follows: (4.9287671 years (May 31, 2000 through May 4, 2005) x 11%) x $6,725,000 = $3,646,054.90

$985,663.56, for a total of $11,356,718.46 and such interest should be deemed to accrue from May 5, 2005 until the date of full payment, at the rate of 3.33%.

## IV.    STATEMENT OF FACTS

### A.    SAMBA's Loan to BS&W

In connection with its agreement to grant credit to BS&W, SAMBA sought and obtained two types of security for payment of its loans to BS&W.  First, SAMBA obtained an assignment of contract proceeds.  Specifically, BS&W assigned to SAMBA, among other things, its rights to all payments to be made by Saudi Arabian Oil Company ("Saudi Aramco") under Contract No. 65004/00 between Saudi Aramco and BS&W ("In-Kingdom Contract"), including all proceeds of all claims arising out of the In-Kingdom Contract ("Assignment of Contract Proceeds").  Second, Bugshan and SWEC each agreed to issue guarantees to SAMBA of 50% of BS&W's obligations to SAMBA.  Specifically, on or about October 11, 1994, SWEC delivered a letter of guaranty guaranteeing payment of 50% of all obligations of BS&W to SAMBA up to $35,000,000 (the "Guaranty").  Pursuant to the terms of the Guaranty, SWEC unconditionally guaranteed the punctual payment when due of fifty percent of all obligations of BS&W to SAMBA together with interest thereon and any and all expenses incurred by SAMBA in enforcing its rights under the Guaranty.  See Guaranty, Exhibit C at A57-A60.

In 1995, with the above-mentioned security in place, SAMBA made an initial loan to BS&W by crediting funds to BS&W's deposit account at SAMBA.  In January of 1998, SAMBA renewed the 1995 loan of $35,000,000 to BS&W ("'98 Loan").  Late in 1998, pursuant to their guarantees, Bugshan and SWEC entered into a letter agreement dated December 22, 1998, with SAMBA (the "Payment Letter"), under which Bugshan and SWEC each undertook to pay its share of the '98 Loan by making monthly deposits of $650,000 into BS&W's deposit account,

which funds would then be used to make monthly payments to SAMBA on the '98 Loan in the aggregate amount of $1,300,000.

Between December 22, 1998 and March of 2000, SWEC made monthly payments to BS&W's deposit account enabling SAMBA to debit that account with respect to that portion of the loan for which SWEC had taken responsibility. The amount outstanding on the date of Debtor's bankruptcy petition, June 2, 2000, on account of the portion of the loan for which SWEC had agreed to be responsible, was $6,728,594, consisting of $6,725,000 of principal and $3,549 of interest.[12]  Due to SWEC's defaults under the Payment Letter, SAMBA made demand for full payment of the loan on May 31, 2000, so that said amount was due and payable at the time Debtors' filed their bankruptcy petition.  See Demand Letter, Exhibit D at A61.

SWEC's Guaranty and the Payment Letter formed the predicate of SAMBA's claims against Shaw in the instant adversary proceeding and the Assignment of Contract Proceeds formed the predicate of SAMBA's claims against Saudi Aramco in a related adversary proceeding, which is more fully discussed below. As expressly provided in the Guaranty and Credit Agreement between BS&W and SAMBA, SAMBA is entitled to collect the interest, commissions and expenses incurred by SAMBA in obtaining and enforcing its rights under the Credit Agreement, Guaranty, promissory note and security documents. See Credit Agreement, Exhibit E at A62-A65; Guaranty, Exhibit C at A57-A58; and Promissory Note, Exhibit F at A66. Thus, SAMBA is entitled to collect all the attorneys' fees and costs incurred by SAMBA in connection with SWEC's Chapter 11 case, including the adversary proceedings initiated by or against Debtors, Shaw and Saudi Aramco, as well as interest on the amount covered by the Guaranty.

---

[12]  That interest had been calculated at the rate of 9.5%, as commission on the '98 Loan.

**B.**    **Procedural History and the Interrelated Adversary Proceedings**

On or about August 24, 2000, SAMBA filed Proof of Claim numbered 3014 and statement of Cure Claim numbered 22220169. SAMBA's claims were based upon SWEC's Guaranty of 50% of all obligations of BS&W to SAMBA, which included the unpaid principal of BS&W's loan, commissions on that loan, and the expenses of protecting and enforcing SAMBA's rights against BS&W.

**1.**    **The Preference Action**

Because SAMBA had submitted to the jurisdiction of the Bankruptcy Court by filing its Cure Claim and Proof of Claim, Debtors were able, on August 1, 2001, to initiate Adversary Proceeding No. 01-1120 (the "Preference Action") by filing a complaint against SAMBA to avoid and recover alleged preferential transfers, to disallow Proof of Claim Numbered 3014, to disallow Claim Numbered 3194, to estimate the SAMBA claims at $0, and to reduce the SAMBA claims to an amount reflective of Debtors' books and records. Debtors subsequently filed an amended complaint on January 23, 2003, adding four additional counts, including improper set off, fraudulent transfers, violation of the automatic stay and unauthorized postpetition transactions and seeking to avoid and recover additional amounts from SAMBA. The causes of action set forth in Debtors' original and amended complaint were related in large part to SWEC's obligations under the Guaranty and Payment letter and actions by the parties relating to BS&W and the other guarantor of BS&W's obligations, Abdullah Said Bugshan & Brothers ("Bugshan"). SAMBA realized that any transfers to it that were avoided and deemed to be recoverable should be added to the amount that SAMBA was entitled to recover under its Cure Claim against Shaw. Thus, in SAMBA's eyes, Shaw would have ultimately been liable for any payments which were avoided in the Preference Action.

On or about October 18, 2001, SAMBA timely filed an answer to the complaint[13] in which it denied material allegations in Debtors' Preference Action and asserted affirmative defenses. It admitted to having filed Cure Claim No. 22220169 in the amount of $6,872,979 for a liability of SWEC which SAMBA asserted had been assumed and should be paid by Shaw, and further asserted that in the event said liability was not assumed by Shaw, it was a liability of SWEC, along with additional contingent claims set forth in a separate proof of claim filed by SAMBA in the amount of $730,843 against Debtors.

> 2. **The Recovery Action**

On October 18, 2001, SAMBA filed a complaint against Shaw, SWINC and SWEC to recover $6,725,000 plus interest[14] and commissions accrued after May 31, 2000, and expenses, including attorneys' fees (the "Recovery Action"). SAMBA sought to recover this money from Shaw and SWINC based on its timely filed Cure Claim and Shaw's assumption of the obligations of SWEC under the Guaranty pursuant to the APA and the Bankruptcy Court Order approving the Agreement. In the alternative, SAMBA asked to have its Cure Claim allowed as an unsecured claim against SWEC. Subsequently, SAMBA filed a motion to be allowed to file an amended complaint, as a result of Debtors' complaint in the Preference Action. That motion became moot by the time the District Court issued its Memorandum of Decision in connection with this proceeding.

---

[13] SAMBA filed an answer to the amended complaint on February 3, 2003.

[14] The interest rate applied and referenced in the Cure Claim was 9.5%. This rate was based on the commission accruing under the Credit Agreement between BS&W and SAMBA. See Statement of Loan Account, Exhibit G at A67.

### 3. <u>Consolidation of Adversary Proceedings</u>

On January 7, 2002, in conjunction with SAMBA's answer in Debtors' Preference Action and SAMBA's complaint in the Recovery Action, SAMBA filed a motion for consolidation or dismissal seeking to consolidate the Preference Action and Recovery Actions, or in the alternative to dismiss the Preference Action because Debtors failed to join Shaw, an indispensable party.  A hearing on that motion was held before Judge Mckelvie in the Bankruptcy Court on January 25, 2002. [15]  At the hearing, Judge Mckelvie instructed the parties, including Shaw, to treat the two cases as if they were consolidated for discovery purposes and as if they would be consolidated for trial.  Specifically, Judge Mckelvie stated "my thought is even if I don't consolidate for trial, I'd [sic] soon consolidate for discovery so everybody is on the same page in terms of discovery, and people should assume I'll end up consolidating it for trial."  <u>See</u> Tr. at 26, Exhibit H at A72.  To clarify the stance of the two Actions, SAMBA's counsel stated: "Your Honor, at this point, for purposes of just clarification we should move forward with discovery as if it's going to be consolidated, I take it."  <u>See</u> Tr. at 29-30, Exhibit H at A75-A76. Judge Mckelvie provided the following direction "[t]hat is, for the purposes of joint notice of depositions and those types of things, I think it makes sense to build the evidentiary record together with the idea you can use it in either case if it's not going to be consolidated."  <u>See</u> Tr. at 30, Exhibit H at A76.  Following Judge Mckelvie's instructions, the parties, including Shaw, treated the Preference and Recovery Actions as if they were consolidated for discovery purposes.

---

[15]  The parties, however, did not receive a decision on SAMBA's motion for consolidation or dismissal until this Court denied SAMBA's motion as part of its Memorandum Opinion issued on May 3, 2005.  <u>See</u> Memorandum Opinion at 11 n.9, Exhibit B at A50.

4.    **Shaw's Failure to Pay or Contest SAMBA's Cure Claim**

SAMBA could have avoided significant attorneys' fees, costs and expenses of litigation if Defendant Shaw had not failed to abide by the contractual obligations it assumed under the APA, its duties and responsibilities under applicable Orders of the Bankruptcy Court and under applicable law.  Rather, because Shaw contested its obligations and failed without justification to follow the cure claim procedure approved by the Bankruptcy Court, SAMBA was forced to engage in three protracted, complicated and inter-related litigations, file and respond to hundreds of pleadings, attend hearings before the Bankruptcy Court and this Court, participate in multi-party mediations and engage in extensive discovery. [16]

On December 20, 2000, the Bankruptcy Court entered an order (the "December 20 Order") approving a letter agreement between Debtors and Shaw dated December 27, 2000 (the "December Agreement"), which supplemented the Asset Purchase Agreement.  In the December Agreement Shaw and Debtors agreed to "use commercially reasonable efforts to review and pay uncontested cure claims and proofs of claim filed with respect to Assumed Liabilities . . . , and to resolve disputes regarding each party's respective liability with respect to disputed filed cure claims and proofs of claim before December 30, 2000."  In addition, Shaw agreed to provide, on or before January 15, 2001, a list "of cure claims and proofs of claim that Shaw contends (i) is a filed cure claim or a filed proof of claim that does not constitute, in whole or in part, an Assumed Liability, or (ii) that the asserted amount of any such filed cure claim or any such filed proof of claim is overstated."

---

[16]  SAMBA is still engaged in an adversary proceeding with Saudi Arabian Oil Company.  Until there is a final, collectable judgment in this proceeding against Shaw, SAMBA will continue to incur fees and litigation costs in the Saudi Arabian Oil Company proceeding, which will be the subject of a subsequent fee application in this proceeding.

Shaw and Debtors did not include commitments to SAMBA in the list of Additional Completed Contracts filed pursuant to the December Agreement, nor did Shaw provide any list of disputed claims to Debtors on or before January 15, 2001, nor did it file such a list with the Bankruptcy Court. Notwithstanding the court's December 20 Order and the December Agreement, Shaw neither contested nor paid SAMBA's Cure Claim by December 30, 2000. Indeed, Shaw failed to assert any objection to SAMBA's Cure Claim until it filed and served its Second Omnibus Objection to Claims on April 17, 2001, and then it merely asserted that SAMBA's claim was duplicative. The fact that Shaw did not do what it was required to do under the December Agreement and December 20 Order was trivialized by Shaw's General Counsel, Gary Graphia, who stated, that in instances where outstanding cure claims do not "properly identify whether or not it constitutes an assumed contract" neither the Debtor nor Shaw "really has an interest in moving that forward . . . . And so if the claimant doesn't appear in court and seek to have one or the other held responsible, it sits there. And I think that – its my understanding that's kind of where a handful of claims still remain." See G. Graphia Dep. Tr. at 190-91, Exhibit I at A80. Clearly, even though SAMBA did everything that it was supposed to do, appearing in Court and filing the necessary pleadings, Shaw nevertheless brushed SAMBA aside. This conduct by Shaw in the face of its agreements and the orders of the Bankruptcy Court, is less than good faith.

**5.    Settlement of the Preference Action**

After extensive motion practice and discovery in the Recovery and Preference Actions,[17] the Debtors and SAMBA entered into a Settlement Agreement in the Preference Action, which

---

[17]    In the Preference Action, for example, SAMBA had to respond to the following motions: two motions for partial summary judgment, motion for partial judgment on the pleadings, motion to strike, and motion for leave to file amended complaint. See Docket Report of Preference Action,

was approved by the Bankruptcy Court on June 12, 2003. <u>See</u> Order Approving Settlement with SAMBA, Exhibit J at A81-A83; Settlement Agreement Exhibit J at A84-A89. The Order approving the Settlement Agreement specifically provided that neither the Order nor the Settlement Agreement would have any effect on the Recovery Action with Shaw. Under the terms of the Settlement Agreement, SAMBA received a one-time cash payment of $1,000,000, which was to be credited against attorneys' fees, and an allowed, general, unsecured claim in the amount of $2,500,000 against SWEC. In addition, the Settlement Agreement provided, in part, that if SAMBA recovered an amount in excess of $3,000,000 from Shaw, SAMBA's allowed claim against SWEC would be reduced dollar-for-dollar by the amount of such recovery in excess of $3,000,000. Notably, Shaw filed a limited response to the Debtors' Motion for Order Under Fed. R. Bankr. P. 9019 Approving Settlement with Saudi American Bank in which Shaw stated that it had "no objection to approval of the Settlement Motion and Settlement Agreement." <u>See</u> Shaw's Limited Response, Exhibit N at A126. Thus, SAMBA effectively mitigated its damages by defending its rights in the Preference Action and by receiving reimbursement for $1,000,000 of the attorneys' fees it had incurred to that time. SAMBA is not seeking to recover any portion of the $1,000,000 fee previously recovered.[18]

### 6.    Saudi Aramco Action

SAMBA holds an Assignment of Contract Proceeds by BS&W of all proceeds of the In-Kingdom Contract, including all claims arising out of the In-Kingdom Contract. The Assignment of Contract Proceeds provides that such proceeds shall be security for all obligations

---

Exhibit K at A90-A104; Docket Report of Recovery Action, Exhibit L at A105-A118; and Docket Report of Saudi Aramco Action, Exhibit M at A119-A124.

[18]  As of that time, SAMBA attorneys' fees had already totaled $1,263,879.75.

of BS&W to SAMBA and may be applied by SAMBA in satisfaction of all such obligations, whether incurred in connection with the In-Kingdom Contract or otherwise.

For more than one year after SAMBA filed the Recovery Action, Shaw had failed to resolve SAMBA's cure claim or to otherwise assume responsibility for any of SWEC's obligations to SAMBA. In fact, Shaw repeatedly, and vehemently, denied any obligation to repay SWEC's outstanding financial obligations to SAMBA. Thus, as a means of mitigating its losses with respect to its loan to BS&W, SAMBA was forced to look to its second source of payment on the '98 Loan – the Assignment of Contract Proceeds. As explained below, SAMBA filed a motion to intervene in an adversary proceeding initiated by Stone & Webster, Inc. and SWEC against Saudi Aramco and Bugshan based on SAMBA's security interest in the proceeds of the In-Kingdom Contract, as an alternative means for collecting BS&W's outstanding obligations to SAMBA.

On or about May 31, 2002, Debtors commenced Adversary Proceeding No. 02-03963 against Saudi Aramco (the "Saudi Aramco Action"). Debtors' complaint sets forth four causes of action against Saudi Aramco, including counts for declaratory relief, indemnification, breach of contract, and turnover. Among other things Debtors' complaint seeks: (1) damages caused by Saudi Aramco's breach of its contract with BS&W, and (2) the turnover of $148 million allegedly due and owing to BS&W under the In-Kingdom Contract. According to Debtors, the amount owed by Saudi Aramco under the In-Kingdom Contract is an asset of BS&W to which SWEC is entitled to assert rights, and which constitutes estate property held by Saudi Aramco.

SAMBA recognized that its priority position with respect to the In-Kingdom Contract could be sufficient to pay BS&W's obligations to SAMBA, and therefore, on November 7, 2002, SAMBA filed a motion to intervene and to join Bugshan as a defendant in the Saudi Aramco

14

Action.  In the complaint in intervention SAMBA seeks declaratory and injunctive relief.

Specifically, SAMBA seeks a declaration (i) that the Assignment of Contract Proceeds is valid

and enforceable; (ii) that any and all compensation due to BS&W from Saudi Aramco under the

In-Kingdom Contract is payable to SAMBA; (iii) that all proceeds of claims arising out of the In-

Kingdom Contract are assigned to SAMBA and that such proceeds secure the obligations of

BS&W to SAMBA; (iv) that all proceeds of the In-Kingdom Contract, including any settlement

proceeds, are to be paid directly to SAMBA for credit to BS&W's account; and, (v) that none of

the proceeds of the In-Kingdom Contract are to be paid by Saudi Aramco to Debtors or Bugshan

without the express written permission of SAMBA or the Bankruptcy Court.  In addition,

SAMBA is seeking an injunction (i) prohibiting Saudi Aramco from making payments related to

the In-Kingdom Contract unless such payments are paid directly to SAMBA, and (ii) prohibiting

Debtors and Bugshan from accepting payments directly or indirectly from Saudi Aramco related

to the In-Kingdom Contract, unless such payments are made with the express written permission

of SAMBA or pursuant to further order of the Bankruptcy Court.

     The Saudi Aramco Action is on-going and is in the early stages of litigation.  Since no

satisfactory settlement has been offered to SAMBA, it is likely that SAMBA will continue to

incur attorneys' fees, costs and litigation expenses, for which Shaw will be liable until Shaw pays

SAMBA the full amount due and owing under this Court's judgment and the Guaranty.

## V.  <u>ARGUMENT</u>

### A.  SAMBA is Entitled to Pre-Judgment Interest on its Judgment as a Matter of Right

     Delaware law is well-settled, "[P]re-judgment interest on compensatory damages is

awarded as a matter of right and is not subject to judicial discretion."  <u>Salaman v. National Media</u>

<u>Corp.</u>, No. C.A. 92C-01-161, 1994 WL 465535, at *1 (Del. Super. July 22, 1994); <u>see</u> <u>also</u>

Hercules Inc. v. Aetna Casualty and Surety Co., Nos. 92C-10-105, 90C-FE-195-1-CV, 1998 WL 962089, at *8 (Del. Super. Sep. 30, 1998); Citadel Holding Corp. v. Roven, 603 A.2d 818, 826 (Del. 1992).  Such interest is awarded in breach of contract actions and is calculated from the date payment is due.  See U.S. v. Star Brite Construction Co., 848 F. Supp. 1161, 1169 (D. Del. 1994); Hercules, 1998 WL 962089, at *8; Citadel, 603 A.2d at 826.  Where the underlying obligation to make payments arises out of a contract, courts look to the contract in order to determine when such interest begins to accrue.  See Star Brite, 848 F. Supp. at 1169; Hercules, 1998 WL 962089, at *8.  Courts routinely hold that pre-judgment interest begins to accrue from the date of demand.  See, e.g., Hercules, 1998 WL 962089, at *8; Citadel, 603 A.2d at 826.

SAMBA is entitled to pre-judgment interest on the loan principal for which SWEC had agreed to be responsible, $6,725,000.  Due to SWEC's defaults under the Payment Letter, SAMBA made demand for full payment of the loan on May 31, 2000.  See Demand Letter, Exhibit D at A61.  Accordingly, the amount of pre-judgment interest to which SAMBA is entitled should be calculated commencing on May 31, 2000.

If a contract does not specify an interest rate, Delaware courts look to the legal rate of interest for guidance in as much as "[t]he legal interest rate serves as a useful default rate when the parties have inadequately developed the record in the issue."  Taylor v. American Specialty Retailing Group, No. Civ. A 19239, 2003 WL 21753752, at *12 (Del. Ch. July 25, 2003).  The legal rate of interest, as set forth in 6 Del. C. sec. 2301, is "5% over the Federal Reserve discount rate."  6 Del. C. sec. 2301.

SWEC's Guaranty and the Payment Letter formed the predicate of SAMBA's claims against Shaw and the Assignment of Contract Proceeds formed the predicate of SAMBA's claims against Saudi Aramco in the related adversary proceeding.  It is beyond dispute that both the

16

Guaranty[19] and the SAMBA/Bugshan Credit Agreement provide that interest is to be paid, but

neither document explicitly provides the applicable interest rate. The amount of interest and

commission owing to SAMBA on the date Debtors' bankruptcy was filed was calculated at a rate

of 9.5% for purposes of the Cure Claim. In SAMBA's subsequent answers to interrogatories in

this action, and as demonstrated in the accompanying Declaration of Arif Usmani, SAMBA's

Chief Risk Officer, SAMBA stated that interest should be calculated at an interest rate of 7.375%

compounded daily, but SAMBA was referring to the applicable rate under the BS&W Credit

Agreement. SAMBA asserts that the interest rate applicable to SWEC's obligations under the

Guaranty need not be the same as the rate applicable to BS&W's obligations under the Credit

Agreement, a Saudi Arabian contract. Under circumstances such as these — that is, where the

contract before the Court (the Guaranty) does not specify an interest rate — Delaware law

provides that the Delaware legal rate as of the date the liability becomes payable should be

applied to determine pre-judgment interest. The Federal Reserve discount rate as of May 31,

2000 was 6%. See Affidavit of Daniel E. Rosenfeld in Support of Plaintiff's Motion for

Assessment of Damages ("Rosenfeld Aff.") at ¶ 12 and Ex. E. Based on the facts of this case,

the appropriate rate for calculating SAMBA's pre-judgment interest under the Guaranty is 11%.

Thus, SAMBA is entitled to pre-judgment interest under the Guaranty in the amount of

---

[19] "[T]he undersigned hereby unconditionally guarantees the punctual payment when due of 50% of all obligations of the Borrower to you now or hereafter existing ("Obligations") together with interest thereon and any and all expenses incurred by you in enforcing your rights under this Guaranty."

$3,646,054.90.[20]  In the alternative, this Court may assess interest at the rate set forth in

SAMBA's interrogatory answers.[21]

      **B.**      **Under the Terms of the Guaranty and Credit Agreement, SAMBA is Entitled to Reimbursement for its Attorneys' Fees, Costs and Other Expenses**

      Delaware courts may order the payment of attorneys' fees as part of the costs to be paid

by a losing party where the payment of such fees is authorized by statute or contract.  <u>See</u>

<u>Bickford v. Smithson</u>, C.A. No. 2002-05-187, 2003 WL 22931394, at *1 (Del. Com. Pl. Nov. 20,

2003).  It is well-established that Delaware courts give "great weight to contract clauses creating

the right to payment of attorneys' fees in subsequent litigation" by "routinely enforc[ing]

provisions of a contract allocating costs of legal actions arising from the breach of a contract."

<u>Bickford</u>, 2003 WL 22931394, at *1.

      The SAMBA/Bugshan Credit Agreement provided that:

> Borrower shall pay upon demand **all expenses, including attorney's fees, court costs, appraisal fees and all other fees and expenses**, incurred by the Bank in obtaining or enforcing any of its rights under this Agreement, the Note or the Security Documents.

SAMBA/Bugshan Credit Agreement ¶ 9 (emphasis added).  Similarly, the Guaranty states:

> "[T]he undersigned hereby unconditionally guarantees the punctual payment when due of 50% of all obligations of the Borrower to you now or hereafter existing ("Obligations") together with interest thereon and **any and all expenses incurred by you in enforcing your rights under this Guaranty**."

Guaranty ¶ 1 (emphasis added).  As such, the Defendants are liable for all of SAMBA's

expenses, including attorneys' fees, court costs and all other fees and expenses SAMBA incurred

---

[20]  This is calculated as follows: (4.9287671 years (May 31, 2000 through May 4, 2005) x 11%) x $6,725,000 = $3,646,054.90

[21]  Pre-judgment interest on the principal, at a rate of 7.375%, compounded daily, totals approximately $2,806,000.00.

in enforcing its rights under the various operative documents.  Delaware courts have consistently

enforced such unambiguous contract provisions.  See Salaman v. National Media Corp., No.

C.A. 92C-01-161, 1994 WL 465535, at *4 (Del. Super. July 22, 1994) (ordering reimbursement

of all attorneys' fees and costs, including travel expenses, photocopying, cost of automated and

manual research, where the contract at issue required the breaching party to pay "all costs and

expenses (including attorneys' fees and disbursements").  Cf. Comrie v. Enterasys Networks,

Inc., No. 19254, 2004 WL 936505, at *4-5 (Del. Ch. Apr. 27, 2004) (denying in part Plaintiff's

application for attorneys' fees and costs where the operative agreement provided that "[i]n any

action or suit to enforce any right or remedy under this Agreement or to interpret any provision

of this Agreement, the prevailing party shall be entitled to recover its costs, including reasonable

attorneys' fees" and recognizing that where an agreement is heavily negotiated between

sophisticated parties who were represented by counsel, it is reasonable to assume that the parties

would have included "a broad term such as 'all' (as in 'all costs') or the legally recognized

broader term 'expenses' " if they intended for a broader reading).

SAMBA has incurred significant expenses, legal fees and costs in connection with its

attempts to recover BS&W's outstanding loan obligations.  These expenses include, but are not

limited to, travel expenses in the amount of $36,931.00, which were incurred by SAMBA in-

house counsel and employees.  See Declaration of Arif Usmani in Support of SAMBA's

Memorandum of Law in Support of Motion for Assessment of Damages ("Usmani Decl.") at ¶¶

4-5.  SAMBA incurred legal fees and costs for services rendered by its primary counsel,

Kirkpatrick & Lockhart Nicholson Graham LLP ("K&LNG") in the amount of $1,836,250.18, as

well as local counsel services provided by Monzack & Monaco, P.A. ("M&M") in the amount of

$91,732.38.  Additionally, K&LNG estimates additional fees of $20,000 and M&M estimates

19

additional fees of $750 to be billed in connection with the preparation of SAMBA's Motion, this

brief and the declaration and affidavits in support thereof as well as any necessary Reply.  These

fees and costs are more fully described in the accompanying affidavits of Daniel E. Rosenfeld,

John C. Hutchins, and Kevin Mangan.  See Affidavit of Daniel E. Rosenfeld in Support of

SAMBA's Memorandum of Law in Support of Motion for Assessment of Damages ("Rosenfeld

Aff."); Affidavit of John C. Hutchins ("Hutchins Aff."); and Affidavit of Kevin Mangan in

Support of SAMBA's Memorandum of Law in Support of Motion for Assessment of Damages

("Mangan Aff.").  SAMBA is seeking total net expenses in the amount of $985,663.56.[22]

### 1.     SAMBA's Request for Attorneys' Fees, Costs and Expenses is Reasonable.

In determining the standard of reasonableness in awarding attorneys' fees, the factors set

forth in the Delaware Lawyers Code of Professional Responsibility DR-1.5 are instructive.

These include:

    (1)    The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

    (2)    The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

    (3)    The fees customarily charged in the locality for similar legal services.

    (4)    The amount involved and the results obtained.

    (5)    The time limitations imposed by the client or by the circumstances.

---

[22] As more fully described below, SAMBA's total expenses are $1,985,663.56.  After a $1,000,000 deduction for monies previously recovered from SWEC in the Preference Action, SAMBA seeks total net expenses of $985,663.56.

    (6)     The nature and length of the professional relationship with the client.

    (7)     The experience, reputation, and ability of the lawyer or lawyers performing the services.

    (8)     Whether the fee is fixed or contingent.

Bickford v. Smithson, C.A. No. 2002-05-187, 2003 WL 22931394, at *2-3 (Del. Com. Pl. Nov. 20, 2003). Some courts have considered an additional factor—the ability of the losing party to pay. See Bickford, 2003 WL 22931394, at *3 (citing General Motors Corp. v. Cox, 304 A.2d 55, 57 (Del. 1973)).

    Under these factors, the fees requested by SAMBA are wholly reasonable. In its efforts to enforce its rights under the Agreements, SAMBA was forced to litigate on three fronts — three separate adversarial proceedings (the Preference Action, the Recovery Action and the Saudi Aramco Action) — and to monitor the administration of the main chapter 11 bankruptcy cases of SWEC and the other Debtors. Were it not for the Defendants' willful failure to perform their obligations, SAMBA could have recovered its monies years ago. Instead, SAMBA, operating from Saudi Arabia, almost 10,000 miles away, was forced to engage in protracted multi-party litigation involving depositions and other discovery in remote parts of the world, engage in mediation and various attempts at settlement and vigorously defend its claim at every turn. See Rosenfeld Aff. Ex. A-D; Mangan Aff. Ex. A & B. The time spent on this complex, multi-front litigation was both reasonable and necessary under the circumstances of this case. See Rosenfeld Aff. at ¶ 4; Hutchins Aff. at ¶ 4; and Mangan Aff. at ¶ 4. As set forth in the accompanying affidavits, the fees charged by both K&LNG and M&M are usual and customary for their respective locals for similar legal services and SAMBA's counsel have favorable reputations in the Boston and Wilmington legal communities. See Rosenfeld Aff. at ¶ 4; Mangan Aff. at ¶ 4. The amount at issue—upwards of $11,000,000 including interest—was significant, and the

21

results obtained—not only the judgment by this Court in SAMBA's favor, but also the favorable outcome in the Preference Action—are significant factors to be considered in determining the reasonableness of the attorneys' fees and costs SAMBA currently seeks.  Finally, there is ample evidence that the Defendants are able to pay the fees sought; in a press release on their website dated May 10, 2005, The Shaw Group boasts of revenues in excess of $3,000,000,000.  See Rosenfeld Aff. at ¶ 13 and Ex. F.  Taken as a whole, these factors fully justify awarding SAMBA its expenses, attorneys' fees and costs in the full amount of $1,985,663.50, less the $1,000,000 previously recovered from SWEC in the Preference Action, resulting in net expenses of $985,663.50.

      C.      **SAMBA is Entitled to Post-Judgment Interest on its Judgment**

      Under 28 U.S.C. sec. 1961, a party is entitled to post-judgment interest on any money judgment in a civil case recovered in a district court from the date of entry.  See 28 U.S.C. sec. 1961; see also U.S. v. Star Brite Construction Co., 848 F. Supp. 1161, 1170 (D. Del. 1994). SAMBA is, therefore, entitled to post-judgment interest from May 5, 2005 until the date of payment at a rate equal to "the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment."  As of the week ending May 6, 2005, the applicable post-judgment interest rate is 3.33%.  See Rosenfeld Aff. at ¶ 14 and Ex. G.  Thus, SAMBA is entitled to post-judgment interest on the sum of (a) $6,725,000.00, (b) the accumulated prejudgment interest of $3,646,054.90, and (c) SAMBA's net expenses of $985,663.56, for a total of $11,356,718,46 and such interest should be deemed to accrue from May 5, 2005 until the date of full payment, at the rate of 3.33%.

VI.    **CONCLUSION**

For the foregoing reasons and in accordance with the Credit Agreement between BS&W and SAMBA, SWEC's Guaranty, SWEC's Payment Letter, applicable Orders of this Court and the Bankruptcy Court, and applicable law, SAMBA respectfully requests that the Court award SAMBA:

(1)    the Initial Judgment of $6,725,000.00;

(2)    pre-judgment interest on this Initial Judgment in the amount of $3,646,054.90 (calculated at the Legal Accrual Rate of 11%); [23]

(3)    SAMBA's net expenses in the amount of $985,663.56, which include:

      (a) SAMBA's travel expenses in the amount of $36,931.00;

      (b) attorneys' fees, court costs, and all other fees and expenses, SAMBA incurred in obtaining or enforcing its rights under the Credit Agreement, in the amount of $1,927,982.56; and

      (c) an estimated $20,750.00 [24] in additional fees and costs incurred in connection with this Motion and Memorandum and Affidavits in Support of same and any necessary Reply,

      which total $1,985,663.56,

      less: $1,000,000.00 in fees and costs already recovered from SWEC in the Preference Action,

      resulting in net expenses to be reimbursed in the amount of $985,663.56;

(4)    post-judgment interest on all portions of the Judgment ($11,356,718.46) at a rate of 3.33% beginning on May 5, 2005 until the date of full payment; and

---

[23]  Alternatively, if the Court decides that interest should be calculated under the Guaranty at the same rate as under the Credit Agreement, namely at a 7.375% compounded daily rate, the total amount of the prejudgment interest would be $2,806,000.00.  As another alternative, if the Court decides that the obligations covered by the Guaranty include the accrued interest and commission under the Credit Agreement, the amount guaranteed would also include the $2,806,000.00 of accrued interest and commissions.

[24]  This estimate may increase.

(5)    leave to file supplemental motions for an assessment of damages pending the resolution of the related cases.

In addition, SAMBA requests that this Court grant any other further relief as justice so requires.

Respectfully submitted,
SAUDI AMERICAN BANK,
By its attorneys,


/s/ Francis A. Monaco, Jr.
Francis A. Monaco, Jr. (#2078)
Kevin Mangan (#3810)
Monzack & Monaco, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE  19801
(302) 656-8163

Of Counsel:

John C. Hutchins (BBO #246060)
Daniel E. Rosenfeld (BBO #560226)
Amy B. Abbott (BBO #648072)
Kirkpatrick & Lockhart Nicholson Graham LLP
75 State Street
Boston, MA  02109
(617) 261-3100

Dated:  May 18, 2005