IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| STONE & WEBSTER, INCORPORATED, *et al.*, | ) | |
| | ) | Case No. 00-02142 (PJW) |
| | ) | Jointly Administered |
| Debtors, | ) | Adv. No. 01-7766 (PJW) |
| | ) | |
| SAUDI AMERICAN BANK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | 1:04-cv-00834-SLR |
| | ) | |
| THE SHAW GROUP INC. and | ) | JURY TRIAL DEMANDED |
| SWINC ACQUISITION THREE, INC., | ) | |
| and STONE & WEBSTER ENGINEERING | ) | |
| CORPORATION, *et. al.* | ) | |
| | ) | |
| Defendants | ) | |

**RESPONSE OF THE SHAW GROUP, INC. IN OPPOSITION TO
PLAINTIFF'S MOTION FOR ASSESSMENT OF DAMAGES**

The Shaw Group, Inc. ("Shaw"), by its undersigned counsel, hereby responds to and opposes the Motion for Assessment of Damages (the "Motion") filed by plaintiff Saudi American Bank ("SAMBA"). Although not expressly so captioned, it appears the Motion might be meant as a motion to reargue the Court's entry of a judgment in this matter in favor of SAMBA for $6,728,549. Shaw has respectfully appealed that judgment, but SAMBA seeks to have the Court revisit it. For the following reasons, Shaw respectfully requests that the Court deny the Motion:

**I.     The Agreements At Issue**

1.      Stone & Webster Engineering Corporation ("SWEC"), a Delaware corporation, and Abdullah Said Bugshan & Bros. ("Bugshan"), a Saudi Arabian company, formed a joint venture,

Bugshan Stone & Webster Company Limited ("BS&W"), under Saudi Arabian laws. (Mem. Op. at 2, Ex. A at B3).[1] In a letter agreement dated October 11, 1994, SWEC guaranteed to repay 50% of any loan, up to $35 million, from SAMBA to BS&W (the "Guaranty"). (*Id. See also* Ex. B at B19). In a credit agreement dated January 22, 1998 (the "Credit Agreement"), SAMBA agreed to loan BS&W $35 million towards its upgrade of a Saudi Arabian oil refinery. (Ex. C at B23 *and* Mem. Op. at 2-3, Ex. A at B3-4). The BS&W project ran into difficulties, and BS&W failed to repay SAMBA the outstanding loan amount. (Mem. Op. at 3, Ex. A at B4). On December 22, 1998, SWEC and Bugshan entered into a letter agreement with SAMBA (the "Payment Letter"), with each agreeing to repay one-half of BS&W's outstanding loan at the rate of $650,000 a month and noting that "[t]he loan will remain in the name of BSW and all other security arrangement[s] will remain in place." (Ex. D at B28).

2.      The Credit Agreement contains a choice of law provision stating: "This Credit Agreement shall be governed by the laws and regulations of the Kingdom of Saudi Arabia...." (Ex. C at B25). The Guaranty contains a choice of law provision providing that: "This Guaranty shall be governed by the laws of the State of New York." (Ex. B at B19). The Payment Letter contains no choice of law provision, but was sent from Bugshan's address in Saudi Arabia to SAMBA, which also is located in Saudi Arabia, (Ex. D at 28) and thus presumably is governed by Saudi law. While the Guaranty provides for interest to accrue on the outstanding principal owed by BS&W to SAMBA, and the Credit Agreement calls for the payment of "commission," the Payment Letter makes no mention of interest. *Compare* Credit Agreement, Ex. C at B24 (BS&W "shall pay commission on the unpaid principal balance outstanding") *and* Guaranty, Ex. A at B19 (SWEC guarantees "payment when due of 50% of all obligations of [BS&W]..., together with interest

---

[1] All exhibits referenced herein are in the Appendix to the Response of The Shaw Group, Inc. in Opposition to Plaintiff's Motion for Assessment of Damages, which is being filed herewith.

2

thereon") *with* Payment Letter, Ex. D at B28 ("Monthly payments of US$1,300,000 will be paid to SAMBA" to be split equally between SWEC and Bugshan).

3. SAMBA now seeks prejudgment interest and attorneys' fees from Shaw, which this Court has held to have assumed the debt to SAMBA.

## II.   SAMBA Is Not Entitled To Prejudgment Interest

4. SAMBA seeks prejudgment interest at Delaware's legal rate -- which was 11% on the day of the Stone & Webster, Inc. ("S&W") bankruptcy. While on can understand why SAMBA would wish such a rule -- who would not want 11% interest -- under Delaware law, it is not entitled to such an award.

5. Under Delaware law, "if a contract contains a choice of law provision regarding prejudgment interest, that choice will be honored." *Cooper v. Ross & Roberts, Inc.*, 505 A.2d 1305, 1306 (Del. Super. Ct. 1986) (citations omitted). If, however, a contract "does not include such a provision, Delaware courts have concluded that the subject of prejudgment interest is governed by the substantive law of the sate where the contract was to be performed." *Id.* Agreeing with this proposition, the Third Circuit similarly held: "When a contract does not include a choice of law provision regarding the availability of prejudgment interest, the Delaware courts have concluded that the subject of prejudgment interest is governed by the substantive law of the state wherein the contract was to be performed." *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 769 F.Supp. 599, 630 (D. Del. 1991), *aff'd in part, rev'd in part on other grounds*, 988 F.2d 386 (3d Cir. 1993). *See also Stentor Electric Mfg. Co. v. Klaxon Co.*, 125 F.3d 820 (3d Cir. 1942) (in a suit brought in Delaware on a contract made and performable elsewhere, a court should look to the place of performance to determine whether and at what rate interest is recoverable).

3

6. BS&W's obligation to SAMBA ultimately arose under and is determined by the Credit Agreement, and SWEC's obligation, which is derivative of that, arises primarily under the Payment Letter. The security arrangements under the Credit Agreement include a choice of law provision holding that Saudi Arabian law governs the agreement (*see* Ex. C at B25), while the Payment Letter, being executed completely in Saudi Arabia, also should be governed by Saudi law. *See, e.g., Phoenix Canada Oil Company Ltd. v. Texaco, Inc.*, 560 F.Supp. 1372, 1379 (D. Del. 1983) (noting the traditional rule that generally "the law of the place of contracting governs the validity and construction of a contract"). Even if the Credit Agreement's choice of law provision is held to be inapplicable, performance of SWEC's obligation to SAMBA requires the payment of money to SAMBA in Saudi Arabia and thus Saudi law should govern the application of prejudgment interest. *See Cooper*, 505 A.2d at 1306; *Coca-Cola*, 769 F.Supp. at 630; *Stentor*, 125 F.3d 820. As such, under either scenario, Saudi Arabian law should apply in determining appropriate prejudgment interest for SAMBA's damages arising from its loan to BS&W.

### A. Saudi Law Forbids Prejudgment Interest

7. "[T]he sources of Saudi Arabian law…include the Koran, and other Muslim teachings." *Harbuck v. Aramco, Inc.*, C.A. No. 99-1971, 1999 WL 999431, at *2 (E.D. Pa. Oct. 21, 1999).[2] *See also* David J. Karl, *Islamic Law in Saudi Arabia: What Foreign Attorneys Should Know*, 25 Geo. Wash. J. Int'l L. & Econ. 131, 137 (1992) ("The Qur'an [or Koran] is considered to be 'the bedrock of Islamic jurisprudence.'"). In Saudi Arabia, "Islamic law prohibits collection of interest" (which is known as "riba").[3] *Saudi Iron and Steel Co. (Hadeed) v. U.S.*, 675 F.Supp. 1362,

---

[2] All unreported decisions are filed herewith at Exhibits F through J, B34-100.
[3] "'The prohibition of riba…is simply part of the divine law which is public policy.'" *Islamic Law*, 25 Geo. Wash. J. Int'l L. & Econ. at n.167 quoting Noel J. Coulson, *Commercial Law in the Gulf States: The Islamic Legal Tradition* 103 (1984). "Literally translated, riba means 'usurious interest,' or 'excess.'" *Id.* at 151-52. And as a group of Muslim scholars from different Islamic

4

1365 (Ct. Int'l Trade 1987). *See also Wafra Leasing Corp. 1999-A-1, v. Prime Capital Corp.*, C.A. No. 01 C 4314, 2004 WL 1977572, at *2 (N.D. Ill. Aug. 31, 2004) ("Islamic law...prohibits investors from collecting interest...."). Because of this prohibition against interest, "there is no absolute certainty that contracts involving interest, such as those for investment or financing, will be enforced in Shari'a courts.[4] Banks in Saudi Arabia have confronted this problem, and have found themselves unable to collect the interest due on their loan agreements." *Islamic Law*, 25 Geo. Wash. J. Int'l L. & Econ. at 152; *see also Saudi Iron*, 675 F.Supp. at 1365 ("interest obligations on loans cannot be enforced in Saudi courts"). For example, in acknowledgment of the prohibition against interest, the Charter of the Saudi Arabian Monetary Agency ("SAMA") holds that SAMA "shall not pay nor receive interest...." Article 2, *Charter of the Saudi Arabian Monetary Agency* (Ex. E at B30). The Charter further holds that SAMA shall not act "in any manner which conflicts with the teachings of the Islamic Law. The Agency shall not charge any interest on its receipts and payments...." *Id.* at Article 6, B31.

8.   Thus, to the extent that SAMBA's claim is predicated on the Payment Letter, which was entirely made in Saudi Arabia and which contains no mention of interest, the substantive law of Saudi Arabia -- which a Delaware court would apply -- would not permit the application of prejudgment interest. The Credit Agreement entered into by BS&W does provide for "commission" (although not at the 11% rate sought by SAMBA), but, to the extent it is a substitution for interest, that provision would not be enforceable under Saudi law. Only the Guaranty, which says it is governed by New York law, would permit the collection of prejudgment interest, but its provisions are entirely derivative of the Credit Agreement. If prejudgment interest is

---

countries, the Islamic Fiqh Academy, have declared, "an agreement that calls for interest to be paid is riba and therefore void." *Id.* at 154 & n.190.

[4] "The Saudi Court system consists of Shari'a courts, which have general jurisdiction over disputes in the Kingdom...." *Islamic Law*, 25 Geo. Wash. J. Int'l L. & Econ. at 144.

not due under the Credit Agreement -- and such interest is positively forbidden by Saudi law -- then no interest can be due under the Guaranty. Accordingly, SAMBA has no right to prejudgment interest here and the Court was therefore correct in entering the maximum amount of judgment at $6,728,549.

### B. SAMBA's Supporting Authority Has No Application Here

9. SAMBA relies upon *Taylor v. American Specialty Retailing Group*, C.A. No. 19239, 2003 WL 21753752 (Del. Ch. July 25, 2003), in support of the proposition that this Court should look to the Delaware legal rate of interest when a contract at issue fails to specify an interest rate. (D.I. 21, SAMBA's Opening Brief "OB" at 16). *Taylor*, however, involved a statutory appraisal action under § 262 of the Delaware General Corporation Law, which specifically requires the award of prejudgment interest. *See* 8 *Del. C.* § 262(i). It was not a breach of contract action involving foreign law, and is thus inapposite here. *Taylor* is correctly decided, but there is nothing in *Taylor* that would say or suggest that a contract entered into in Saudi Arabia allows the payment of prejudgment interest at Delaware's legal rate.

### C. The Only "Legal Rate" That Could Apply Would Be The Saudi Rate – Which Is Zero

10. Indeed the only legal rate of interest that possibly could apply would be the legal rate of the forum with the most significant relationship to the contract at issue. *See, e.g., Phoenix Canada Oil Company Ltd. v. Texaco, Inc.*, 658 F.Supp. 1061 (D. Del. 1987). In *Phoenix*, a Canadian corporation brought a breach of contract action regarding the right to develop petroleum in Ecuador. *Id.* at 1063. This Court previously had decided, according to the "most significant relationship" test, that Ecuadorian law would apply to determine whether a breach of contract had occurred. *Phoenix Canada Oil Company Ltd. v. Texaco, Inc.*, 560 F.Supp. 1372, 1379 (D. Del. 1983). Neither party disputed that prejudgment interest was appropriate, but "in situations where no

interest rate has been agreed upon by the parties, the current legal rate of interest should be held to apply." *Phoenix*, 658 F.Supp. at 1084. As such, in awarding prejudgment interest, this Court applied the current legal rate of Ecuador -- the place with the most significant relationship to the breached contract.

        11.    Under Delaware's "most significant relationship" test, the factors considered to determine what law applies to the contract at issue include: "(a) the place of contracting; (b) the place of negotiation; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Hurley v. Columbia Casualty Co.*, 976 F.Supp. 268, 272 (D. Del. 1997). Given these factors, Saudi Arabia clearly has the most significant relationship to the Credit Agreement, the Guaranty and the Payment Letter. SAMBA, BS&W and Bugshan are all Saudi Arabian entities with places of business in Saudi Arabia. (Mem. Op. at 2, Ex. A at B3 *and* D.I. 1, Complaint at 3). SWEC is a Delaware corporation with an office in Boston, Massachusetts. (D.I. 1, Complaint at 3). The Credit Agreement, written in both Arabic and English, was negotiated and entered into in Saudi Arabia between two Saudi Arabian companies, to provide credit for a contract at the Ras Tanura refinery, which also is located in Saudi Arabia. The Guaranty was sent from SWEC's office in Boston, Massachusetts to SAMBA in Saudi Arabia to support that loan, and was not effective until SAMBA loaned money to BS&W in Saudi Arabia. The Payment Letter was sent from Bugshan's office in Saudi Arabia to SAMBA in Saudi Arabia. All of the agreements revolve around SAMBA providing money to BS&W for use in upgrading the Ras Tanura refinery. Performance under each of the agreements requires the payment of money to SAMBA in Saudi Arabia. Delaware's only connection to any of the issues is that SWEC is a Delaware corporation that filed here for Chapter 11 bankruptcy protection.

7

12.     There can be no question that Saudi Arabia is the forum with the "most significant relationship" to the agreements at issue. Therefore, according to *Phoenix*, the Saudi Arabian legal rate of interest should apply absent any agreement by the parties on the appropriate rate of prejudgment interest. As discussed above, Saudi Arabian law prohibits interest. Thus, the legal rate of interest in Saudi Arabia is zero and SAMBA is not entitled to any prejudgment interest on its damages against Shaw.

13.     SAMBA alternatively argues that it should receive the "commission" rate in the Credit Agreement as the rate of prejudgment interest for its award of damages against Shaw. The Credit Agreement states: "Borrower shall pay commission on the unpaid principal balance outstanding…. The commission rate shall be determined by the Bank and subject to change from time to time. *Borrower shall be deemed to have agreed to the commission rate as determined by the Bank*…." (Ex. C at B24 (emphasis added)). As set forth in the Declaration of Arif Usmani: "Under the credit agreement, interest has accrued and continues to accrue on the outstanding principal at the rate of 7.375% compounded monthly. The interest accrued under the credit agreement constitutes part of the obligations covered by the SWEC Guaranty." (D.I. 15, Declaration of Arif Usmani at ¶ 6). In fact, Mr. Usmani's declaration is wrong. There is no interest rate in the Credit Agreement -- it is a "commission," presumably to avoid the Saudi restrictions on interest. As shown above, Saudi law controls this question and Saudi law forbids the collection of interest. Thus, a "commission" rate cannot, by law, be deemed to be the same thing as an interest rate and cannot apply to prejudgment interest. But, if any interest were to be awarded, the 7.375% commission rate would be the maximum amount awardable.

8

### III.   SAMBA Is Not Entitled To Recover Attorneys' Fees

#### A.   The Guaranty Does Not Allow Recovery Of Attorneys' Fees

14.   SAMBA argues that it is entitled to recover its attorneys' fees under both the Credit Agreement and the Guaranty. (*See* D.I. 21, OB at 18). The third agreement at issue, the Payment Letter, contains no provision for the recovery of attorneys' fees. (*See* Ex. D, B28). It is true that "a prevailing party may be entitled to reasonable attorneys' fees if such fees are provided for by contract" (*McKnatt v. Delaware*, C.A. No. 02-1659SLR, 2004 WL 3332044, at *1 (D. Del. May 12, 2004)), but *only* the Credit Agreement specifically allows for the recovery of attorneys' fees while the Guaranty states merely that "expenses" are recoverable, and the Payment Letter is silent on the issue. (*Compare* Credit Agreement, Ex. C at B25 ("all expenses, including attorney's fees, court costs, appraisal fees and all other fees and expenses") *with* Guaranty, Ex. B at B19 ("any and all expenses") *and* Payment Letter, Ex. D at B28). According to the rule of *expressio unius est exclusio alteris*, "'[i]f one subject is specifically named, or if several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded.'" *Active Asset Recovery, Inc. v. Real Estate Asset Recovery Services, Inc.*, C.A. No. 15478, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) quoting *Corbin on Contracts* § 552 at 206 (1960). For example, in *Active Asset*, the Court interpreted a provision in a partnership agreement regarding "all other direct cost" as failing to include overhead since the agreement specifically provided: "Direct costs include commissions, brokers fees, professional fees closing costs and inspection fees." *Id.* at *10. In deciding that overhead was <u>not</u> included in "all other direct cost," the Court noted that "[o]verhead is not an obscure term. [The party's] failure to use it expressly speaks volumes." *Id.* at *11.

9

15.     Similarly here, "attorneys' fees" is not an obscure term, and the failure to include it expressly as a recoverable expense under the Guaranty is not an oversight given the specific enumeration in the Credit Agreement as to what types of expenses are recoverable. The Credit Agreement demonstrates SAMBA's ability to contract specifically for the types of expenses that should be recoverable under an agreement, and under the principle in *Active Asset*, the Guaranty, which only includes expenses <u>without reference</u> to attorneys' fees, must be interpreted according to the rule of *expressio unius est exclusio alteris* as only allowing for the recovery of expenses that do not include attorneys' fees. Such expenses could include, among other things, expenditures for copying, telephone/facsimile, travel, food, lodging, computer research, deposition transcripts, filing fees, consulting services, *etc.*, so long as such expenses were adequately documented. *Steiner v. Hercules Inc.*, 835 F.Supp. 771, 793-96 (D. Del. 1993) (in a common fund recovery, discussing separately the recovery of attorneys' fees and expenses).

16.     The Payment Letter provides no basis for the recovery of attorneys' fees. The Guaranty only allows for the recovery of expenses that do not include attorneys' fees. If this case involved a direct suit to recover against BS&W, SAMBA would be entitled to attorneys' fees. But it is not. For SWEC (and hence Shaw) to be liable for an event, that liability must both be a primary liability of BS&W <u>and</u> specifically assumed by SWEC in the Guaranty or Payment Letter. SWEC assumed no such obligation here although SAMBA clearly knew how to draft documents providing for such obligation. Accordingly, under Delaware law, SAMBA's attorneys' fees may not be assessed against Shaw.

   **B. If SAMBA's Attorneys' Fees Are Recoverable, They Should Be Limited To Fees Incurred In Prosecuting This Action**

17.     Even if SAMBA is entitled contractually to recover its attorneys' fees, those fees are necessarily limited to the attorneys' fees incurred while prosecuting <u>this</u> action (the "Recovery

Action") -- and do not include those fees incurred in defending itself in the bankruptcy preference action (the "Preference Action") or in bringing actions against other entities to collect the amount owed under the Credit Agreement (the "Saudi Aramco Action").[5] The Preference Action was brought by Stone & Webster, Inc. and its subsidiaries (collectively, the "Debtors") against SAMBA in connection with the Debtors' filing for relief under Chapter 11 of the Bankruptcy Code. Shaw was never a party to the Preference Action and thus cannot be liable for attorneys' fees sustained by SAMBA in defending such action. Similarly, SAMBA has no right to recover from Shaw the attorneys' fees SAMBA incurred in connection with prosecuting the Saudi Aramco Action, as Shaw was never a party to that litigation. That SAMBA chose to pursue an alternative avenue for recovering the amount owed under the Credit Agreement is no fault of Shaw. Shaw had every right to actively defend the Recovery Action when it legitimately believed (and respectfully continues to believe) that it never assumed this debt. Therefore, while Shaw does not dispute the hours or rates incurred by SAMBA's attorneys, it does dispute that all of the work was performed in furtherance of the Recovery Action against Shaw. Accordingly, if Shaw is liable for any attorneys' fees, in order for SAMBA to recover only those attorneys' fees Shaw actually might owe, SAMBA must submit a breakdown of its attorneys' fees demonstrating which hours were dedicated to prosecuting this, and only this, action.

WHEREFORE, for the foregoing reasons, Shaw respectfully requests that the Court deny SAMBA's Motion for Assessment of Damages.

---

[5] The Preference Action, the Recovery Action and the Saudi Aramco Action are defined, respectively, at pages 8, 9 and 14 of SAMBA's Opening Brief, D.I. 21.

<table>
<tr><td></td><td>ASHBY & GEDDES<br><br>/s/ Stephen E. Jenkins<br>_____<br>Stephen E. Jenkins (I.D. No. 2152)<br>Christopher S. Sontchi (I.D. No. 3159)<br>Catherine A. Strickler (I.D. No. 4310)<br>222 Delaware Avenue<br>P.O. Box 1150<br>Wilmington, DE 19899<br>(302) 654-1888</td></tr>
<tr><td>Dated: June 1, 2005<br>157753.1</td><td>*Attorneys for The Shaw Group Inc.*</td></tr>
</table>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2005 true and correct copies of **Response of The Shaw Group, Inc. in Opposition to Plaintiff's Motion for Assessment of Damages** were served by electronic filing on the attorneys of record below:

Gary Adam Rubin
Skadden Arps, Slate, Meagher & Flom
One Rodney Square
Wilmington, DE 19801

Francis A. Monaco, Jr.
Kevin J. Mangan
Walsh Monzack and Monaco, P.A.
1201 Orange Street, Suite 400
Wilmington, DE 19801

Adam G. Landis
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801

/s/ *Stephen E. Jenkins (#2152)*
_____
Stephen E. Jenkins (#2152)

1