## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| STONE & WEBSTER, INCORPORATED, *et al.*, | ) | |
| | ) | Case No. 00-02142 (PJW) |
| | ) | Jointly Administered |
| Debtors, | ) | Adv. No. 01-7766 (PJW) |
| | ) | |
| | ) | |
| SAUDI AMERICAN BANK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | 1:04-cv-00834-SLR |
| | ) | |
| THE SHAW GROUP INC. and | ) | JURY TRIAL DEMANDED |
| SWINC ACQUISITION THREE, INC., | ) | |
| and STONE & WEBSTER ENGINEERING | ) | |
| CORPORATION, *et. al.* | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## APPENDIX TO THE RESPONSE OF THE SHAW GROUP, INC. IN
## OPPOSITION TO PLAINTIFF'S MOTION FOR ASSESSMENT OF DAMAGES

**ASHBY & GEDDES**
Stephen E. Jenkins (I.D. No. 2152)
Christopher S. Sontchi (I.D. No. 3159)
Catherine A. Strickler (I.D. No. 4310)
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
*Attorneys for The Shaw Group Inc.*

Dated: June 1, 2005
157970.1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2005 true and correct copies of **Appendix to the**

**Response of The Shaw Group, Inc. in Opposition to Plaintiff's Motion for Assessment of**

**Damages** were served by electronic filing on the attorneys of record below:


Gary Adam Rubin
Skadden Arps, Slate, Meagher & Flom
One Rodney Square
Wilmington, DE 19801

Francis A. Monaco, Jr.
Kevin J. Mangan
Walsh Monzack and Monaco, P.A.
1201 Orange Street, Suite 400
Wilmington, DE 19801

Adam G. Landis
Landis Rath & Cobb LLP
919 Market Street, Suite 600
Wilmington, DE 19801


                                        */s/ Stephen E. Jenkins (#2152)*
                                        _____
                                        Stephen E. Jenkins  (#2152)



**A**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

Francis A. Monaco, Esquire and Kevin J. Mangan, Esquire of Walsh
Monzack & Monaco, P.A., Wilmington, Delaware.  Counsel for
Plaintiff.  Of Counsel:  John C. Hutchins, Esquire, Daniel E.
Rosenfeld, Esquire and Amy Beth Abbott, Esquire of Kirkpatrick &
Lockhart L.L.P., Boston, Massachusetts.

Gregory Alan Taylor, Esquire, Stephen E. Jenkins, Esquire,
Christopher S. Sontchi, Esquire and Liza H. Meltzer, Esquire of
Ashby & Geddes, Wilmington, Delaware.  Counsel for Defendants
Shaw Group, Inc. and SWINC Acquisition Three.

Adam G. Landis, Esquire of Landis, Rath & Cobb, L.L.P.,
Wilmington, Delaware.  Counsel for Defendant SWE&C Liquidating
Trustee.

**MEMORANDUM OPINION**

Dated:  May 3, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On June 2, 2000, debtor Stone & Webster, Inc. ("debtor")[1]
filed a voluntary petition for relief under chapter 11, title 11
of the United States Code.  On October 18, 2001, plaintiff Saudi
American Bank ("SAMBA") filed an adversary action against
defendants Shaw Group, Inc. ("Shaw"), SWINC Acquisition Three,
Inc. and SWE&C Liquidating Trustee (collectively "defendants") in
the United States Bankruptcy Court for the District of Delaware
("the bankruptcy court").  (D.I. 1)[2]  Plaintiff alleged that,
under an Asset Purchase Agreement ("the APA"), defendants assumed
a debt owed to plaintiff by Stone & Webster Engineering
Corporation ("SWEC"), a subsidiary of debtor.  (Id.)  On June 1,
2004, defendants moved to withdraw the adversary proceeding from
the bankruptcy court.  (D.I. 75)  This court granted the motion
on September 13, 2004.  (D.I. 88)  The court has jurisdiction
over actions arising out of chapter 11 of the bankruptcy code
pursuant to 28 U.S.C. § 1334(a).  Presently before the court are
plaintiff's and defendants' motions for summary judgment.  (D.I.
29, 47)[3]  For the reasons set forth below, the court grants

---

[1] Although there are multiple named debtors, for ease of
reference this order shall refer to a single "debtor."

[2] Unless otherwise noted, the docket items (i.e., D.I. __)
will be from the bankruptcy court's docket for this case.

[3] There are several motions which are currently pending
before the court.  While this memorandum opinion will focus on
plaintiff's and defendants' cross motions for summary judgment,

plaintiff's motion for summary judgment (D.I. 47) and denies
defendants' motion for summary judgment (D.I. 29).

## II. BACKGROUND

On May 31, 1980, SWEC and Abdullah Said Bugshan & Bros.
("Bugshan"), a Saudi Arabian business enterprise, formed a joint
venture called Bugshan Stone & Webster ("BSW") under the laws of
Saudi Arabia. (D.I. 1 at 5)  BSW was owned in equal shares by
SWEC and Bugshan. (Id.)  In the mid 1990s, BSW entered a $130
million contract with Saudi Arabian American Oil Company
("Aramco") to upgrade a large oil refinery at Ras Tanura in Saudi
Arabia (the "Ras Tanura Contract"). (D.I. 31 at A-173)  In an
attempt to induce plaintiff to grant credit to BSW, Bugshan and
SWEC each agreed to issue guaranties to plaintiff for 50% of any
loans plaintiff made to BSW. (D.I. 1, ex. A; D.I. 49 at A95-A96,
A125)  On October 11, 1994, SWEC delivered a letter guarantying
payment of 50% of all obligations owed to plaintiff by BSW, up to
thirty five million dollars (the "Guaranty"). (D.I. 1, ex. A)
In a letter dated July 10, 1997, plaintiff approved a loan for
$35 million "to finance mobilization & working capital

---

it will also resolve several other pending motions.  Most notably
this order will address:  (1) plaintiff's motion for leave to
file an amended complaint (D.I. 8); (2) plaintiff's motion for
consolidation or dismissal (D.I. 9); (3) defendants' motion for
summary judgment (D.I. 29); (4) plaintiff's motion for summary
judgment (D.I. 47); and (5) plaintiff's motion to strike the
declaration of James P. Carroll (D.I. 48).  Because debtor Stone
& Webster, Inc. has been terminated from the present matter, its
motion for summary judgment (D.I. 11) is denied as moot.

2

requirements of Saudi Aramco Cont[r]act [No.] 65004/00 (IK)."[4]
(D.I. 31 at A-168)  Unfortunately, BSW ran into difficulties on
the Ras Tanura project and was unable to repay plaintiff the
outstanding amount of the loan when the project was completed.
In late 1998, pursuant to their guaranties, SWEC and Bugshan each
agreed to repay one-half of the outstanding Ras Tanura Contract
loan at a rate of $650,000 per month (the "Payment Letter").
(D.I. 49 at A67, A127)

By June 2000, debtor was operating its businesses and
managing its properties pursuant to 11 U.S.C. §§ 1107(a) and
1108.  At the time of debtor's chapter 11 filing, SWEC allegedly
owed plaintiff approximately $6 million.  (D.I. 49 at A69)  On
July 6 and 7, 2000, substantially all of debtor's assets were
sold to defendant Shaw through an auction sale (the "Auction
Sale").  (D.I. 49 at A131-A291)

On July 7 and 12, 2000, a hearing for approval of the
Auction Sale (the "Sale Hearing") was conducted.[5]  (D.I. 50 at
A497-A648)  At the Sale Hearing, counsel for debtor represented
that debtor had

sent out a notice of sale . . . that said, essentially, if

---

[4] Contract No. 65004/00 (IK) was BSW's name for the contract
to upgrade Aramco's Ras Tanura facility.  (D.I. 31 at A-131, A-170)

[5] At the time of the Sale Hearing, the United States
District Court for the District of Delaware was hearing
bankruptcy cases pursuant to 28 U.S.C. § 1334(a).

3

you don't see your name on this list, or this schedule of
contracts, which is the, what I like to call the excluded
contracts, then your contract is being assumed.

. . .

Sometimes, Your Honor, in purchase contracts, schedules are
merely informative and not necessarily per se material to
the deal.  That is not the nature of this agreement.  This
agreement revolves, in terms of its economics, around three
schedules, or let's say two schedules, and whether or not
your contract is on one of those two schedules.  **And those
two schedules are the schedule for rejected contracts and
the schedule for completed contracts.  If they are not on
those schedules, in essence, your contract is an assumed
contract, and the economic impact to you as a stakeholder is
dependent upon whether you are on those two lists . . . .**

(D.I. 50 at A518-A529) (emphasis added)

On July 13, 2000, an order (the "Sale and Assumption Order")

regarding the Auction Sale was entered.  (D.I. 49 at A1-A36)   In

the Sale and Assumption Order, the court stated:

[A]ll rights and remedies of any non-debtor party or Shaw
under any of the Assumed Contracts (the "Rights and
Remedies") are fully preserved and shall be enforceable
after the Closing against Shaw or the non-debtor party
unless such Rights and Remedies are or were expressly waived
in a separate agreement or on the record of the Auction.

(D.I. 49 at A18-A19)   The court also stated that

[t]he terms and provisions of the [APA] and this Sale Order
shall be binding in all respects upon, and shall inure to
the benefit of, the [debtor], [its] estates, and [its]
creditors, Shaw, and its respective affiliates, successors
and assigns, and any affected third parties including, but
not limited to, all persons asserting Interests in the
Assets to be sold to Shaw pursuant to the [APA] . . . .

(D.I. 49 at A26)   Finally, the court stated that the APA could

not be modified without further order unless "such modification,

amendment, or supplement does not have a material adverse effect

4

B5

on the [debtor's] estates." (D.I. 49 at A27)

On July 14, 2000, debtor and defendant Shaw entered into the APA whereby Shaw purchased a substantial portion of debtor's assets and assumed many of its liabilities. (D.I. 50 at A861-A969) On the same date, the court entered an order approving the APA.

Section 2.02 of the APA, titled "Excluded Assets," excludes a number of assets from those being acquired by defendant Shaw. (D.I. 31 at A-240) Subsection (b) defines as "Excluded Assets" all "Completed Contracts" of debtor. Section 1.01 of the APA defines "Completed Contracts" as contracts of debtor, "including those specifically set forth on Schedule 2.02(b), under which substantially all of the contractual work effort of [debtor] has been completed, even if such Contracts have continuing warranty obligations, administrative matters or work related to warranty or other claims[.]" (Id. at A-229) Schedule 2.02(b) does not include any reference to the Guaranty, the Payment Letter, or the underlying Ras Tanura Contract. (Id. at A-306)

Subsection (e) of Section 2.02 of the APA defines as "Excluded Assets" all the "Special Project Claims". (Id. at A-241) Section 1.01 of the APA defines "Special Project Claims" as "any and all claims under the project agreements set forth on Schedule 2.02(e) to the extent not reflected on the March 31

5

B6

Balance Sheet[.]"[6]  (Id. at A-237)  Schedule 2.02(e) lists the
"Ras Tanura, Saudi Arabia, Refinery Upgrade Project" as one of
the "Special Project Claims."  (D.I. 50 at A979)  Schedule
2.02(e) also specifically identifies a "Contract for Construction
dated as of June 28, 1994 by and between Saudi Arabian Oil
Company ("Saudi Aramco") and [BSW] (designated by Saudi Aramco as
Contract No. 65004/00)[]" as a "Special Project Claim".  (Id.)
Finally, Schedule 2.02(e) identifies "[o]ne or more potential
claims for payment under a series of Letters of Credit issued by
[plaintiff] and involving materials supplied under a number of
purchase orders issued by [BSW] . . . for materials incorporated
into the [Ras Tanura Refinery Upgrade Project]" as "Special
Project Claims".  (Id.)

     Section 2.03 of the APA states that "[Shaw] shall assume the
Assumed Liabilities[]" as of the closing date.  (Id. at A887)
Section 1.01 of the APA defines "Assumed Liabilities" as "all
liabilities and obligations of [debtor] set forth on Schedule
2.03 as of the Closing Date . . . ."  (Id. at A872)  Schedule
2.03 is the "List of Assumed Liabilities".  (Id. at A957)
Paragraph three of Schedule 2.03 provides that "[l]iabilities

---

     [6] Although the APA defines "Special Project Claims" as any
and all claims set forth on Schedule 2.02(e), the Execution Copy
of the APA did not include a Schedule 2.02(e).  Rather, Schedule
2.02(e) was added to the APA by debtor and defendant Shaw
subsequent to this court's approval of the Execution Copy of the
APA.  (D.I. 51 at 42; D.I. 57 at 14 n.3)

under [debtor's] outstanding bank indebtedness, including amounts outstanding and pursuant to existing standby letters of credit[]" are "Assumed Liabilities." (Id.) Section 3.17 of the APA states that Schedule 3.17(a)(ix) is "a true, complete and correct list" of "any bond, indenture, note, loan or credit agreement . . . or other Contract relating to the borrowing of money or to the direct or indirect guarant[y] or assumption of obligations of any other Person for borrowed money." (Id. at A897) Schedule 3.17(a)(ix) lists: (1) a guaranty by BSW to plaintiff (id. at A983); (2) a letter of guaranty dated September 1, 1992 from SWEC to plaintiff regarding BSW securing credit facilities (id. at A984); and (3) a letter of guaranty dated October 19, 1992 whereby SWEC guaranteed plaintiff the repayment of 40 million Saudi Riyals (id.). Defendant Shaw admits that Schedule 3.17(a)(ix) lists a guaranty by SWEC for BSW's borrowing from plaintiff. (D.I. 49 at A91) Defendant Shaw assumes that the guaranty listed on Schedule 3.17(a)(ix) incorporates the Guaranty by which SWEC guaranteed 50% of BSW's obligations to plaintiff up to $35 million. (Id. at A91-A92) Defendant Shaw admits that Schedule 3.17(a)(ix) lists contractual liabilities disclosed to defendant Shaw by debtor. (D.I. 49 at A91)

Section 2.04 of the APA, captioned "Excluded Liabilities," states that "[u]nder no circumstances shall [defendant Shaw] assume or be obligated to pay . . . any of the Excluded

Liabilities, including the following liabilities, which shall be and remain liabilities of [debtor]:  . . . (c) liabilities or obligations associated with any Excluded Assets; . . . (e) liabilities or obligations under the Assumed Contracts that are not Assumed Liabilities and liabilities or obligations arising under the Rejected Contracts or the Completed Contracts[.]"  (D.I. 31 at A-241)

On July 18, 2001, the court entered an order establishing a cure claim procedure.  (D.I. 49 at A293-A307)  The cure claim procedure defined "cure claims" as "any and all liquidated monetary claims[7] arising or accruing on or before July 14, 2000 under the Assumed Contracts and actually known by the non-[debtor] party to an Assumed Contract."  (Id. at A294)  The cure claim procedure also required debtor to file a list of all Assumed Contracts and an amended list of all Excluded Contracts. (Id. at A305)  According to the cure claim procedure, a cure claim had to be filed by August 25, 2000.  (Id. at A299)

On July 21, 2000, debtor filed an Assumed Contract List, an Excluded Contract List, and an Amended Excluded Contract List. (D.I. 50 at A649-A660)  Neither the Guaranty nor the Payment

---

[7] "Liquidated monetary claims" relate to "money due and owing or allegedly due and owing by the [debtor] under the Assumed Contracts, but does not include any claims by the non-[debtor] party for any defective work (whether latent or otherwise) by the [debtor] or [its] subcontractors or under any warranty provisions of the Assumed Contract."  (D.I. 49 at A294-A295)

8

Letter was included on any of those lists.  On August 4, 2000,
debtor filed a Second Amended Excluded Contract List, and a
Second Amended Assumed Contract List.  (D.I. 50 at A661-A668)
The Second Amended Assumed Contract List includes a contract with
Aramco Services Co. and two contracts with plaintiff.  (D.I. 50
at A666, A668)

On August 24, 2000, plaintiff filed a statement of cure
claim against SWEC, alleging that SWEC owed outstanding financial
obligations to plaintiff.  (D.I. 49 at A52-A85)  Plaintiff
attached the Guaranty and the Payment Letter as exhibits to its
cure claim.  (Id. at A56, A67)  Defendant Shaw failed to pay or
contest plaintiff's cure claim.

On December 28, 2000, the court entered an order approving a
letter agreement, dated December 27, 2000, which confirmed the
terms of the APA.  (D.I. 50 at A857-A860)  Pursuant to this
letter agreement and order, certain additional projects were to
be treated as Completed Contracts under the APA and Schedule
2.02(b).  (D.I. 50 at A670)  Neither the Guaranty nor the Payment
Letter were added to the list of Completed Contracts.  (Id.)
Debtor also stated that the additional completed contracts
"constitute the only completed contracts or substantially
completed contracts of which [debtor has] actual knowledge as not
being listed on Schedule 2.02(b) to the Disclosure Schedules
(collectively with Schedule 2.02(b), the 'Completed Contracts

9

B10

List')."  (Id.)  Neither the letter agreement nor the order

sought to amend the Schedule of Rejected Contracts.

On August 1, 2001, debtor commenced a preference action

against plaintiff to avoid and recover certain preferential

transfers, to disallow plaintiff's claims, to estimate

plaintiff's claims at $0, and to reduce plaintiff's claims to an

amount reflected on the debtor's books and records (the

"Preference Action").  Plaintiff filed its answer and affirmative

defenses on October 18, 2001.

On August 1, 2002, plaintiff commenced the instant adversary

proceeding.  (D.I. 1)  Plaintiff's complaint alleged that, under

the APA, defendant Shaw assumed the $6,728,529 debt owed to

plaintiff by SWEC.  In the alternative, plaintiff claimed that

"[u]nless [defendant] Shaw assume[d] its obligation to pay

[plaintiff] . . . SWEC is obligated to pay [plaintiff] . . . ."

(D.I. 1 at 12)

On January 2, 2002, defendants filed an answer to

plaintiff's adversary proceeding complaint.  (D.I. 5)  Plaintiff

filed a motion for leave to file an amended complaint on January

7, 2002.[8]  (D.I. 8)  That same day, plaintiff filed a motion

seeking to consolidate the Preference Action and the instant

---

[8] The court denies plaintiff's motion for leave to file an
amended complaint (D.I. 8), as amending the complaint will
further delay this case, which lingered in the bankruptcy court
for several years before it was withdrawn to this court.

litigation.[9]  (D.I. 9)  On August 13, 2002, defendant Shaw filed
a motion for summary judgment.[10]  (D.I. 29)  On October 18, 2002,
plaintiff filed its motion for summary judgment.  (D.I. 47)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The moving party bears the burden of proving that no
genuine issue of material fact exists.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).
"Facts that could alter the outcome are 'material,' and disputes
are 'genuine' if evidence exists from which a rational person
could conclude that the position of the person with the burden of

---

[9] The court denies plaintiff's motion to consolidate.  (D.I.
9)  Federal Rule of Civil Procedure 42(a) provides this court
with authority to consolidate "actions involving a common
question of law or fact . . . pending before the court."
Decisions to consolidate cases are at the discretion of the
district court, but often courts balance considerations of
efficiency, expense and fairness.  See United States v. Dentsply
Int'l, Inc., 190 F.R.D. 140, 142-43 (D. Del. 1999).  Because the
Preference Action and this litigation stem from different factual
circumstances, consolidation is not appropriate.
    The court also denies plaintiff's motion to dismiss the
preference action (D.I. 9), as the preference action is not
pending in this court.

[10] The court grants plaintiff's motion to strike the
declaration of James P. Carroll submitted in support of
defendants' motion for summary judgment.  (D.I. 48)

proof on the disputed issue is correct." <u>Horowitz v. Fed. Kemper</u> <u>Life Assurance Co.</u>, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." <u>Pa. Coal Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. <u>See Anderson v. Liberty</u> <u>Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. <u>See Celotex</u> <u>Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

IV.  **DISCUSSION**[11]

Construction of contract language is a question of law.  <u>See</u>
<u>Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.</u>, 616
A.2d 1192, 1195 (Del. 1992).  The primary consideration in
interpreting a contract is to "attempt to fulfill, to the extent
possible, the reasonable shared expectations of the parties at
the time they contracted."  <u>See Comrie v. Enterasys Networks,</u>
<u>Inc.</u>, 837 A.2d 1, 13 (Del. Ch. 2003).  In ascertaining intent,
Delaware courts adhere to the "objective" theory of contracts.
<u>See Haft v. Haft</u>, 671 A.2d 413, 417 (Del. Ch. 1995).  Under this
approach, a contract's "construction should be that which would
be understood by an objective reasonable third party."  <u>R.E.</u>
<u>Haight & Assocs. v. W.B. Venables & Sons, Inc.</u>, C.A. No. 94C-11-
023, 1996 WL 658969, at *3 (Del. Super. Oct. 30, 1996) (quoting
<u>Demetree v. Commonwealth Trust Co.</u>, No. 14354, 1996 WL 494910, at
*4 (Del. Ch. Aug. 27, 1996)).  Thus,

> [w]here parties have entered into an unambiguous integrated
> written contract, the contract's construction should be that
> which would be understood by an objective reasonable third
> party.  An inquiry into the subjective unexpressed intent or
> understanding of the individual parties [to the contract] is
> neither necessary nor appropriate where the words of the

---

[11] In the case at bar, plaintiff asserts that defendant Shaw
assumed a debt owed to plaintiff by SWEC through operation of the
Guaranty and Payment Letter.  Because there is no dispute that
plaintiff has standing to enforce these contracts if they were
assumed by defendant Shaw pursuant to the Sale and Assumption
Order and Sections 2.03 and 3.17 of the APA, there can be no
dispute that plaintiff has standing to bring the issue for
resolution before this court.

contract are sufficiently clear to prevent reasonable
persons from disagreeing as to their meaning.

Demetree, 1996 WL 494910, at *4 (citations omitted); accord Eagle

Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232

(Del. 1997) ("Contract terms themselves will be controlling when

they establish the parties' common meaning so that a reasonable

person in the position of either party would have no expectations

inconsistent with the contract language."). The court,

therefore, must determine whether the contractual language in

dispute, when read in the context of the entire contract, is

ambiguous.

Ambiguity exists only when a contractual provision is

"reasonably or fairly susceptible of different interpretations or

may have two or more different meanings." Rhone-Poulenc, 616

A.2d at 1196; accord SI Mgmt. L.P. v. Wininger, 707 A.2d 37, 42

(Del. 1998). Contractual language "is not rendered ambiguous

simply because the parties do not agree upon its proper

construction." Id.; see also City Investing Co. Liquidating

Trust v. Cont'l Cas. Co., 624 A.2d 1191, 1198 (Del. 1993)

(finding contract language is not ambiguous "simply because the

parties in litigation differ concerning its meaning."). However,

inconsistent contractual provisions may create ambiguity in a

contract. Fraternal Order of Police v. City of Fairmont, 468

S.E.2d 712, 717 (W. Va. 1996) ("Contract language usually is

considered ambiguous where an agreement's terms are inconsistent

14

on their face . . . ."); <u>Weber v. Tillman</u>, 913 P.2d 84, 96 (Kan. 1996) ("To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."); <u>Franklin v. White Egret Condo., Inc.</u>, 358 So. 2d 1084 (Fla. Dist. Ct. App. 1977), <u>aff'd</u>, 379 So. 2d 346 (Fla. 1979) (finding "two sections [of a disputed contract] are inconsistent, and inherently ambiguous."). When a contract is ambiguous, it raises "factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties." <u>Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.</u>, 702 A.2d 1228, 1230 (Del. 1997). If "the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide." <u>In re Columbia Gas Sys.</u>, 50 F.3d 233 (3d Cir. 1995).

The question of whether defendant Shaw assumed the Guaranty and Payment Letter must be considered in light of the fundamental premise that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral."[12] <u>Financeamerica Private Brands,</u>

---

[12] Given the very clear case law establishing that a guaranty and the underlying contract are separate contracts, the court rejects defendant Shaw's argument that the contract at issue is the Ras Tanura Contract.

15

Inc. v. Harvey E. Hall, Inc., 380 A.2d 1377, 1379 (Del. Super.
1977); see also Jones Motor Co. v. Teledyne, Inc., 690 F. Supp.
310, 313 (D. Del. 1988). Therefore, the issue presented by the
parties is whether the Guaranty and Payment Letter were
unambiguously assumed or rejected under the APA.

The court concludes that the Guaranty and Payment Letter
were assumed under the APA. First, neither the Guaranty nor the
Payment Letter fall within the definition of an "Excluded Asset"
either as a "Completed Contract" or as a "Special Project Claim",
as defined in Section 2.02 of the APA and the schedules related
thereto. Second, Section 1.01 of the APA defines an "Assumed
Contract" as any contract that is not specifically identified as
a "Rejected Contract" or a "Completed Contract". Sections 1.01
and 2.03 and Schedule 2.03 of the APA define the scope of
"Assumed Liabilities" as including "outstanding bank
indebtedness". The record indicates that Schedule 3.17, listing
those contracts which relate to such outstanding bank
indebtedness as guaranties, includes at least an indirect
reference to the Guaranty and Payment Letter. Defendant failed
to pay or contest plaintiff's cure claim. Finally, and of great
significance, are the representations made to this court by
counsel for the debtor, that if contracts were not identified on
the schedules listing rejected and completed contracts, then the
contract would be deemed an assumed contract.

16

**V.    CONCLUSION**

For all of these reasons, the court concludes that the Guaranty and Payment Letter are contracts that were assumed by defendant Shaw by operation of the APA and the Sale and Assumption Order.  Therefore, plaintiff's motion for summary judgment shall be granted.  An appropriate order shall issue.

**B**

EXHIBIT 5

# STONE & WEBSTER ENGINEERING CORPORATION



## 245 SUMMER STREET, BOSTON, MASSACHUSETTS 02210

TELEPHONE: 617-589-5111          FAX: 617-589-2156, 6071

BOSTON, MA
CHATTANOOGA, TN
CHERRY HILL, N.J.
DALLAS, TX
DENVER, CO
FT. LAUDERDALE, FL
HOUSTON, TX
MADISON, AL
OAK RIDGE, TN

NEW YORK, NY
PLEASANTON, CA
PORTLAND, ME
PORTLAND, OR
RICHLAND, WA
RICHMOND, VA
TAMPA, FL
WASHINGTON, D.C.

October 11, 1994

Saudi American Bank
P. O. Box 842
Al Khobar 31952
Saudi Arabia

Gentlemen:

To induce you to extend credit by way of overdraft, short termloans, letters of credit, letters of guarantees, to or for the account of Bugshan S&W Company Ltd. (the "Borrower") and purchase or accept instruments upon which the Borrower is liable, the undersigned hereby unconditionally guarantees the punctual payment when due of 50% of all obligations of the Borrower to you now or hereafter existing ("Obligations") together with interest thereon and any and all expenses incurred by you in enforcing your rights under this Guaranty. The remaining 50% is guaranteed by A. S. Bugshan & Bros.

The liability of the undersigned under this Guaranty shall be unconditional irrespective of (i) any lack of enforceability of any Obligation, (ii) any change of the time, manner or place of payment, or any other term, of any Obligation, (iii) any exchange, release, or non-perfection of any collateral securing payment of any Obligation, (iv) any law, regulation or order of any jurisdiction affecting any term of any Obligation or your rights with respect thereto, and (v) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Borrower or a guarantor.

The undersigned waives promptness, diligence, and notices with respect to any Obligation and this Guaranty and any requirement that you exhaust any right or take any action against the Borrower or any collateral security. This Guaranty shall be governed by the laws of the State of New York.

This is a continuing guaranty and shall remain in full force and effect until written notice shall have been received by you from the undersigned that it has been revoked, but any such notice shall not release the undersigned from any liability as to any Obligation existing at the time of receipt of such notice.

*1889 · STONE & WEBSTER · 1989*

2.

If and only if an amount of a designated currency is here specified
Thirty Five Million U.S. Dollars (U.S. $35,000,000.00) then the
liability of the undersigned under this Guaranty with respect to
the aggregate principal amount of Obligations shall not exceed 50%
of the equivalent of the amount here specified.


STONE & WEBSTER ENGINEERING CORPORATION


By: _____

    R. B. Kelly, Senior Executive Vice President
    and Chief Financial Officer



Notary: _____


Commonwealth of Massachusetts
Middlesex, S.S. Date *October 12, 1994*
Then personally appeared the above na.
... *Richard B. Kelly* ....
and acknowledged the foregoing instrument
to be his free act and deed, before me
John C. Smith, Notary Public
My Commission Expires *March 30, 2001*


003-SAUDAMER.3

B20

## STONE & WEBSTER ENGINEERING CORPORATION

### TRANSCRIPT FROM RECORDS OF BOARD OF DIRECTORS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

RESOLVED, that, without in any way limiting the powers conferred upon them by law, by the Agreement of Association and Articles of Organization, as amended, or the By-laws of this Corporation, the Chairman of the Executive Committee, the Chairman of the Board, the Vice Chairman of the Board, the President, any Executive Vice President, any Senior Vice President, any elected Vice President (not including appointed Vice Presidents of a Group or Division of the Corporation) and the Secretary of this Corporation, be and each of them hereby is authorized, without further action by this Board or otherwise, to carry on and conduct the business of this Corporation and to do any and all things, and to sign, seal, acknowledge and deliver any and all documents pertinent or necessary to be done or delivered in and about the conduct of the said business, including specifically, without in any way limiting the generality of the foregoing, the power to sign contracts, agreements, requisitions, orders, reports and letters.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I, the undersigned, Assistant Secretary of Stone & Webster Engineering Corporation, hereby certify that the foregoing is a true and correct transcript from the records of a Meeting of the Board of Directors of said Corporation held on December 15, 1982, said meeting having been duly held and a quorum being present and voting in the affirmative on the above all as required by the By-laws of the Corporation, and that said resolution remains in full force and effect on the date hereof;

and do further certify that Richard B. Kelly is the duly elected Senior Executive Vice President and Chief Financial Officer of the Corporation and that he currently holds said office, and as such is authorized to execute agreements and contracts on behalf of the Corporation, including guarantees to support the borrowing from banks by subsidiaries and affiliated companies.

WITNESS my hand and the seal of said Corporation this 10th day of October, 1994.

_Patricia M. Corbett_
Assistant Secretary

B21

STATE OF NEW YORK )
                  ) SS:
COUNTY OF NEW YORK)

## STONE & WEBSTER ENGINEERING CORPORATION

## INCUMBENCY CERTIFICATE

I, the undersigned, Secretary of Stone & Webster Engineering Corporation, HEREBY CERTIFY that the following individual has been duly appointed and currently holds the office as set forth opposite her respective name:

**NAME**                          **OFFICE**

Patricia M. Corbutt               Assistant Secretary

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of said Corporation this 23rd day of January, 1995.

_____
Secretary

Subscribed and sworn to before me this 23rd day of January, 1995.

_____
Notary Public

JOHN P. McGANN
Notary Public, State of New York
No. 52-4507300
Qualified in Suffolk County
Certificate filed in New York County
Commission Expires Nov 30, 1995

B22

C



البنك السعودي الامريكي
**Saudi American Bank**

1

**CREDIT AGREEMENT**

اتفاقية تسهيلات

Between Saudi American Bank
(the "Bank") and
<u>BUGSHAN S&W COMPANY LIMITED</u>

_____

(the "Borrower").

**WITNESSETH:**

فيما بين البنك السعودي الامريكي

البنك ) و

_____

_____

المقترض ) .

مـهـيـد :

١ - التسهيلات

**1. The credit**

The Bank hereby grants the Borrower a credit facility (the "Facility") in the maximun principal amount of SR / US$ / _35,000,000.00_ (Saudi Riyals / United States Dollars / THIRTY FIVE MILLION ONLY= _____ ) and agrees to consider from time to time the Borrower's requests for advances under such Facility. Neither this Agreement nor the Facility is a commitment to lend, and the Bank reserves the right to terminate the Facility at any time.

بهذا يمنح البنك المقترض تسهيلات اقتراض ( تسهيلات )

مبلغ أساسي لا يتجاوز ( ـــــــــــــــ

ـــــــــــــــ )

ريال سعودي/دولار امريكي/ ـــــــــــــــ ) كما

يوافق البنك على ان ينظر بين الحين والآخر ، بعين الاعتبار في

طلبات المقترض للحصول على سلف بموجب تلك التسهيلات .

لا تشكل هذه الاتفاقية او التسهيلات الزاما بالاقراض ، ويحتفظ

بنك بالحق في انهاء التسهيلات في اى وقت من الاوقات .

٢ - الدفع

**2. Payment**

Borrower hereby agrees to make full and prompt payment of all principal and commission in the currency specified above and in accordance with the terms of this Agreement. The Bank reserves the right at any time to demand payment in full of all outstanding indebtedness, including principal, commission and any expenses payable by the Borrower pursuant to Section 6 of this Agreement.

بهذا يوافق المقترض على ان يدفع بالكامل وفورا اجمالي

مبلغ الاساسي والعمولة وذلك بالعملة المحددة اعلاه ووفقا

صوص هذه الاتفاقية . ويحتفظ البنك بالحق في أي وقت من

وقات في ان يطلب السداد الكامل لكافة الديون غير المسددة ،

ا في ذلك المبلغ الاساسي ، والعمولة واية مصروفات تكون

ستحقة على المقترض وفقا للمادة ٦ من هذه الاتفاقية .

٣ - السند : اثبات الدين

**3. The Note; Evidence of Dept.**

Borrower has issued and delivered to the Bank a note (the "Note") evidencing the maximum principal indebtedness permitted under the Facility. The Bank agrees not to enforce the Note for more than the amount of indebtedness actually outstanding at the time of enforcement plus any unpaid commission and unreimbursed expenses then due under this Agreement. The Bank will maintain an account or accounts evidencing the Borrower's indebtedness and the amount of principal and commission payable and paid

لقد اصدر المقترض وسلم البنك سندا ( السند ) يثبت الحد

قصى للمبلغ الاساسي للدين المصرح به بموجب التسهيلات .

يوافق البنك على عدم انفاذ السند باكثر من مبلغ الدين الذي يكون

ير مسدد فعليا في وقت الانفاذ ، مضافا اليه اية عمولة غير

فوعة او اية مصاريف تكون في ذلك الوقت مستحقة بموجب

تفاقية ولم يتم تسديدها . وسيحتفظ البنك بحساب او حسابات

بيت مديونية المقترض وقيمة المبلغ الاساسي والعمولة المستحقة

*from time to time. In any legal action or proceedings, such accounts and the Note shall be conclusive evidence of the existence and amounts of the Borrower's obligations.*

### 4. commission

*Borrower shall pay commission on the unpaid principal balance outstanding from time to time under the Facility, payable monthly or as otherwise advised by the Bank. The commission rate shall be determined by the Bank and subject to change from time to time. Borrower shall be deemed to have agreed to the commission rate as determined by the Bank according to the advices and statements sent to the Borrower unless he notifies the Bank in writing of any objection within 30 days from such advice or statement from the Bank, in which case Borrower shall be bound by the commission rate determined by the Bank until a new rate ( if any ) is agreed. Commission shall be computed on the basis of a 360-days year.*

### 5. Conditions to the Extensions of Credit

#### a) Conditions Precedent

*If so requested by the Bank, the Borrower will furnish to the Bank, as appropriate in the circumstances:*

> *i) Certified copies of constitutive and corporate documents of the Borrower and/or such other documents which the Bank may require.*

> *ii) A certified copy of a resolution of the Board of Directors of the Borrower and/or the shareholders accepting the Facility on the terms and conditions stated in the Credit Agreement.*

#### b) Security

*As security for the Facility and for all other obligations of the Borrower to the Bank now outstanding or hereafter arising herein or otherwise, the Borrower agrees to provide whatever security that the Bank may request from time to time. Such security shall be furnished or procured by the Borrower at its own expense and shall be in form and substance satisfactory to the Bank. No extension of credit by the Bank (if any) shall be construed as a waiver of Borrower's obligation to provide such security or the*

مدفوعة مرة بعد أخرى . وتعتبر تلك الحسابات والسند بينة
لمة في أية دعوى أو إجراءات قانونية على قيام وعلى قيمة
ـامات المقترض .

### – العمـــولة

يدفع المقترض شهريا ، أو وفقا لما يحدده البنك ، عمولة
ـ المبالغ التي تكون غير مسددة من حين لآخر بموجب اتفاقية
ـهيلات ، وتحدد نسبة العمولة بواسطة البنك وتكون خاضعة
ـيير من حين لآخر . ويعتبر المقترض قد وافق على نسبة
ـولة التي حددها البنك وفقا للاشعارات والبيانـات الحسابية
ـسلة الى المقترض بإخطار البنك خطيا بأي اعتراض خلال ٣٠
ا من تاريخ ذلك الاشعار أو البيان الحسابي . وفي تلك الحالة ،
ـن المقترض ملزما بنسبة العمولة التي حددها البنك الى أن يتم
ـاق على نسبة جديدة ( إن وجدت ) وتحتسب العمولة علـى
ـس أن السنة ٣٦٠ يوما .

### – شروط تمديدات التسهيلات

#### شـروط مسبقـة

يتعين على المقترض ، اذا طلب منه البنك ، أن يوافي البنك
لما تقتضيه الظروف بما يلي :

١) صورا مصدقة من مستندات تأسيس وتسجيل المقترض
و/أو غير ذلك من المستندات التي قد يطلبها البنك .

٢) صورة مصدقة من قرار مجلس ادارة المقترض و/أو
قرار الشركاء القاضي بقبول التسهيلات على أساس الاحكام
والشروط المضمنة باتفاقية القرض .

#### الضمـــان

كضمان للتسهيلات ولكافة الالتزامات الاخرى للمقترض تجاه
ـ سواء كانت قائمة حاليا أو التي تنشأ فيما بعد او غير ذلك ،
ـ المقترض على تقديم اي ضمان يطلبه البنك بين الحين
ـ . ويجب على المقترض تقديم او العمل على تقديم ذلك
ـن على نفقته الخاصة كما يجب ان يكون ذلك الضمان في
والمضمون الذي يقبله البنك . ولايفسر اي تمديد من قبل
ـ للتسهيلات (ان وجد) على انه الغاء لالتزام المقترض بتقديم

*6. Expenses*

Borrower shall pay upon demand all expenses, including attorney's fees, court costs, appraisal fees and all other fees and expenses, incurred by the Bank in obtaining or enforcing any of its rights under this Agreement, the Note or the Security Documents.

*7. Set-Off; Sale of Property*

In the event of failure to make timely payment of any amount due hereunder, the Bank may immediately and without notice set off against such amount any and all of the Borrower's deposits with the Bank or other indebtedness owing from the Bank. Furthermore, without prior notice, the Bank may sell any securities or property of the orrower held by the Bank, and retain from e proceeds the total amount remaining unpaid, including all expenses arising from such sale, and the Borrower shall be responsible to the Bank for any deficiency and will pay on demand to the Bank the amount of any such deficiency. The Bank's rights under this section are in addition to any other rights the Bank may have.

*8. Representations and Warranties*

If the Borrower is other than an individual, the Borrower represents and warrants that it is an entity duly formed, validly existing and in good standing under the laws of __Kingdom of Saudi Arabia__ that xecution, delivery and performance by the rrower of this Agreement are within the Borrower's powers and in furtherance of its purposes, have been duly authorized by all necessary action on behalf of the Borrower, and do not contravene any law or contractual restriction binding on the Borrower; and that this Agreement is a valid and legally binding obligation of the Borrower enforceable in accordance with its terms.

*9. Governing Law and Jurisdiction*

This Credit Agreement shall be governed by and construed in accordance with the laws and regulations of the Kingdom of Saudi Arabia and the Borrower agrees that any disputes arising Thereunder shall be submitted to the appropriate courts and/or committees in the Kingdom of Saudi Arabia for

B25

٢

٦ – المصاريف

يدفع المقترض عند الطلب كافة المصاريف بما في ذلك اتعاب المحاماة ، مصروفات المحاكم ، رسوم التثمين وكافة الاتعاب والمصاريف الاخرى التي يكون البنك قد تحملها في الحصول على انفاذ اي من حقوقه بموجب هذه الاتفاقية ، السند او ستندات الضمان .

٧ – المقاصة : بيع الممتلكات

في حالة الاخفاق في دفع اي مبلغ مستحق بموجب هذه الاتفاقية في موعده المحدد يجوز للبنك ، دون سابق اخطار ، اجراء مقاصة ذلك المبلغ من اي من وكافة ودائع المقترض لدى البنك او من اية ديون اخرى تكون مطلوبة من البنك . وبالاضافة الى ذلك ودون اشعار مسبق ، يجوز للبنك ان يبيع اية اوراق مالية او ايا من ممتلكات المقترض المحفوظة لدى البنك ، وان يحتفظ من عائدات البيع باجمالي المبلغ غير المسدد ، بما في ذلك كافة المصروفات الناشئة عن مثل هذا البيع ، ويكون المقترض مسئولا تجاه البنك عن اى نقص ، وعليه ان يدفع للبنك عند الطلب قيمة ذلك النقص . وتكون حقوق البنك بموجب هذه المادة اضافة الى اي حقوق اخرى يتمتع بها البنك .

٨ – الاقرارات والتعهدات

اذا لم يكن المقترض فردا ، فانه يقر ويتعهد بأنه كيان تأسس حسب الاصول وقائم بطريقة صحيحة وفي وضع سليم بموجب قوانيـــن ------------------- ، وان توقيــــع وتسليم وتنفيذ المقترض لهذه الاتفاقية يقع ضمن صلاحيات المقترض وتحقيق لاغراضه ، ولايتعارض ذلك مع اي قانون أو التزامات عقدية ملزمة للمقترض ، وان هذه الاتفاقية هي اتفاقية صحيحة وتشكل التزاما قانونيا قابل للتنفيذ على المقترض وفقا لاحكامها .

٩ – القانون الذي يحكم الاتفاقية والاختصاص

تخضع اتفاقية التسهيلات هذه وتفسر وفقا لقوانين وانظمة المملكة العربية السعودية ، ويوافق المقترض على تقديم اية نزاعات تنشأ عن هذه الاتفاقية للمحاكم و/أو اللجان المختصة

*A*

Signed this _____22nd_____ day of .................. د تم التوقيع على هذه الاتفاقية في هذا اليوم
_____January_____ year _1998_ ن شهر .................. لسنة

### BORROWER

<div dir="rtl">مقترض</div>

Name of Borrower : .................. : م المقترض
BUGSHAN S&W COMPANY LIMITED

1. Signature: _____ .................. : – التوقيع
   Name: ___MICHAEL W. MOTT___ .................. : الاسم
   Address: _P.O. BOX 3790, AL-KHOBAR31952_ .................. : العنوان

   I. D. No. : _2114890995_ .................. : رقم الحفيظة
   Date of Issue: _6-10-1418_ .................. : تاريخ الاصدار
   Place of Issue : _DAMMAM_ .................. : مكان الاصدار

2. Signature: _____ .................. : – التوقيع
   Name: _____ .................. : الاسم
   Address: _____ .................. : العنوان

   I. D. No. : _____ .................. : رقم الحفيظة
   Date of Issue: _____ .................. : تاريخ الاصدار
   Place of Issue : _____ .................. : مكان الاصدار

(Company Stamp/Seal ختم الشركة)

### SAUDI AMERICAN BANK

<div dir="rtl">بنك السعودى الامريكى</div>

Kenrud

Signature: _____ .................. : التوقيع
Name: ___SHEHERYAR ALI___ .................. : الاسم

### WITNESSED BY :

<div dir="rtl">يشهد على ذلك :</div>

1. Signature: _____ .................. : التوقيع
   Name: _DAWOOD S. AL-AWAD_ .................. : الاسم
   Address: _P.O. BOX 3790 AL KHOBAR_ .................. : العنوان
   .................. : الجنسية
   I. D. No. : _145 457_ .................. : هوية الشاهد
   Date of Issue: _4.7.1400_ .................. : رقم
   Place of Issue : _RIYADH_ .................. : مكان الاصدار
   .................. : تاريخ الاصدار

2. Signature: _____ .................. : التوقيع
   Name: _Mohamoud Hashi Ahd_ .................. : الاسم
   Address: _P.O. BOX 1783 AL-Khob_ .................. : العنوان
   .................. : الجنسية
   I. D. No. : _2015293 171_ .................. : هوية الشاهد
   Date of Issue: _29/3/1414_ .................. : رقم
   Place of Issue : _Dammam_ .................. : مكان الاصدار

B26

البنك السعودي الأمريكي
## Saudi American Bank



# PROMISSORY NOTE

**$FR  US$ 35,000,000.00 (U.S. DOLLARS:  THIRTY FIVE MILLION ONLY)**

Place : **Al-Khobar** _____ Saudi Arabia

Day : **22nd** _____

Month : **January** _____

Year : **1998** _____

For Value Received, the undersigned hereby unconditionally and irrevocably promises to pay on (date) ___**demand**_____ to the order of Saudi American Bank (the Bank) at the **Fluor Branch** office of the bank in **Al-Khobar** _____ Saudi Arabia, the principal sum of **U.S. Dollars:  Thirty Five Million Only**————————————————————————————— ~~$$$$**RR?R?K**~~ (**$LR. US$ 35,000,000.00**————————————————————————————) in immediately available funds.

The undersigned hereby waives all diligence, presentment, demand, protest, notice of dishonor with respect to this promissory note.

Saudi American Bank may endorse this note to any party without the approval of the undersigned.   The holder of this note may obtain recourse without notice or protest for non-payment.   The undersigned will pay all expenses of the holder of this note in the collection or enforcement of this note.

**DEBTOR :**

Name of Debtor : **BUGSHAN S&W COMPANY LIMITED** _____

1) Signature : _____
   Name       : **MICHAEL W. MOTT** _____
   Title      : **GENERAL MANAGER** _____

2) Signature : _____
   Name       : _____
   Title      : _____

(Company Stamp/Seal)

**WITNESSED BY :**

1) Signature of Witness : _____
   Name of Witness    : DAWOOD S. AL-AWAD
   Address of Witness : P.O. Box 3790 AL KHOBAR
   Nationality        : SAUDI
   I.D. of Witness    : 145-457 14.7.1400 / RIYADH
                        No.        Place of Issue   Date of Issue

2) Signature of Witness : _____
   Name of Witness    : Mohmoud Hashi Ahmed
   Address of Witness : P.O. Box 1783 Al Khobar
   Nationality        : Somali
   I.D. of Witness    : 2018293171  Dammam  29/3/1418
                        No.        Place of Issue   Date of Issue

B27

**D**

# Abdullah Said Bugshan & Bros.

Date:  22nd December, 1998
Ref.:  ASB-12/98-1176

To:          **Saudi American Bank**
             Corporate Banking Group
             PO Box 833
             Riyadh 11421

Attention:   **Mr. Tirad M. Mahmoud**

Subject:     ***Re-scheduling of Bugshan Stone & Webster (BSW) loan facility.***

Dear Mr. Tirad,

It is our desire as Shareholders of BS&W to restructure the loan facility of US$ 31,800,000.00 (US Dollars thirty one million and eight hundred thousand only) as follows:

1.  The current outstanding balance is split as follows:
       ASB   - $ 16,150,000.00
       SWEC - $ 15,650,000.00

2.  Monthly payment of US$ 1,300,000.00 will be paid to SAMBA starting from the end of January 1999 until the loan is fully repaid.

3.  It is understood that US$ 1,300,000.00 will be funded equally by the shareholders, which means that Stone & Webster Engineering Corporation will contribute US$ 650,000.00 and A.S. Bugshan & Bros. will contribute US$ 650,000.00.

4.  The loan will remain in the name of BSW and all other security arrangement will remain in place.

Kindly advise if the above are acceptable to you, in order to finalize the arrangement.

Thank you and best regards.

**Abdullah Said Bugshan & Bros.**          **Stone & Webster Engineering Corporation**

MMJ/sim

**E**



Search                                                        عربي 7    Wed, Jun 01, 2005

Start Page
About SAMA
News
Publications and statistics
Insurance
Banking Control
Financial
Currency Museum
Payment Systems
Links

FAQ
SAMA E-Mail alert
Contact US
friend

king Control → Guidelines and Procedure

# CHARTER

## Of The

## Saudi Arabian Monetary Agency

## Issued By Royal Decree

## No.23 Dated 23-5-1377

### ROYAL DECREE

No.23

Date: 23-5-1377

15-12-1957

With the help of God Almighty,

We, Saud Ibn Abdul Aziz Al Saud

King of the Kingdom of Saudi Arabia,

Having seen Decree No. 30141111047 issued on 25th Rajab 1371,

Decree No.17191218762 issued on 17th Ramadan 1374 and Council of

Ministers' Resolution No.103 dated 20th Jumad Awa11377, and

In view of what our Minister of Finance has submitted to us,

Ordain the following:

B29

## Article 1

The objectives of the Saudi Arabian Monetary Agency shall be:

(a) To issue and strengthen the Saudi currency and to stabilize its internal and external value;

(b) To deal with the banking affairs of the Government;

(c) To regulate commercial banks and exchange dealers.

## Article 2

The Saudi Arabian Monetary Agency shall not pay nor receive interest, but it shall only charge certain fees on services rendered to the public and to the Government, in order to cover the Agency's expenditures. Such fees shall be charged in accordance with a regulation passed by the Board of Directors and approved by the Minister of Finance.

The Agency shall not have a capital and shall, therefore, repay to the Government its entire capital.

## Article 3

The functions of the Saudi Arabian Monetary Agency, in relation to circulation of currency and regulation of commercial banks, shall be:

a. To stabilize and strengthen the internal and extern value of the currency and take measures capable of strengthening the currency's cover. (For that end, the agency may buy and sell gold and foreign exchange in the market, whenever it deems it necessary and within the limits and conditions approved by the Minister of Finance and National Economy. Such transactions should be conducted with the utmost confidentiality.) *

　* An addition was made to Article 3 (a) under Royal decree No. 10 issued on 1.7.

b. To hold and operate monetary reserve funds as separate funds earmarked for monetary purposes only.

c. To mint, print and issue the Saudi Currency and handle all matters relating thereto in conformity with Saudi Currency law No.24, dated 23rd Jumada Awa11377.

d. To regulate commercial banks and exchange dealers as may be found appropriate

Each commercial bank operating in Saudi Arabia shall render to the Monetary Agency a monthly statement of its financial position in accordance with the specimen forms prepared by the Agency for this purpose. Each bank shall also make available to the Monetary Agency any information required to clarify or complement the above-mentioned statements.

The statements required by the Agency from banks shall not disclose the private accounts of bank customers.

e. The commercial banks shall be asked to keep with the Monetary Agency permanent funds in certain ratio with what deposits the bank is holding. Such percentage shall,

B30

from time to time, be adjusted to suit the prevailing circumstances, in accordance with a decision passed by the Minister of Finance upon the suggestion of the Agency.

Each bank shall strictly adhere to the instructions issued by the Agency in this respect.

## Article 4

The Agency shall undertake the functions of the Government bank in receiving all Government revenues and in paying out funds in accordance with its instructions intimated to the Agency through the Minister of Finance.

## Article 5

The Agency shall establish a Research Department to collect and analize data needed to aid the Government and the Agency in formulating and carrying out financial and economic policies.

## Article 6

The Agency shall not undertake any of the following functions:

a. Acting in any manner which conflicts with the teachings of the Islamic Law. The Agency shall not charge any interest on its receipts and payments;

b. Receiving private deposits;

c. Making advances to the Government or private parties;

d. Engaging in trade or having an interest in any commercial, industrial, or agricultural enterprise;

e. Buying or holding fixed property except what the Agency reasonably needs for its operations.

## Article 7

The Agency shall be under the control of a Board of Directors, which shall be generally responsible for its efficient administration and operation and shall have such powers as are necessary and appropriate to that end. The Board of Directors may make such rules and regulations, as it may consider necessary and appropriate to the conduct of the work of the Agency in accordance with its charter. In the event that changes are found necessary the Board of Directors shall recommend them to the Government through the

Minister of Finance.

## Article 8

The Agency, named "Saudi Arabian Monetary Agency", shall be a corporation with continuing succession. The Agency is authorized to take such action as may be necessary and appropriate to give effect to this Charter, including, but without thereby limiting its authority, the power to make contracts, to acquire and hold and pledge assets, and to incur such liabilities as are necessary and appropriate to the conduct of its operations.

## Article 9

B31

The Saudi Arabian Monetary Agency's Board of Directors shall consist of:

a. A Chairman, who shall also be the Governor;

b. Vice Governor;

c. Three members, non-government officials who shall be conversant with financial and commercial affairs.

The Governor and members of the Board shall be appointed for five years by a Royal Decree, in accordance with the nomination of the Minister of Finance and the approval of the Council of Ministers. They shall not be removed from office except by a Royal Decree, which shall be issued the same way. The Board of Directors shall meet at the call of the Chairman, or Vice Chair-man in the absence of the former. Meetings shall be held, at least, once per month. In the event of the absence of the Governor, the Vice Governor shall preside over the Board.

The resolutions of the Board shall be passed by a minimum majority of three votes, and in the case of an equal division of votes, the Chairman shall have a casting vote.

Resolutions of the Board shall be transmitted to the Minister of Finance immediately after their adoption.

## Article 10

The Governor shall be responsible for the efficient operation of the Agency and shall represent it before courts. The Vice Governor shall be appointed by a Royal Decree on the nomination of the Minister of Finance and the approval of the Council of Ministers. He shall act for the Governor in the absence of the latter, whose power shall then be vested in him. His removal from office shall be by a Royal Decree.

The remunerations of the Governor, Vice Governor and Members of the Board shall be fixed by a Resolution of the Council of Ministers in accordance with the recommendations of the Minister of Finance. The appointment of the remaining staff of the Agency, other than the Governor and the Vice Governor, their promotion and dismissal, shall be dealt with by the Governor under the provisions of a regulation approved by the Board of Directors and generally based on similar rules and regulations pertaining to Saudi and non-Saudi government employees. The Governor may also fix the salaries of these employees, their wages, the duration and terms of their services, their duties and responsibilities in conformity with the said regulation.

## Article 11

The Agency shall render to the Government, through the Minister of Finance, a copy of the half-monthly and annual statements published in the official gazette as provided by Article II of Royal Decree No.24 dated 1st Rajab 1379, in regard to Saudi Arabian Currency Law.

## Article 12

Any bank or exchange dealer who fails to furnish the Agency with the information specified in para (d) Article 3, or fails to keep with the Agency the deposit mentioned in para (e) of the same article in the ratio suggested by the Minister of Finance, shall sustain a maximum penalty of S. Rls. 10,000. In the event of repetition to such act, the Government, in addition to the above-mentioned penalty, shall temporarily halt the operations of the establishment, which committed

B32

the violation or close it down.

### Article 13

This Charter shall replace the previous Charter of the Agency together with the entire amendments inserted therein and shall cancel each provision not conforming with its articles.

### Article 14

The Prime Minister and the Minister of Finance shall put this Statute into effect.

ROYAL SIGNATURE

© Please see disclaimer and copyright information

B33