**H**

Westlaw.

Not Reported in A.2d                                                          Page 1
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
(Cite as: Not Reported in A.2d)

c

Not Reported in A.2d, 2003 WL 21753752, 29 Del. J.
Corp. L. 280

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Michael F. TAYLOR, Petitioner,
v.
AMERICAN SPECIALTY RETAILING GROUP,
INC., a Delaware corporation, Respondent.
No. Civ.A. 19239.

Submitted May 16, 2003.
Decided July 25, 2003.

Robert J. Katzenstein , Smith Katzenstein & Furlow
LLP , Wilmington, Delaware; Patrick C. Hall, Troy,
Michigan, for Petitioner.
M. Duncan Grant , Joseph S. Naylor , Pepper
Hamilton LLP, Wilmington, Delaware, for
Respondent.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 This is an appraisal action, pursuant to 8 Del. C. §
262, filed as a result of a merger that cashed-out the
petitioner's shares and shares of one other
stockholder, at a price of $2,200 per share. Both
parties presented expert testimony regarding the fair
value of the shares held by the petitioner as of the
merger date. Neither expert was fully persuasive,
and, accordingly, the court must exercise its own
independent judgment as to the value of the
petitioner's shares. After considering the totality of
the evidence presented, the court concludes that the
fair value of the petitioner's shares, as of the effective
date of the merger, was $9,079.43 per share or a total
of $181,588.60.

II.

A. *Background*

Respondent American Specialty Retailing Group,
Inc. and its subsidiary, Dunham's Athleisure
Corporation, both Delaware corporations
(collectively "Dunham's"), operate a retail sporting
goods chain, with 116 stores in 12 states. Dunham's is
in the top ten in sales for sporting goods retailers in
the United States. As of October 15, 2001, Dunham's
had 3,000 shares of Class A common stock
outstanding.

The petitioner, Michael Taylor, is a former employee
of Dunham's. He purchased 20 shares of Dunham's
Class A common stock during his employment. His
entitlement to appraisal arises out of an October 15,
2001 merger (the "Merger Date") that eliminated his
interest in Dunham's. The parties stipulated that
Taylor timely filed his Petition for Appraisal, and has
timely perfected his rights to appraisal. It is also
stipulated that Taylor is entitled to the payment of
fair value for his shares pursuant to 8 Del. C. § 262.

B. *The Experts*

Taylor's trial expert was Andrew P. Wilkinson, a
principal at the Lefko Group. Wilkinson has worked
as a financial analyst, with an emphasis on business
valuations, at the Lefko Group since 1988. He earned
an M.B.A. in finance from the University of
Michigan, and has taught advanced business
valuation classes to a master's degree program at
Walsh College in Troy, Michigan. Wilkinson is also
a chartered financial analyst and an accredited senior
appraiser in business valuation through the American
Society of Appraisers. He is a member of various
professional societies and organizations, and has
testified in approximately 20 to 25 trials as an expert
witness.

Wilkinson testified that his company was initially
retained by Taylor to do a planning or feasibility
analysis involving a rough estimate of Dunham's
value as of January 2001. His company was
thereafter asked to prepare a complete valuation of
Dunham's as of the Merger Date. Wilkinson testified
that, in order to prepare his October 15, 2001
valuation, he reviewed information provided by
Dunham's and also conducted independent research.
FN1 He concluded that Dunham's had a total equity
value of $44 million as of the Merger Date.

B64

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 2
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
(Cite as: Not Reported in A.2d)

FN1. Wilkinson reviewed, among other things, Dunham's financial statements, tax returns, fixed asset listings, lease summaries, monthly financial income statements, departmental sales data, publicly available documents such as SEC filings, web pages for different companies, industry association data, and general information on the retail sporting goods industry.

Dunham's expert witness was Michael Kern, a managing director at Stout Risius Ross. Stout Risius Ross has employed Kern for the past seven years, and during the course of that period, Kern has been involved with over 550 business valuations. His main area of specialty relates to valuations for companies with annual revenues in the range of $25 million to $1 billion, primarily in the pet supplies industry, clothing industry and the grocery industry. Before he appeared in this action, he has testified only twice, either in court or in arbitration proceedings.

*2 Kern testified that he originally valued Dunham's as of January 31, 2001, and at that time he concluded that Dunham's total equity value as of January 31, 2001 was $6.6 million. Kern later updated his valuation as of the Merger Date and testified at trial that Dunham's equity value had not increased since his January 31, 2001 valuation, so that, as of the Merger Date, Dunham's total equity value continued to be no greater than $6.6 million.

### C. The Valuation Methods Used

The experts for the parties used essentially the same valuation methods to value Dunham's stock. Both experts utilized: (1) the discounted cash flow approach ("DCF"); (2) the comparable/guideline companies approach; and (3) the transaction based approach. Both experts used essentially the same "comparable companies" in their analyses, and both used the same "transaction" in applying the transaction-based approach. FN2

FN2. Dunham's expert also analyzed a second "transaction" involving its own stock that Taylor's expert did not. For the reasons discussed in Section IV(C)(1) *infra*, this second "transaction" does little to establish the value of Taylor's shares.

Wilkinson valued Dunham's as of the Merger Date at

$44 million or $14,666.67 per share, and the value of the 20 shares held by Taylor at $293,333. Kern valued Dunham's as of the Merger Date at $6.6 million, or $2,200 per share, and the value of the 20 shares held by Taylor at $44,000.

### III.

Under 8 Del. C. § 262, Taylor is entitled to his *pro rata* share of the fair value of Dunham's common stock as of the Merger Date. FN3 Moreover, Section 262(h) requires this court to calculate the going concern value "exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation," FN4 "In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of the evidence." FN5 If neither party satisfies its burden, however, the court must then use its own independent judgment to determine fair value. FN6

FN3. *Gray v. Cytokine Pharmasciences, Inc.,* 2002 WL 853549, at *6 (Del. Ch. Apr. 25, 2002).

FN4. 8 Del. C. § 262(h).

FN5. *M.G. Bancorporation, Inc. v. LeBeau,* 737 A.2d 513, 520 (Del.1999) (citation omitted).

FN6. See *Gonsalves v. Straight Arrow Publishers,* 701 A.2d 357, 361 (Del.1997) (noting this court's responsibility to "independently determine the value of the shares that are the subject of the appraisal action"); *Cooper v. Pabst Brewing Co.,* 1993 WL 208763, at *8 (Del. Ch. June 8, 1993) (noting that in cases where "none of the parties establish [ ] a value that is persuasive, the Court must make a determination based upon its own analysis").

### IV.

As an initial matter, neither expert has fully satisfied its burden of persuasion regarding its respective valuation of Dunham's, though Wilkinson's valuation is more credible. Both experts make certain meritorious observations and assumptions, while other observations and assumptions lack relevance or credibility. Significantly, Kern's valuation lacks

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
(Cite as: Not Reported in A.2d)

credibility because, although he was retained by Dunham's, he ignored a contemporaneous set of projections prepared by Dunham's management, choosing instead to rely on far more pessimistic assumptions of Dunham's future prospects that he prepared on his own. Moreover, the court is persuaded that Kern's valuation conclusion is strikingly low. For example, Kern's total equity value of $6.6 million is lower than Dunham's trailing 12-month pre-tax income, and only approximately 65% of its trailing 12-month operating income. FN7 Thus, using Wilkinson's valuation as a baseline, the court will analyze each of the three valuation methods utilized by both experts and come to its own independent judgment for proper valuation of Dunham's.

> FN7. The court understands that these comparisons are, in some sense, "apples to oranges." For example, were Dunham's faced with a mounting debt load (which it was not) or with decreasing growth prospects (which it was not) then such a valuation may in fact be reasonable. Nonetheless in the absence of any convincing explanation (and none was given by Kern), these comparisons are strongly suggestive of a gross undervaluation by Kern. In this connection, the court notes that Marshall Sosne, Dunham's Chief Financial Officer (who is himself a stockholder of the surviving entity) refused to endorse Kern's valuation. Trial Tr. at 167-68.

### A. The Discounted Cash Flow Approach

*3 The court begins its DCF analysis by accepting the basic framework of Wilkinson's model and then considering objections to that analysis that have been lodged by Dunham's. Wilkinson explained that a DCF analysis involves projecting operating cash flows for an extended period, determining a terminal value upon sale at the end of the period, and then discounting those values at a set rate to determine the net present value for 100% of Dunham's common stock. Dunham's does not object to this theoretical framework for valuation.

### 1. Projected Revenue Growth

Dunham's first objection to Wilkinson's valuation relates to his projected revenue growth for the company, which Dunham's argues places too much

emphasis on its atypical success during the winter of 2000. Kern and Marshal Sosne, Dunham's Chief Financial Officer, testified about the allegedly unusual winter of 2000 and how it led to increased sales that should be treated as a one-time occurrence rather than a sign of increasing long-term sales growth potential. This is so, the argument goes, because of the combination of an extremely cold winter and tremendous sales of scooters, which were peaking in popularity in the Midwest at the time. Those circumstances led directly to abnormally high sales figures for both scooters and all winter-related items, including skis and accessories, boots, and brand name outerwear.

When Wilkinson prepared his projections, he did discount the winter 2000 sales. He just did not discount them as much as Dunham's would have liked. Wilkinson explained that in making the appropriate revenue projections, one examines the company's history, its position within the industry, prospects for the industry and the economy in general, and how the company has grown compared to past expectations. Wilkinson projected results for the four-month period ended January 31, 2002. He also projected revenues through January 31, 2005. Wilkinson projected revenues for the fiscal year ended January 31, 2005 to be $249,000,103 based on an assumed revenue growth rate of 3.5% for fiscal years 2003, 2004, and 2005. FN8 Finally he determined that the terminal value sales growth rate should be 3%. In contrast, sales for November and December 2000 grew by 15% compared to the same period in 1999.

> FN8. Dunham's fiscal years end on January 31. For example, fiscal year 2002 covers the period from February 1, 2001 through January 31, 2002.

Kern's DCF analysis instead projected 2.5% revenue growth for fiscal 2002 and 2% growth thereafter. Kern's projections in this regard are highly suspect for a variety of reasons. First, Kern stated that he considered the overall industry growth rate of 1% to 2%, but conceded this growth rate included not only large chain stores (like Dunham's), but also one-store mom-and-pop sporting good retailers, and that larger retailers like Dunham's were growing at substantially higher rates than smaller ones. FN9

> FN9. Dunham's continually portrays itself as a minor player in the retail sporting goods

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
**(Cite as: Not Reported in A.2d)**

industry, maintaining that it operates "small sporting goods stores" in "small- to medium-sized markets" to avoid competing with "big box national stores." Resp. Br. at 3. In reality, Dunham's is in the top ten in sales for retail sporting goods chains in the United States with 116 stores in 12 states, with many in larger markets. Trial Tr, at 48.

Second, Kern characterizes sales in November and December 2000 as a one-time event, and argues that it was unreasonable for Wilkinson to make revenue projections based on the assumption that such factors would persist. This is so, the argument goes, because the Midwest experienced an unusually cold winter, which led to higher than expected sales of skis and related equipment and apparel. To buttress this argument, Dunham's claims that, during the period between the Christmas season of 2000 and the Merger Date, it "returned to its historical pattern of growth," thereby "undercutting Mr. Wilkinson's theory that fiscal year 2001, [was] a benchmark." FN10 This is an incorrect assertion, however. For example, Dunham's average monthly revenues grew at 5% for the eight-month period from February 2001 through September 2001. FN11 In addition, there has been no evidence provided, scientific or otherwise, that demonstrates the conditions the Midwest experienced during winter 2000 will not repeat itself. Moreover, all of the other major companies in the retail sporting goods industry, including southern climate-based entities, experienced growth during this period and were experiencing substantial growth into 2002 as well. FN12

FN10. Resp. Br. at 19.

FN11. Pet. Trial Ex. 1, Sch. B-4.

FN12. *See* Pet. Trial Ex. 1, Sch. G-1.

**\*4** Finally, and most significantly, Kern's revenue growth rate analysis is suspect because he neglected to consider Dunham's management's own financial projections, which called for 9.7% annual revenue growth through 2007. FN13 These projections were provided to Fleet Capital, Dunham's lender, for the purpose of extending a credit facility for an additional five years and increasing the line available from $42 million to $55 million. These projections were, according to Sosne, formulated in October 2001, *the very month of the merger.* Sosne testified they were prepared with the full authority and approval of management and were submitted in good

faith. Considering management's own projections regarding revenue growth, Wilkinson's 3.5% growth rate for revenue is far more reasonable than Kern's 2% growth rate.

FN13. Pet. Trial Ex. 7.

*2. Estimates Of Operating Income As A Percentage Of Revenue*

Dunham's second objection to Wilkinson's valuation is that Wilkinson allegedly erred in his estimates of Dunham's operating income as a percentage of its revenue ("Operating Margins"). Wilkinson's valuation assumes that Dunham's Operating Margins would likely range from 4.3% to 5.1% in the years following the Merger Date. This estimate, according to Kern, is erroneously high because it ignores the fact that on a historical basis Dunham's Operating Margins had never been higher than 2.6% until fiscal year 2001, and that even in that year its Operating Margin was only 3.2%. Although this argument has some merit, Kern's projections in this regard are flawed as well.

Kern would have this court believe that in the face of continuously increasing Operating Margins from 1998 through 2001, Dunham's was somehow headed for a major reversal of fortune and would only experience Operating Margins of 3.2% for 2002 and eventually decline to 2.1% in 2006 and beyond. FN14 There is no evidence to indicate that such a decrease in Operating Margins is looming. Rather, the evidence tends to show that Operating Margins were improving with time, albeit at a slower pace than Wilkinson projected. The court finds that management's own projections in this regard are the most persuasive. The projections that Dunham's provided to Fleet Capital the same month the merger occurred demonstrate that management believed that Operating Margins were improving over time. Management projected Operating Margins as 3.4% for 2002, 3.3% for 2003, 3.4% for 2004, 3.6% for 2005, and 3.8% for 2006 and 2007. FN15 These projections appear both reasonable and in line with the upward trend for Dunham's Operating Margins, and, as such, the court will rely upon them.

FN14. *See* Resp. Trial Ex. 21, Ex. E.

FN15. Pet. Trial Ex. 7.

*3. Adjustments To Account For Working Capital And*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
(Cite as: Not Reported in A.2d)

### Impending Capital Expenditures

Dunham's third objection to Wilkinson's DCF analysis relates to supposedly impending capital expenditures that were necessary and known at the time of his valuation. In particular, Dunham's first complains that Wilkinson failed to reduce his DCF analysis to account for its impending $4 million purchase of new cash registers for its stores. Dunham's then complains that Wilkinson failed to make an adjustment for increased working capital requirements, which it would need in order to grow revenues in the future. There are easy answers to both these complaints.

**\*5** First, there was simply no reliable evidence establishing the need for, and imminence of, a $4 million expenditure for new cash registers at Dunham's stores. Kern testified his consideration of this anticipated expenditure was a significant difference between his DCF analysis and Wilkinson's. Kern, however, failed to independently verify how much this alleged expenditure would cost or whether it was even necessary. He also testified that he was not provided any written documentation relative to this alleged anticipated expenditure. Instead he simply accepted management's word at face value about such an expenditure. For these reasons, the court is persuaded that Wilkinson's decision not to account for a $4 million capital expenditure for cash register purchases was appropriate.

Second, Wilkinson did account for additional working capital and capital expenditure requirements. This was accomplished by assuming that those needs would be financed. Given that Dunham's has plenty of borrowing power, Wilkinson's interest expense provision in his projection included an interest provision to handle an additional $10 million in capital expenditures and working capital provisions.

### 4. Size-Risk Premium

One of the requirements for a DCF analysis is to select the appropriate discount and capitalization rates based on market risk. The capitalization rate is used to determine the terminal value for a company. The discount rate is used to reduce values from future years to present value. As a practical matter, the lower the capitalization and discount rates, the higher the terminal value and present value will be.

One of the key elements in calculating capitalization

and discount rates is a modifier that takes into account the risk associated with the company based on its size. This modifier is typically referred to as a "Size-Risk Premium." At trial, both experts testified that they selected their Size-Risk Premium based on charts from Ibbotson Associates' 2001 yearbook. Ibbotson Associates is a well-respected organization that provides, among other things, data for valuation premiums that should be applied to various companies.

The first part of the chart at issue breaks companies down into sequential deciles 1 through 10, with 1 representing companies with the largest market capitalization and 10 the smallest, and then provides the relevant Size-Risk Premium for each size. <u>FN16</u> Ibbotson then divides decile 10 into two halves, with the first half (decile 10a) applicable to the larger companies within decile 10 and the second half (decile 10b) the smaller ones. <u>FN17</u> The Ibbotson Associates yearbook explains that the largest company within decile 10b is Vlasic Foods International, which has a market capitalization of approximately $48.3 million. Unfortunately, the Ibbotson Associates yearbook does not provide what is the market capitalization of the smallest company in decile 10a. <u>FN18</u> This first portion of the chart states, in relevant part, that the Size-Risk Premiums for companies in deciles 9, 10a, and 10b are 1.74%, 2.78%, and 8.42% respectively. <u>FN19</u>

<u>FN16.</u> *See* Resp. Trial Ex. 22, Tab 4.

<u>FN17.</u> *See id.*

<u>FN18.</u> Dunham's asserts that "[t]he Ibbotson yearbook clearly states that the capitalization cut-off between deciles 10a and 10b is $48,345,000. That is, all companies with market capitalizations of $48,345,000 or less fall within decile 10b, while companies with market capitalizations greater than $48,345,000 but no greater than $84,521,000 fall within decile 10a" Resp. Br. at 24. This is not what the Ibbotson Associates yearbook says. Rather, it merely provides that the largest company within decile 10b has a market capitalization of $48,345,000 and the company with the largest capitalization within decile 10a has a market capitalization of $84,521,000. There is no indication of whether a company with a market capitalization of less than $48,345,000 may nonetheless fall within

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
(Cite as: Not Reported in A.2d)

Page 6

decile 10a or even decile 9 given certain characteristics. This is evidenced by Kern's own determination of Dunham's Size-Risk Premium of 3.95%, which was significantly lower than what decile 10b suggests it should be.

FN19. *See* Resp. Trial Ex. 22, Tab 4.

**\*6** The second portion of the Ibbotson chart consists of three categories that sequentially combine deciles 3 through 10b into broader groupings, each encompassing a three decile band. FN20 It calls these bands "Mid-Cap, 3-5," "Low-Cap 6-8," and "Micro-Cap 9-10." Just as with the first part of the chart, the second part provides a relevant Size-Risk Premium for each band, essentially averaging the statistics for the three deciles encompassed within that group. For example, the second portion of the chart states in relevant part that the Size-Risk Premium for companies in the Micro-Cap 9-10 is 2.62%. This is the Size-Risk Premium Wilkinson utilized in determining his capitalization and discount rate.

FN20. *See id.*

Dunham's disagrees with Wilkinson's use of the more generalized Micro Cap 9-10 category to determine its Size-Risk Premium. Dunham's instead argues that because its equity value (even assuming Wilkinson's $44 million valuation) is below $48,345,000, Wilkinson was obligated to use a Size-Risk Premium of 8.62% pursuant to decile 10b. This argument, however, is belied by Kern's use of a significantly lower Size-Risk Premium in his own projections. Kern's valuation report specifically discusses his choice of Size-Risk Premium to apply. His report provides:

> We estimated the small stock risk premium based on information compiled by Ibbotson as published in its [yearbook]. Based thereon, we estimate a small stock premium of 3.95% based on the historical returns (in excess of the return on the S & P 500 Index) of companies that are comparable in size to Dunham's. FN21

FN21. Pet. Trial Ex. 21 at 54.

The court finds this reasoning persuasive and adopts it. Wilkinson inappropriately used a risk size premium of 2.62%, which was based on essentially an average of deciles 9, 10a, and 10b. Dunham's does not share similar characteristics with companies in

decile 9. A more accurate Size-Risk Premium should fall within the range of deciles 10a and 10b. A Size-Risk Premium of 3.95% is closer to decile 10a than it is to decile 10b, but this is an appropriate weighting because Dunham's shares more risk characteristics with companies in decile 10a than it does with companies in decile 10b. This is because companies falling within decile 10b include many start-up ventures that receive public funding and are inherently riskier.

### 5. *The Court's DCF Valuation*

The court begins by accepting Wilkinson's basic framework, and then adjusts his projections and valuation based on the valid objections advanced by Dunham's. By accepting management's accounts of projected Operating Margins, Wilkinson's projected free cash flow for Dunham's becomes $1,400,900 for the four months ended January 31, 2002, $3,768,100 for fiscal year 2003, $4,099,200 for fiscal year 2004, and $4,609,100 for fiscal year 2005. Using a Size-Risk Premium of 3.95% increases Wilkinson's terminal value capitalization rate from 15% to 16.35%, thus reducing the terminal value of Dunham's to $29,035,500. Moreover, a 3.95% Size-Risk Premium increases Wilkinson's discount rate to 19.35%, which leads to a present value factor of 97.09% for the four months ended January 31, 2002, 81.35% for fiscal year 2003, 68.16% for fiscal year 2004, 57.11% for fiscal year 2005, and 55.45% for the terminal value. This all results in a DCF for 100% of Dunham's value of $25,953,200.

### B. *The Comparable/Guideline Companies Approach*

**\*7** The comparable company approach involves reviewing publicly traded competitors or participants in the same market or industry, generating relevant multiples from public pricing data of the comparable companies and applying those multiples to Dunham's in order to arrive at a value. Wilkinson looked at comparable publicly traded companies in the sporting goods industry with ascertained market values to determine those companies' multiples of market value of invested capital ("MVIC") to EBITDA. FN22 Specifically, Wilkinson selected Sports Authority, Inc., Gart Sports Company, Sports Chalet, Inc., and Hibbett Sporting Goods, Inc. as publicly traded sporting goods companies that were comparable to Dunham's. The four companies selected offer a wide spectrum of store type, geographic location, capital structure, number of stores, financial performance,

B69

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
**(Cite as: Not Reported in A.2d)**

and other factors. These four companies summarize the risks facing a similar privately held entity very well.

> FN22. EBITDA is a company's earnings before interest, taxes, depreciation and amortization.

Wilkinson averaged the multiples of MVIC to EBITDA of the comparable companies as of the Merger Date. He then reduced that average, which was 5.77, by 10% to reach his proposed EBITDA multiple of 5.2. Next, Wilkinson multiplied his 5.2 figure by Dunham's unadjusted EBITDA of approximately $10.3 million for the trailing twelve-month period ending September 25, 2001, to obtain a total capital value estimate of approximately $53.8 million. Subtracting from that figure $14.4 million, representing Dunham's interest-bearing debt as of January 31, 2001, Wilkinson stated that his MVIC analysis suggested a total equity value of $39.4 million as of the Merger Date. FN23 The court starts with this figure and will next address each of Dunham's objections to it. FN24

> FN23. Wilkinson also conducted a price-to-earnings analysis and a price-to-book-value analysis, which suggested equity values of $48.6 million and $36.3 million, respectively. Neither of these valuations has a significant degree of relevance, however. Price-to-earnings ratio is not a reliable indicator of Dunham's value because such a ratio does not take into account differences in companies' ratio of debt capital to MVIC. Moreover, price-to-book value ratio is not a reliable indicator of Dunham's value because it is well established that use of book value in valuation methodologies is generally not recommended. *See Paskill v. Alcoma Corp., 747 A.2d 549, 554 (Del.2000)* (noting that it is inappropriate to rely solely on a net asset value methodology because it does not represent the value of the corporation as a going concern); Shannon P. Pratt *et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 230-33 (4th ed.2000) ("book value is not a recommended business valuation method ... [and] "it is generally inappropriate to estimate a business valuation based solely on accounting book value").

> FN24. In this Opinion, the court does not address whether its comparable companies analysis should be adjusted upward to reflect an inherent minority discount. The petitioner's expert made no such adjustment because he assumed it would be roughly offset by a marketability discount related to Dunham's status as a privately held company. *See* Trial Tr. at 298-99.

### 1. *The Correct Interest-Bearing Debt Figure*

Wilkinson used the incorrect interest-bearing debt figure in reducing his total capital value to equity value under his guideline companies analysis. He used Dunham's interest-bearing debt figure as of January 31, 2001, which was $14.4 million, despite the fact that he was valuing Dunham's as of October 15, 2001. At the end of September 2001, which is the time closest to the Merger Date for which there is a debt figure available, Dunham's interest-bearing debt was $22.5 million. This has a direct dollar-for-dollar effect on Wilkinson's valuation, and results in that valuation, based on a guideline companies analysis, being $8.1 million greater than it should be.

The petitioner has two responses to this argument. First, he argues that Kern did not make a similar reduction to his analysis and instead used the $14.4 million interest-bearing debt figure. This argument is not persuasive because Kern (however erroneously) valued Dunham's as of January 31, 2001, when Dunham's interest-bearing debt figure actually was $14.4 million. Rather than conducting a new valuation analysis as of the Merger Date, Kern merely looked at key factors that could affect value, and how they had changed during the intervening period of time. He concluded (again, however erroneously) that Dunham's value as of the Merger Date was no greater than it had been as of January 31, 2001. Had Kern performed a new valuation as of the Merger Date, he would have been required to include the full interest-bearing debt figure of $22.5 million to arrive at a correct equity value for Dunham's.

**\*8** The petitioner's second response is that because Dunham's finances short-term inventory needs through its line of credit, as the Christmas season approaches financed inventory purchases grow, leading to an abnormally high interest-bearing debt figure in its financial statements. Therefore, the argument goes, upon review of Dunham's normalized debt level, it may not be necessary to consider this run-up of interest-bearing debt in a valuation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
(Cite as: Not Reported in A.2d)

Page 8

calculation. This argument, however, does not withstand scrutiny. Wilkinson's methodology gives the petitioner the benefit of increased prospects for future revenue and earnings associated with the then-upcoming Christmas season, while at the same time effectively relieving him from his obligation to offset those prospects through the debt incurred in obtaining the increased inventories necessary to create the revenue and earnings in the first place. For these reasons, the court agrees that Wilkinson should have considered the full $22.5 million interest-bearing debt figure in his guideline companies analysis.

### 2. One-Time Gains

Wilkinson failed to adjust Dunham's EBITDA for a one-time non-recurring gain of $550,000, relating to the August 2001 buyout of Dunham's store lease in Janesville, Wisconsin. Although this one-time gain was not expressly identified as such in Dunham's financial statements, John Palmer, Dunham's general counsel, testified at trial that the buyout of the Janesville lease was "not typical." FN25 Palmer further testified that during the five years preceding the Merger Date, no other leases were bought out. FN26

FN25. Trial Tr. at 287.

FN26. See id.

The petitioner focuses on the fact that the Janesville buyout was not expressly identified as a non-recurring gain in Dunham's financial statements. FN27 Because of this omission, the petitioner argues that the court should not consider that transaction to have been non-recurring. FN28 The only evidence adduced at trial (which was Palmer's testimony), however, demonstrates that the Janesville buyout actually was a one-time, non-recurring transaction. There are many reasons why an auditor might not have required Dunham's to identify the gain as non-recurring in the financial statements. For example, the Janesville buyout may not have been a material event for financial statement purposes, despite the fact that it is plainly material for the very different purposes involved in valuing a company. Accordingly, the court will reduce Wilkinson's EBITDA calculation by $550,000.

FN27. See Pet. Br. at 29.

FN28. See id.

### 3. The Correct EBITDA Multiple

As previously mentioned, Kern and Wilkinson essentially agree on the appropriate comparable companies for the purposes of a guideline companies analysis. Wilkinson selected his 5.2 multiple by averaging the EBITDA multiples of the comparable companies as of the Merger Date, and then reducing that average by 10%. Kern, on the other hand, discounted 48% from the average guideline company multiple.

One of the basic principles of employing the guideline companies approach is that the chosen guideline companies should not be selected if they are dissimilar to the subject company. FN29 Those not similar are not used. There may be some differences between comparable companies-they may make significantly more in earnings or have a significantly higher book value. The key is that the figures gleaned from a guideline company analysis are in fact multiples, which summarize how the investing public values one dollar of earnings in a given industry. FN30 That is why these multiples are transferable. They summarize the risks facing, in this instance, large, regional sporting goods retailers very well.

FN29. See, e.g., Pratt, supra note 23, at 230-33.

FN30. See id.

*9 Dunham's criticizes Wilkinson's guideline companies analysis because Wilkinson did not subjectively select what he thought to be appropriate multiples from the comparable companies and instead "merely averaged" the EBITDA multiples of the companies. FN31 After selecting appropriate comparable companies, however, objectively averaging those companies' multiples is the next step in the analysis. FN32 Only after establishing the average multiples for guideline companies does one adjust that average to account for relative risk and relative growth prospects of the subject company compared with the guideline companies. FN33 This is exactly what Wilkinson did in his analysis when he discounted the average multiples for the guideline companies by 10% before applying that multiple to Dunham's. FN34 Wilkinson chose a 10% discount to account for risks and costs such as floatation costs to Dunham's if it were to go public and its lower

B71

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                     Page 9
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
(Cite as: Not Reported in A.2d)

profitability levels relative to the guideline companies chosen. FN35 He did not discount the multiples by more than 10% because Dunham's was growing, in terms of profitability, at a faster rate than many of the comparable companies. FN36

FN31. Resp. Br. at 13.

FN32. *See, e.g.,* Pratt, *supra* note 23, at 244 (stating that "[t]he harmonic mean is used to give equal weight to each guideline company in summarizing ratios that have ... [MVIC] in the numerator").

FN33. *See id.* at 244-45.

FN34. Delaware case law supports the practice of calculating a weighted average and increasing or decreasing the resulting multiple to reflect the superiority or inferiority of the subject company. *See Bell v. Kirby Lumber Corp., 413 A.2d 137, 146 (Del.*1980) (approving use of higher than average price/earnings ratio because "Kirby was among the higher quality companies in the field"); *Boyer v. Wilmington Building Materials, Inc., 754 A.2d 881, 904 (Del. Ch.*1999) (discounting derived multiples by 25% "[t]o account for the peculiar, negative characteristics" of the subject company); *Matter of Appraisal of Shell Oil Co., 1990 WL 201390, at *23 (Dec. 11, 1990)* (finding that "Shell was a superior company to most of those studied by Morgan Stanley and should have been priced above the median" of comparables).

FN35. Trial Tr. at 51-52.

FN36. *Id.* at 129.

Dunham's stated in its brief that in using the guideline company analysis, Kern determined that the guideline companies were trading from 3.1 to 11 times adjusted normalized EBITDA and that Kern chose a multiple of 3.0 for Dunham's, which was "slightly smaller" than the multiple of any comparable company because Dunham's was "less profitable" with "lower growth expectations." FN37 What Dunham's failed to mention, however, is that Kern discounted 48% from the average guideline company multiple. Kern also could not explain why Dunham's had lower growth expectations than other guideline companies. Essentially, he disregarded the multiples. FN38 In

choosing a drastically reduced multiple, Kern demonstrated that he believes the guideline companies are not truly comparable to Dunham's, which undermines his entire analysis.

FN37. Resp. Br. at 7.

FN38. *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 2003 WL 21639071, at *14 & n. 31 (Del. Ch. July 8, 2002)* (discussing the dangers of significantly deviating from the mean or median of guideline companies' multiples because the analysis becomes too biased and subjective).

For all these reasons, the court concludes that Wilkinson chose the correct discount to apply to the average guideline company multiple, and the court will use a multiple of 5.2 to determine Dunham's MVIC.

### 4. *The Court's Comparable/Guideline Companies Valuation*

The court begins by accepting Wilkinson's basic framework, and then adjusts his valuation based on the valid objections advanced by Dunham's. Reducing Dunham's EBITDA by $550,000 to account for the one-time gain from the Janesville lease buyout leads to an EBITDA figure of $9,812,200. Applying Wilkinson's 5.2 multiple to Dunham's adjusted EBITDA results in a total value of Dunham's invested capital of $51,023,400. Reducing that value by $22,500,000, Dunham's interest-bearing debt as of October 15, 2001 (rather than January 31, 2001) ends in an equity valuation for Dunham's of $28,523,400.

### C. *The Transaction Approach*

### 1. *The Prudential Transaction Does Not Provide A "Reliable Benchmark" For Measuring Dunham's Value*

**\*10** In March 1999, a special-purpose entity comprised primarily of Dunham's officers bought all Dunham's outstanding redeemable preferred stock and Class B common stock for $4 million from The Prudential Insurance Company of America and one of its subsidiaries (collectively, the "Prudential

B72

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
(Cite as: Not Reported in A.2d)

Transaction"). At the time of the Prudential Transaction, there were accrued but unpaid dividends on the preferred stock approximating $20 million.

Dunham's argues that at the time of the Prudential Transaction, Dunham's common stock was worth nothing, because:

> [g]iven the fact that the Prudential entities were owed some $20 million in preferred dividends, but agreed to forego their right to seek payment of that amount, and given the fact that such dividends would have to be paid before common equity could be paid in a bankruptcy context, Prudential's decision to accept only $4 million for its interest in [Dunham's] demonstrates that when the Prudential Transaction occurred, the common equity had no material value.... Accordingly, the only fair conclusion that may be reached from the Prudential Transaction is that [Dunham]'s total equity value implied by the Prudential Transaction was equal to the purchase price of $4 million. FN39

FN39. Resp. Br. at 9.

The problem with this argument is that the Prudential Transaction was not truly an arm's-length deal. Sosne testified that Prudential was frustrated with its inability to get liquidity out of Dunham's for its investment. FN40 Prudential was apparently willing to take whatever management was willing to offer for the Class B and preferred stock. FN41

FN40. Trial Tr. at 158.

FN41. Id.

If the Prudential Transaction has significance with respect to Dunham's value as of the Merger Date, it is this; retiring the debt essentially transformed Dunham's into an entirely new company. Once members of management succeeded in purchasing the Class B and preferred shares and retiring this debt, growth was explosive and all of the financial information provided by Dunham's support this. Operating income had gone from $3.4 million in fiscal year 1999 to $9.6 million in fiscal year 2002, and net income had risen from $456,000 in fiscal year 1999 to $4.4 million for the twelve months ended September 25, 2001. Moreover, as discussed above, Dunham's own projections suggest that it expected such growth to continue well into the foreseeable future.

### 2. The Gart/Oshman's Transaction

On February 22, 2001, Gart Sports Company announced it was acquiring Oshman's Sporting Goods, Inc. for $84 million in cash and company stock (the "Gart/Oshman's Transaction"). The merger ultimately closed on June 7, 2001, and its value had increased to $99 million. Both parties agree that the Gart/Oshman's Transaction is a valid transaction to use as a basis for valuing Dunham's. That being said, the parties (and their experts) differ dramatically about what the Gart/Oshman's Transaction implies with respect to Dunham's value.

Wilkinson analyzed the data surrounding the Gart/Oshman's Transaction and concluded that it produced a MVIC to EBITDA multiple of 5.17. This multiple was arrived at by reducing Oshman's EBITDA by approximately $7 million, which Wilkinson believed was necessary because Oshman's 1999 income statement listed that value as a negative number under the heading "Other Operating Expense." There is no evidence regarding what this number relates to. Moreover, it seems unlikely that it is a one-time negative expenditure, because Oshman's three previous years' income statements also had negative numbers listed as "Other Operating Expenses," and the relevant figure for 1998 was in the $6 million range.

*11 In contrast, Kern originally found that the Gart/Oshman's Transaction yielded a MVIC to EBITDA multiple of 4.7. After final terms of the deal were announced, Kern reduced that multiple to 3.7 times Oshman's EBITDA. To arrive at this figure, Kern used the EBITDA figure from Oshman's financial statements for the year ended February 3, 2001, despite the fact that the merger closed on June 7, 2001.

There is virtually no consistency in the analyses performed by the two experts regarding the Gart/Oshman's Transaction, and there is little discussion in either of the experts' reports related to the Gart/Oshman's Transaction. Neither Wilkinson nor Kern actually provide enough evidence for the court to make a determination about either's credibility on this subject. Neither report's appendices attempts to justify the ultimate conclusions regarding that Transaction. As such, the court concludes that neither report satisfies the burden of proof on this issue, and the court will not consider the Oshman's/Gart Transaction in its analysis.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
**(Cite as: Not Reported in A.2d)**

### D. *The Value Of Taylor's Shares*

The court's DCF analysis yields a value for 100% of Dunham's stock of $25,953,200. The court's guideline companies analysis indicates a value of $28,523,400. These two values are reasonably close (the guideline companies valuation is approximately 9.9% higher than the DCF valuation), and the court believes that the average of these two values is the most accurate value for 100% of Dunham's stock. FN42 Therefore, the court concludes that the total value for 100% of Dunham's stock is $27,238,300.

> FN42. *Compare* Gotham Partners, L.P., 2003 WL 21639071, at *18 & n. 44 (valuing a company using the average of four valuations, where those valuations diverged by more than 173%).

As of the Dunham's merger date, Dunham's had 3,000 shares of common stock outstanding. Applying the court's valuation for 100% of Dunham's stock, each share of Dunham's stock is worth $9,079.43. Petitioner Taylor owned 20 shares of Dunham's common stock, and, accordingly, the value of his shares is $181,588.60.

### E. *Taylor Is Entitled To Compound Interest On The Fair Value Of His Shares*

8 *Del. C.* § 262(h) provides that in appraising a stockholder's shares:

> the Court shall appraise the shares, determining their fair value ... together with a *fair rate of interest,* if any, to be paid upon the amount determined to be fair value.... In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding. FN43

> FN43. 8 *Del. C.* § 262(h) (emphasis added).

Moreover, 8 *Del. C.* § 262(i) provides "[t]he Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. *Interest may be simple or compound as the Court may direct."* FN44 These two sections read together "demonstrate that an interest award

necessarily has two components-a rate of interest and a form of interest. The court must determine both parts in fashioning an interest award that is fair to the dissenting stockholder as well as to the surviving corporation." FN45

> FN44. 8 *Del. C.* § 262(i) (emphasis added).

> FN45. *Gonsalves v. Straight Arrow Publishers, Inc.,* 2002 WL 31057465, at *9 (Del. Ch. Sept. 10, 2002).

**\*12** Regarding the rate of interest, "[e]ach party bears the burden of proving the appropriate rate under the circumstances." FN46 In this case, however, neither side submitted evidence concerning the appropriate rate of interest. Thus, the court looks to the legal rate of interest for guidance, because "[t]he legal interest rate serves as a useful default rate when the parties have inadequately developed the record in the issue." FN47 The legal rate of interest, defined by 6 *Del. C.* § 2301, is 5% over the Federal Reserve discount rate. The Federal Reserve discount rate on October 15, 2001 was 2%. Therefore, the applicable rate of interest is 7%.

> FN46. *Grimes v. Vitalink Communications,* 1997 WL 538676, at *1 (Del. Ch. Aug. 26, 1997).

> FN47. *Chang's Holdings, S.A. v. Universal Chemical & Coatings, Inc .,* 1994 WL 681091, at *2-*3 (Del. Ch. Nov. 22 1994) ; *Ryan v. Tad's Enters., Inc.,* 709 A.2d 682, 705 (Del. Ch.1996), *aff'd,* 693 A.2d 1082 (Del.1997).

Taylor requests that interest on his appraisal award be compounded. The court agrees that Taylor should be entitled to compound interest on his award. This court has discretion when deciding whether to award compound or simple interest in appraisal cases. FN48 Although the Supreme Court has noted its concern over the "developing standard practice" of awarding compound interest in appraisal cases, it still only requires that the Court of Chancery base an award of compound interest on sound and articulated reasoning. FN49

> FN48. *See Gonsalves v. Straight Arrow Publishers, Inc.,* 1999 WL 87280, at *4 (Del. Jan. 5, 1999) ("We emphasize again

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
**(Cite as: Not Reported in A.2d)**

Page 12

that the Court of Chancery has broad discretion under the appraisal statute to award either simple or compound interest").

FN49. *Id.* ("the [appraisal] statute provides discretion to choose [simple or compound interest] on a case-by-case basis, but requires explanation for the choice").

An award of compound interest is generally the form of interest most likely to fulfill the purposes of Delaware's appraisal statute. FN50 This is so because the award of interest pursuant to 8 *Del. C.* § 262(h) supports two goals: first, the award compensates the petitioner for the loss of the use of the fair value of his or her shares during the pendency of the proceeding; and second, the award forces the corporation to disgorge any benefits it obtained from the use of the fair value of the petitioner's shares during the pendency of the proceeding. FN51

FN50. See *Gonsalves,* 2002 WL 31057465, at *10 (citing *Onti, Inc. v. Integra Bank,* 751 A.2d 904, 926-29 (Del. Ch.1999)).

FN51. *Gilbert v. MPM Enterprises, Inc.,* 709 A.2d 663, 674 (Del. Ch.1997) (citing *Grimes,* 1997 WL 538676, at *9).

An award of simple interest does not satisfy the first goal of Section 262(h) because "[i]t is simply not credible in today's financial markets that a person sophisticated enough to perfect his or her appraisal rights would be unsophisticated enough to make an investment at simple interest." FN52 Moreover, an award of simple interest does not satisfy the second goal of Section 262(h) because "[a]s for the defendant company in an appraisal action, it is even harder to imagine a corporation today that would seek simple interest on the funds it holds.... Nor is it conceivable that [the defendant company's] lenders were providing ... capital at simple rates of interest." FN53 Thus, awarding simple interest "would not force the defendant company to disgorge the full benefit it received from having use of the plaintiff's funds." FN54

FN52. *Onti, Inc.,* 751 A.2d at 926.

FN53. *Id.* at 926-27 (footnote omitted).

FN54. *Gonsalves,* 2002 WL 31057465, at *10.

There is nothing presently in the record before the court that would cause it to diverge from the general principle that compound interest should be awarded in appraisal cases. For example, there is nothing in the record from which the court could conclude that the length of this litigation was the result of any intentional delay on the part of Taylor. The court concludes, therefore, that the evidence supports a finding that compound interest is the most appropriate form of interest award for these parties.

*13 The final issue to resolve is the rate of compounding for the court's interest award. There is support for the conclusion that the compounding should occur at a monthly or even daily rate. FN55 Because the court has chosen to apply the legal rate of interest, however, the appropriate compounding rate is quarterly. This is due to the fact that the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly. FN56

FN55. See *Onti, Inc.,* 751 A.2d at 927 & n. 93.

FN56. See *Borruso v. Communications Telesystems,* 753 A.2d 451, 461 (Del. Ch.1999).

### F. *Taylor Is Not Entitled To Recover Costs For His Expert*

The petitioner has requested that Dunham's reimburse him for both his court costs and Wilkinson's expert witness fees incurred as a result of his testifying at trial. Dunham's has conceded that it has an obligation to pay court costs. FN57 The only issue, therefore, is whether Dunham's should have to reimburse Taylor for Wilkinson's fees. The court concludes that Dunham's should not have to reimburse Taylor for such fees.

FN57. Resp. Reply Br. at 27.

As a general principle, Delaware law does not permit the shifting of expert witness fees in an appraisal proceeding. FN58 Moreover, "[i]n the absence of an equitable exception, the plaintiff in an appraisal proceeding should bear the burden of paying its own expert witnesses...." FN59 In the current action, there was nothing presented to the court demonstrating that such an equitable exception should apply. There has been no undue delay, no

**B75**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280
(Cite as: Not Reported in A.2d)

showing of bad faith, or any other reason to shift the costs of an expert witness. The petitioner's expert witness costs were simply to establish the fair value of his shares. FN60

> FN58. *See In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 501 (Del. Ch.1991) (citation omitted) ("as with any appraisal proceeding, plaintiff should bear the costs of his own expert").

> FN59. *Cede & Co.*, 684 A.2d at 301 (citation omitted).

> FN60. *See In re Radiology Assocs., Inc. Litig.*, 611 A.2d at 501.

The petitioner argues that pursuant to 10 *Del. C.* § 8906 and *Sliwinski v. Duncan*, FN61 the court may award, as costs, fees for witnesses testifying as experts. FN62 *Sliwinski* involved the application of Section 8906 in the context of a physician's charges in a medical malpractice case, and is inconsistent with the more specific fee shifting provisions of 8 *Del. C.* § 262(j). In addition, Section 8906 has never been applied in an appraisal case. For all these reasons, there is no basis for the petitioner's request that Dunham's pay his expert's fees, and his request will be denied.

> FN61. 1992 WL 21132 (Del. Jan. 15, 1992).

> FN62. *See* Pet. Br. at 43.

### G. *Taylor Is Not Entitled To An Award Of Attorneys' Fees*

The petitioner requests attorneys' fees for the first time in his Opening Post Trial Brief. The petitioner concedes that unless some equitable exception applies involving egregious misconduct, he should bear the burden of paying his own attorneys' fees. FN63 He submits that such misconduct is present in this case "based on the bad faith of [Dunham's] which ... was *clearly demonstrated at trial.*" FN64 To support his bad faith argument, the petitioner primarily looks to "[t]he indefensibly one sided valuation offered by [Dunham's] expert witnesses...." FN65 This argument fails to satisfy the necessarily high burden to shift attorneys' fees.

> FN63. *See id.* at 44.

> FN64. *Id.* (emphasis in original).

> FN65. *Id.*

"[B]ad faith turns on the special facts of the particular case." FN66 Examples of bad faith include parties misleading the court, altering their testimony, or changing positions. FN67 None of that occurred here. This case is merely a dispute involving the value of Dunham's stock. Both sides presented experts, neither of which completely satisfied the court, but also neither of which demonstrated bad faith or intentional misconduct. There was nothing unusual about how this appraisal action proceeded. Both parties must pay their own attorneys' fees.

> FN66. *Jacobson v. Dryson Acceptance Corp.*, 2002 WL 31521109, at *16 (Del. Ch. Nov. 1, 2002), *aff'd*, 2003 WL 21381092 (Del. June 13, 2003) (citing *Cantor Fitzgerald L.P. v. Cantor*, 2001 WL 536911, at *4 (Del. Ch. May 11, 2001)).

> FN67. *See Jacobson*, 2002 WL 31521109, at *16 (citation omitted).

### V.

**\*14** For all the foregoing reasons, the court determines that the fair value for each share of Dunham's common stock, as of the date of the merger, was $9,079.43 and, thus, will enter an order awarding the petitioner a total of $181,588.60 plus interest at the legal rate, compounded quarterly. Dunham's is also directed to reimburse the petitioner for all his court costs. The parties are directed to present an order of final judgment in conformity with this opinion within 10 days.

Del.Ch.,2003.
Taylor v. American Specialty Retailing Group, Inc.
Not Reported in A.2d, 2003 WL 21753752, 29 Del. J. Corp. L. 280

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**I**

Westlaw.

2004 WL 3332044
--- F.Supp.2d ---
(Cite as: 2004 WL 3332044 (D.Del.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Rebecca B. MCKNATT, Plaintiff,
v.
STATE OF DELAWARE, Department of Public
Safety, Defendant.
No. CIV. 02-1659SLR.

May 12, 2004.

**Background:** Employee sued state agency, alleging discrimination and retaliation in violation of Title VII. Following entry of jury verdict in favor of employee, employee moved for costs and attorney fees.

**Holdings:** The District Court, Robinson, Chief Judge, held that:
(1) hours claimed by plaintiff were reasonable;
(2) hourly rates claimed by plaintiff were reasonable;
(3) no upward adjustment of lodestar amount was warranted; and
(4) downward adjustment based on mixed success was warranted.
Motion granted.

**[1] Federal Civil Procedure** ⬡~~2737.1

170Ak2737.1 Most Cited Cases
Under the American Rule, courts generally do not award attorney fees to the party who prevails on the merits; however, a prevailing party may be entitled to reasonable **attorney fees** if such fees are **provided** for by **contract**, statute, or equity.

**[2] Federal Civil Procedure** ⬡~~2737.1
170Ak2737.1 Most Cited Cases
If a statute provides for an award of attorney fees, an award should be given unless special circumstances render the award unjust.

**[3] Federal Civil Procedure** ⬡~~2737.4
170Ak2737.4 Most Cited Cases

In awarding attorney fees, the District Court may exclude from the lodestar calculation unnecessary hours or hours that lack proper documentation.

**[4] Federal Civil Procedure** ⬡~~2737.4
170Ak2737.4 Most Cited Cases
With respect to the number of hours expended, the prevailing party, in seeking attorney fees, must establish that those hours were reasonably expended.

**[5] Federal Civil Procedure** ⬡~~2737.4
170Ak2737.4 Most Cited Cases

**[5] Federal Civil Procedure** ⬡~~2742.5
170Ak2742.5 Most Cited Cases
A court examines the prevailing market rates in the community to determine the reasonable hourly rate for purposes of attorney fees, and the prevailing party bears the burden of establishing, by way of satisfactory evidence, that the requested hourly rate aligns with this standard.

**[6] Federal Civil Procedure** ⬡~~2737.4
170Ak2737.4 Most Cited Cases
Calculation of the lodestar does not end the reasonable attorney fees inquiry, as the court may adjust the lodestar upward or downward, using the 12 *Johnson* factors to adjust the lodestar.

**[7] Federal Civil Procedure** ⬡~~2737.4
170Ak2737.4 Most Cited Cases
The *Johnson* factors for awarding attorney fees that cannot be used to increase the lodestar amount, because the factors are properly considered as part of the lodestar calculation, are: (1) the novelty and difficulty of the question; (2) the skill requisite to perform the legal service properly; (3) the experience, reputation, and ability of the attorney; and (4) the amount involved and the results obtained.

**[8] Federal Civil Procedure** ⬡~~2737.4
170Ak2737.4 Most Cited Cases
A contingency fee cannot be used as a risk factor to increase attorney fees.

**[9] Federal Civil Procedure** ⬡~~2737.4
170Ak2737.4 Most Cited Cases
A court can adjust the lodestar amount of attorney fees downward if the lodestar is not reasonable in light of the results obtained.

B77

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3332044
--- F.Supp.2d ---
**(Cite as: 2004 WL 3332044 (D.Del.))**

Page 2

**[10] Federal Civil Procedure** ⛭2742.5
170Ak2742.5 Most Cited Cases
A court may not sua sponte reduce a request for attorney fees.

**[11] Federal Civil Procedure** ⛭2742.5
170Ak2742.5 Most Cited Cases
The party who asks for attorney fees to be adjusted has the burden of proving an adjustment is necessary.

**[12] Civil Rights** ⛭1595
78k1595 Most Cited Cases
Hours claimed by plaintiff, including 315.1 hours of attorney time, .2 hours of law clerk time, and 78.4 hours of paralegal time, were reasonable, for purposes of attorney fees in Title VII action. 42 U.S.C.A. § 2000e-5(k).

**[13] Civil Rights** ⛭1595
78k1595 Most Cited Cases
Reasonable hourly rates in Title VII action were $250 and $200 per hour for plaintiff's attorneys, $95 for law clerk, and $85 for paralegal. 42 U.S.C.A. § 2000e-5(k).

**[14] Civil Rights** ⛭1594
78k1594 Most Cited Cases
No upward adjustment of lodestar amount of attorney fees was warranted in Title VII action, where plaintiff's affidavits did not claim or mention entitlement to bonus or upward revision, case was not rare and exceptional, there was no evidence that plaintiff's attorneys were precluded from any employment because of demands of case, and contingency fee, which would have been $26,640, did not support upward adjustment of $79,958 lodestar. 42 U.S.C.A. § 2000e-5(k).

**[15] Civil Rights** ⛭1594
78k1594 Most Cited Cases
Title VII plaintiff's mixed success at trial warranted downward adjustment of lodestar amount of attorney fees by 40%, inasmuch as original lodestar of $79,958 was not reasonable compared to $80,000 awarded to plaintiff, and plaintiff presented four related claims, only two of which were successful. 42 U.S.C.A. § 2000e-5(k).

**[16] Civil Rights** ⛭1584
78k1584 Most Cited Cases
Title VII plaintiff was not entitled under local rule to costs of mileage, parking, or meals of attorneys or their employees. 42 U.S.C.A. § 2000e-5(k); Local Rule 54.1(b).

Jeffrey K. Martin, Esquire and Timothy J. Wilson, Esquire of Margolis Edelstein, Wilmington, Counsel for Plaintiff.

W. Michael Tupman, Esquire and Ralph K. Durstein, III, Esquire of the Delaware Department of Justice, Dover, Counsel for Defendant.

MEMORANDUM OPINION

ROBINSON, Chief J.

**I. INTRODUCTION**

*1 On December 3, 2002, plaintiff Rebecca McKnatt commenced this action against defendant State of Delaware, Department of Public Safety. (D.I.1) In her complaint, plaintiff asserted claims of: (1) gender discrimination and sexual harassment in violation of Title VII; (2) retaliation in violation of Title VII; [FN1] and (3) discriminatory failure to promote. (Id. at ¶¶ 41-55) The court held a jury trial in November 2004. (D.I.70-74) The jury returned a verdict which found for plaintiff on her hostile work environment claim and the fitness-for-duty evaluation retaliation claim, but found against her on the retaliation by failure to transfer claim and discriminatory failure to promote claim. (D.I.68) The jury awarded plaintiff $80,000 for her emotional pain, suffering, and mental anguish. (Id.)

Presently before the court is plaintiff's motion for costs and attorneys' fees. (D.I. 77) Plaintiff seeks an award of $79,958.00 in attorneys' fees and $1,623.30 in costs. (D.I. 81 at ¶¶ 17-18) [FN2] In support of her application for attorneys' fees, plaintiff's attorneys submitted an itemized billing record for the litigation. (D.I. 77, ex. A; D.I. 81, ex. D) Plaintiff's counsel also submitted affidavits from Mr. Martin; his associate, Timothy J. Wilson; and three other practitioners. (D.I. 77, exs. B, D, E; D.I. 81, exs. B, C) Defendant filed a brief in opposition. (D.I.80) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons set forth below, the court grants plaintiff's motion.

**II. DISCUSSION**

**A. The American Rule**

[1][2] Under the "American Rule," courts generally do not award attorneys' fees to the party who prevails on the merits. [FN3] *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health & Human Res.*, 532

B78

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3332044
--- F.Supp.2d ---
(Cite as: 2004 WL 3332044 (D.Del.))
Page 3

U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). However, a prevailing party may be entitled to reasonable **attorneys' fees** if such fees are **provided** for by contract, statute, or equity. *Summit Valley Indus., Inc. v. Carpenters*, 456 U.S. 717, 721, 102 S.Ct. 2112, 72 L.Ed.2d 511 (1982). If a statute provides for an award of attorneys' fees, an award should be given unless "special circumstances" render the award unjust. *Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).

Plaintiff's successful causes of action arose under 42 U.S.C. § 2000e-2, which is part of Title VII. (D.I.68) This court may award plaintiff reasonable attorneys' fees for her successful claims since Title VII provides, "[i]n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party ... reasonable attorney[s'] fee[s] (including expert fees) as part of the costs ...." 42 U.S.C. § 2000e-2(k). The court does not discern any special circumstance which would render an award of attorneys' fees in the present matter unjust. Furthermore, defendant does not contest the award of attorneys' fees to plaintiff. (D.I. 80 at ¶ ¶ 2-3) The court concludes plaintiff is entitled to attorneys' fees.

Federal courts in this jurisdiction have adopted the "lodestar" approach to calculate reasonable attorneys' fees granted pursuant to statutes. *Brytus v. Spang & Co.*, 203 F.3d 238, 242 (3d Cir.2000). The lodestar is calculated by taking the amount of time reasonably expended by counsel for the prevailing party on the litigation, and multiplying that time by a reasonable hourly rate. *Id.* This "lodestar" is presumed to be the reasonable fee to which the prevailing party is entitled. *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

*2 [3][4] The court may exclude from the lodestar calculation unnecessary hours or hours that lack proper documentation. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). With respect to the number of hours expended, the prevailing party must establish that those hours were "reasonably expended." *Id.* at 434.

[5] A court examines the prevailing market rates in the community to determine the "reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 895 & n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The prevailing party bears the burden of establishing, by way of satisfactory evidence, that the requested hourly rate aligns with this standard. *Id.* at 895 n. 11.

[6][7][8][9][10][11] Calculation of the lodestar does not end the reasonable attorneys' fees inquiry, as the court may adjust the loadstar upward or downward. A district court may use twelve factors [FN4] (the "*Johnson* factors") to adjust the lodestar. *Hensley*, 461 U.S. at 434. However, several of the *Johnson* factors cannot be used to increase the lodestar amount because these factors are properly considered as part of the lodestar calculation. These factors are: (1) the novelty and difficulty of the question; (2) the skill requisite to perform the legal service properly; (3) the experience, reputation, and ability of the attorney; and (4) the amount involved and the results obtained. *Del. Valley*, 478 U.S. at 565; *Stenson*, 465 U.S. at 898-900. Furthermore, a contingency fee cannot be used as a risk factor to increase attorneys' fees. *City of Burlington v. Dague*, 505 U.S. 559, 559, 567 (1992). The Supreme Court has held that an upward adjustment of a lodestar is permissible only in " 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Del. Valley*, 478 U.S. at 565 (citing *Stenson*, 465 U.S. at 898- 901). In contrast, a court "can adjust the lodestar downward if the lodestar is not reasonable in light of the results obtained." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990) (citing *Hensley*, 461 U.S. at 434-37). This downward adjustment "accounts for time spent litigating wholly or partially unsuccessful claims that are related to the litigation of successful claims." *Id.* A court may not sua sponte reduce a request for attorneys' fees. *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 719 (3d Cir.1989). However, "the district court retains a great deal of discretion in deciding what a reasonable fee award is, so long as any reduction is based on objections actually raised by the adverse party." *Id.* at 721. The party who asks for the fees to be adjusted has the burden of proving an adjustment is necessary. *Stenson*, 465 U.S. at 898.

B. Reasonable Amount of Time Expended [FN5]

[12] Plaintiff's attorneys submitted twenty pages of itemized records indicating the date legal work was performed, the person performing the work, the nature of the work, the number of hours spent, and the hourly rate charged for the work. (D.I. 77, ex. A; D.I. 81, ex. E) Defendant does not challenge, and the court does not find, any of these hours to be unnecessary or lacking proper documentation. The amounts of time reasonably expended by plaintiff's counsel are:

**B79**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3332044                                                                                      Page 4
--- F.Supp.2d ---
**(Cite as: 2004 WL 3332044 (D.Del.))**

| | |
|---|---:|
| Jeffrey K. Martin, Esquire | 205.1 hours |
| Timothy J. Wilson, Esquire | 110.0 hours |
| Jackie Goffney, Law Clerk | 0.2 hours |
| Anthony Iannini, Paralegal | 78.4 hours |

C. Reasonable Hourly Rate  [FN6]

*3 [13] Plaintiff's lead attorney submitted an affidavit

| | |
|---|---:|
| Jeffrey K. Martin, Esquire | $250.00/hour |
| Timothy J. Wilson, Esquire | $200.00/hour |
| Jackie Goffney, Law Clerk | $ 95.00/hour |
| Anthony Iannini, Paralegal | $ 85.00/hour |

(D.I. 77, ex. B) Timothy J. Wilson, Mr. Martin's associate, attested in an affidavit that his standard billing rate is $200.00 per hour. (D.I. 81, ex. C) Plaintiff submitted three additional affidavits in support of these statements by Mr. Martin and Mr. Wilson. [FN7] (D.I. 77, exs. D, E; D.I. 81, ex. B) These affidavits establish the following reasonable hourly rates: (1) $250.00 per hour for Mr. Martin; (2) $200.00 per hour for Mr. Wilson; and (3) $85.00 per hour for Mr. Iannini. [FN8] (D.I. 77, exs.

attesting that the following hourly rates are consistent with prevailing market rates for each respective person:

D, E; D.I. 81, ex. B)

D. The Lodestar

Based on the preceding analysis, the court concludes that the lodestar in this case is:

| | | | | | |
|---|---|---|---|---:|---:|
| Jeffrey K. Martin | $250/hour | * | 205.1 hours | = | $51,275.00 |
| Timothy J. Wilson | $200/hour | * | 110.0 hours | = | $22,000.00 |
| Jackie Goffrey | $ 95/hour | * | 0.2 hours | = | $ 19.00 |
| Anthony Iannini | $ 85/hour | * | 78.4 hours | = | $ 6,664.00 |
| | | | Lodestar | = | $79,958.00 |

E. Adjustment of the Lodestar

[14] The record contains no evidence supporting an upward adjustment of plaintiff's lodestar. First, none of plaintiff's affidavits claim, or even mention, entitlement to a bonus or upward revision. *Stenson, 465 U.S. at 898.* Furthermore, the relevant *Johnson* factors do not establish this case as "rare" and "exceptional." *Del. Valley, 478 U.S. at 565.* While plaintiff has established the number of hours her attorneys spent on this case, she presented no evidence showing that this was a substantial expenditure of time. Plaintiff also failed to present evidence that her lawyers were precluded from any employment because of the demands of this case. Plaintiff's attorneys' contingency fee in this case would have been $26,640.00. (D.I. 77 at 3)

This customary fee does not support an upward adjustment of the $79,958.00 lodestar. Plaintiff paid the fees and costs in this case on the date they were due or shortly thereafter. (D.I. 77, ex. G; D.I. 81 at ¶ 17) Plaintiff also failed to present evidence showing that this was an undesirable case or that few attorneys would be willing to represent a civil rights plaintiff. That plaintiff's attorneys represented her solely in this case also does not support an upward adjustment of the lodestar. Finally, plaintiff does not even argue that upward adjustment is warranted based on fee awards in similar cases. Consequently, the *Johnson* factors properly considered in a lodestar adjustment analysis suggest that plaintiff's lodestar should not be increased.

[15] However, plaintiff's mixed success at trial makes a downward adjustment of the lodestar appropriate. *Rode,*

**B80**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3332044
Page 5
--- F.Supp.2d ---
(Cite as: 2004 WL 3332044 (D.Del.))

892 F.2d at 1183. The court finds that plaintiff's original loadstar of $79,958.00 is not reasonable compared to the $80,000.00 the jury awarded plaintiff. (D.I.68) This finding is strengthened by the fact that, without an award of reasonable attorneys' fees, plaintiff's attorneys would receive a contingency fee of $26,640.00. (D.I. 77 at ¶ 5) Plaintiff presented four related claims, two of which were successful and two which were unsuccessful. To account for the time plaintiff's attorneys spent on her unsuccessful claims, the court shall reduce plaintiff's lodestar by 40%. After a 40% reduction ($31,983.20) to the lodestar, the court shall award attorneys' fees in the amount of $47,974.80. The downward adjustment of the lodestar adopted by the court puts plaintiff's attorneys' fees in line with the overall relief obtained.

F. Costs

*4 [16] Local Rule 54.1(b) identifies all costs which may be recovered by the prevailing party in a civil litigation in the District of Delaware. Nowhere in Local Rule 54.1(b) is there any provision for mileage, parking or subsistence of attorneys or their employees. Plaintiff submitted a bill of costs totaling $1,623.30. (D.I.81, ex. D) The court rejects plaintiff's request for parking fees and Mr. Martins's travel fees and meals, thereby reducing plaintiff's bill of costs by $200.42. [FN9] As a result, the court grants plaintiff $1,422.88 in costs.

### III. CONCLUSION

For the reasons set forth above, the court shall award $47,974.80 in attorney% & s fees and $1,422.88 in costs to plaintiff as the prevailing party in her suit against defendant. An appropriate order shall issue.

### ORDER

At Wilmington this 12th day of May, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that plaintiff's motion for costs and attorneys' fees (D.I.77) is granted to the amount of $47,974.80 in attorneys' fees and $1,422.88 in costs.

FN1. Plaintiff brought two claims that defendant retaliated against her: (1) when defendant required her to undergo a fitness-for-duty evaluation in September of 2000; and (2) when plaintiff was not transferred to Governor Minner's security detail. (D.I. 68 at 2) Consequently, plaintiff brought a total of four claims against defendant.

FN2. These figures are from plaintiff's reply brief. (D.I.81)

FN3. Plaintiff is the prevailing party in this case because the jury returned a verdict in her favor. Defendant filed a motion and a renewed motion for judgment as a matter of law. (D.I.63, 78) The court denied these motions.

FN4. The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974).

FN5. The second *Johnson* factor, "novelty and difficulty of the question", is "presumably ... fully reflected in the number of billable hours[.]" *Stenson*, 465 U.S. at 898. The court finds the present matter is not novel or complex enough to warrant enhancement of the reasonable billable hours.

FN6. The calculation of reasonable hourly rates subsumes the following *Johnson* factors: (1) the skill requisite to perform the legal service properly; (2) the experience, reputation, and ability of the attorney; and (3) the amount involved and the results obtained. *Stenson*, 465 U.S. at 898-900; *Del. Valley*, 478 U.S. at 565. Plaintiff presents no evidence that the skill required; the experience, reputation, and ability of counsel; or the results obtained in this case were exceptional. The court will not adjust the reasonable hourly rate based on these factors.

FN7. Each of these affiants had several years of experience in labor and employment law litigation and was familiar with the market for attorney (and, in the case of Richard Wier, paralegal) hourly rates in Wilmington, Delaware.

FN8. Defendant argued, "a paralegal's 'hourly rate should not exceed those of law [clerks]." ' (D.I. 80 at ¶ 13) Plaintiff established that $85.00 per hour is a reasonable rate for Mr. Iannini, a paralegal. The court concludes $95.00 per hour is

**B81**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3332044

Page 6

--- F.Supp.2d ---

**(Cite as: 2004 WL 3332044 (D.Del.))**

a reasonable rate for Ms. Goffney, a law clerk.

bill of costs (D.I. 81 ex. D) are:

FN9. The costs **excluded** from plaintiff? revised

| | | |
|---|---|---:|
| 12/3/02 | Parking at Courthouse (filing) | $ 3.50 |
| 11/25/03 | Travel to & from Dover re: deposition of Becky | $ 34.65 |
| 10/7/04 | 9/14 Mileage to attend mediation--Jeffrey K. Martin | $ 1.13 |
| 10/7/04 | Parking--Jeffrey K. Martin | $ 4.00 |
| 10/7/04 | 9/28 mileage to attend pretrial conf--Jeffrey K. Martin | $ 1.50 |
| 10/7/04 | Parking--Jeffrey K. Martin | $ 3.00 |
| 12/6/04 | Parking Jeffrey K. Martin | $ 8.50 |
| | | |
| 12/6/04 | Parking--Jeffrey K. Martin | $ 8.50 |
| 12/6/04 | Parking--Jeffrey K. Martin | $ 9.50 |
| 12/7/04 | Local meals--Jeffrey K. Martin | $ 42.25 |
| 12/7/04 | Parking--Jeffrey K. Martin | $ 8.50 |
| 12/7/04 | Local Meals--Jeffrey K. Martin | $ 29.00 |
| 12/7/04 | Local meals--Jeffrey K. Martin | $ 38.51 |
| 12/15/04 | 11/23 Mileage to file response to motion--Jeffrey K. Martin | $ 1.88 |
| 12/16/04 | 11/4, 11/5, 11/8 & 11/9 mileage to/from courthouse for trial--Jeffrey K. Martin | $ 6.00 |

```
                                                        -------
                                                        $200.42
```

2004 WL 3332044 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

- 1:02CV01659 _____(Docket)
(Dec. 03, 2002)

END OF DOCUMENT

B82

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.