**J**

Westlaw

Not Reported in A.2d                                                                                                                       Page 1
Not Reported in A.2d, 1999 WL 743479
**(Cite as: Not Reported in A.2d)**

Not Reported in A.2d, 1999 WL 743479
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
ACTIVE ASSET RECOVERY, INC., Plaintiff
v.
REAL ESTATE ASSET RECOVERY SERVICES, INC., Defendant,
and ACTIVE ASSET RECOVERY, L.P., Nominal Defendant.
No. Civ.A. 15478.

Sept. 10, 1999.

Alan J. Stone , David J. Teklits , Stephanie L. Nagel , of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Plaintiff.
David J. Margules , of Bouchard Margules Friedlander & Maloneyhuss , Wilmington, Delaware; James P. Donohue, Jr. , of Gilbride, Tusa, Last & Spellane, New York, New York, for Defendant, of counsel.

MEMORANDUM OPINION

STRINE, Vice Chancellor.
*1 In 1991, Active Media Services, Inc. ("AMS"), through its president, Al Elkin, and Real Estate Asset Recovery Services, Inc. ("REARS" or the "Limited Partnership"), through its founders and co-owners Albert Holland and Mark Holod, agreed to form a joint venture, which became Active Asset Recovery, L.P. (the "Partnership"), a Delaware limited partnership. The two companies (the "Partners") were in the business of bartering media trade credits for unwanted corporate assets, in particular corporate real estate.

For five or so years, the Partnership operated as a business even though AMS and REARS never reached accord on a written partnership agreement. The two companies did business as partners while fighting over the basic, material terms of their economic relationship.

Unsurprisingly, this *ad hoc,* common law marriage came to an end, and the former partners are now before me fighting over what remains of the Partnership in this dissolution proceeding pursuant to 6 Del. C. § 17-802. The general partner, Active Asset Recovery, Inc. ("AAR"), is the plaintiff in this action. AAR is a wholly-owned subsidiary of AMS. Because AMS and AAR essentially functioned as the same entity without observing corporate distinctions and because the two corporations' economic interests in this litigation are perfectly aligned, I refer to both as "AMS" or the "General Partner."

On January 21, 1998, this court issued a decree of dissolution of the Partnership (the "Dissolution Decree"). After the Dissolution Decree, the case became a fight over the size of the Partnership pie. REARS, the Limited Partner, will gain if the pie is found to be larger in size. The reverse is true for AMS, the General Partner.

In this post-trial opinion, I find that the Partnership pie is larger than AMS says it is in its proposed accounting (the "Proposed Accounting"), but smaller than REARS claims. Specifically, I conclude that: the Partnership was dissolved January 23, 1997, when AMS first gave express notice of dissolution to REARS; AMS improperly charged the Partnership overhead for the salary costs of AMS's media department; AMS inappropriately calculated the profits on certain Partnership contracts by allocating to itself a "preferred return" for contracts not subject to such returns and by denying REARS a reciprocal preferred return on certain contracts referred by the Partnership to AMS; AMS improperly advanced to itself and its officers certain litigation expenses; and there is no quantifiable "good will" to be distributed in winding up the Partnership.

I. *Factual Background*

A. *The Creation of the Partnership*

Alan Elkin and Arthur Wagner have operated AMS since the early 1980s. AMS specializes in the media trade credit barter business, which involves the exchange of media trade credits for unwanted corporate assets.

Put simply, a typical AMS deal works in the following way. Assume a corporation has 500,000 "Cheap Trick Live At Buddakan" compact discs it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

wants to unload. AMS would place a value on that unwanted inventory and offer to pay for it using media credits. A dollar of media credits, in turn, enables the holder to purchase a dollar of print, radio, or television advertising media. In the standard AMS deal, AMS would purchase the Cheap Trick CDs in a contract enabling the selling corporation to purchase a pre-set amount of media for some combination of media credits and cash. In such a deal, AMS essentially bets that it will get more value from the combination of the Cheap Trick CDs and the cash component of the client's media purchases than it costs AMS to place the media. AMS's client bets that AMS's media purchasing skills and volume leverage will enable AMS to get good value for the client's media dollars and obtain a solid return for unwanted assets unlikely to yield a satisfactory price on a straight cash basis.

*2 Both Elkin and Wagner were experienced players in the media industry. Applying their expertise to the barter business, they made AMS successful at obtaining contracts with corporations seeking to get rid of inventory. AMS was less successful, however, when the unwanted corporate assets in question consisted of real estate. Elkin's and Wagner's efforts to convince corporate America to trade real estate holdings for media trade credits had not borne fruit.

In 1991, Elkin was introduced to Albert Holland, who had recently become unemployed from a position in the securities industry and who was working as a consultant. Elkin and Holland began discussing a joint venture whereby Holland and a friend of Holland's, Mark Holod, would work with AMS to develop its media barter business, focusing primarily on corporate real estate and financial assets. Such a joint venture would marry complementary strengths. Holland and Holod seemed to have substantial experience in the real estate and investment banking fields as well as good contacts in the relevant departments of some large corporations. Holland and Holod therefore had the potential to open new markets and clients to AMS. In return, AMS had the existing infrastructure for redeeming the media trade credits to be provided to the joint venture's clients.

On August 1, 1991, Elkin, on behalf of AMS, and Holod and Holland executed a short document stating:
> This is to advise you Active Media Services, Inc., Al Holland, Mark Holod, will enter into an agreement to form a corporation which will be named at a later date. The object of this company will be to sell barter through the use of real estate and other unwanted assets.
> The company shares will be split 1/3 Al Holland and Mark Holod and 2/3 Active Media Services. Under separate cover a more definitive agreement will be forwarded.

PX 18 (hereinafter the "Agreement in Principle"). Some time thereafter, Holod and Holland decided to call their corporate vehicle for the joint venture "REARS" and formed a Delaware corporation in that name in which each held a 50% share.

After reaching this sketchy agreement, AMS and REARS proceeded on a two-track course. The first was to start doing business as a joint venture without entering into a formal agreement constituting the joint venture. In late 1991, Holland and Holod started searching for new business for the joint venture. In January 1992, they officially began working for the joint venture in office space provided by AMS and receiving a draw against future profits but no salaries.

The second track was to formalize the terms of the joint venture. For purposes of this opinion, the second track is more significant and will be reviewed in some detail after a brief discussion of the Partnership's focus and a history of its short existence.

### B. *The Focus of the Partnership's Business*

During this litigation, the Partners have sparred over the focus of the Partnership. Although they have kicked up a lot of dust, the Partnership's focus is apparent.

*3 AMS's specialty was trading media credits for inventory. AMS's interest in investing in the Partnership stemmed from Elkin's belief that Holod and Holland had the ability to generate more lucrative barter deals involving the exchange of a variety of unwanted real estate or financial assets. Real estate and financial assets were defined broadly by AMS and REARS and included such property interests as cash, leases, debt securities, and accounts receivables. They did not extend, however, to plain vanilla "inventory" such as excess Cheap Trick CDs.

That is, it was not expected that the Partnership would do straight "inventory" for media credit deals. If the Partnership developed a relationship with a client who ultimately decided to trade inventory rather than real estate or financial assets, the Partnership would turn that deal over to AMS for

B84

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

closure. In such a circumstance, appropriate compensation would go to REARS in the form of a preferred return, as discussed below, but not necessarily at the same level as when the Partnership itself closed the deal.

### C. *The Partnership's Rocky Business History*

As in retrospect might have been expected, the Partnership took some time to get rolling. Eventually, however, Holod's and Holland's sales efforts, along with the substantial assistance of AMS and its staff, led the Partnership to close some contracts. From 1993 to 1995, the Partnership's gross profits grew from $1.7 million to $3 million. During that period the Partnership did business with such well-known companies as Texaco, Discover Card, Citibank, and Cigna.

Even so, business was uneven and tensions ran high among Holod, Holland, and Elkin. None of them dispute that their relations were quite emotional at times, although this was apparently not unusual at AMS. By late 1995, Elkin was displeased by the performance of the Partnership and felt that Holod's and Holland's difficulty in working together accounted for the Partnership's failure to produce results Elkin deemed satisfactory. According to Elkin, Holod and Holland went through periods of not speaking to one another, which deprived the Partnership of the benefits of their collaborative thinking and efforts. While not particularly relevant to this proceeding, it is only fair to note that Holod and Holland did not share Elkin's perception, either of their relationship or of the performance of the Partnership. FN1

> FN1. Although Holod and Holland admit that at times they fought and did not speak, each believed himself capable of working with the other and that the Partnership had the potential for future growth and prosperity. Moreover, they questioned several of Elkin's business decisions, including his October 1995 decision to have the Partnership hire an old friend at a six-figure salary when Elkin allegedly believed the Partnership to be sinking.

Regardless, Elkin was the head of AMS, the General Partner, and he exercised firm control over the Partnership. After failing (in his mind) to correct the relationship between Holod and Holland, Elkin in December 1995 assigned them and the other Partnership employees to work alongside AMS's sales staff. Elkin announced this move as a realignment of the Partnership and AMS, whereby the two entities would work together "to set a unified course for success." PX 66. When this realignment did not satisfy Elkin's expectations, Elkin fired Holod in March of 1996. He then told Holland that Holland could work as a member of the AMS sales staff under compensation provisions similar to those given other AMS sales staff.

*4 When Elkin fired Holod, Elkin did not give Holod notice that he intended to terminate the Partnership. Nor did he notify Holland to that effect. Most important, no formal termination notice was sent to REARS.

Indeed, the Partnership employees were paid by checks from the Partnership until the end of 1996 calendar year. A voluminous exhibit of "ADP" records shows that the Partnership continued to receive regular payroll reports detailing the salaries, benefits, and payroll taxes paid by the Partnership on behalf of its employees. Thus the Partnership continued to carry employees on its payroll, and those employees believed themselves to be still working for the Partnership. FN2 The Partnership employees continued as a separate work unit until early 1997, at which time they were disbanded and assigned to AMS. This led the employees to believe that the Partnership terminated at that time.

> FN2. The parties have left me befuddled regarding whether the Partnership or AMS initially paid the employees' salaries for the period July 1, 1996 until December 31, 1996. It is undisputed that the Partnership paid the salaries until June 30, 1996, which was the end of all the fiscal years for AMS affiliates. After that point, it is not clear whether the Partnership paid the salaries first and then was paid back by AMS after December 31, 1996 or whether Partnership employees were continuing to receiving Partnership checks during that period which were paid for contemporaneously by AMS. The general ledger on which these salaries appears, which was published well after the end of calendar year 1996, is unclear, as is the basis for the testimony of AMS's expert that AMS funded the salaries contemporaneously with their payment. It appears plausible that the employees were

paid by the Partnership originally and that the charges for those payments were later reversed and made payable by AMS through some sort of inter-company transfer. And even if AMS did reverse the salary payments, it apparently never reversed certain payroll expenses the Partnership paid its employees (e.g., 401(k) matching contributions) during this period.

In the late spring of 1996, AMS's General Counsel, Eric Weiss ("Weiss"), met with Holod. The purpose of the meeting was for Weiss to find out what Holod wanted in exchange for his agreement to a dissolution of the Partnership. Later in 1996, Holod's counsel wrote AMS and indicated that Holod would seek a judicial dissolution and accounting unless an accord was reached. Although AMS expressed continued interest in a settlement, it does not appear that AMS pressed hard to achieve such a result. Instead, the parties found themselves in litigation. On January 23, 1997, AMS gave REARS formal notice that it was dissolving the Partnership and filed this action (the "Delaware Action") seeking a judicial dissolution. AMS's notice apparently crossed in the mail with a letter from REARS's counsel complaining about inaction on the settlement front and reiterating REARS's willingness to pursue its legal remedies.

On April 11, 1997, REARS filed its own action in New York State (the "New York Action") seeking a judicial dissolution and accounting of the Partnership. In the New York Action, REARS also asserted claims of breach of fiduciary duty, breach of contract, and fraud against AMS and several of its officers and directors (the "Affiliate Defendants").

Since that time, AMS has continued to pursue barter contracts involving real estate and financial assets and has pursued contracts with former Partnership clients. Holland continues to work for AMS. Holod has returned to the world of corporate real estate.

D. *The Partners' Failure to Reach a Written Partnership Agreement*

From the August 1991 Agreement in Principle through 1996, AMS and REARS attempted to hammer out a final agreement. During the course of these negotiations they agreed to form a Delaware limited partnership through which to conduct their business. At one point AMS and REARS executed a written partnership agreement (the "Revoked Agreement") solely for the purposes of obtaining a contract from a corporate client who insisted on such an agreement before doing business with the Partnership. Because the Agreement was presented to REARS without negotiations with REARS's counsel, REARS was given the right to revoke it. REARS exercised this right after the Agreement served its business-getting purpose. FN3

> FN3. Earlier in this litigation, REARS disputed that the Partners agreed to conduct all of their business through the Delaware limited partnership, arguing instead that the Partners had a much larger joint venture that could conduct business through different entities. REARS does not press this contention before me in this Action, however, and appears to argue merely that any transactions it views as "joint venture transactions" should be accounted for as part of the winding-up of the Partnership.

*5 Despite years of sporadic negotiations, the Partners failed to ever negotiate a definitive, written partnership agreement. In the Dissolution Decree, Vice Chancellor Balick concluded that the Partners had done business through the Partnership as a Delaware limited partnership "governed by an oral partnership agreement of the parties." Dkt. 36, ¶ 2. In light of the parties' failure to reach a written accord, it remains for me to ascertain with greater precision several terms of this oral agreement.

II. *Framework for Legal Analysis*

At this stage of the AMS-REARS litigation, the key issues requiring judicial resolution are:
• the precise point at which the Partnership was dissolved;
• whether AMS and REARS reached an agreement that AMS would receive 66% of Partnership profits after receiving full compensation for its "overhead" costs in placing media required pursuant to Partnership contracts;
• whether AMS and REARS reached an agreement that a "preferred return" should be paid to AMS, REARS, or the Partnership on certain contracts;
• whether AMS acted properly in causing the Partnership to pay its expenses in this Action as well as those of itself and its Affiliate Defendants in the New York Action; and
• whether the assets of the Partnership to be distributed include any quantifiable goodwill.

B86

The Delaware Revised Uniform Limited Partnership Act ("DRULPA") is designed to provide contracting parties with the maximum level of contracting freedom. 6 Del. C. § 17-1101(c). This case presents the uncommon situation where a limited partnership has no written agreement and where the court must make sense of the muddle created by that void.

In the absence of a written accord, I will do my best to discern and implement the oral understandings of the Partners. This process will inevitably lead to conclusions with which reasonable minds could differ, given that the Partners themselves were never able to achieve a level of harmony sufficient to reduce their understandings to writing. Delaware law permits partners of a limited partnership to operate their business as they choose, insofar as their actions do not conflict with specific commands of public policy. I will therefore attempt to give effect to such bottom-line agreements between the Partners as I can reasonably glean from the Partners' bargaining history and conduct.

Where no understanding existed, I will draw on the relevant provisions of the DRULPA. Where the DRULPA does not provide guidance, I will look to the Delaware Uniform Partnership Act ("DUPA") and the "rules of law and equity" for guidance. 6 Del. C. § 17-1005.

Perhaps most important, I will measure the conduct of AMS against its fiduciary obligations as the Partnership's General Partner. In accordance with its emphasis on contractual freedom, the DRULPA enables " 'the traditional fiduciary duties among and between partners [to] ... be modified by partnership agreements.' " Sonet v. Timber Co., Del. Ch., 722 A.2d 319, 322 (1998) (quoting Kahn v. Icahn, Del. Ch., C.A. No. 15916, 1998 Del. Ch. LEXIS 223, at *8, Chandler, C. (Nov. 12, 1998)). But in the absence of a partnership agreement making plain the parties' intention to preempt the fundamental fiduciary duties of loyalty and care, a general partner remains obligated to act fairly toward the limited partners and to prove fairness when it makes self-interested decisions. Seaford Funding, L.P. v. M & M Associates II, L.P., Del. Ch., 672 A.2d 66, 70 (1995); Sonet, 722 A.2d at 322.

### III. Legal Analysis and Conclusions

### A. When Was the Partnership Dissolved?

*6 Section 17-801 of the DRULPA provides that a "limited partnership is dissolved and its affairs shall be wound up upon the first to occur of" five statutorily-specified events. 6 Del. C. § 17-801. One of these certainly occurred on January 21, 1998, when this court entered "a decree of judicial dissolution under § 1708-2 of [Title 6]." 6 Del. C. § 17-801(5). Thus there is no dispute that the Partnership was dissolved as of January 21, 1998 at the latest.

AMS argues, however, that dissolution of the Partnership occurred in March 1996, when Elkin fired Holod. Pursuant to § 17-801(1), dissolution of a limited partnership can occur "[a]t the time or upon the happening of events specified in the partnership agreement." 6 Del. C. § 17-801(1). AMS argues that Elkin's termination of Holod was an "event specified in the partnership agreement" as triggering dissolution and that the termination of Holod was the "first to occur" of the statutory events.

In support of this position, AMS argues first that Vice Chancellor Balick made an implicit finding that the Partnership had been dissolved in March 1996, because the basis for the Dissolution Decree was the fact that it was not "reasonably practical" to carry on the Partnership in Holod's absence. Second, AMS points to Holod's alleged concession that the Partnership could be dissolved by any of the Limited Partners at any time, arguing that Holod must have known that his firing was intended by Elkin as a termination of the Partnership.

The first argument is at odds with the DRULPA and with the limited nature of Vice Chancellor Balick's prior decision. The DRULPA clearly states that a judicial dissolution "occur[s]" upon the "[e]ntry of a decree of judicial dissolution." 6 Del. C. § 17-801(5). The Decree followed the language of § 17-801 precisely by declaring the Partnership "hereby dissolved" on January 21, 1998. AMS has not pointed to statutory language or history suggesting that a decree of judicial dissolution relates back in time to the events making it, in the court's judgment, "reasonably impractical" for the partnership to continue. I refuse to assume that the General Assembly implicitly intended to inject such an unpredictable concept into the DRULPA.

From a practical perspective, reading into the statute the authority to declare a partnership dissolved on the date on which the events necessary to the court's determination of reasonable impracticability had occurred would work a significant extension of 6 Del.

B87

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C. § 17-802. As a general matter, this court's power to dissolve a partnership where events have made it "reasonably impractical" for the partnership to continue in accordance with the partnership agreement is a "limited" one and should be exercised with corresponding care. M.I. Lubaroff & P.M. Altman, *Lubaroff & Altman on Delaware Limited Partnerships,* § 8.2 at 8-12 (1999) (hereinafter "Lubaroff & Altman"). Because the standard to be applied in a dissolution proceeding under § 17-802 is that of reasonable impracticability rather than impossibility, it will not always be certain exactly when circumstances changed from the practicable to the impracticable. Using a highly discretionary, *ex post facto* judicial decision as the basis for fixing a dissolution date appears likely to result in a variety of unintended consequences for participants in Delaware limited partnerships. This court is not the proper authority to determine that such consequences, be they for good or ill, are appropriately borne.

*7 The proposed extension is also hard to square with the specific language of 6 *Del. C.* 17-801. Section 17-801 provides for a dissolution to be effective on the "first to occur" of five specific statutory events. Those events do not include the "date on which it became reasonably impracticable to carry on the partnership business in conformity with the partnership agreement as provided for in a decree of judicial dissolution under § 17-802." That the General Assembly chose to set forth five specific triggering events and did not include the one AMS presses upon me provides strong evidence that the statute excludes that event. Most important, the legislature included judicial dissolution as one of the five events while stating that such dissolution "occur[s]" on "[e]ntry" of the decree. 6 *Del. C.* § 17-801(5).

On the other hand, I reject REARS's argument that the Dissolution Decree in and of itself precludes AMS from arguing for an earlier effective date of dissolution. Unlike AMS and REARS, I do not read the Dissolution Decree as opining one way or the other on whether the Partnership was dissolved at an earlier time than January 21, 1998 because of the "happening of an event" specified in the partnership agreement.

I will therefore address AMS's second argument that the Partnership was dissolved in March 1996 because the "oral partnership agreement" included the understanding that a firing of one of the limited partners from employment by the Partnership would result in an automatic dissolution of the Partnership.

AMS bolsters this contention by citing to testimony by Holod that REARS did not object to the Partnership being terminable by either Partner so long as REARS had the same termination rights as AMS. Because the Partnership contemplated the marriage of Holod's and Holland's sales skills with AMS's media placement capabilities, AMS argues that Holod should have recognized that when Elkin fired him, Elkin was in effect dissolving the Partnership. FN4

> FN4. At trial and in his deposition, Elkin testified that it was "obvious" that the Partnership was being terminated in December 1995 when he "moved" Holod and Holland to work alongside AMS's sales staff. Elkin Dep. 140, *see also* Tr. 657 ("implicit" in memorandum describing the realignment that the Partnership was being terminated). However, Elkin admitted that he never told Holod and Holland that he was thereby revoking the Partnership agreement. Elkin Dep. 141; *see also* Tr. 65-658 (admitting his memoranda do not use the word "terminate"); *see also* Tr. 903-904; 1036 (Holod testimony that Elkin did not give him notice of termination of the Partnership when he realigned the staff of the Partnership). In fact, Elkin's own December 1995 memoranda continue to refer to the Partnership as a separate entity from AMS. *See* PX 66; PX 67 (repeatedly referring to the Partnership as an entity separate from AMS). The evidence therefore does not support Elkin's contention that he intended to dissolve the Partnership in December 1995, and certainly does not support a finding that he gave REARS notice to that effect.

The problem is that Elkin never manifested his subjective, unspoken intent to terminate the Partnership by expressly communicating that intent to REARS in March 1996. When Elkin fired Holod in March 1996, he did not inform him that AMS was terminating the Partnership. FN5 Even when Elkin informed Holland that Holod had been fired and "proposed" a new employment relationship between Holland and AMS, Elkin did not notify Holland that the Partnership was terminated. No written termination notice was provided formally to REARS, which is a corporation, not a human being. FN6

FN5. Holod went to work for a competitor of the Partnership, Maxwell Trading, for a short time after his firing. Holod believed he was individually free to do that since he had been fired and had not departed voluntarily. While Holod was at Maxwell, that company closed a transaction for which the Partnership, through Holod, had been competing before his firing. Holod testified that Maxwell had been competing for the transaction before Holod joined it and that he was not involved in bringing in or closing that transaction for Maxwell. Regarding Holod's employment at Maxwell, it is noteworthy that the parties never reached an agreement about Holod's and Holland's duty to refrain from competing individually upon a termination of their employment. AMS's own proposed terms contemplated that Holod would be free to compete individually unless he was dismissed for "cause," DX 66 at 13, a term of art in the employment field that AMS has not proven existed with respect to Holod.

FN6. When Holland agreed to the new employment terms, he viewed himself as negotiating for himself only and not for REARS.

The fact that the Partnership's employees continued to work as a unit on the Partnership's payroll until 1997 reinforces the absence of a clear expression by AMS of its intent to dissolve the Partnership. Given that AMS had conducted many of its negotiations with REARS through counsel, it is also telling that AMS never had its lawyers prepare and deliver a dissolution notice to REARS in March 1996. Instead, AMS had its General Counsel Weiss approach Holod later that year about the terms on which a consensual dissolution and winding-up might occur.

*8 Based on this record, I conclude that AMS did not give notice that it was terminating the Partnership until January 23, 1997, the date it gave written notice to REARS to that effect. That notice stated that "the General Partner *is terminating* the Partnership" and was sent to REARS's corporate address and to REARS's registered agent. DX 133 (emphasis added). AMS's earlier, implicit efforts at termination were not effective as against REARS.

In this regard, it appears that one of the few things upon which the Partners agreed was that if the Partnership was to be dissolved at the instigation of either AMS or REARS, then the Partner seeking dissolution had to give appropriate notice to the other Partner. For example, the Revoked Agreement gave AMS the right to dissolve "the Partnership upon ninety (90) days prior within [sic] notice to [REARS]." DX 15, ¶ 14.1. The earlier terms proposed by the law firm of Schulte Roth & Zabel on AMS's behalf gave AMS the right to terminate upon 60 days' notice to REARS. During all the back and forth after the revocation about what should be in a new agreement, there seems to have been no dispute about the requirement of notice of dissolution.

As important, the negotiating history does not support the conclusion that the firing of Holod individually would, without more, cause a dissolution of the Partnership. In the negotiations between the Partners, AMS presented contractual terms proposing that upon a termination of Holod's or Holland's employment by death or disability, AMS would have the right to purchase the relevant Partner's interest at book value. The proposed terms state that the Partnership would be automatically dissolved by reason of Holod's departure only if such departure resulted from a "material breach" of Holod's employment contract by Holod himself. DX 66, § 19. These terms are at odds with AMS's position that the Partners knew that if AMS fired Holod or Holland, then the Partnership would automatically dissolve.

On the other hand, I reject REARS's argument that AMS had no ability to walk away, absent judicial intervention. Although REARS and AMS never reached a final accord on the dissolution rights each possessed, I conclude that either Partner had the right to dissolve the Partnership by giving express notice of dissolution to the other Partner. REARS never challenged AMS's assertion of such a right; it simply wanted the same right itself.

In the absence of an agreement limiting their dissolution rights, the Partners retained such walk-away rights. Where parties fail to hammer out a written partnership agreement or reach an accord about their right to walk away, it would be anomalous to interpret them as having entered into an indissoluble bond. To the extent that joint venturers want to create a partnership that is difficult to escape, they should be required to reach a clear agreement to that effect. Implying such a bond in the absence of an agreement would encourage commercial parties to behave as AMS and REARS have done, an incentive system that is irrational. Finally, Delaware public policy, as reflected in the Delaware Uniform

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Partnership Act, indicates that general partnerships are dissolvable by the "express will" of any Partner, absent agreement to the contrary. 6 Del. C. § 1531(2). Where the partners of a limited partnership fail to reach a precise accord, the partners of a limited partnership implicitly agree to retain this dissolution right. 6 Del. C. § 17-1105.

*9 AMS expressed its will to dissolve on January 23, 1997. This statutory dissolution event occurred before the Dissolution Decree and fixes the date of dissolution under 6 Del. C. § 17-801. January 23, 1997 is therefore the appropriate marker for determining which assets are to be included in the distribution. As then Superior Court Judge (now Chancellor) Chandler has explained, "a former partner is entitled to share, according to his interest, in the profits earned on business pending at dissolution." *Burrus v. Fraser,* Del.Super., C.A. No. 87A-MY9, 1988 Del.Super. LEXIS 266, at *9-10, Chandler, J. (Aug. 12, 1988) (*citing* 1 R. Rowley, *Rowley on Partnership* § 42.3(C)(1) (2d ed.1960)); *see also Kirkpatrick v. Caines Landing Wildlife Preserve Ass'n,* Del. Ch., C.A. No. 11833, 1992 Del. Ch. LEXIS 233, at *6, Jacobs, V.C. (Nov. 12, 1992) (dissolution date is the reference point for determining what amounts, if any, the partners are owed), *aff'd, Kirkpatrick v. Caines Landing Wildlife Preserve Ass'n,* Del.Supr., 633 A.2d 369 (1993).

The parties have devoted little attention to the nettlesome question of exactly what pending business means in this context. That is, does it apply only to consummated contracts or to contracts close to consummation on the date of dissolution but closed thereafter? *Cf. Paciaroni v. Crane,* Del Ch., 408 A.2d 946, 956 (1979) (indicating that a partnership may commit to new contracts during the wind-up period if necessary or advantageous to the partners' economic interests). For purposes of this case only, I will therefore adopt the standard employed by AMS in making its Proposed Accounting and attribute to the Partnership any transactions that, as of the Dissolution Date, "were sufficiently in the negotiation process" so that equity dictates their inclusion in the accounting. FN7 AMS Post-Trial Reply Br., at 13.

> FN7. The parties, in particular AMS, asked me to issue a decision before the New York Action's trial date of September 13. That has left me little opportunity to research this question thoroughly. A rapid search did not generate clear authority.

### B. *The Overhead Dispute*

The overhead dispute centers on whether or not the parties agreed that AMS could recoup 100% of its infrastructure costs attributable to AMS's placement of media resulting from Partnership contracts. This controversy is of material economic significance. In the Proposed Accounting, AMS charges the Partnership several million dollars in media overhead. In this opinion, I refer to "media overhead" as the salary and benefit costs of the employees of AMS's media department, since that is the major portion of the overhead at issue and the aspect over which the Partners primarily duel. FN8

> FN8. AMS implemented the overhead charge using the following allocation method. First, AMS determined the approximate total employment cost of running its media department ("Total Media Department Employment Costs"). Second, AMS determined what percentage of the media placed by its media Department was placed for Partnership clients ("Partnership Percentage"). Finally, AMS multiplied its Total Media Department Employment Costs times the Partnership Percentage to determine the overhead charge. Thus, if in 1995 the AMS Total Media Department Employment Costs were $2 million and the Partnership Percentage was 25%, the Overhead Charge would be $500,000 for that year. The Partnership paid as a direct cost any commissions due AMS staff on Partnership contracts and REARS agreed to those costs.
>
> I exclude from the category of media overhead any overhead AMS charged for legal and accounting expenses. REARS agreed to cover legal and accounting expenses directly required by the Partnership, *see* PX 26, ¶ 1.5, and has not argued that AMS's legal and accounting departments were a justification for AMS's 66% profit share. In the absence of a showing by REARS that the legal and accounting charges were in excess of what outside vendors would have charged to draft the Partnership's contracts and keep its books, I will allow that portion of the overhead charged in the Proposed Accounting. Although this results in a somewhat inconsistent outcome, it is the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 9
Not Reported in A.2d, 1999 WL 743479
(Cite as: Not Reported in A.2d)

most equitable approach in light of the bargaining history.

AMS contends that Elkin made it clear to Holod and Holland from the outset that the Partnership would bear all costs of its operations, including media overhead. REARS counters that the media overhead charge constituted an after-the-fact grab by AMS for more than AMS's agreed-upon 66% return. REARS argues that the media infrastructure was AMS's contribution to the Partnership, similar to Holod's and Holland's willingness to work free of charge and live off of advances against future profits.

*10 During the initial discussions about a formal partnership agreement, AMS proposed terms for determining the basis for allocating profits between the Partners. Specifically, AMS proposed that AMS receive 66%-and REARS 33%-of the Partnership's gross profits according to the following definition:

> Gross profit is determined by the sale of assets and media (and/or services) less cost of media and all other direct cost. Direct costs include commissions, brokers fees, professional fees, closing costs and inspection fees.

PX 26; see also PX 25 (1/23/92 memo from AMS proposing similar definition to Holod and Holland). This definition of direct costs was consistent with another provision of the proposed terms, which provided:

> The Joint Venture shall bear all of the costs associated with the formation and operation of the Joint Venture including, but not limited to, rent, telephone, printing, duplicating, postage, travel expenses, legal expenses, accounting expenses, and fees of agents and consultants, including brokerage commissions and finders fees. All such expenditures must be passed upon by the Board of Directors of AMS, G.P. which shall approve or disapprove expenditures in accordance with the policies then in effect at Active Media Services, Inc.; appropriate documentation will be required.

PX 26 at ¶ 1.5.

REARS argues that, based on these proposals and the absence of any claim for media overhead at that time, Holod and Holland both reasonably believed that direct costs meant only those costs that were incurred directly as a result of the Partnership or a Partnership deal *and* that would not have been incurred otherwise . FN9 At trial, Weiss admitted that REARS "always took the position" that the rationale for according AMS 66% of the Partnership was that AMS was bringing its existing media placement infrastructure to the table free of charge. Tr. 36-37.

FN9. For example, if it cost AMS $25,000 to purchase media for a Partnership client, that would be a direct cost. Similarly, if the Partnership had to pay a finder's fee to a source whose lead generated a contract, that would be a direct cost. However, the fact that an existing AMS employee spent time placing media for a Partnership client was not, in their view, a direct cost.

By 1993, however, the Partnership had secured enough contracts such that its clients were beginning to execute the media trade credits. At that time, AMS began to charge media overhead to the Partnership and pay profits out of what was left after AMS was paid its direct costs and overhead. AMS's decision to charge media overhead was a unilateral one, based on AMS's view that it would have never done a deal with REARS if it could not recapture the full costs of its media overhead. AMS believed it had the right to walk away from the Partnership at any time and thus considered it fair to impose a reasonable media overhead charge. This decision was made informally by Elkin and Wagner rather than through formal action by the General Partner's board of directors. Holod and Holland objected to this practice.

In subsequent negotiations AMS pressed Holod and Holland to accept a media overhead charge. On January 11, 1995, AMS proposed contractual language different from what AMS proposed in 1992. This proposal stated:

> The Limited Partnership shall pay all of its expenses of operation including rent, telephone, printing, duplicating, postage, travel expenses, entertainment expenses, legal expenses, accounting expenses, agents fees, consultants fees, brokerage fees, finder fees *and other overhead expenses incurred through the Service Agreement (as such term is defined below)*.

*11 The Limited Partnership shall enter into a service agreement ("Service Agreement") with AMS to obtain media, goods and/or services to satisfy the Limited Partnership's trade credit obligations. In payment for the media, goods and/or services provided to the Limited Partnership, the Limited Partnership shall pay AMS or its affiliates (i) AMS's or its affiliates' actual costs of media, goods and/or services *and (ii) an overhead charge equal to a percentage of the gross media placed (net media costs adjusted*

B91

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*for agency commission) or the cash cost of goods and/or services provided and billed to clients of the Limited Partnership.*

DX 66, ¶ 16, 18 (emphasis added). This was the first time AMS proposed language specifically requiring the Partnership to pay "overhead."

AMS and REARS negotiated over the overhead issue until Elkin fired Holod. During these negotiations, REARS was willing to entertain a charge for incremental overhead costs resulting from the Partnership's growth. That is, to the extent that AMS was required to add staff or resources to handle Partnership business, REARS was willing to consider paying for such incremental costs. But in exchange for such payments, REARS sought a say, if not control, over how such resources would be employed or a bigger share of the Partnership. However, the parties were never able to forge a compromise on the overhead issue and REARS never agreed to pay overhead. FN10

> FN10. I reject AMS's contention that REARS acquiesced in media overhead charges. AMS admits that the parties engaged in virtually unbroken negotiations over the issue and that REARS consistently opposed such charges during that process. As such, I see no basis for AMS's assertion that REARS "remain[ed] inactive for a considerable time," "freely g[a]ve recognition" to the legitimacy of the overhead charged, or in any way "conduct[ed] itself] in a manner inconsistent" with its present challenge to the imposition of overhead. Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in The Delaware Court of Chancery*, § 11-3, at 760 (1998); *see also Cantera v. Marriott Senior Living Services, Inc.,* Del. Ch., C.A. No. 16948, 1999 Del. Ch. LEXIS 26, *23-24, Lamb, V.C., (Feb.18, 1999) (same). The fact that REARS did not pull the plug on these negotiations does not constitute acquiescence. A contrary result would discourage good faith negotiations over such issues and encourage a race to the courthouse. Such a result would also be inequitable given the relative power positions of AMS and REARS. Holod and Holland needed distributions to feed their families. By not racing to court to protest media overhead distributions and instead accepting a hold-back for media overhead while the parties negotiated the issue, Holod and Holland were able to obtain distributions to meet their economic needs. In so doing, they never gave AMS reason to believe that they were "acquiescing" in these charges.

After reviewing the record outlined above, I conclude that, contrary to AMS's assertions, no agreement existed among the Partners that the Partnership would pay AMS overhead for media placed by it on Partnership contracts. I find that Elkin led (in part through his lack of clarity) REARS to believe that AMS's media infrastructure constituted AMS's contribution to the Partnership, justifying its 66% ownership interest. This belief led Holod and Holland to accept 33%, to pay for certain direct costs out of the Partnership, and to work exclusively for the Partnership without salary.

AMS did not communicate to REARS at the inception of the Partnership that media overhead charges would be assessed to the Partnership. To the contrary, the reasonableness of Holod's and Holland's belief that media overhead was not included in the term "direct costs" is demonstrated by the contractual terms AMS itself proposed, which never clearly identify "overhead"-i.e., a percentage of AMS's existing fixed costs-as one of the components of direct cost chargeable to the Partnership. FN11 Given the material economic significance of media overhead charges, it is difficult to believe that AMS's experienced outside counsel would have buried that issue under a pile of less economically significant but expressly included terms, such as "duplicating" and "telephone" charges. Overhead is not an obscure term; AMS's failure to use it expressly speaks volumes. *Cf.* Arthur L. Corbin, 3 *Corbin on Contracts* § 552 at 206 (1960) (explaining that under the rule of *expressio unius est exclusio alteris,* "If one subject is specifically named, or if several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded").

> FN11. In support of AMS's position that Elkin made it clear to REARS from the beginning that overhead would be included in the costs chargeable to the Partnership, Elkin testified at trial that he told Holod and Holland that the Partnership would have to

B92

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pay for "what it used." Tr. 597. Elkin explained that this covered such things as "travel, secretarial, entertainment, media costs," but only when prompted by his counsel did he mention that "overhead" was included in that concept. Tr. 597-98; see also Tr. 815-816 (Holod testimony that Elkin never discussed allocation of overhead during discussions of direct cost reimbursement).

*12 In contrast to media overhead, the direct costs explicitly agreed upon by the Partners were those directly caused by the Partnership's activity, in accordance with the examples identified in the term sheets. Each of those examples relates to a cost that, but for the existence of the Partnership, would never have been incurred. For example, the definition of direct costs includes telephone charges attributable to phones for Partnership employees and calls made by them as well as the direct costs of placing media for Partnership contracts. Such charges would not have occurred absent the Partnership. General media overhead differs from such direct costs in that it assesses to the Partnership a charge for costs that were largely independent of the Partnership's existence; AMS had a media department before the Partnership was started and maintains one today. Further, AMS failed to demonstrate at trial that the Partnership caused it to incur additional departmental costs. FN12

> FN12. At trial, AMS presented an exhibit showing the growth in employment costs for AMS's media department during the course of the Partnership. PX 81. AMS did not convince me that the incremental growth in its media department was due predominantly to the business generated by the Partnership. Moreover, if this were true, it would completely undercut Elkin's testimony that the Partnership was "sinking" at the time he thought he terminated it. Most important, if AMS had to incur incremental costs to obtain the benefits of its 66% profit share in the Partnership that would not be unreasonable, as an objective matter.

It may well be that AMS and REARS talked past one another in the negotiations and that each is fairly representing its own intentions in entering into the Partnership. To me, it appears more probable that AMS bemoaned its failure to strike a more specific bargain with Holod and Holland in the beginning.

When the Partnership began to generate contracts, AMS recognized that it would receive a much lower net profit on Partnership-generated contracts than it would on purely AMS contracts. AMS then attempted to "oh by the way" its way into a media overhead charge it had never clearly proposed but met with objections from Holod and Holland. Unfortunately for AMS, the record indicates instead that media overhead was *not* within the concept of direct costs agreed to by its Partner.

When AMS determined that the Partners had a materially different view of the media overhead issue, AMS had the option to either dissolve the Partnership or seek a judicial declaration that the charges were appropriate. Either would have been a fair way of resolving the Partners' failure to agree on a material issue. By contrast, AMS's unilateral imposition of terms favorable to itself at the expense of REARS is at odds with a general partner's fiduciary duty of loyalty to its limited partner.

In this respect, I am unpersuaded by AMS's reliance upon general enabling sections of the DRULPA, which accord general partners of limited partnerships managerial authority, as a justification for AMS's unilateral decision to have its own way on the media overhead issue. See, e.g., 6 Del. C. § 17-403 (general partner has managerial authority over a limited partnership, absent a contrary provision in the partnership agreement). Nothing in the DRULPA divests a corporate general partner of its fiduciary obligations. In this case, AMS did not contract with itself to provide the Partnership with services but simply imposed its own view of the profit-sharing arrangement between itself and REARS when REARS would not bend to its will. In reaching this self-interested decision, AMS employed no procedural protections designed to ensure fairness to REARS; indeed, the decision was not even made through formal action of the corporate board of the General Partner.

*13 The argument that AMS should be able to recover 100% of its costs before the profit allocation is also hard to square with AMS's refusal to pay Holland and Holod a retrospective salary for the first three years of the Partnerships. Like corporations, human beings also have overhead. Holod and Holland were forced to absorb their overhead-mortgages, car payments, clothes, food-out of their profit share. In the absence of an agreement, an even-handed approach would have required the General Partner to at least consider this reality. FN13

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN13. AMS unilaterally decided to change the basis for allocating overhead during the wind-up period. Eschewing its prior allocation approach, which resulted in an overhead charge equal to approximately 3.5% of the cost of media placed by the Partnership through AMS, AMS instead applied an overhead charge equal to 8.2% of the media placed. Tr. 771-776. The wind-up overhead charge was developed solely for the wind-up of the Partnership and is not the basis on which AMS allocates overhead to any of its other corporate subsidiaries. Tr. 792-793. Apparently, AMS's legal counsel ordered AMS staff to impose the charge on the basis that AMS could fairly charge the Partnership overhead rates comparable to what AMS would have had to pay for media placement on the open market. Tr. 782. I reject AMS's assertion that it can unilaterally reapportion the profits between the Partners by calling this overhead a "wind-up" expense. That expense is compensated for in its 66% share of the profits.

C. *The Preferred Returns Dispute*

Because AMS was already in the barter business and had a stable of existing clients with whom it traded media credits for inventory, AMS was concerned from the beginning about the potential for zero-sum conflicts between the Partnership and itself. AMS's clients had a finite need for media and if they simply started exchanging real estate and financial assets with the Partnership in exchange for media credits, AMS might find any gains through Partnership transactions offset by a reduction of those clients' direct transactions with AMS. Even so, AMS wanted to introduce the Partnership to its own clients if it could still capture a fair return.

To address these somewhat conflicting objectives, AMS proposed that it receive a "preferred return" on certain Partnership transactions. Originally, AMS proposed a 55% preferred return. A 55% preferred return on a Partnership transaction equaled a total profit share of 85% for AMS and 15% for REARS. According to AMS, this return was set because 15% was the highest fee AMS paid to finders.

As originally proposed by Schulte Roth on behalf of AMS, the 55% return was reciprocal. AMS was to receive a 55% preferred return if it "introduced" a "real estate transaction" to the Partnership. DX 7. Thus AMS's original proposal advocated that it receive a preferred return on all deals that it referred to the Partnership and not just on deals involving prior clients of AMS. In turn, REARS-not the Partnership-would receive a 55% return on any non-real estate contracts it referred to the Partnership or AMS.

AMS and REARS haggled over the preferred return issue for most of 1992 and 1993. On March 25, 1993, AMS attempted to secure REARS's agreement that "potential transactions will be deemed [AMS] generated transactions [i.e., earn a preferred return for AMS] when AMS has concluded a transaction with the client in the past or has had significant previous contacts with the client." DX 12. REARS objected to this proposal and instead agreed that a preferred return was appropriate where the Partnership closed a transaction with a client that "ha[d] an established business relationship with" AMS. *Id.* In cases where AMS sales staff helped refer a transaction involving entities without an existing client relationship to AMS, REARS did agree that the Partnership would pay the commissions earned by the AMS staff.

The parties failed to reach a written accord, however, and continued to dispute the size of the preferred returns and how reciprocity would be achieved. While AMS and REARS agreed that the preferred return concept was intended to be reciprocal, they disagreed over whether the referral fee would be paid to the Partnership in the case of a referral from the Partnership to AMS or whether the fee would be paid to REARS. Both Holod and Holland understood the fee to be payable to REARS in a circumstance where the Partnership initiated a relationship with a client and found out that the client was interested in doing a barter transaction involving inventory (AMS's bread and butter) rather than real estate or financial assets. This understanding was consistent with the terms proposed by Schulte Roth on AMS's behalf. In 1993, Holod and Holland signed off on a preferred return of 40% to AMS for two Partnership transactions. Both of these transactions were with entities that had existing contractual relationships with AMS. But at a meeting in the fall of 1994, REARS and AMS agreed that any future preferred returns would be at the 25% level. FN14

FN14. This agreement came in the context of larger negotiations about the economic terms of the Partnership and accompanied an agreement to pay Holod, Holland, Elkin, and

B94

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Wagner salaries out of the Partnership. There is no basis for an inference that the salaries for Holod and Holland were the *quid pro quo* for an agreement on the preferred return or the overhead issue. These remained as points in dispute.

*14 Holod and Holland continued to take the position that REARS would receive the preferred return on any transaction referred to AMS by the Partnership. Their testimony to this effect is reinforced by AMS's admission that REARS wanted to reduce the referral fee to 25%. Had REARS taken this position along with the position that the Partnership, not REARS, would receive the preferred return on an inventory transaction referred to AMS, REARS would have been agreeing to a 8.33% profit share on such referred transactions. Holod and Holland were tough negotiators unlikely to have silently assented to such a drastic reduction in their cut. In contrast, a 25% preferred return payable to either Partner results in a 75% AMS, 25% REARS profit split on all preferred return transactions, a result more in accord with the concept's objectives and with genuine reciprocity.

Based on the negotiating history and testimony, I therefore conclude that the parties' bottom-line agreement was that the preferred return concept would be reciprocal in accordance with AMS's original, Schulte Roth proposals. As such, preferred returns payable were due to either the General Partner AMS or the Limited Partner REARS, with none to be paid to the Partnership itself. In addition, I find that AMS and REARS agreed that AMS would receive a preferred return on any Partnership transaction concluded with an existing AMS client. REARS would receive a preferred return on any AMS inventory transaction referred to AMS by the Partnership. Before the fall of 1994, the level of the preferred return to be paid was 40%; afterward, the level was set at 25%.

I recognize that there was no perfect meeting of the minds and that AMS may have subjectively intended that it and the Partnership would receive preferred returns but that REARS never would. Yet REARS never assented to that intention, and it is at odds with AMS's own original position and with the record of the subsequent bargaining history. Moreover, if there was no meeting of the minds, I see no reason in equity or law why AMS, as General Partner, should have its way at the expense of REARS, the Limited Partner, in the context of this winding-up.

D. *Are AMS's Legal Costs In The Delaware and New York Actions A Proper Partnership Expense?*

REARS challenges AMS's decision to pay for all of AMS's legal fees and expenses in the New York and Delaware Actions out of the Partnership (the "Advancement Decision"). This includes the fees and expenses incurred by the AMS Affiliate Defendants in the New York Action.

AMS's decision cannot be upheld on the basis of any understanding between AMS and REARS regarding indemnification. The only evidence that the parties even considered indemnification is a provision of the Revoked Agreement drafted by AMS. That provision permitted indemnification of "the General Partner and its Affiliates from and against any and all losses, liabilities and expenses (including reasonable attorneys' fees) arising from or related to damages, claims, demands, investigations, suits or proceedings ... in which it or its affiliates may be involved, as a party or otherwise, by reason of the management of the affairs of the Partnership ..." DX 15, at § 11.4. It further provided that "[n]either the General Partner nor its Affiliates shall be entitled to indemnification hereunder for any conduct arising from (i) gross negligence or willful misconduct, or (ii) the breach of this Agreement." *Id.*

*15 The provision was contained in the Revoked Agreement and therefore is not determinative of the issue. Still, it does provide some insight into the type of indemnification powers AMS desired. Unfortunately, there is no further negotiating history on the indemnification issue.

In the absence of any such agreement, AMS decided to advance itself and its Affiliate Defendants the funds necessary to cover their legal expenses in the New York Action and in this Action. This decision was not made by the board of directors of the General Partner but instead by Elkin on the basis of advice from counsel that he could approve such funding.

In determining whether this decision was proper, I must consider the fact that the Partnership must be wound up. There are costs to this process that our law generally does not consider to be the charitable duty of the partner responsible for winding up a partnership's affairs. *See* 6 Del. C. § 1518(6) ("[A] surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs."). One such cost is that of preparing an accounting; another such cost, in this fractious situation, is that of securing dissolution and

a judicial approval of that accounting. Given the poor relations between REARS and AMS and their futile efforts to reach a final partnership agreement, there is no reason to believe that AMS could have ever avoided a judicial resolution of the dissolution or accounting issues presented in this dispute.

On the other hand, it is clear that AMS has pursued the Delaware Action primarily for its own self-interest: this case is mostly a fight over a pot of money. In so stating, I do not mean that AMS has engaged in inappropriate or oppressive conduct. I simply state a commercial truth. AMS's intent has been to prove that the Partnership was dissolved as early as possible and was as lacking in value and limited in purpose as possible.

In the New York Action, AMS has been even more self-interested. It has acted to defend itself and its Affiliate Defendants against serious accusations of wrongdoing and has attempted to ensure that the Delaware Action proceeded ahead of the New York Action (after failing to ensure that this case proceeded in lieu of the New York Action).

From this factual scenario, REARS and AMS draw opposite conclusions about the validity of AMS's Advancement Decision. AMS contends that I must defer to its decision to pay its own fees and expenses out of the Partnership as a valid business judgment authorized by the DRULPA. REARS contends that the Advancement Decision was *ultra vires* since it reads the DRULPA as barring advancement and indemnification in the absence of an agreement between the Partners on those issues. Even if the Advancement Decision was not *ultra vires,* REARS argues that it was a self-interested choice unfair to REARS.

The propriety of AMS's decision to have the Partnership pay all of its costs requires consideration of three legal questions. First, does the DRULPA permit a limited partnership to indemnify partners and other persons in the absence of a partnership agreement providing for such indemnification? Second, does the interplay of 6 Del. C. § 17-403(a) of the DRULPA and 6 Del. C. § 1518(6) of the DUPA suggest that a general partner of a limited partnership has the right to recover proper litigation-related winding up expenses from the limited partnership? Finally, if the DRULPA permits indemnification absent a partnership agreement, under what fiduciary standard of review must one measure AMS's Advancement Decision and did AMS satisfy that standard?

1. *Was The Advancement Decision Permissible Under The DRULPA?*

*16 Section 17-708 of the DRULPA provides: "Subject to such standards and restrictions, if any, as are set forth in its partnership agreement, a limited partnership may, and shall have the power to, indemnify and hold harmless any partner or other person from and against any and all claims and demands whatsoever." 6 Del. C. § 17-108. No Delaware case has decided whether § 17-708 permits a limited partnership to indemnify a partner or other person in the absence of a provision in the limited partnership agreement providing for such indemnification. *Lubaroff & Altman,* § 4.3 at 4-8. Nor has a Delaware case determined whether a component of the indemnification referred to in § 17-708 includes, in the absence of a partnership agreement speaking to the issue, the advancement of litigation fees and expenses.

Section § 17-708, like the rest of DRULPA, is broadly empowering and deferential to the contracting parties' wishes regarding indemnification and advancement. *Delphi Easter Partners Limited Partnership v. Spectacular Partners, Inc.,* C.A. No. 12409, Del. Ch. LEXIS 159, *4, Allen, C. (Aug. 6, 1993). "In fact, Section 17-108 defers completely to the contracting parties to create and delimit rights and obligations with respect to indemnification and advancement of expenses." *Id.* As is true with any statute, the most important guide to interpreting § 17-708 is the statute's language. This is especially so with respect to § 17-708 because neither the parties nor the leading treatise explicating the DRULPA cite relevant statutory history on the issue posed here. *Lubaroff & Altman,* § 4.3.

The best reading of § 17-108 is that it permits a limited partnership to indemnify a partner or other person even in the absence of a provision in the partnership agreement contemplating that result. The statute says that "a limited partnership may, and shall have the power to, indemnify[.]" 6 Del. C. § 17-108. That statutory authority is tempered by "such standards and restrictions, if any, as are set forth in the partnership agreement." *Id.* Thus, the partnership agreement may eliminate or tailor the power vested in the limited partnership. Absent a provision in the partnership agreement, the limited partnership would retain the power granted it by the statute.

Unlike REARS, I do not read *Delphi Easter* as

B96

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

holding to the contrary. REARS argues that Chancellor Allen's statement in *Delphi Easter* that § 17-108 "itself creates no rights to indemnification" precludes a limited partnership from indemnifying a partner or other person in the absence of an authorizing provision in the limited partnership agreement. *Delphi Easter,* 1993 Del. Ch. LEXIS 159, at *4. In the *Delphi Easter* opinion, however, Chancellor Allen was merely observing that the statute did not invest any partner or person with a right to indemnity in certain situations. In this regard, Chancellor Allen compared § 17-108 "to the [DUPA general] partnership indemnification provision, 6 Del. C. § 1518(2)(1991), which provides for mandatory indemnification in a narrower set of cases[.]" *Id.*

*17 Further, because DRULPA § 17-108 speaks directly to the issue of indemnification, I reject AMS's contention that 6 Del. C. § 1518(2) provides a back-up rule in the absence of a provision in a limited partnership agreement dealing with indemnification. As Chancellor Allen pointed out in *Delphi Easter,* § 1518(2) is substantively different in approach than § 17-108, and the DRULPA's drafters appear to have declined to adopt the more prescriptive method of the DUPA. Section 17-108 's language that a limited partnership "may" indemnify cannot be squared with § 1518(2)'s language that a general partnership "must" indemnify in certain circumstances.

I conclude that in the absence of an agreement, § 17-108 leaves a limited partnership with the power but not the duty to indemnify. Given that the power to indemnify would seem broader than-and, indeed, inclusive of-the power to advance litigation expenses, it seems reasonable to infer that a limited partnership also has the power of advancement. *Cf. Advanced Min. Systems, Inc. v. Fricke,* Del. Ch., 623 A.2d 82, 84 (1992) (noting that if a person receiving advancement either repays the funds or is ultimately entitled to indemnify, "the decision to extend advancement rights should ultimately give rise to no net liability on the corporation's part"). *Delphi Easter's* own recognition that a partnership agreement may contain advancement provisions strongly suggests that this is so, because § 17-108 was the statutory basis for the Chancellor's conclusion that a limited partnership agreement could legitimately include an advancement provision and because § 17-108 does not mention the term advancement. *But see Delphi Easter,* 1993 Del. Ch. LEXIS 159, at *22 ("The public policy of Delaware is to allow advancement, if the partnership agreement so provides, even in cases in which the plaintiff is a limited partner and the claims are for breach of fiduciary duty."); *see also Christman v. Brauvin Realty Advisors, Inc.,* 1997 U.S. Dist. LEXIS 19563, at *7 (N.D.Ill.1997) ("The language in *Delphi* strongly suggests that the right to advancement exists only if it is provided for in the partnership agreement."), *appeal dismissed without op.,* 134 F.3d 374 (1998). FN15

> FN15. It must be remembered that this case deals with the "power" to indemnify not any "right" of indemnity or advancement. There is case law that legitimately distinguishes between the right to advancement and the right to indemnification under statutes and specific corporate bylaws. *See, e.g., Advanced Min. Systems,* 623 A.2d at 84-85. Such case law is not at odds with the result I reach, as I do not address any party's right to demand advancement or indemnity, but simply a limited partnership's power to provide those benefits.

*2. Does The DRULPA Give A General Partner The Right To Recoup Reasonable Litigation Expenses Necessary To The Winding Up Of A Limited Partnership?*

Section 17-403(a) of the DRULPA provides that a general partner of a limited partner has the "rights" of a partner in a general partnership unless a provision in the DRULPA or the partnership agreement provides to the contrary. 6 Del. C. § 17-403(a). Section 1518(6) of the DUPA provides that the partner who winds up a general partnership has the right to receive reasonable compensation for that task. 6 Del. C. § 1518(6). This right would seem to include the right to recover reasonable litigation expenses incurred in that effort.

As there is no contrary partnership agreement or DRULPA provision precluding AMS from recovering such expenses, I conclude that AMS had the right to recover its expenses necessary for winding up the Partnership in accordance with 6 Del. C. § 1518(6). I do not believe, however, that AMS can call every penny it has spent in litigation a "wind-up expense."

*18 AMS had to hire an accountant to gather the books and records of the Partnership and to prepare an accounting. Reasonable attorney's fees necessary for the presentation of that accounting to the court are also a legitimate cost. To the extent that AMS was in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

possession of the books and records that REARS needed to challenge that accounting, it was also proper that the Partnership pay for the collection, reproduction, and delivery of those documents.

On the other hand, it does not seem to be me to be a "winding up" expense for a general partner to deploy its own attorneys in a partisan battle with the limited partners over who gets what out of the partnership pie, much less over whether the general partner breached its fiduciary duties to the limited partners. At some point, a legitimate winding up expense becomes an expense incurred solely for the pecuniary advantage of the general partner. As discussed below, it is not at all clear which of the expenses AMS has incurred fall into the former category and which fall into the latter.

### 3. *Is The Advancement Decision Protected By The Business Judgment Rule Or Is It Invalid Unless AMS Proves The Decision Is Fair?*

The DRULPA permits a limited partnership to indemnify and advance expenses to a general partner even in the absence of an agreement to that effect. The exercise of these powers in the absence of an agreement is a delicate matter, however, for the general partner. In such a circumstance, the general partner remains bound by its fiduciary duties of care and loyalty. Thus, it cannot advance fees to or indemnify itself or its affiliates unless it demonstrates that it is fair for it to do so. The business judgment rule does not apply to such a self-interested decision, nor does it apply if the general partner did not act in an informed manner. *Seaford Fund,* 672 A.2d at 70 (general partner of limited partnership cannot claim protection of the business judgment rule if the general partner was on both sides of the transaction or was uninformed).

Similarly, even though a general partner may recover reasonable winding-up expenses, the general partner must prove the fairness of any such expenses it pays to itself. In this case, the AMS board-the board of the General Partner- made no business judgment regarding this matter, as Elkin made the decision himself. Moreover, this decision was a self-interested one. Therefore, AMS bears the burden of demonstrating fairness. *Seaford Fund,* 672 A.2d at 70.

### 4. *Was The Advancement Decision Fair, In Whole Or In Part?*

The preceding consideration of the pertinent legal principles leads me to the following, albeit imperfect, resolution. The decision of AMS to advance its fees and expenses necessary for the winding up of the Partnership is fair and reasonable, since it had a statutory right to recover reasonable winding up expenses. But I reach a contrary conclusion as to any fees and expenses incurred by AMS in an effort to defend itself and its Affiliate Defendants against charges of breach of fiduciary duty and breach of contract in the New York Action. I also conclude that AMS cannot recover any expenses in either the Delaware or New York Actions that result primarily from partisan efforts to argue that the Partnership was dissolved at a date of advantage to AMS or that the Partnership's scope was extremely narrow. These expenses were incurred solely to benefit AMS, not the Partnership. Although distinguishing between expenses necessary to prepare and present a basis for a final accounting and expenses incurred solely in order to turn that accounting toward AMS's advantage is a difficult task, a sensible allocation between these two categories of expenses should have been made by AMS. The Advancement Decision made no effort to compartmentalize such partisan costs from the core costs of the Partnership wind-up.

*19 AMS has also failed to explain why it was consistent with its fiduciary obligations to REARS for it to have the Partnership fund only the AMS side of a fight between the Partners. Much, if not most, of the litigation expense AMS has incurred fall in this category of purely partisan expense, paid to advance AMS's financial position at the expense of REARS. In analogous circumstances, Vice Chancellor Jacobs denied fees to a partner of a general partnership who sought attorney's fees for prosecuting a dissolution and accounting action. Because the partner brought the action "for his own personal financial benefit" rather than "for the 'preservation of [the partnership] business or property' as 6 *Del. C.* § 1518(2) requires," he held that the partner should bear his own litigation costs. *Shah v. Shah,* Del. Ch., C.A. No. 904-K, 1994 Del. Ch. LEXIS 185, at *21-22, Jacobs, V.C. (Sept. 15, 1994).

Nor has AMS explained why it caused the Partnership to advance funds and expenses to itself and its Affiliate Defendants without a commitment to repay those sums if any of them was later found to have committed a wrongful act- e.g., a breach of the duty of loyalty-toward REARS or the Partnership. FN16 Even the Revoked Agreement AMS drafted

Not Reported in A.2d                                                                                                    Page 17
Not Reported in A.2d, 1999 WL 743479
(Cite as: Not Reported in A.2d)

refused indemnification in cases of wrongdoing.

> FN16. Although I do not conclude that AMS intended to harm REARS through its actions, but believed it had the right to act as it has, I have concluded that several of AMS's acts were fiduciarily and contractually improper. This factor cuts against AMS's allocation of all of its litigation costs to the Partnership.

A comparison between how AMS handled the Advancement Decision and the requirements for statutory indemnification under 8 Del. C. § 145 is revealing. Under the Delaware General Corporation Law ("DGCL"), a corporation must obtain from the party seeking advancement an undertaking requiring repayment in the event that it is ultimately determined that the party is not entitled to indemnity. 8 Del. C. § 145(e). Under the DGCL, a corporation indemnifying a party must approve such indemnity through a vote of the non-interested directors, by approval by independent legal counsel in a written opinion, or by a stockholder vote. 8 Del. C. § 145(d). Such indemnity is available only if the approving authority determines that the party seeking indemnity "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation...." 8 Del. C. § 145(a). In cases where the person seeking indemnity has been held liable to the corporation, even stricter conditions are placed on the right of the corporation to indemnify under the statute. 8 Del. C. § 145(b).

AMS employed no comparable procedures to ensure fairness. The only substantive justification for its self-interested decision to fund its partisan expenditures entirely out of the Partnership seems to be that it controlled the Partnership's purse strings.

This analysis provides an outcome that is not easily reduced to a specific monetary outcome. Frankly, the parties have not provided me with any basis to evaluate what percentage of the fees and expenses in the Delaware and New York Actions should be considered necessary wind-up expenditures. While the burden should be on AMS to prove that, I will not inequitably penalize it for not focusing on the categorical distinction I have articulated. As a result, I suggest the following alternatives to the parties.

*20 The first alternative is that the total fees and expenses incurred by AMS in the Delaware Action be considered an approximation of the reasonable winding up expenses incurred by AMS. Such fees and expenses would be allowed in their entirety, whereas the fees and expenses in the New York Action would be denied in their entirety. Unless AMS objects, that will be my finding.

If AMS objects, I will hold a further evidentiary hearing. At that hearing, AMS will have the opportunity to prove the amount of its fees and expenses in the New York and Delaware Actions *necessary* to the winding up of the Partnership, such as the gathering of the books and records required for the preparation of the Proposed Accounting and in order to assist REARS in presenting objections to the Accounting. At such a hearing, I will disallow as a winding up expense any costs associated with partisan litigation efforts undertaken by AMS for its own pecuniary or tactical advantage. For example, costs incurred by AMS in arguing that it should receive more in the accounting, in arguing against motions for discovery by REARS, or in jockeying to go first in its chosen forum will not be considered winding up expenses. FN17

> FN17. REARS devoted a good deal of time and attention to picking apart the legal bills of AMS's attorneys. While some of its arguments are meritorious, the overall presentation and approach of its "expert" on legal fees was too simplistic to be given any weight. This expert, for example, apparently believes that two lawyers working on the same matter should not be permitted to confer about how the case should proceed and bill that time to their client-despite the fact that such coordination can allow for a more efficient approach to litigation and a smaller litigation team. Given that I am denying AMS its fees for the entire New York litigation, I will not pick apart the fees for this Action. AMS's counsel in this Action have been very efficient. Two lawyers presented this complicated case in an effective and clear manner. AMS's decision to pay their full billings was therefore quite reasonable.

E. *The Valuation of Partnership Goodwill*

Section 17-804 of the DRULPA provides that the "assets" of the Partnership must be distributed among the Partners. FN18 6 Del. C. § 17-804. REARS contends that the Partnership possessed quantifiable goodwill at the time of dissolution. AMS's Proposed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Accounting did not assign any value for goodwill. By goodwill, I refer to the value of such intangible assets as employee morale, customer relations, and reputation that may cause an enterprise's fair market value as a going concern to exceed the aggregate value of its other assets. *See Downes and Goodman, Dictionary of Finance and Investment Terms* 222 (4th ed. 1995). Goodwill can be an asset distributable in a partnership accounting. *Evans v. Gunnip,* Del.Supr., 135 A.2d 128, 131 (1957).

> FN18. At trial, REARS presented a going concern valuation of the Partnership. After trial, it appeared to withdraw its assertion that such a valuation was relevant in a limited partnership dissolution proceeding. The DRULPA's focus on assets precludes REARS' approach. Under the DRULPA, the court must determine the value of the limited partnership's assets and distribute them to the partners, not provide the limited partners with the value of their proportionate ownership interests in the limited partnership as a going concern. The General Assembly knows how to draft an appraisal statute, *see* 8 *Del. C.* § 262 ; 6 *Del. C.* § 17-804 is not one.

The problem is that REARS has not proven that the Partnership had any goodwill of value to distribute. The Partnership was not McDonald's (home of the Egg McMuffin); its name has no discernible economic value. There were no binding contracts prohibiting the Partners from competing with the Partnership after dissolution; therefore, no Partner is receiving exclusive rights to pursue the Partnership's former clients. There appear to have been no contracts prohibiting former employees from competing with the Partnership after termination and before dissolution. In fact, the Partnership did not even have employment agreements with its staff.

No reasonable third-party buyer would pay the Partners for the good will of this Partnership in a sale absent some limitation on the selling Partners' right to continue to pursue barter contracts within the province of the Partnership. Since no such limitation exists on the exploitation of the Partnership's clients or method of doing business, there is no goodwill a third-party would be willing to buy and none upon which I can place a dollar value. As such, there is none to distribute to the Partners in this dissolution proceeding.

### IV. *Conclusion*

*21 Given the multitude of issues involved in this accounting, I will not reduce my findings to a specific number at this point. Rather, I will allow the parties an opportunity to digest this opinion and a separate letter opinion I have issued today dealing with particular issues and contracts. Furthermore, certain adjustments will have to be made to the Proposed Accounting in view of my determinations. For example, costs associated with the employment of Partnership employees, as well as any other standard direct costs, must be added back into the Partnership for the period July 1, 1996 until January 23, 1997.

I therefore direct the parties to confer and to attempt to narrow their differences. The parties shall report to me within ten days on the status of these efforts. If no agreement has been reached, a prompt date for further hearing shall be set to resolve the remaining issues. FN19

> FN19. As a matter of equity and clarity, it is worth noting that my ruling today in no way diminishes any right AMS has to offset its obligations to REARS through a separate action against Albert Holland personally. Holland-in his personal capacity-may well have waived any or most of his share of any proceeds due REARS as a result of this proceeding. My conclusion that REARS-a corporate entity-did not waive any claims it had does not preclude another court from finding that Holland, by express agreement or consent, did waive his personal share of Partnership profits in exchange for continued employment. Put simply, half of what AMS pays REARS may come back to it from Holland.

Del.Ch.,1999.
Active Asset Recovery, Inc. v. Real Estate Asset Recovery Services, Inc.
Not Reported in A.2d, 1999 WL 743479

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.