## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>STONE & WEBSTER, INCORPORATED, et al.<br><br>Debtors, | Chapter 11<br><br>Case No. 00-02142 (RRM)<br>Jointly Administered<br>Adv. No. 01-7766 (PJW) |
| SAUDI AMERICAN BANK,<br><br>Plaintiff,<br><br>v.<br><br>THE SHAW GROUP, INC., SWINC<br>ACQUISITION THREE, INC. and STONE &<br>WEBSTER ENGINEERING CORPORATION, et<br>al.,<br><br>Defendants. | 1:04-cv-00834-SLR |

### APPENDIX TO
### SAUDI AMERICAN BANK'S REPLY BRIEF TO THE
### RESPONSE OF THE SHAW GROUP, INC. IN OPPOSITION TO
### SAUDI AMERICAN BANK'S MOTION FOR ASSESSMENT OF DAMAGES

**Monzack & Monaco, P.A.**
Francis A. Monaco, Jr. (#2078)
Kevin Mangan (#3810)
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
(302) 656-8163


**Kirkpatrick & Lockhart Nicholson Graham LLP**
John C. Hutchins (BBO #246060)
Daniel E. Rosenfeld (BBO #560226)
Amy B. Abbott (BBO #648072)
75 State Street
Boston, MA 02109
(617) 261-3100

Dated: June 8, 2004

## TABLE OF CONTENTS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Unpublished Decisions Cited in Reply Brief | |
| | *American Equities Grp., Inc. v. Ahava Dairy Prods. Corp.*, No. 01 Civ. 5207 (RWS), 2004 U.S. Dist. LEXIS 6970 (S.D.N.Y. Apr. 23, 2004) | B1-B13 |
| | *In re LaForgia*, Nos. 5-95-00036, 5-95-000976, 1998 WL 59480 (Bankr. M.D.Pa. Jan. 21, 1998) | B14-B18 |
| | *Sinclair Oil Corp. v. Schaefer*, No. 91-36089, 1993 WL 441988 (9th Cir. Nov. 2, 1993) | B19-B22 |
| | *Steadman v. Steadman*, No. Civ. A. 02-CV-8888, 2004 WL 503512 (E.D.Pa. 2004) | B23-B25 |
| Exhibit B | December Agreement | B26-B34 |

# Exhibit A

LEXSEE 2004 U.S. DIST. LEXIS 6970

**AMERICAN EQUITIES GROUP, INC., Plaintiff, - against - AHAVA DAIRY PRODUCTS CORP., LEWIS COUNTY DAIRY CORP., and MOISE BANAYAN, Defendants.**

**01 Civ. 5207 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2004 U.S. Dist. LEXIS 6970**

**April 23, 2004, Decided**

**PRIOR HISTORY:** Am. Equities Group, Inc. v. Ahava Dairy Prods. Corp., 2002 U.S. Dist. LEXIS 9211 (S.D.N.Y., May 21, 2002)

**DISPOSITION:** Parties' motions for summary judgment denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1]   DICKSTEIN SHAPIRO MORIN & OSHINSKY, Attorney for Plaintiff, New York, NY, By: JOSEPH F. FIELDS, ESQ., KEITH A. MARKEL, ESQ. Of Counsel.

SUSAN G. KELLMAN, ESQ., Attorney for Defendants.

STAHL & ZELMANOVITZ, Attorneys for Defendant Ahava Food Corp., New York, NY, By: JOSEPH ZELMANOVITZ, ESQ. Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINIONBY:** ROBERT W. SWEET

**OPINION: Sweet, D.J.**

Plaintiff American Equities Group, Inc. ("AEG") and defendants Ahava Dairy Products Corporation ("Ahava"), Lewis County Dairy Corporation ("Lewis County Dairy"), Ahava Food Corporation ("AFC") and Moise Banayan ("Banayan") have each moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(b). For the reasons set forth below, both motions are denied.

**Parties**

AEG is a corporation organized and existing pursuant to the laws of the State of New York. Its current principal place of business is in New York, as it was when AEG filed a voluntary petition for bankruptcy on November 21, 2000. When AEG commenced contractual relations with Ahava, its principal place of business was in Wayne, New Jersey. AEG does business as a financial [*2]  services company engaged principally in the business of accounts receivable factoring.

Ahava is a corporation organized and existing pursuant to the laws of the State of New York, with its principal place of business in Brooklyn, New York, engaged in the sale of dairy products.

Lewis County Dairy is a corporation organized and existing pursuant to the laws of the State of New York, with its principal place of business in the Lowville, New York.

AFC is a corporation organized and existing pursuant to the laws of the State of New York, with its principal place of business in Brooklyn, New York.

Banayan is a resident of the State of New York, and is President of Ahava, Lewis Dairy and AFC.

**Prior Proceedings**

On November 21, 2000, AEG filed a voluntary petition for relief under Chapter 11, Title 11, United States Code (the "Bankruptcy Code") and is continuing to operate its business and manage its property as a debtor-in-possession.

On April 17, 2001, AEG commenced an adversary proceeding against Ahava, Lewis County Dairy and Banayan to recover an account balance of over $ 8 million arising out of a Master Purchase & Sale Agreement of November 6, 1996 (the "Agreement") [*3] to provide factoring of Ahava's accounts. A factoring agreement is an "agreement to convert receivables into cash by selling them at a discount." E. Armata, Inc. v. Korea Commercial Bank of New York, 367 F.3d 123, 133 (2d Cir. 2004) (internal quotations omitted).

On September 27, 2001, the motion by defendants to withdraw the adversary proceeding in Bankruptcy Court was granted, and defendants' motion to transfer this case to the District of New Jersey was denied. See Am. Equities Group v. Ahava Dairy Prods. Corp., 2001 U.S. Dist. LEXIS 15321, 01 Civ. 5207, 2001 WL 1143188 (S.D.N.Y. Sept. 27, 2001).

Following discovery, both plaintiff and defendants filed simultaneous motions for summary judgment on January 12, 2004. After submission of briefs, oral argument was heard on the motions on February 11, 2004, at which time the motions were deemed fully submitted.

**Facts**

The following facts are taken from the parties' Rule 56.1 statements, the responses to those statements, and the briefs. Factual disputes are noted. As required, the facts are construed in the light most favorable to the non-movant, as applicable. They do not constitute findings of [*4] fact by the Court.

Other than the actual wording of the relevant contracts, virtually every aspect of the relationship between the parties is disputed. AEG contends that the Agreement was generally followed properly by both parties, except that Ahava fell behind on its obligations to AEG, ultimately owing AEG millions of dollars. Ahava, by contrast, argues that the Agreement was not followed from the start, and resembled not a factoring agreement but a criminally usurious loan.

As mentioned above, the parties entered into the Agreement on November 6, 1996. The Agreement specifies that it, along with

> all transactions occurring hereunder shall be deemed made laws of the State of New Jersey, except as to the without regard to the principles of conflict of law.

Agreement, P9 (in all capitals in original). The Agreement also contains a provision waiving any right Ahava may have to a jury trial. Id., P10. On the same date, Lewis County Dairy and Banayan executed an absolute and unconditional guaranty (the "Guaranty") of payment for all of Ahava's contractual obligations under the Agreement.

The Agreement provided that AEG would purchase the account receivables of [*5] Ahava and advance Ahava, pursuant to a formula set forth in the Agreement, 55% to 75% of the net in and governed by and construed in accordance with the application of the New York Uniform Commercial Code, outstanding value of the receivables, less any management, service, discount and overdraft fees.

Immediately following the signing of the Agreement, the parties executed a supplemental letter agreement (the "Letter Agreement"). The Letter Agreement permitted Ahava "to collect any amounts owed by customers whether prepay, COD or payments on account and to deposit said moneys in a bank account designated and owned solely by AEG (the 'AEG Collection Account')." Further, Ahava agreed "to provide its reasonable commercial best efforts in collecting, excluding litigation, and depositing promptly into the AEG Collection Account all outstanding consumer debts."

**AEG's Claims**

Pursuant to the Letter Agreement, Ahava did its own collections of receivables from its customer and deposited the proceeds into a bank account at Republic Bank maintained under the exclusive control of AEG (the "DBA Account"). Ahava could not make any withdrawals out of the DBA Account. Ahava would report [*6] the information about the account receivables it had collected in a regular or weekly submission of customer sales reports. AEG contends that the receivables were purchased by AEG pursuant to the Agreement, that the purchase of a group of receivables was referred to as a "pool," and that AEG subsequently advanced funds to Ahava based on the purchasing of the account receivable pools. Ahava disputes this account, referring to the advance of funds by AEG as a loan, and contending that the pools were held by AEG as collateral. According to AEG, however, it did loan Ahava additional monies via credit line arrangements and term loan arrangements, but those began some time in 1998 and continued through December 2000.

The Agreement's initial term expired on November 6, 1997. AEG contends that the term expired with a balance due of over $ 4 million. Ahava contends that the numbers are drawn from the Summary of Ahava's Account, which is an inaccurate document. AEG and Ahava agreed to continue their contractual relationship and to extend the Agreement through November 2000.

AEG contends that from November 1997 through November 2000, the parties continued their contractual relationship in accordance [*7] with the terms of the Agreement. During this time, AEG claims that it advanced millions of dollars to Ahava, and that Ahava was obligated to continue depositing its collected accounts receivables and related fees into a collection account set up by Ahava for the benefit of AEG. Ahava denies this, stating that the terms of the Agreement were not followed from the very beginning.

AEG contends that it performed its obligations under the Agreement, but that Ahava fell behind on its payment obligations. Ahava denies that it fell behind on its payment obligations, and contends that AEG failed to perform its obligations under the Agreement. AEG contends that at no time prior to the commencement of this litigation did Ahava give notice of non-acceptance of any of the advanced monies or dispute the money or fees assessed to Ahava.

According to AEG, by December 2000 Ahava breached its payment obligations under the Agreement by failing to deposit all of the account receivables it collected into the collection account, leaving an outstanding balance due to AEG of over $ 8 million. AEG alleges that in total, Ahava paid only $ 35,271,338 of the $ 43,353,157 owed to AEG. AEG states that as of late [*8] 2000 Ahava has made no payments to AEG on the outstanding balance. Ahava disputes this, stating that there was no funding to Ahava from AEG in 2000, and thus no obligation to pay AEG. Further, Ahava alleges that the Book Account is an unreliable document, and that approximately $ 8.7 million of payments by Ahava were not recorded.

On December 20, 2000, pursuant to the Agreement, AEG gave notice of default to Ahava. Ahava acknowledges receiving the default notice from AEG, but denies that it was sent pursuant to the Agreement, because it denies that it owed AEG anything.

AEG states that it was advised by Ahava that it was unwilling to pay its outstanding payment obligations under the Agreement and that Ahava would shortly no longer be in business. AEG also alleges that Ahava is undercapitalized, as that term is generally construed. Ahava argues that these statements are inadmissible under Fed. R. Evidence 408 because they were made in the context of settlement negotiations.

AEG states, and Ahava does not deny, that at no time prior to the commencement of this lawsuit did Ahava give notice of non-acceptance of any of the monies advanced to Ahava. [*9]

**Ahava's Alleged Alter Egos**

AEG claims that Ahava, Lewis County Dairy and AFC are alter egos of each other, and that Ahava and AFC share the same (i) post office boxes, (ii) office space, (iii) telephone and facsimile numbers, (iv) officers, directors and personnel; (v) customers; and (vi) plant and equipment. Ahava disputes this and states that Ahava and AFC have different post office boxes, offices, and telephone and facsimile numbers.

As to the shareholders, Ahava states that when AFC was formed in 1999, Banayan, Ruben Beityakov, Farrojollah Banayan, and Yossi Banayan were each 25% shareholders. Later, after AFC received a $ 7.1 million loan from New York City's Economic Development Corporation ("EDC"), Banayan was forced to take a second and third mortgage on his home in order to support AFC, which none of the other shareholders were willing to do. Banayan thereby became AFC's sole shareholder. AFC's funding comes virtually exclusively from EDC, and AFC did not use any of Ahava's assets as seed money.

Ahava also states that while Ahava never employed more than 31 people, AFC employs nearly 60 people. Ahava also states that the customers of Ahava and AFC are not [*10] the same. Ahava distributed only dairy products, while AFC distributes a variety of Israeli salads, Canadian juices, imported cheeses, meats and fish. AFC's customer base is larger and more diverse than Ahava's. Ahava notes that AFC has made millions of dollars in purchases of food products from various companies, while Ahava makes no purchases from those companies. Finally, Ahava and AFC distribute their products from different Brooklyn locations.

AEG alleges that Ahava receives and has received payment from customers for amounts owed under invoices sent by AFC. Ahava disputes this, although it acknowledges that years ago, monies due and owing were occasionally sent to AFC. Ahava maintains that this was a rare occurrence which has not been repeated in years.

AEG also claims that Ahava and AFC have intermingled corporate funds and have not maintained or observed corporate formalities. Ahava denies that funds were ever intermingled. Ahava also notes that in addition to the differences already listed, the two entities have different banking relationships. Ahava did its banking at Republic Bank and later HSBC and the Bank of Utica, while AFC banks at Commerce Bank and Staten Island [*11] Bank. Further, Ahava only functioned as a distributorship, while AFC is also a manufacturer.

AEG alleges that on or about July 1, 2000, AFC assumed from Ahava Dairy the exclusive right to distribute the products of Lewis County Dairy, without giving an explanation or notice to AEG. Ahava denies

that either Ahava or AFC ever had the right to be an exclusive distributor of Lewis County Dairy. Ahava further states that AFC never took over any business from Ahava.

AEG states, and Ahava does not deny, that Ahava, AFC and Lewis County Dairy all use the same accountant, and that Lewis County Dairy and Banayan guaranteed Ahava's obligations to AEG.

**Ahava's Claims**

Ahava contends that AEG never examined Ahava's receivables, never investigated Ahava's customers, did no credit checks of Ahava's customers and had no contact with them. AEG contends that AEG attempted for months to access Ahava's clients and to get financial information from Ahava, but that Ahava refused to allow AEG to contact Ahava's customers. AEG also contends that while AEG agreed to let Ahava make the calls to its customers, AEG maintained control of the collections.

Ahava alleges that AEG assessed fees [*12] against Ahava whether or not receivables were purchased. AEG disputes this, contending that it assessed fees according to the terms of the Agreement. AEG was entitled to the following fees: 2% discount fee of the face value of the receivable pool purchased; .80% to 1.5% service fee (depending on initial receivable value) of the face value of the receivable pool purchase; .50% penalty fee of the outstanding receivables at 90 days from the establishment of the receivable pool; and 18% per annum interest on any daily overdraft position in the book account.

Ahava alleges that Initial Receivable Values ("IRVs") were never set by Ahava and were established solely by AEG. AEG does not directly dispute this, noting only that AEG purchased account receivables from Ahava based on a formula set forth in the Agreement, which took into account the outstanding value of the receivables. AEG does not specify how the value of these receivables was assessed.

Ahava also alleges that AEG reduced IRVs below that 55% level set forth in the Agreement, and that although the levels were below that permitted in the Agreement, the services were not correspondingly lowered. AEG disputes this, and contends that [*13] the tables prepared by Ahava to demonstrate this allegation are misleading, as they do not reflect the fact that uncollected accounts receivable pools were replaced with new accounts receivable pools from Ahava. A portion of the receivables which are identified in the tables that Ahava has provided to illustrate improperly valued IRVs are "simply additional accounts receivable factored as collateral to replace past uncollected receivables." Affidavit of Susan Henry ("Henry Aff."), P14(c). Ahava

also alleges that fees were charged by AEG even when no money was advanced. AEG disputes this by noting that account receivables not paid within 90 days were subject to penalty fees and annual interest under the Agreement.

Ahava alleges that AEG improperly charged fees based on the gross receivables it "batched," although Ahava does not explain what this means or why it is improper. Ahava also alleges that AEG charged fees based on receivables that it arbitrarily declared to be Client Risk Receivables. In response, AEG argues that Ahava has failed to acknowledge that according the Agreement, fees are to be calculated based on the gross receivable value.

Ahava further alleges that AEG charged [*14] fees on cash sales. AEG does not directly dispute this, but refers to the Letter Agreement, according to which AEG was not permitted to charge fees on COD or prepay amounts. However, a payment will be considered COD or prepaid only if the customer has no outstanding indebtedness to AEG or Ahava.

Perhaps most importantly, Ahava alleges that the Book Account did not accurately reflect the monies transferring hands between the parties. Ahava charges that deposits made by Ahava into the DBA Account were not posted in the Book Account on the day that they were deposited. AEG disputes this characterization. AEG states that in the first month or two of the relationship between the parties, Ahava had not provided complete and timely information to AEG, and as a result collected funds were not posted promptly to the Book Account. However, AEG states that Ahava was charged no interest fees or interest because of this delay. After the initial period, AEG states that it would provide Ahava with credit for cleared funds. Further, AEG notes that Ahava received credit only for cleared funds after first subtracting any adjustments for returned checks and related bank charges.

Ahava alleges that [*15] if the fees recorded in the Book Account are considered to be interest, AEG charged an effective interest rate in excess of 25% and at times approaching 1000%. AEG disputes this, arguing that Ahava calculates numerous imputed interest rates based on a skewed sample of pools and not on the entirety of the transactions in the Book Account. AEG maintains that the amounts charged to Ahava over the entire course of their relationship did not exceed 24.54% per annum, including all interest and fees charged. If overdraft interest and penalty fees charged to Ahava are excluded, AEG argues that the effective interest rate would be 16.75%.

Ahava also alleges that IRV levels both declined below and rose above the levels contemplated in the

Agreement. AEG disputes this characterization, arguing that the tables prepared by Ahava fail accurately to account for remittances that are properly applied to factored receivables within the Book Account. Ahava raises several related allegations as to the disparities between the remittances received and the IRV. In each case, AEG disputes that such disparities exist, and argues that Ahava has provided misleading figures.

Ahava claims that the Book Account [*16] fails to record approximately $ 8,000,000 of payments made by Ahava to AEG, as reflected in the bank statements for the DBA Account. According to AEG, in November 1999, AEG and Ahava agreed to transfer the money deposited into the AEG collection back to Ahava's bank account on the same day minus $ 2,500 to AEG as collections. Over the course of their relationship, the amount transferred back to Ahava totals approximately $ 8,000,000, according to AEG's estimate.

Ahava also claims that over $ 900,000 was recorded in the Book Account as having been transferred by AEG to Ahava, but there is no corresponding entry in Ahava's bank statement. AEG counters that the amount was $ 821,000, and that AEG forwarded that amount on November 6, 1996, at AEG's direction, to its prior factor to pay off an outstanding invoice that Ahava owed to them. Further, AEG states that Ahava instructed AEG to pay $ 24,400 directly to Mark's Dairy the next day.

Ahava claims that the difference between the amount advanced to Ahava according to the Book Account and the amount that should have been advanced according to the Agreement exceeds $ 13 million. AEG disputes this figure, arguing that Ahava has improperly [*17] based the amount due to Ahava on the gross receivables, rather than the "factor risk," as specified in the Agreement.

Ahava argues that it was charged $ 70,335 for the issuance of only two letters of credit. AEG conversely argues that several letters of credit were provided to Ahava throughout the contractual relationship.

Ahava further claims that the Book Account fixed the service fee throughout at 1.5%, irrespective of the IRV. The application of an incorrect service fee occurred in 290 pools of receivables, representing purchases of over $ 40 million. Ahava also alleges that AEG improperly charged fees on 220 pools of Client Risk Receivables, representing over $ 17 million in receivables. AEG disputes these charges as well, arguing that Ahava's figures are misleading, and that the service and discount fees should be based on the gross receivable value of the accounts receivable, as indicated in the Agreement.

Ahava claims that Banayan complained to AEG's CEO David Goldberg ("Goldberg") as early as 1997 that the effective interest rate being charged to Ahava was approximately 50%. According to Ahava, Goldberg wrote back to Banayan, stating that the cost of funding was not 50%, [*18] and did not exceed 33.05%. AEG disputes this, stating that at no time prior to the commencement of this lawsuit did Ahava give notice of its non-acceptance of any of the advanced monies, nor did it dispute the money or fees assessed to Ahava. According to AEG, up until December 2000, Ahava was paying AEG in accordance with the Agreement. AEG alleges that it was only after AEG had advanced Ahava millions of dollars that Ahava refused to pay the outstanding balance and fees owed to AEG under the Agreement. In the letter from Goldberg to Banayan, Goldberg objected to the method by which Banayan was calculating interest.

Ahava claims that despite numerous requests from Ahava, AEG did not provide any payoff letter for Ahava. AEG disputes this, stating that AEG provided a payoff amount to Ahava every month in the reports that were sent to Ahava. Further, AEG provided a special report to Ahava whenever Ahava requested a payoff amount before the monthly report was sent to Ahava.

## New York Law Applies to AEG's Claims against Defendants

The Agreement states that it is to be governed in accordance with "the laws of the State of New Jersey, except as to the application of the [*19] New York Uniform Commercial Code, without regard to the principles of conflict of law." In a previous opinion in this case, it was noted that "the choice of law clause likely mandates the application of New Jersey law," American Equities, 2001 U.S. Dist. LEXIS 15321, 2001 WL 1143188, at *4, although the issue was not decided at that time. Ahava argues that New York law should apply. The choice of law may be significant for Ahava's defense of usury because "New York's maximum rate of interest of 25% is half of New Jersey's permissible interest rate." In re McCorhill Pub., Inc., 86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988). n1

n1 As discussed further below, however, it is not clear that Ahava would be entitled to void the Agreement even if it could establish that AEG charged an annual interest rate that exceeded 25 and was therefore criminally usurious. See In re Venture Mortgage Fund, L.P., 282 F.3d 185, 190-91 (2d Cir. 2002) (noting in dicta that "it is an open question under New York law whether a criminally usurious loan is void.").

[*20]

A bankruptcy court hearing claims that are based upon state law and that do not implicate a significant federal interest must apply the choice of law rules of the forum state, here the State of New York. See In re Gaston & Snow), 243 F.3d 599, 605-07 (2d Cir. 2001); see also In re PSINet, Inc., 268 B.R. 358, 376 (Bankr. S.D.N.Y. 2001).

Although New York recognizes the "choice of law principle that parties to a contract have a right to choose the law to be applied to their contract, this freedom of choice on the part of the parties is not absolute." S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F. Supp. 1014, 1025 (S.D.N.Y. 1984), aff'd 762 F.2d 990 (2d Cir. 1985) (internal citation omitted). To determine the appropriateness of the parties' choice of law, New York follows the "substantial relationship" approach, as stated in Restatement (Second) of Conflicts of Law § 187:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either

(a) the chosen state has no substantial relationship to [*21] the parties . . . or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state... .

See Leo Harmonay, 597 F. Supp. at 1025; see also Levine v. Arabian American Oil Co., 1985 U.S. Dist. LEXIS 13386, 84 Civ. 2396, 1985 WL 3945, at *3-* 4 (S.D.N.Y. Nov. 27, 1985); Southern Int'l Sales. Co. v. Potter & Brumfield Division, 410 F. Supp. 1339, 1342-43 (S.D.N.Y. 1976) (Weinfeld, J.). "The New York Court of Appeals has addressed the 'substantial relationship' approach and held that while the parties' choice of law is to be given 'heavy weight, 'the law of the state with the 'most significant contacts' is to be applied." Agricultural Ins. Co., Inc. v. Ace Hardware Corp., 2003 U.S. Dist. LEXIS 711, 98 Civ. 8708, 2003 WL 164272, at *5 (S.D.N.Y. Jan. 17, 2003) (quoting Haag v. Barnes, 9 N.Y. 2d 554, 559-60, 216 N.Y.S. 2d 65, 175 N.E.2d

441 (1961)); see also Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51, 55 (2d Cir. 1991) ("New York law allows a court to disregard the parties' choice when the 'most significant contacts' [*22] are in another state.") (quoting Haag); Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52 (2d Cir. 1984) (same).

It is undisputed that the Agreement was negotiated in New York; it was signed by Ahava in New York; all performance there-under was in New York, including the deposit of money into the AEG controlled bank account located in New York. Further, both Ahava and AEG are incorporated in New York. Ahava's principal place of business is in New York. AEG's place of business, now and at the time it filed for bankruptcy is in New York. However, when AEG and Ahava executed the Agreement, AEG's principal place of business was in New Jersey. That, however, is the only significant contact of the parties with New Jersey, apart from the fact that the Agreement was delivered to AEG in New Jersey. Under these circumstances, New Jersey

has no substantial relationship to the parties and New York would seem to have a materially greater interest in the application of its law. In light of the foregoing, the rights and duties of the parties are governed by the law of New York, despite the 'agreement' of the parties to the contrary.

Leo Harmonay, 597 F. Supp. at 1025. [*23] In addition, "New York has a strong public policy against interest rates which exceed 25%, which policy must be enforced." In re McCorhill, 86 B.R. at 793 (citing North American Bank, Ltd. v. Schulman, 123 Misc. 2d 516, 474 N.Y.S. 2d 383 (N.Y. Co. Ct. 1984)).

AEG argues that New Jersey law should apply to Ahava's usury defense under New York's so-called "rule of validation." Under that rule, "the forum state chooses the state whose usury statute would sustain the contract in full or else impose the lightest penalty for usury from the set of all states that have a substantial relationship to the contract." Walter E. Heller & Co. v. Chopp-Wincraft Printing Specialties, Inc., 587 F. Supp. 557, 560 (S.D.N.Y. 1982) (citing Speare v. Consolidated Assets Corp., 367 F.2d 208 (2d Cir. 1966)). The rule of validation has, however, been disapproved by New York courts subsequent to the Chopp-Wincraft decision. In A. Conner General Contracting Inc. v. Rols Capital Co., 145 A.D.2d 452, 535 N.Y.S. 2d 420 (2d Dep't 1988), the Second Department held:

New York's present choice-of-law rule, dubbed the center [*24] of gravity approach is that the law of the State having the most significant contacts with the matter in dispute is usury. The Federal courts have held by way of dicta that New York follows the rule of validation [citing Chopp-Wincraft and Speare] and approval of that rule has occasionally been expressed by New York courts.

However, the Court of Appeals has not articulated a special rule for usury cases. Rather, it appears to remain that "the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."

145 A.D.2d at 453 (quoting Miller v. Miller, 22 N.Y. 2d 12, 290 N.Y.S. 2d 734, 237 N.E.2d 877 (1968)) (internal citations omitted); accord Industrial Development Bank of Israel, Ltd. v. Bier, 149 Misc. 2d 797, 804, 565 N.Y.S. 2d 980, 984 (Sup. Ct., N.Y. Co. 1991), aff'd 182 A.D.2d 570, 582 N.Y.S. 2d 429 (1st Dep't 1992); see also In re Chateaugay Corp., 150 B.R. 529, 540 n.13 (Bankr. S.D.N.Y. 1993) ("it [*25] appears far from settled that New York courts apply the 'rule of validation' even in usury cases."). While this Court applied the rule of validation following the publication of the A. Conner decision, see Superior Funding Corp. v. Big Apple Capital Corp., 738 F. Supp. 1468, 1471 (S.D.N.Y. 1990), it did so without considering the Second Department's ruling.

Because New York is the state with the most significant contacts to the parties in the context of the Agreement, and because the rule of validation is not the law of the jurisdiction, New York law will apply to the claims made by AEG against Ahava.

### The Book Account is Admissible as a Business Record

Ahava argues that the Book Account, which is one of the crucial documents relied on by AEG in order to establish its claims against Ahava, is inadmissible as it does not qualify as a business record under Fed. R. Evid. 803(6). Rule 803(6) provides an exception to the rule excluding hearsay. It provides, in part, for the admission of any

memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made [*26] at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness ... unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The "principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." Potamkin Cadillac Corp. v. B.R.I. Coverage Corp., 38 F.3d 627, 632 (2d Cir. 1994) (quoting Saks Int'l, Inc. v. M/V Export Champion", 817 F.2d 1011, 1013 (2d Cir. 1987)). The Second Circuit has stated that Rule 803(6) "favors the admission of evidence rather than its exclusion if it has any probative value at all." United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (quoting In re Ollag Constr. Equip. Corp., 665 F.2d 43, 46 (2d Cir. 1981)). [*27]

Ahava argues that the Book Account is inadmissible because of a lack of foundation. Ahava contends that AEG is unable to show that the record was made by an individual with personal knowledge. In particular, Ahava alleges that Sam Awar ("Awar"), AEG's former Director of Operations, could not name the particular person who was responsible for making entries in the Book Account, and that no single person was responsible for data entry. AEG has put forward Awar and Jack Sandler ("Sandler"), AEG's former Controller, as the "custodians or other qualified witnesses" who have testified that the Book Account was "kept in the course of a regularly conducted business activity." The "' custodian need not have personal knowledge of the actual creation of the document' to lay a proper foundation ...Nor is there any requirement under Rule 803(6) that the records be prepared by the party who has custody of the documents and seeks to introduce them into evidence." Phoenix Associates III v. Stone, 60 F.3d 95, 101 (2d Cir. 1995) (quoting 4 Weinstein's Evidence, at 803-201-04). In Phoenix, the Second Circuit therefore rejected the argument that the failure of the custodian "to [*28] identify the specific employee responsible for filling out the record proved fatal to its foundation." Id.

2004 U.S. Dist. LEXIS 6970, *

Awar testified that while other individuals inputted data into the Book Account, Awar Deposition at 176, when he was Director of Operations, "it was my responsibility to keep accurate records of the book account." Id. at 45. Ahava alleges that, according to Sandler, there was no system of verification which ensured that the Book Account tracked the Agreement or that deposits by Ahava were correctly recorded. However, Sandler testified that while he had not

> seen anything on a day-to-day basis ... I know that all of the information [in the Book Account] was definitely checked on a monthly basis, and I know personally I looked at the summary information for the month and compared them to the bank statements on probably half the time I was there, maybe more.

Sandler Deposition at 57. Such statements are sufficient to create a foundation by the custodians of the business records.

Ahava further argues that the Book Account is unreliable and untrustworthy because it does not contain all of the transactions between Ahava and AEG in the course of the contractual [*29] relationship between the parties, and because the Book Account does not follow the terms of the Agreement in several material respects. AEG argues that Ahava never objected to the inaccuracy of the Book Account until this litigation had commenced, despite the fact that it was provided with the information contained in the Book Account throughout the contractual relationship between the parties.

Questions as to the completeness of the Book Account and its congruence with the Agreement are more appropriately directed toward showing that the Book Account, by itself or with other documents, does not demonstrate that Ahava breached the Agreement. In other words, Ahava's arguments go to the weight to be placed on the Book Account, rather than to its admissibility. In United States v. Scholl, 166 F.3d 964 (9th Cir.), cert. denied, 528 U.S. 873, 145 L. Ed. 2d 149, 120 S. Ct. 176 (1999), the Ninth Circuit held that

> a party need not prove that business records are accurate before they are admitted. "Generally, objections that an exhibit may contain inaccuracies, ambiguities, or omissions go to the weight and not the admissibility of the evidence." United States v. Keplinger, 776 F.2d 678, 694 (7th Cir. 1985); [*30] see also La Porte v. United States, 300 F.2d 878, 880

> (9th Cir. 1962) (noting "the admissibility of a document, as distinguished from its weight, normally does not depend upon either completeness or freedom from ambiguity").

166 F.3d at 978; see also United States v. Reyes, 157 F.3d 949, 953 (2d Cir. 1998) (business records admitted despite questions raised about trustworthiness); Schachtman Fagan, Inc. v. Winthrop Labs., Inc., 82 Civ. 8398, 1985 WL 3126, at *1 (Oct. 15, 1985) ("absence or extent of personal knowledge regarding preparation of business records affects weight rather than admissibility of evidence") (citing United States v. Page, 544 F.2d 982 (8th Cir. 1976)). Ahava's many objections to the Book Account are taken into account below. However, the Book Account displays sufficient indicia of trustworthiness for admission as a business record pursuant to Fed. R. Evid. 803(6).

**The Henry Affidavit is Admissible**

Ahava objects to the affidavit submitted by Susan Henry ("Henry"), a senior manager in the Litigation & Fraud Investigations Department [*31] at the accounting firm of BDO Seidman, on the grounds that it is based on insufficient facts or data, that it is "based on conversations with others and knowledge gleaned about the case as opposed to general experience in the particular industry," and that Henry "opines as to the meaning and application of the contract terms at issue." Def.'s Reply Mem. in Further Support of Def.'s Mot. for Summ. Judgment and in Opposition to Pl.'s Mot. for Summ. J. at 4.

The standard for the admissibility of expert testimony is set forth in Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the case.

Fed. R. Evid. 702.

The standard was the subject [*32] of extensive analysis by the Supreme Court in Daubert v. Merrell

Dow Pharms., Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999). Daubert charges "trial judges with the responsibility of acting as 'gatekeepers,'" in light of the fact that "the Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" United States v. Salim, 189 F. Supp. 2d 93, 99-100 (S.D.N.Y. 2002) (quoting Daubert, 509 U.S. at 597). Thus, "the determination as to the relevance and reliability of such evidence is committed to the sound discretion of the trial court." Daubert, 509 U.S. at 591. In Kumho Tire Co. v. Carmichael, the Supreme Court clarified that this gatekeeper function applies to all expert testimony, not just scientific testimony. 526 U.S. at 147 (explaining that Rule 702 makes "no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. It makes clear that any such knowledge [*33] might become the subject of expert testimony.").

Henry testified that she based her opinions on review of legal pleadings in this case, the Agreement and Letter Agreement, correspondence related to the dealings between AEG and Ahava, the Book Account and related reconciliations, various bank statements and other documents evidencing transactions between AEG and Ahava. Henry also based her opinions on discussions with AEG's present and former personnel. In the context of the instant motions, Henry's opinions are based on sufficient facts and data.

Ahava's objections to Henry's testifying based on her discussions with AEG personnel are drawn from United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2002). However, in that case, a Special Agent for the Drug Enforcement Administration was testifying in a dual capacity as case agent and as expert in drug jargon. The Second Circuit was therefore concerned that his non-expert testimony may have been hearsay. See id. at 55. Because Henry was retained solely to render an expert opinion, no such potential confusion exists here.

Finally, Ahava alleges in a conclusory manner that Henry opines as to the meaning of [*34] contract terms. While "testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible," United States v. Bilzerian, 926 F.2d 1285, 1295 (2d Cir. 1991), Ahava has not demonstrated that Henry has given any such opinion. The thrust of the Henry affidavit is that the amounts charged by AEG to Ahava do not equal or exceed 50% interest per annum. Such testimony is within Henry's expertise, and is an appropriate subject for expert testimony. The Henry Affidavit is therefore admissible.

## Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Silver v. City Univ., 947 F.2d 1021, 1022 (2d Cir. 1991); see generally 11 James Wm. Moore, et al., Moore's Federal Practice § 56.11 (3d ed. 1997 & Supp. 2004). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents [*35] a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). Thus, "summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993).

A material [*36] fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997). The Court is "to grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." Schwimmer v. Kaladjian, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing Anderson, 477 U.S. at 249-50).

## Summary Judgment is Denied AEG's Alter Ego Claim

AEG argues that Ahava, AFC, and Lewis County Dairy are all alter egos of one another. n2 Under New York law, a plaintiff can establish alter ego liability only by showing that one defendant has exercised such "complete domination 'in respect to the transaction

attacked' so that the [other defendants] had 'at the time' no separate will of [their] own, and such domination must have been used to 'commit fraud or wrong' against plaintiff, which proximately caused plaintiff's [*37] injury." American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988), (quoting Lowendahl v. Baltimore & Ohio R.R., 247 A.D. 144, 157, 287 N.Y.S. 62 (1st Dept.), aff'd, 272 N.Y. 360, 6 N.E.2d 56 (1936), quoted with approval in Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985)). To satisfy the control element, AEG must demonstrate "by a preponderance of the evidence" that AFC and Lewis County Dairy was controlled and dominated by Ahava with respect to its payment obligations under the Agreement "to such an extent that it had no separate will of its own" or in other words, that AFC and Lewis County Dairy were "mere instrumentalities of Ahava." Id.

> n2 AEG also named Ahava Products Corporation ("APC") as a defendant, and had argued that it was also an alter ego of Ahava. However, based on Ahava's statement that APC does not exist, and that it was "nothing more than a careless shortening of Ahava Dairy Products Corp.'s name," Banayan Declaration in Opposition to Pl.'s Mot. for Summary Judgment P40, AEG has stated that it will no longer refer to APC as the alter ego of Ahava.

[*38]

Factors indicating that one defendant controls another "include lack of normal corporate formality in the subsidiary's existence, under-capitalization, and personal use of the [other defendants'] funds" by the defendant. Id. (citing Video Innovations, 730 F.2d at 53).

In support of its claim, AEG argues that (i) Banayan is the president of Ahava, AFC and Lewis County Dairy; (ii) Ahava has represented that it is undercapitalized; (iii) Ahava and Lewis County Dairy have commingled funds; (iv) all defendants receive mail from the same mail box addresses; (v) AFC and Ahava distribute products for Lewis County Dairy; (vi) Ahava and AFC have substantially identical customers; (vii) customers of AFC write checks addressed to Ahava to satisfy invoices sent by Ahava; (viii) AFC and Ahava use the same plant to distribute products; (ix) Ahava, AFC and Lewis County Dairy employ the same accountant; (ix) AFC served notice to customers of Ahava that AFC would begin distributing Lewis County Dairy's products in place of Ahava; and (x) Lewis County Dairy and Banayan guaranteed the debts Ahava owes to AEG.

Except for (i), (viii), and (x), Ahava either contests AEG's allegations [*39] or argues that such practices

occurred only rarely and ceased years ago. Ahava states that the three companies had different addresses, customers, funding sources, and banking relationships. Ahava also contests the admissibility of the statement that Ahava is undercapitalized on the grounds that it was made in the course of settlement negotiations. See Fed. R. Evid. 408. Taking the facts in the light most favorable to Ahava, AEG has not met its burden on this motion of establishing by a preponderance of evidence that any domination of AFC and Lewis County Dairy was so complete that these entities had no will of their own. In particular, AEG has adduced no specific evidence of domination with respect to Ahava's payment obligations under the Agreement, alleging only that because of the alleged overlaps in customers and distribution plants, as well as commingled funds, that "Defendants have been able to improperly divert millions of dollars derived from Ahava's account receivables ...to other bank accounts controlled by" AFC. Donnelly Declaration P38. Even if Ahava had the ability to divert funds, AEG has not shown that Ahava has actually done [*40] so. AEG's motion for summary judgment on its claim of alter ego liability is accordingly denied.

### Summary Judgment is Denied on AEG's Claims for Breach of Contract, Unjust Enrichment and Conversion

AEG has moved for summary judgment against all defendants on its claims for breach of contract, unjust enrichment and conversion. Because Ahava has raised a genuine issue of material fact as to whether the defendants breached the Agreement, summary judgment is denied as to all claims.

Although the Book Account will be admitted based on the testimony of Awar and Sandler that it was kept in the course of regularly conducted business and that it generally shows trustworthiness, the Book Account and supporting documentation do not support a finding that AEG is entitled to judgment as a matter of law on its claims in light of Ahava's numerous challenges to the incompleteness of the document, and in particular in light of Ahava's allegations that the Book Account does not comport with the Agreement.

Each of AEG's claims rests on the argument that Ahava either breached the Agreement by defaulting on its contractual obligations or that Ahava improperly refused to return approximately [*41] $ 2.5 million of over $ 37 million advanced to Ahava by AEG. In order to prevail on its breach of contract claim, AEG must demonstrate that the undisputed facts prove that Ahava breached the contract. See Saffire Corp. v. Newkidco, LLC, 286 F. Supp. 2d 302, 306 (S.D.N.Y. 2003). Similarly, to prevail on a claim of unjust enrichment, the undisputed facts must show, among other elements, "that

the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." Golden Pacific Bancorp v. F.D.I.C., 273 F.3d 509, 519 (2d Cir. 2001). To establish a claim of conversion under New York law, the undisputed facts must show, among other elements, "that the defendant exercised unauthorized interference with the plaintiff's ownership or possession of that property." Rose v. Amsouth Bank of Florida, 296 F. Supp. 2d 383, 397 (E.D.N.Y. 2003). Construing all ambiguities and inferences against AEG, there are disputed facts as to each of these elements.

As to the breach of contract claim, there is a material dispute as to whether the terms of the Agreement were followed. Ahava has alleged that [*42] AEG never purchased accounts receivable from Ahava, even though such transactions formed the basis for the Agreement. Ahava also alleges that AEG has failed to credit approximately $ 8 million which Ahava claims it paid to AEG. The claim for unjust enrichment is similarly based on AEG's claim that Ahava breached the Agreement, see Pl.'s Summary Judgment Mem. at 13, and Ahava's claims raise material questions of fact. As to the conversion claim, for the reasons stated previously, AEG has not shown undisputed facts which prove that AEG owes Ahava $ 2 million. While AEG has provided substantial rebuttals to Ahava's claims that AEG breached the Agreement and that Ahava does not owe AEG anything, it cannot be determined on this record that no "reasonable [factfinder] could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248, and summary judgment is therefore denied as to each claim. Further, because AEG has not demonstrated on this motion a breach by Ahava "of or failure to perform any of its representations, warranties, commitments or covenants in this Agreement," Agreement P13, AEG is not entitled to costs and attorneys' fees.

## Ahava's   [*43]   Motion for Summary Judgment is Denied

The defendants have moved for summary judgment dismissing the same three claims against them, for breach of contract, unjust enrichment, and conversion. Construing all ambiguities and inferences against Ahava, it cannot be shown that no reasonable factfinder would not find for AEG on each of its claims.

In particular, the Book Account and Henry's testimony, which are presumed accurate in the context of Ahava's motion, both demonstrate that Ahava owes AEG several million dollars. Henry's testimony raises numerous issues of material fact as to the accuracy and completeness of the tables submitted by Ahava purporting to show improper fees and exorbitant rates of interest charged by AEG. Construing the Book Account

and the Henry Affidavit in AEG's favor, AEG has shown both that Ahava defaulted on the Agreement, and that the interest rate charged to Ahava was below 25%, negating the factual basis for Ahava's usury defense.

Ahava also moves to dismiss the conversion claim on the grounds that it is duplicative of the breach of contract claim. "It is a well-established principle that a simple breach of contract is not to be considered a tort unless [*44] a legal duty independent of the contract itself has been violated..." Spanierman Gallery, PSP v. Love, 2003 U.S. Dist. LEXIS 19511, 03 Civ. 3188, 2003 WL 22480055, at *3 (S.D.N.Y. Oct. 31, 2003)(quoting Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y. 2d 382, 521 N.Y.S. 2d 653, 516 N.E.2d 190, 193 (1987)); see also New York Racing Ass'n v. Meganews, Inc., 97 CV 1091, 2000 WL 307378, at *5 (E.D.N.Y. Mar. 21, 2000) (conversion claims "will be deemed redundant when 'damages are merely being sought for breach of contract.'") (quoting Peters Griffin Woodward, Inc. v. WCSC, Inc., 88 A.D.2d 883, 884, 452 N.Y.S. 2d 599, 600 (1st Dept' 1982)).

AEG has alleged a distinct harm in its claim for conversion. The damages from the breach of contract allegedly arise from Ahava's failure to pay AEG any part of the overdraft position on the Book Account, while the damages on the conversion claim (as well as the unjust enrichment claim) allegedly arise from the approximately $ 2.5 million in funds which were advanced to Ahava, and which Ahava has not repaid. Further, AEG has alleged "that defendants had a duty to remit particular funds to the plaintiff." [*45] Meganews, 2000 WL 307378, at *5. Conversion claims may be alleged in addition to breach of contract claims as long as the "legal duty ...springs from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Spanierman, 2003 U.S. Dist. LEXIS 19511, 2003 WL 22480055, at *3. AEG's conversion claim will therefore not be dismissed as duplicative.

## Neither The Applicability Nor the Effect of Ahava's Usury Defense is Clear from the Record

Ahava has alleged that AEG is guilty of criminal usury because the effective interest rate charged to Ahava over the course of their contractual relationship exceeds 25% per annum. See N.Y. Penal Law § 190.40. AEG disputes Ahava's calculation of the interest rate, arguing that even if all fees charged to Ahava are included when calculating the effective rate of interest, the rate does not exceed 24.54%.

On the record before the Court, it is not possible to make a determination as a matter of law as to the

effective interest rate. However, for the purposes of AEG's motion for summary judgment only, it may be assumed that [*46] the interest rate exceeds 25%. Even if that were the case, it is still not clear to what relief Ahava would be entitled, if any.

Ahava has not specified the total amount of money which was allegedly loaned to it by AEG. However, the money advanced to Ahava over the course of their contractual relationship apparently totaled in the tens of millions of dollars. New York's usury laws, however, do not regulate transactions over $ 2.5 million. See N.Y. Gen. Oblig. Law § 5-501(6)(b); see also Tides Edge Corp v. Central Federal Sav., F.S.B., 151 A.D.2d 741, 742, 542 N.Y.S. 2d 763, 765 (2d Dep't 1989). For purposes of determining the law's applicability,

> Loans ... aggregating two million five hundred thousand dollars or more which are to be made or advanced to any one borrower in one or more installments pursuant to a written agreement ... shall be deemed to be a single loan ... for the total amount which the lender or lenders have agreed to advance or make pursuant to such agreement on the terms and conditions provided therein.

§ 5-501(6)(b). The total amount of AEG's loans to Ahava therefore must be calculated in order [*47] to determine the applicability of the usury defense.

Loans of greater than $ 250,000 but less than $ 2.5 million are not subject to New York's civil usury laws but are subject to criminal usury laws. § 5-501(6)(a). If AEG's loans to Ahava total less than $ 2.5 million, and if Ahava is able to establish that the loans were criminally usurious, it is unclear under New York law what remedy is authorized. Ahava argues that AEG should be barred from recovering under the Agreement because of the usurious arrangement. Ahava is apparently contending that if the Agreement is found to be criminally usurious, in effect if not on its face, it will be rendered void, although Ahava nowhere makes this point explicitly. Some courts have so held. See, e.g., Hufnagel v. George, 135 F. Supp. 2d 406, 406-07 (S.D.N.Y. 2001); Fareri v. Rain's Intern. Ltd., 187 A.D.2d 481, 589 N.Y.S. 2d 579 (2d Dep't 1992); In re McCorhill, 86 B.R. at 792. However, the Second Circuit considered the issue in a section of its opinion explicitly labeled as dictum, and opined that "it is an open question under New York law whether a criminally usurious loan is void." Venture Mortgage, 282 F.3d at 190-91 [*48] (disagreeing with Hufnagel and Fareri).

The Venture Mortgage court reached that conclusion "from a close reading of the complex and cross-referencing statutes that compose New York's usury law," in which it appears "that the voiding provision only operates to void loans that violate the civil usury statute --a statute that by its terms applies only to loans of less than $ 250,000. .." Id. at 189 (citing N.Y. Gen. Oblig. Law § § 5-501, 5-511; N.Y. Banking Law § 14-a). It further noted that "nothing we see in the criminal usury statute provides for voiding, and it is unclear whether the Legislature intended that criminally usurious loans of $ 250,000 or greater be voided." Id. (citing N.Y. Penal Law § 190.40). The Venture Mortgage court reviewed the policy rationales and noted that they both favored and disfavored finding criminally usurious loans void. Id. Because this unsettled issue was neither raised nor briefed by either party, it would be premature for the Court to rule on it.

It appears, however, that at least some remedy was contemplated by the Legislature [*49] for a borrower who is subjected to a criminally usurious loan. General Obligation Law § 5-521(1) prohibits corporations from interposing the defense of usury in any action. However, subsection 3 of § 5-521 provides an exception to that provision in "any action in which a corporation interposes a defense of criminal usury as described in section 190.40 of the penal law." Because it would be inconsistent to provide for a defense without also providing a remedy, some kind of remedy must be available. n3 The Venture Mortgage court, however, was not convinced that § 5-521(3) implied "that a loan in violation of the penal law is void ab initio." Id. at 189n.3. Instead of voiding the loan, a successful defense of criminal usury may result instead "merely in a cancellation of the interest obligation but not the obligation to pay principal, or in a revised obligation to pay a non-usurious rate." Id. Neither of these remedies can be derived either from case law or from statutory law. Without further briefing from the parties, the Court will not rule on this question.

> n3 In Hammelburger v. Foursome Inn Corp., 54 N.Y. 2d 580, 590, 446 N.Y.S. 2d 917, 431 N.E.2d 278 (1981), the Court of Appeals quotes from an administrative memorandum prepared by the Attorney Order on May 5. The final Pretrial Order will be filed on May 17 General and others and submitted to the Legislature with the bill that eventually became § 5-521, which argues that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted." Because the quoted document does not report the statements of the Legislature, or even of an individual representative, it is not necessarily a reliable indicator of the Legislature's intent.

2004 U.S. Dist. LEXIS 6970, *

[*50]

**Conclusion**

For the reasons set forth above, the motions for summary judgment by both AEG and Ahava are denied, as is AEG's motion for costs and attorneys' fees. The Book Account is admissible as a business record pursuant to Fed. R. Evid. 803(6), and the Henry Affidavit is admissible pursuant to Fed. R. Evid. 702. Finally, if Ahava elects to continue to pursue its usury defense under New York law, the parties are directed to brief the applicability of the usury defense as well as available remedies in connection with any in limine motions. AEG will serve Ahava with its proposed Pretrial and any motions in limine will be made returnable on that day. The trial will commence on May 17, 2004.

It is so ordered.

**New York, NY**

**April 23, 2004**

    **ROBERT W. SWEET**

    **U.S.D.J**

Westlaw.

Not Reported in B.R.
1998 WL 59480 (Bankr.M.D.Pa.)
**(Cite as: 1998 WL 59480 (Bankr.M.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States Bankruptcy Court, M.D. Pennsylvania.
In re Guiseppe LAFORGIA, Debtor
In re Charles B. Edwards, Patricia Edwards, Debtors
**Nos. 5-95-00036, 5-95-00976.**

Jan. 21, 1998.
Joseph G. Murray, Wilkes-Barre, PA, for debtors.

Charles DeHart, Trustee in Bankruptcy, Hummelstown, PA, Angelo Frattarelli, Washington, D.C., for IRS.

**OPINION AND ORDER**

THOMAS, Bankruptcy J.

```
Internal Revenue Service      $3,634.00
Commonwealth of Pennsylvania  $1,259.00
```

4. *SECURED CLAIMS. Arrearages:* The following amounts shall be paid through the Plan to secured creditors, which amounts equal arrearages due as of the filing of this Plan:

First Fidelity Bank, N.A. $9,064.55
5. *SECURED CLAIMS. Regular Monthly Payments:* The Debtors shall maintain their regular monthly payment to First Fidelity Bank. N.A. First Fidelity will retain its lien upon the Debtors' real property.
6. *UNSECURED CLAIMS.* No payments shall be made to holders of unsecured, non-priority claims.
7. *COMPENSATION TO THE TRUSTEE.* The Chapter 13 Trustee will receive compensation through the Plan in the amount of One Thousand Three

```
Internal Revenue Service
Carbon County Tax Claim Bureau
Monroe County Tax Claim Bureau
Commonwealth of PA, Department of Revenue
Commonwealth of PA, Unemployment Compensation
```

4. *SECURED CLAIMS. Arrearages:* There are no secured arrearages as of the filing of this Plan.

5. *SECURED CLAIMS. Regular Monthly Payments:*

**\*1** In the Debtors' own convoluted way, they are challenging the manner by which the Chapter 13 Trustee makes distribution of funds in his possession.

In Edwards, the confirmed plan specifically provides that:
1. *PAYMENTS TO THE TRUSTEE.* The Debtors shall pay the sum of Two Hundred, Fifty-Six ($256.00) Dollars per month to the Chapter 13 Trustee for sixty (60) months, for a total of Fifteen Thousand, Three Hundred, Fifty-Two ($15,352.00) Dollars.
2. *CLASSIFICATION OF CLAIMS.* This Plan classifies claims as follows: priority, secured and unsecured claims.
3. *PRIORITY CLAIMS.* The following priority claims shall be paid in full through the Plan:

Hundred ($1,395.00) Dollars(sic).

In LaForgia, the confirmed plan reads similarly:
1. *PAYMENTS TO THE TRUSTEE.* The Debtors shall pay the sum of Three Hundred Ninety-two ($392.00) Dollars per month to the Chapter 13 Trustee for sixty (60) months, for a total of Twenty-three Thousand Five Hundred Sixteen ($23,516.00) Dollars.
2. *CLASSIFICATION OF CLAIMS.* This Plan classifies claims as follows: priority, secured and unsecured claims.
3. *PRIORITY CLAIMS.* The following priority claims shall be paid in full through the plan:

```
$14,500.00
```

The Debtor shall maintain his regular monthly payments as follows:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                          Page 2
1998 WL 59480 (Bankr.M.D.Pa.)
**(Cite as: 1998 WL 59480 (Bankr.M.D.Pa.))**

```
First National Bank of Palmerton        $368.00
First Naitonal(sic) Bank of Palmerton   $330.00
The Money Store                                   $995.00
```

6. *UNSECURED CLAIMS.*   No payments shall be made to holders of unsecured, non-priority claims.

7. *COMPENSATION TO THE TRUSTEE.*   The Chapter 13 Trustee will receive compensation through the Plan in the amount of Two Thousand One Hundred Thirty-seven ($2,137.00) Dollars.

After confirmation, in both cases, the Trustee gratuitously filed a "Schedule of Distribution" apparently evidencing his intention to pay creditors in accordance with his determination as to which creditors should receive what amounts over the life of the plan. Those schedules read as follows:

*2 In Re:  Charles and Patricia Edwards

The time for filing proofs of claim under Bankruptct(sic) rule 3002(c) having elapsed and claims duly filed begin(sic) allowed if not objected to by Debtors;

NOW THEREFORE, the Trustee shall make the following distributions during the life of the plan, adjusted to pay allowed claims only, as shown by this schedule.

| Claims filed | Creditor | Status | Amt. to be paid |
|---|---|---|---|
| $0.00 | Joseph G. Murray, Esq.<br>10 E. South St., # B<br>Wilkes-Barre, PA 18701-2325 | Adminis. | $0.00 |
| $55,721.31 | IRS<br><br>Special Procedures<br><br>P.O. Box 12051<br><br>Philadelphia, PA 19105-2051 | Priority | $55,721.3 [FNa1] |
| $7,860.95 | Pa. Dept. Of Revenue<br><br>Bureau of Compliance<br><br>Dept. 280946<br><br>Harrisburg, PA 17128-0946 | Priority | $7,860.95 |
| $76,307.74 | First Fidelity Bank, NA<br><br>Phillip D. Berger, Esq. | Secured<br><br>(arrears) | $8,884.54 |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B15

Not Reported in B.R.
1998 WL 59480 (Bankr.M.D.Pa.)
(Cite as: 1998 WL 59480 (Bankr.M.D.Pa.))

Page 3

```
                    Ste. 200, Jenkins Court
                    610 Old York Rd.
                    Jenkintown, PA 19046
------------------------------------------------------------------
      SUBTOTAL OF PLAN                                 $72,466.80
      Charles J. DeHart, III, Trustee                   $7,346.00
      TOTAL PLAN                                       $79,812.80
      MAXIMUM MONTHS TO COMPLETION:                            60
      MINIMUM MONTHLY PAYMENTS:                   Tiers [FNaa1]
```

FNa1. The IRS claim is based on estimates. Payment to the IRS may be altered

  if the debtor files the necessary returns and the IRS files an amended claim.

FNaa1. Tiers: 1st 6 months--$256/mo.

FNBeginning in March, 1996 and for the remaining 54 months--$1449/mo.

METHOD OF PAYMENT: BY ORDER OF PRIORITY

In Re: Guiseppe LaForgia

The time for filing proofs of claim under Bankruptct(sic) rule 3002(c) having elapsed and claims duly filed begin(sic) allowed if not objected to by Debtors;

NOW THEREFORE, the Trustee shall make the following distributions during the life of the plan, adjusted to pay allowed claims only, as shown by this schedule.

```
------------------------------------------------------------------
Claims filed  Creditor                     Status     Amt. to be paid
$0.00         Joseph G. Murray, Esq.       Adminis.             $0.00
              304 Park Ave. 2nd Fl
------------------------------------------------------------------
              Stroudsburg, PA 18360
------------------------------------------------------------------
$36,038.92    IRS                          Priority       $36,038.92
                                                           [FNaa1]

              Special Procedures

              P.O. Box 12051

              Philadelphia, PA 19105-2051

------------------------------------------------------------------

$629.19       Monroe Cty. Tax Claim        Priority          $629.19

              Monroe Cty. Courthouse

              Stroudsburg, PA 18360

------------------------------------------------------------------

$5,376.15     Carbon County Tax Cl. Bur.   Secured         $5,376.15

              Courthouse Annex
```

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B16

Not Reported in B.R.
1998 WL 59480 (Bankr.M.D.Pa.)
(Cite as: 1998 WL 59480 (Bankr.M.D.Pa.))

Page 4

```
                    Jim Thorpe, PA 18229

--------------------------------------------------------------------
            SUBTOTAL OF PLAN                             $42,044.26
            Charles J. DeHart, III, Trustee              $4,204.00
            TOTAL PLAN                                   $46,248.26
            MAXIMUM MONTHS TO COMPLETION:                        60
            MINIMUM MONTHLY PAYMENTS:              Tiers [FNa1]

FNa1. Tiers: 1st 10 months--$392/mo.

FN$847/mo. For remaining fifty (50) months (commence 1/96)
FNaa1. The IRS claim is based on estimates. Payment to the IRS may be altered
    if the debtor files the necessary returns and the IRS files an amended claim.
```

METHOD OF PAYMENT: BY ORDER OF PRIORITY

What is first apparent, is that the Trustee has unilaterally indicated an intention to distribute twice the amount of receipts anticipated in the LaForgia case and five times the receipts in the Edwards case. This anomaly is a result of a rather tortured logic based on the conclusion that (1) 11 U.S.C. § 1322(a)(2) requires the plan to fully pay all § 507 priority claims, (2) the Internal Revenue Service has filed a Proof of Claim for $55,721.31 in Edwards and $36,038.92 in LaForgia, which is considered allowed unless objected to pursuant to 11 U.S.C. § 502(a), and (3) no objection to the Internal Revenue Service claim was filed prior to confirmation.

*3 In an effort to alter this rather bizarre development, the Debtors in each case, being represented by the same counsel, have objected to the Internal Revenue Service claims arguing that the failure of the Internal Revenue Service to object to the plan effectively limits their recovery to those amounts specified by the plan.

A proof of claim is prima facie evidence of the validity and amount of a claim. Federal Rule of Bankruptcy Procedure 3001(f). It is the burden of the objector to come forward with evidence sufficient to rebut the presumption of validity. 9 Lawrence P. King, Collier on Bankruptcy, ¶ 3001.10[2] at 3001- 25 (15th ed. rev.1996). The Debtors have not offered such evidence. The Debtors' reliance on the fact that the proof of claim exceeds the allowance in the plan as cause to reduce the claim is misplaced. While an unsecured creditor must file a claim to be paid under the plan pursuant to Federal Rule of Bankruptcy Procedure 3002(a), the *amount* of the payment is limited to "[t]he provisions of a confirmed plan [which] bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has *accepted,* or has rejected the plan." (Emphasis ours.) 11 U.S.C.A. § 1327(a). This is especially true in light of

authority that the failure to object to the plan is the equivalent of an agreement or a consent to a treatment different than provided for by the Code. *In re Facciponte,* 1992 WL 722289 (Bankr.N.D.N.Y.1992) (unpublished opinion), *In re Lindgren,* 85 B.R. 447 (Bankr.N.D.Ohio 1988), *In re Hebert,* 61 B.R. 44 (Bankr.W.D.La.1986). But see, *In re Escobedo,* 28 F.3d 34 (7th Cir.1994), *In re Northrup,* 141 B.R. 171, 172 (N.D.Iowa 1991), *In re Smith,* 212 B.R. 830 (Bankr.E.D.Va.1997). "[T]he better view is that the issue of compliance with section 1322(a), like other issues pertaining to whether a plan is confirmable, must be raised at the confirmation hearing or else they are barred." 8 Lawrence P. King, Collier on Bankruptcy, ¶ 1327.02[1][c] at 1326-6, 7 (15th ed. rev.1996). Cf. *In re Szostek,* 886 F.2d 1405 (3rd Cir.1989), *United States ex rel. I.R.S. v. Norton,* 717 F.2d 767 (3rd Cir.1983), *Matter of Gregory,* 705 F.2d 1118 (9th Cir.1983).

It is for these reasons that the Debtors' Objections to the claims of the Internal Revenue Service are denied.

As an aside, it is plain that the Debtors' real beef is with the Chapter 13 Trustee who has indicated an intention to pay creditors in accordance with his Schedule of Distribution filed February 28, 1996 in Edwards and December 21, 1995 in LaForgia, rather than under the terms of the plan. While that issue is not directly before me, I will merely observe that the Debtors certainly have standing to compel the Trustee to comply with the provisions of 11 U.S.C. § 1326(a)(2), which requires the Trustee to make distributions under the terms of the plan. Should the parties have reservations with the plan as confirmed, Congress has vested the debtor, the trustee, and the unsecured creditors with the power to request a modification of those terms. 11 U.S.C. § 1329(a).

*4 My Order is attached.

**ORDER**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
1998 WL 59480 (Bankr.M.D.Pa.)
**(Cite as: 1998 WL 59480 (Bankr.M.D.Pa.))**

 For the reasons indicated in the attached Opinion, the Debtors' Objections to the claims of the Internal Revenue Service are denied.

 1998 WL 59480 (Bankr.M.D.Pa.)

END OF DOCUMENT

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

9 F.3d 1553 (Table)                                                    Page 1
9 F.3d 1553 (Table), 1993 WL 441988 (9th Cir.(Idaho))
**Unpublished Disposition**
**(Cite as: 9 F.3d 1553, 1993 WL 441988 (9th Cir.(Idaho)))**

C
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA9 Rule 36-3 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Ninth Circuit.
SINCLAIR OIL CORPORATION, a Wyoming Corporation, Plaintiff-Appellant,
v.
Forrest R. SCHAEFER; Lynn F. Schaefer, Defendants-Appellees.
**No. 91-36089.**

Argued and Submitted Oct. 4, 1993
Decided Nov. 2, 1993.

Appeal from the United States District Court for the District of Idaho;  No. CV-91-28-MJC, Marion J. Callister, District Judge, Presiding.

D.Idaho

REVERSED AND REMANDED.

Before:  Goodwin, Schroeder and Pregerson, Circuit Judges.

MEMORANDUM [FN*]
**1 Sinclair Oil Corporation appeals the district court's summary judgment in favor of Forrest R. Schaefer in Sinclair's action to collect $76,000 under a personal guaranty contract signed by Schaefer. Sinclair's predecessors required Schaefer to sign the contract as a condition of extending credit to Blue and White Transport, Inc., a corporation which Schaefer owned and which has since become bankrupt.  We have jurisdiction over the appeal under 28 U.S.C. § 1291.  We reverse and remand.

BACKGROUND
In October 1983, Appellee Forrest Schaefer was the majority shareholder, officer, and director of Blue & White Transport, Inc. ("Blue & White").  He executed a personal guaranty in favor of two corporations that later merged into Appellant Sinclair Oil Corporation.  The guaranty contract supports the corporations' credit sales of petroleum products to Blue & White.  The contract is "unlimited as to the amount of [o]bligations covered ...," and relates to "any additional credit" that the corporations, in their discretion, extend to Blue & White.  (Appellant ER, Exhibit A).  Furthermore, the contract contains no expiration date and provides that it "is a continuing and unconditional guaranty" that shall remain in full force and effect until thirty days after the receipt of a signed, written notice of termination and until payment of Blue & White's debts through the end of the thirty-day period. Id.

The October guaranty contract was the last of several guaranties that Schaefer executed in favor of Sinclair's predecessor corporations.  Virtually every year, the corporations requested that he sign a new guaranty contract.  (Schaefer Memorandum in Support of Motion for Summary Judgment, p. 2; Affidavit, p. 2).

In March 1986, Schaefer sold his interest in Blue & White, leaving his sons as sole shareholders, and resigned as company officer and director.  Schaefer never sent a written notice of termination of the guaranty.  (Schaefer Deposition, p. 17, Appellee ER, p. 30).  Instead, Schaefer told Sinclair's agent that he no longer had any responsibility for Blue & White's affairs, and nobody ever mentioned that Sinclair considered Schaefer continually liable under the guaranty.  (Schaefer Deposition, pp. 19-20, 24, Appellee ER, pp. 32- 33, 37).  After Schaefer withdrew from Blue & White, Sinclair requested the new guaranty from his sons, not from Schaefer, as owners of the company. (Schaefer Deposition, p. 20, Appellee ER, p. 33).

Also after Schaefer's withdrawal, Sinclair imposed a $75,000 credit limit on Blue & White, without Schaefer's consent.  (Schaefer Deposition, p. 24, Appellee ER, p. 37).  Previously, Sinclair had provided an unlimited credit line to Blue & White, which the company occasionally ran up to $250,000.  (Schaefer Deposition, pp. 22-23, Appellee ER, pp. 35-36).  After Schaefer transferred ownership of the company, Sinclair agreed to raise Blue & White's credit limit to $100,000, if Schaefer signed another continuing and unconditional guaranty for unlimited liability;  Schaefer received the new guaranty, signed it, and never returned it to Sinclair.  (Schaefer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9 F.3d 1553 (Table)                                                      Page 2
9 F.3d 1553 (Table), 1993 WL 441988 (9th Cir.(Idaho))
**Unpublished Disposition**
**(Cite as: 9 F.3d 1553, 1993 WL 441988 (9th Cir.(Idaho)))**

Deposition, pp. 28-29, Appellee ER, pp. 41-42; Exhibit 1, ER, pp. 7-8). Blue & White filed bankruptcy in 1990; the company still owes approximately $76,000 to Sinclair.

**\*\*2** Based on the guaranty contract, Sinclair sued Schaefer to collect the $76,000 owed by Blue & White. On cross-motions for summary judgment, the district court granted summary judgment in favor of Schaefer. Sinclair appeals.

ANALYSIS

We review de novo the district court's grant of summary judgment in favor of Schaefer. *Jones v. Union Pac. R.R.*, 968 F.2d 937, 940 (9th Cir.1992). Viewing the evidence in the light most favorable to the nonmoving party, Sinclair Oil, we must determine whether there were any genuine issues of material fact for trial and whether the district court correctly applied the relevant substantive law. *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir.1992).

Under guaranty law, if Schaefer was a gratuitous guarantor, his obligation would be discharged by the material alteration of the principal contract that increased his risk of liability, absent his consent. However, because his contract covered the credit reduction, contract law principles require us to find consent and therefore to reject Schaefer's guarantor defense.

*1. A Material Alteration in the Underlying Principal Contract Did Not Increase Schaefer's Risk of Liability Beyond the Scope of the Guaranty Contract*

We find that, even if the district court correctly ruled that Schaefer was a gratuitous guarantor, Schaefer's guarantee obligation was not discharged by the reduction in Blue & White's credit limit. For our analysis, we discuss the guaranty law test for discharge and then the express terms of Schaefer's contract, by which he effectively consented to the credit reduction and forfeited any defense under guaranty law.

A. *Guaranty Law:     Discharge of Guarantor's Obligation*

The district court in this case applied § 128(a) of the Restatement of Security as the test under Idaho law for discharging liability of a gratuitous guarantor. Under that section, all guarantors, including gratuitous guarantors, remain liable after an unconsented-to, material alteration of the underlying principal contract, if the modification "can *only* be beneficial" to them. Restatement of Security § 128(a); § 128(a), cmt. f (1941) (emphasis added). For continued liability, the modification "must be of the sort that by its very nature, *in no circumstances*, can increase the risk of ... a surety." *Id.* at cmt. e (emphasis added).

A modification that can only be beneficial to the guarantor is "the reduction of the total amount due" from the principal. *Id.* For example, the principal and creditor reduce the amount owed for purchased products, even though the guaranty covers the total debt. *Gebrueder Heidemann, K.G. v. A.M.R. Corp.*, 746 P.2d 579, 584 (Idaho App.Ct. 1987) ("*Heidemann II*") ("We fail to see how a reduction in a debtor's obligation can injure his guarantor."), *review denied*, 750 P.2d 378 (Idaho 1988); Restatement of Security § 128(a) cmt. e, illus. 6 (parties reduced guaranteed rent obligation from $300 to $250 per month).

**\*\*3** This case is distinguishable from cases involving reduction of a guaranteed debt. Where a modification of the principal's obligation "indirectly affect[s] the probability of performance by him, the surety may be discharged." 10 *Williston on Contracts* § 1241 (3d ed. 1967) (citing *Atterbury v. Carpenter*, 321 F.2d 921 (9th Cir.1963) (reversing Oregon district court and applying the Restatement of Security)). In *Atterbury*, an increase in the principal's debt and interest rate without an increase in the extent of a gratuitous guarantor's liability discharged the gratuitous guarantor's liability, because the modification "made it more difficult for [the principal] to repay and thereby increased the risk ... [of] default" and resort to the guarantor's assets. *Atterbury*, 321 F.2d at 924. In this case, the district court found that the reduced credit line must have placed Schaefer at greater risk that Blue & White would default, because the company had been operating for years with an unlimited credit line. (Memorandum Decision, p. 3). Sinclair does not dispute that the reduced credit limit could potentially be injurious to Schaefer. (Memorandum Decision, p. 5).

Still, Sinclair argues that the district court erred by concluding that Schaefer, as a gratuitous guarantor, need not prove actual injury. Idaho law clearly requires that a compensated guarantor show prejudice, as well as a material alteration of the underlying contract, to relieve himself of liability.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Ore-Ida Potato Products, Inc.,* 392 P.2d at 199; *Heidemann I,* 688 P.2d at 1185. Sinclair points to the fact that the Idaho Supreme Court, in *Heidemann I,* expressly left the question of whether a gratuitous guarantor must show injury open. *Heidemann I,* 688 P.2d at 1185 ("Without deciding whether a 'gratuitous' guarantor must show injury, we hold that A.M.R. is not a gratuitous guarantor.").

Because the Court has not announced that "actual injury" is the appropriate test for gratuitous guarantors under Idaho law, we do not require such proof here. *See Ore-Ida Potato Products, Inc.,* 392 F.2d at 199 ("[G]ratuitous guarantors ... are regarded as favorites of the law."); *Kaufman,* 810 P.2d at 1148 (gratuitous guarantor's liability discharged by extension agreement; no proof of prejudice required); *Heidemann II,* 746 P.2d at 583 ("Gratuitous sureties remain governed by the 'narrow' modification rule. However, the compensated surety bears the burden of demonstrating injury or prejudice caused by modification of the principal debtor's duty."). Because Schaefer could be injured by the reduced credit line, if he was a gratuitous guarantor, his obligation would be discharged *absent consent, by his contract,* to the change.

B. *The Terms of the Guaranty Contract Negate Schaefer's Defense of Material Alteration*

Sinclair contends, and we agree, that contract law, rather than guaranty law, determines the outcome of this case. "The extent of a guarantor's liability is determined by the precise terms of the guaranty contract." *Valley Bank v. Larsen,* 663 P.2d 653, 655-56 (Idaho 1983) (citations omitted). A guarantor is not liable for debts that he did not agree to guarantee. However, even a gratuitous guarantor is bound by his contract. *Id.* at 659.

**4** By the guaranty contract, Schaefer waived a defense of material alteration of the principal contract. In effect, Schaefer consented to future extensions of credit on *any* terms, even if new terms effected an increase in his risk of liability. The following provisions in the guaranty contract authorize Sinclair's predecessors to define the amount of Blue & White's credit: Schaefer's guaranty serves: [T]o induce [the creditors,] *at [their] discretion, at any time hereafter* to extend *any* additional credit to Debtor" Blue & White, for merchandise, or "to extend credit *in any other manner* ...[;] liability hereunder [is] unlimited as to the amount of [o]bligations covered.... [Schaefer] guarantees that

the [o]bligations will be paid ... strictly in accordance with the terms and provisions of *any* agreement ... which has been or *may hereafter be made* or entered into by the Debtor.... (Appellant ER, Exhibit A) (emphasis added). We find that Sinclair's broad contract rights and Schaefer's broad guaranty obligation negate Schaefer's guarantor defense. *See McGill v. Idaho Bank & Trust Co.,* 632 P.2d 683, 688 (Idaho 1981) (guaranty liability based on contractual waiver of the defense of release of the principal debtor); *Valley Bank,* 663 P.2d at 657 (express waiver of statutory defense against a deficiency judgment action); Restatement of Security § 128, cmt. c ("The consent of the surety to alterations is binding on him ... [if] expressed as a part of his obligation.... [H]e is bound on his contract....").

In this case, Schaefer did not bargain for protection from the credit line reduction. The obligations for which Schaefer agreed to be bound were broad enough to cover the modified credit terms. We reverse the district court's grant of summary judgment for Schaefer based on the incorrect finding of discharge due to increased risk of liability.

2. *Parties' Requests For Attorney Fees*

Sinclair and Schaefer request awards of their attorney fees on appeal pursuant to Idaho Code § 12-120(3). The Idaho statute provides for a reasonable attorney fee to the prevailing party, in an action to recover on a guaranty. Idaho Code § 12-120(3) (1970). Sinclair also relies upon the express terms of the guaranty contract signed by Schaefer. The guaranty contract states that Schaefer guarantees payment of all expenses that may be incurred in enforcing any rights under the contract. (Appellant ER, Exhibit A). We grant Sinclair's requests for an attorney fee award. We also grant Sinclair's request for reversal of the district court's attorney fee award to Schaefer pursuant to Idaho Code § 12-120(3).

REVERSED AND REMANDED.

FN* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3.

9 F.3d 1553 (Table), 1993 WL 441988 (9th Cir.(Idaho)), Unpublished Disposition

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9 F.3d 1553 (Table)
9 F.3d 1553 (Table), 1993 WL 441988 (9th Cir.(Idaho))
**Unpublished Disposition**
**(Cite as: 9 F.3d 1553, 1993 WL 441988 (9th Cir.(Idaho)))**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                   Page 1
2004 WL 503512 (E.D.Pa.)
**(Cite as: 2004 WL 503512 (E.D.Pa.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Angelina STEADMAN, Appellant,
·v.
Bruce E. STEADMAN, Debtor-in-Possession
and
WASHINGTON MUTUAL BANK, FA, successor in
interest to Washington Home Loans,
Inc., successor in interest by merger to Fleet
Mortgage Corp., Appellee.
**No. Civ.A. 02-CV-8888.**

March 15, 2004.
Kenneth A. Murphy, Miller, Alfano & Raspanti PC,
Philadelphia, PA, for Appellant.

Andrea B. Paul, Harper & Paul, Philadelphia, PA,
for Debtor-in-Possession.

Danielle Boyle-Ebersole, Shapiro & Kreisman, King
of Prussia, PA, for Creditor.

Frederick L. Reigle, pro se, Reading, PA, Frederick
Baker, pro se, Philadelphia, PA, for Trustees.

*MEMORANDUM ORDER*

DAVIS, J.

*1 Appellant Angelina Steadman ("Appellant")
appeals from the bankruptcy court's October 8, 2002
order overruling Appellant's objection to the
amended proof of claim filed by Washington Mutual
Bank, FA, successor in interest to Washington Home
Loans, Inc., successor in interest by merger to Fleet
Mortgage Corp. (collectively, "Washington Mutual").
In her appeal, Appellant argues that the bankruptcy
court erred in finding that she failed to rebut the
*prime facie* effect of Washington Mutual's amended
proof of claim.

I. Factual Background and Procedural History
On August 26, 1977, the Debtor-in-Possession,
Bruce E. Steadman ("Debtor"), and his wife,
Appellant, Angelina Steadman (collectively, the

"Steadmans"), executed a mortgage note in the
principal sum of $28,000 for the property located at
120-122 West Washington Lane, Philadelphia,
Pennsylvania 19144 (the "Property"). On June 8,
1990, Washington Mutual instituted an action in
mortgage foreclosure against the Steadmans for their
failure to make the required monthly payments of
principal, interest and other collectible charges and,
on May 10, 1991, a default judgment was entered
against the Steadmans in the amount of $32,090.72.

On December 28, 2001, Debtor filed for bankruptcy
protection under Chapter 13 of the Bankruptcy Code.
This was the first time Debtor had filed for
bankruptcy. Appellant, on the other hand, had filed
six Chapter 13 bankruptcy petitions, all of which
were dismissed. On January 30, 2002, Washington
Mutual filed a proof of claim in the amount of
$42,449.22. On February 11, 2002, Debtor filed an
objection to that claim. In the interim, Washington
Mutual filed a Motion to Dismiss Debtor's
bankruptcy case on the basis of Appellant's serial
filings.

Debtor and Washington Mutual subsequently settled
their differences and entered into a stipulation--
approved by the bankruptcy court on April 2, 2002--
whereby Washington Mutual agreed to reduce its
proof of claim from $42,449.22 to $39,310.73 and
Debtor agreed that should his bankruptcy case be
dismissed for any reason, he and his wife would be
barred from filling another bankruptcy petition for a
period of 180 days. Pursuant to the stipulation,
Debtor filed an amended Chapter 13 plan in which he
agreed to pay Washington Mutual its claim of
$39,310.73 in full. The bankruptcy court confirmed
the amended plan on May 17, 2002.

On April 15, 2002, Appellant proceeding *pro se* filed
her own objection to Washington Mutual's amended
proof of claim. According to the bankruptcy court,
attached to the objection was "an uncatalogued
jumble of documentation ... which [Appellant]
proffered for the ostensible purpose of demonstrating
that the amended claim of Washington Mutual was
still too high[ ] because it failed to reflect proper
credit for various monies tendered over the years to
Washington Mutual by [Appellant] and/or [Debtor]."
Order at 2. Through his counsel, Debtor wrote a letter
to the bankruptcy court, stating that he did not want
Appellant's objection to affect his bankruptcy case, as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 503512 (E.D.Pa.)
(Cite as: 2004 WL 503512 (E.D.Pa.))

he was satisfied with the stipulation he entered into with Washington Mutual.

**\*2** The bankruptcy court scheduled a hearing with respect to Appellant's objection for May 15, 2002. During the hearing, it was learned that Washington Mutual failed to serve its Motion to Dismiss on Appellant. On this basis, Appellant objected to the entry of an order barring her from filing another bankruptcy petition for a period of 180 days. Ultimately, the hearing was adjourned because the parties expressed a desire to attempt to negotiate a settlement.

Settlement efforts proved fruitless, however, and the hearing was rescheduled for August 15, 2002. At the hearing, Appellant testified as to her belief that Washington Mutual's amended proof of claim was too high, in that it failed to reflect payments made to Washington Mutual. She also proffered documents purporting to support her testimony. According to the bankruptcy court, these documents were "impossible to analyze ... in any meaningful way" because they did not correlate to Washington Mutual's amended proof of claim. Order at 3.

After concluding that Appellant had standing to object to Washington Mutual's amended proof of claim, the bankruptcy court held that she failed to overcome the *prima facie* validity of Washington Mutual's claim and, as a result, overruled Appellant's objection. [FN1] The court also vacated that portion of the stipulation Debtor entered into with Washington Mutual, barring Appellant from filing another bankruptcy petition for a period of 180 days.

> FN1. Federal Rule of Bankruptcy Procedure 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure constitutes *prima facie* evidence of the validity and amount of the claim. *See Amatex Corp. v. Aetna Cas. & Sur. Co.,* 107 B.R. 856, 870 (E.D.Pa.1989), *aff'd,* 908 F.2d 961 (3d Cir.1990); *In re Wall to Wall Sound & Video, Inc.,* 151 B.R. 700, 701 (Bankr.E.D.Pa.1993). Where an objection is filed, the objecting party bears the initial burden of presenting sufficient evidence to overcome the presumed validity and amount of the claim. *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir.1992) ("The objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claims legal sufficiency."). If the objecting

party overcomes the *prima facie* effect of the claim, then the burden of persuasion shifts to the claimant. *Id.* at 174. After considering Appellant's objection, the documents attached to it, her testimony at the August 2002 hearing, and the exhibits she introduced at that hearing, the bankruptcy court concluded that Appellant did not rebut the *prima facie* validity of Washington Mutual's amended proof of claim. Specifically, Judge Raslavich found that Appellant failed to explain the significance of the documents she submitted to the bankruptcy court and that her testimony "did little, if anything, to illuminate the matters of which she complain[ed]...." Order at 4-5.

On July 17, 2003, Appellant filed an appeal from the October 8, 2002 order of the bankruptcy court, arguing that the bankruptcy court erred in finding that Appellant only contributed $1,700 towards mortgage payments in the years 1993, 1994 and 1995, in failing to consider the "uncontroverted evidence that Washington Mutual ... failed to account for in excess of $8,700.00 in Bankruptcy Trustee payments," and in "concluding that certain money order payments were recently made to Washington Mutual [ ], when they were actually made between 1997 and 2001." Brief of Appellant Angelina Steadman ("Appellant's Br.") at 1-2. In support of her argument, Appellant attaches to her brief a disbursement report, which Washington Mutual contends is not part of the record on appeal. *Id.,* Ex. C.

## II. Jurisdiction

This court has jurisdiction pursuant to 28 U.S.C. § 158(a).

## III. Standard of Review

A district court reviews a bankruptcy court's findings of fact findings of fact for clear error and applies a plenary standard to its conclusions of law. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir.1999). The district court must accept the bankruptcy court's factual determination "unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Hoots v. Pennsylvania,* 703 F.2d 722, 725 (3d Cir.1983) (citing *Krasnov v. Dinan,* 465 F.2d 1298, 1302- 03 (3d Cir.1972)). Mixed questions of fact and law require the district court to accept the bankruptcy court's "finding of historical or narrative facts unless

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 503512 (E.D.Pa.)
(Cite as: 2004 WL 503512 (E.D.Pa.))

Page 3

clearly erroneous, but exercise 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." ' *Mellon Bank N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir.1991)* (quoting *Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 10102 (3rd Cir.1981)).*

### III. Analysis

**\*3** The Court must first determine whether it is permitted to consider the disbursement report Appellant attached to her brief as evidence of Washington Mutual's "fail[ing] to account for in excess of $8,700.00 in Bankruptcy Trustee payments." Appellant's Br. at 1. As noted above, a district court has jurisdiction to hear appeals from final judgments and orders of bankruptcy judges. *See 28 U.S.C. § 158(a).* When reviewing a bankruptcy judge's ruling, the district court sits as an appellate court. It is hornbook law that appellate courts generally cannot consider evidence that was not before the court below. *See Drexel v. Union Prescription Centers, Inc., 582 F.2d 781, 784 n. 4* (citing *Sound Ship Bldg. Corp. v. Bethlehem Steel Co., 533 F.2d 96, 1001 n. 3 (3d Cir.1976), cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976) and 2 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2716, at 650 (1983)).

Appellant designated the following items be made a part of the record on appeal: (1) the bankruptcy court's opinion and accompanying order; (2) the August 2002 hearing transcript; and (3) exhibits S-1 and S-2, and exhibits F-1 through F-7, which were introduced at the hearing. Appellant failed to designate the disbursement report as an item to be included in the record. Accordingly, the Court cannot consider the report in deciding this appeal.

The Court now turns to the merits of Appellant's appeal. After reviewing the record, there is nothing to suggest that the bankruptcy court committed the errors ascribed to it by Appellant. First, the bankruptcy court did not rely on, or adopt, a typographical error in the hearing transcript in concluding that Appellant failed to overcome the *prima facie* validity of Washington Mutual's claim. Indeed, nowhere in his opinion does Judge Raslavich find that Appellant only "contributed $1,700 towards mortgage payments in the years 1993, 1994, and 1995...." Order at 2. Second, neither the documents Appellant submitted to the bankruptcy court nor her testimony at the August 2002 hearing demonstrate that Washington Mutual failed to account for in

excess of $8,700 in bankruptcy trustee payments. The documents are, as the bankruptcy court described them, difficult to understand, and Appellant does not explain their significance in her brief. As for Appellant's generalized testimony, it did not pinpoint a specific instance where Washington Mutual failed to apply a payment. Finally, the bankruptcy court appropriately described money order receipts from 1997-2001 as "recent" compared to mortgage account statements from 1989-1995.

ACCORDINGLY, this day of March 2004, upon consideration of Appellant Angelina Steadman's appeal of the Bankruptcy Court's Order in Bankruptcy No. 01-37900 SR (Dkt. No. 9), IT IS HEREBY ORDERED that said Order is AFFIRMED.

2004 WL 503512 (E.D.Pa.)

### Motions, Pleadings and Filings (Back to top)

- 2:02CV08888 _____(Docket) (Dec. 04, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

STONE & WEBSTER, INCORPORATED
245 SUMMER STREET
BOSTON, MASSACHUSETTS 02210

December 27, 2000

VIA FACSIMILE AND FEDERAL EXPRESS

The Shaw Group Inc.
8545 United Plaza Boulevard
Baton Rouge, Louisiana 70809

Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of July 14, 2000, by and among The Shaw Group Inc., a Louisiana corporation ("Shaw"), Stone & Webster, Incorporated, a Delaware corporation and a debtor-in-possession ("S&W"), and certain of the subsidiaries of S&W (S&W, together with such subsidiaries, being hereinafter collectively referred to as the "Sellers") (as amended by Amendment No.1 to Asset Purchase Agreement, dated August 2, 2000, the "Shaw Agreement"). Capitalized terms used and not otherwise defined herein shall have the respective meanings assigned to them in the Shaw Agreement.

This letter confirms the agreement of Shaw and the Sellers as follows:

1.       Shaw and the Sellers hereby agree that the Sellers' Disclosure Schedules to the Shaw Agreement consist of those schedules filed by the Sellers with the United States District Court for the District of Delaware on June 28, 2000 (the "Bankruptcy Court Filing"), which Sellers represent to be those same schedules as negotiated with Jacobs Engineering Corporation, except as otherwise modified by the parties to the Shaw Agreement through mutual agreement. The Sellers' Disclosure Schedules in the Bankruptcy Court Filing include, without

The Shaw Group Inc.
December 27, 2000
Page 2

limitation, the following schedules which have been attached hereto as
Exhibit A: (a) Schedule 3.06 - Financial Statements, (b) Schedule 3.07
- Undisclosed Liabilities, (c) Schedule 3.12(a) - Real Property
Encumbrances, (d) Schedule 3.12(b) - Permitted Real Property En-
cumbrances, (e) Schedule 3.13(d) - List of Environmental Reports, (f)
Schedule 3.17(a)(iii) - List of Contracts and Foreign and Domestic
Representative Contracts and (g) Schedule 3.17(a)(xiii) - Joint Ven-
ture, Consortium, License and Other Partnership Agreements.

Notwithstanding the foregoing, (a) the Sellers and Shaw hereby agree
that the following projects (the "Additional Completed Contracts")
shall be treated as Completed Contracts under the Shaw Agreement
and Schedule 2.02(b) - Completed Contracts shall be deemed amended
to include such Additional Completed Contracts: (i) the Waste Options
Nantucket project, project no. 08069022, (ii) the Petroleum
Development Oman project, project no. 00193145, (iii) the Tapoco
Inc. project, project no. 08989011, and (iv) the Yadkin Inc./Alcoa
project, project no. 08779011, and (b) S&W hereby assigns to Shaw
and Shaw hereby assumes from S&W the (i) ABB-Combustion
Engineering project, project no. 07769011 (the "ABB Project"), and
(ii) the US Sugar Corporation/Delta II project, project no. 06604011
(the U.S. Sugar Project"), and Sellers and Shaw agree that the ABB
Project and the U.S. Sugar Project shall be treated as Assumed
Contracts under the Shaw Agreement.  Sellers represent and warrant
that these Additional Completed Contracts constitute the only
completed contracts or substantially completed contracts of which
Sellers have actual knowledge as not being listed on Schedule 2.02(b)
to the Disclosure Schedules (collectively with Schedule 2.02(b), the
"Completed Contracts List").  Subject to the preceding sentence, Shaw
hereby undertakes to indemnify the Sellers' Indemnified Persons for a
period commencing on the date hereof and ending on the first
anniversary of the date hereof, with respect to any claims or
adjustments arising out of the performance of the contracts which are

The Shaw Group Inc.
December 27, 2000
Page 3

complete or substantially complete, but which are not listed on the
Completed Contracts List as defined herein, up to an aggregate
amount of $22.75 million.

2.      S&W is hereby relieved of its obligation to prepare and provide Shaw
with a Closing Balance Sheet, a Purchase Price Adjustment Schedule
and such other information or reports contemplated by Section
2.05(c)(i) of the Shaw Agreement.

3.      There shall be no Adjustment Amount payable by either Shaw or the
Sellers pursuant to Section 2.05(c) of the Shaw Agreement.

4.      S&W hereby assigns to Shaw and Shaw hereby assumes from S&W
the Mobil Chemical/Chemical Ethylene Revamp project, project no.
06180011 (the "Project"), which Project shall be treated as an As-
sumed Contract under the Shaw Agreement effective as of the date
hereof.   In connection therewith, Shaw hereby (a) assumes any and all
actual or potential liabilities related to the Project (whether contingent
or fixed, known or unknown) and (b) releases and waives any claim
Shaw has or may have against S&W for reimbursement, contribution,
indemnity or the like with respect to the Project, whether pursuant to
Section 9.01 of the Shaw Agreement or otherwise. In that regard,
Sellers represent that they presently know of no claims related to or
arising in connection with the Project, other than the litigation between
among others, S&W and Mobil and Bertrand v. Mobil Chemical
Company, et al., Case No. A164065, 58th Judicial District Court,
Jefferson County, Texas.

5.      By instructions substantially in the form of Exhibit B hereto, Shaw and
S&W shall, on the first business day following Court Approval (as
hereinafter defined), instruct the Escrow Agent to distribute all
amounts currently held in the Indemnity Deposit as follows: (i) to
Shaw, cash in the amount of $22.75 million plus interest thereon from

The Shaw Group Inc.
December 27, 2000
Page 4

October 12, 2000 to the date of distribution and (ii) to S&W, cash in the amount of the balance of the Indemnity Deposit of approximately $8.3 million plus any Earnings. Except as set forth in the next sentence, upon such distribution, Sellers shall be relieved of all of their obligations under the Shaw Agreement., including, without limitation, their obligation to indemnify any Buyer's Indemnified Person under the Shaw Agreement pursuant to Section 9.01 of the Shaw Agreement. Notwithstanding the foregoing, the Sellers shall not be relieved of their obligations (i) to transfer to Shaw the Cold Storage Business and the Process Business pursuant to the Shaw Agreement and the Sale Order, (ii) to take certain actions post-closing pursuant to Sections 5.04(a), 5.06, 5.07, 5.08, 5.09, 5.10, 5.11, 5.12, 5.18, 5.24, 5.26 and 10.11 of the Shaw Agreement, and (iii) to indemnify any Buyer's Indemnified Person with respect to Losses incurred by such Buyer's Indemnified Person from any amounts paid under (A) letters of credit relating to Project Rejected Contracts, as set forth on Schedule 5.16(b) to the Shaw Agreement, (B) financial guarantees in favor of insurance carriers, pursuant to the second clause of Section 9.01(b) of the Shaw Agreement, (C) UK bank guarantees/letters of credit set forth on Schedule I hereto or (D) any other letters of credit, financial guarantees or similar obligations incurred by any Seller. Upon such distribution, Shaw shall be relieved of all its obligations under the Shaw Agreement, except that Shaw shall not be relieved of its obligations to take certain actions post-closing pursuant to Sections 5.04(a), 5.06, 5.07, 5.10, 5.11, 5.12, 5.18, 5.24, 5.26, 9.03 and 10.11 of the Shaw Agreement.

6.      S&W and Shaw shall work in good faith to expeditiously terminate the LC Deposit as follows: S&W and Shaw shall have the backup letters of credit posted by Shaw with respect to the Project Rejected Contracts withdrawn and S&W shall use the cash contained in the LC Deposit to cash collateralize the letters of credit, bank guarantees or financial guarantees in favor of insurance carriers set forth on Schedule I hereto (the "LCs") issued by the prepetition lenders in connection with the Project Rejected Contracts. Upon the cash collateralization of the LCs and the release of such backup letters of credit posted by Shaw, any cash remaining in the LC Deposit shall be distributed to

B29

The Shaw Group Inc.
December 27, 2000
Page 5

S&W and the Sellers shall be relieved of their obligation to indemnify any Buyer's Indemnified Person with respect to Losses incurred by such Buyer's Indemnified Persons from any amounts paid under (A) letters of credit relating to Project Rejected Contracts, as set forth on Schedule 5.16(b) to the Shaw Agreement, (B) financial guarantees in favor of insurance carriers, pursuant to the second clause of Section 9.01(b) of the Shaw Agreement, (C) UK bank guarantees/letters of credit set forth on Schedule I hereto or (D) any other letters of credit, financial guarantees or similar obligations incurred by any Seller.

7.    Shaw and S&W shall use commercially reasonable efforts to review and pay uncontested cure claims and proofs of claim filed with respect to Assumed Liabilities in the chapter 11 cases of S&W and certain of its subsidiaries (the "Chapter 11 Cases") and to resolve disputes regarding each party's respective liability with respect to disputed filed cure claims and filed proofs of claim on or before December 30, 2000, but in all cases where Shaw agrees that a cure claim or proof of claim is related to an Assumed Contract or is an Assumed Liability under the Shaw Agreement and does not contest the amount of the cure claim or proof of claim, Shaw shall make full payment on or before January 31, 2001, unless otherwise agreed to by Shaw and the claimant.

On or before January 15, 2001, Shaw shall provide the Debtors, the Creditors' Committee and the Equity Committee (the "Estate Representatives") with a list (the "Disputed Claims List") of cure claims and proofs of claims that Shaw contends (i) is a filed cure claim or a filed proof of claim that does not constitute, in whole or in part, an Assumed Liability, or (ii) that the asserted amount of any such filed cure claim or any such filed proof of claim is overstated (the "Disputed Claims"), and shall set forth therein the specific basis for such contention (i.e., that the Disputed Claim was overstated as to amount or not an Assumed Liability under the Shaw Agreement).

On or before January 31, 2001, Shaw shall file and serve an objection to those proofs of claim or cure claims that Shaw agrees are its liabilities under the Shaw Agreement but has a dispute as to the amount of the proof of claim or cure claim, which objection shall be set for

The Shaw Group Inc.
December 27, 2000
Page 6

hearing on the next omnibus hearing date not less than 30 days following January 31, 2001.

On or before January 31, 2001, the Debtors shall file a motion seeking to reclassify any cure claims or proofs of claim filed that they believe are Shaw's liability under the Shaw Agreement but which Shaw contends are the Debtors' liability, which motion shall be set for hearing on the next omnibus hearing date not less than 30 days following January 31, 2001.

8.    Shaw and the Sellers shall act in good faith and take such actions and execute such documents as may be necessary to effectuate the terms of this letter agreement.

9.    Each party's obligations under this letter agreement are subject to the approval of the District Court for the District of Delaware in connection with the Bankruptcy Cases ("Court Approval") and the agreements and obligations of the parties set forth in this letter agreement shall be enforceable only upon Court Approval.

10.    This letter agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to such state's conflict of laws rules.

11.    This letter agreement shall constitute an amendment of the Shaw Agreement in accordance with the provisions of Section 10.13 thereof.

12.    This letter agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

Please indicate your acknowledgment and acceptance of the foregoing by signing a copy of this letter agreement where indicated below and returning the signed copy of this letter agreement to us. Upon receipt of your executed acceptance and acknowledgment, S&W shall prepare file a motion seeking Court Approval.

B31

The Shaw Group Inc.
December 27, 2000
Page 7

Very truly yours,

STONE & WEBSTER, INCORPORATED
Debtor-in-Possession

By: _____

Name: James P. Jones
Title: Secretary

The Shaw Group Inc.
December 27, 2000
Page 18


STONE & WEBSTER CONSTRUCTION COMPANY, INC., DEBTOR-IN-POSSESSION

By: _____
Title: Secretary


STONE & WEBSTER DEVELOPMENT CORPORATION, DEBTOR-IN-POSSESSION

By: _____
Title: Secretary


STONE & WEBSTER DOMINICAN REPUBLIC, INCORPORATED,
DEBTOR-IN-POSSESSION

By: _____
Title: Secretary


STONE & WEBSTER ENGINEERING CORPORATION, DEBTOR-IN-POSSESSION

By: _____
Title: Secretary


B33

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INCORPORATED | ) | Case No. 00-02142 (PJW) |
| et al., | ) | Jointly Administered |
| | ) | Adv. No. 01-7766 (PJW) |
| Debtors | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 04-CV-834 (SLR) |
| | ) | |
| THE SHAW GROUP INC., SWINC | ) | |
| ACQUISTION THREE, INC., and | ) | |
| STONE & WEBSTER ENGINEERING | ) | |
| CORPORATION, et al., | ) | |
| Defendants | ) | |

## CERTIFICATE OF SERVICE

I, Francis A. Monaco, Jr., certify that I am not less than 18 years of age, and that service of the foregoing document was made on June 8, 2005 upon:

**VIA HAND DELIVERY and Electronic Mail**

| | |
|---|---|
| Gregory A. Taylor, Esq. | Adam G. Landis, Esq. |
| Stephen Jenkins, Esq. | Landis Rath & Cobb LLP |
| Ashby & Geddes | 919 Market Street, Suite 600 |
| 222 Delaware Avenue | Wilmington, DE 19801 |
| Wilmington, DE 19899 | *(Counsel to SWE&C)* |
| gtaylor@ashby-geddes.com | landis@lrclaw.com |
| *(Counsel to Shaw Group, Inc.* | |
| *and SWINC Acquisition)* | |

Under penalty of perjury, I declare that the foregoing is true and correct.

Date: June 8, 2005          _/s/ Francis A. Monaco, Jr.___
                                         Francis A. Monaco, Jr.