IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC ACQUISITION THREE, INC., and SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

Francis A. Monaco, Esquire and Kevin J. Mangan, Esquire of Walsh Monzack & Monaco, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: John C. Hutchins, Esquire, Daniel E. Rosenfeld, Esquire and Amy Beth Abbott, Esquire of Kirkpatrick & Lockhart L.L.P., Boston, Massachusetts.

**Gregory Alan Taylor, Esquire, and Stephen E. Jenkins, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendants Shaw Group, Inc. and SWINC Acquisition Three.

Adam G. Landis, Esquire of Landis, Rath & Cobb, L.L.P., Wilmington, Delaware. Counsel for Defendant SWE&C Liquidating Trustee.

****AMENDED MEMORANDUM OPINION**

Dated: October 30, 2006
Wilmington, Delaware

**ROBINSON, Chief Judge**

## I. INTRODUCTION

On June 2, 2000, debtor Stone & Webster, Inc. ("debtor")[1] filed a voluntary petition for relief under chapter 11, title 11 of the United States Code. On October 18, 2001, plaintiff Saudi American Bank ("SAMBA") filed an adversary action against defendants Shaw Group, Inc. ("Shaw"), SWINC Acquisition Three, Inc. and SWE&C Liquidating Trustee (collectively "defendants") in the United States Bankruptcy Court for the District of Delaware ("the bankruptcy court"). (Bank. D.I. 1)[2] Plaintiff alleged that, under an Asset Purchase Agreement ("the APA"), defendants assumed a debt owed to plaintiff by Stone & Webster Engineering Corporation ("SWEC"), a subsidiary of debtor. (Id.)

The adversary proceeding was withdrawn from bankruptcy court on September 13, 2004. (Bank. D.I. 88) Plaintiff and defendants filed motions for summary judgment. The court granted plaintiff's motion for summary judgment (Bank. D.I. 47) and denied defendants' motion for summary judgment (Bank. D.I. 29). (D.I. 11) Defendant Shaw appealed (D.I. 24) and the case was remanded for clarification on the issue of damages. (D.I. 30) Presently before the court is plaintiff's motion for assessment of damages. (D.I. 14) The court has jurisdiction over actions

---

[1] Although there were multiple named debtors, for ease of reference this order shall refer to a single "debtor."

[2] References to "Bank. D.I." refer to the docket in the bankruptcy Court for adversary proceeding number 01-7766.

arising out of chapter 11 of the bankruptcy code pursuant to 28 U.S.C. § 1334(a).

## II. BACKGROUND

The court recited many of the pertinent facts in its memorandum opinion accompanying its order granting summary judgment to plaintiff SAMBA (D.I. 11), and the most pertinent facts related to the present motion for assessment of damages are summarized below.

In 1980, a joint venture called Bugshan Stone & Webster ("BS&W") was created under the laws of Saudi Arabia. BS&W was owned in equal shares by SWEC, a subsidiary of Stone & Webster, Inc., and Abdullah Said Bugshan & Bros. ("Bugshan"). BS&W entered into a $130 million contract in the mid-1990s to upgrade a large oil refinery at Ras Tanura in Saudi Arabia (the "Ras Tanura Contract"). In an effort to induce plaintiff to grant credit to BS&W, Bugshan and SWEC executed a Guaranty wherein each party guaranteed 50% of all obligations to plaintiff bank from BS&W. (D.I. 26 at ex. B) Plaintiff granted $35 million of credit to BS&W by agreement on January 22, 1998 (the "Credit Agreement"). (Id. at ex. C) A contract was signed by Bugshan and SWEC on December 22, 1998 (the "Payment Letter") which specified that Bugshan and SWEC were each obligated to repay half of the loan balance to plaintiff, for a total of $650,000 by each party per month. (Id. at ex. D) The court previously determined

that defendant Shaw assumed the obligations of the Guaranty and Payment Letter when it acquired SWEC. (D.I. 11 at 17)

The Credit Agreement between plaintiff and BS&W stated:

> Borrower shall pay commission on the unpaid principal balance outstanding . . . The commission rate shall be determined by the Bank and subject to change from time to time. Borrower shall be deemed to have agreed to the commission rate as determined by the Bank . . .

(D.I. 26 at ex. C, B024). The Credit Agreement further states:

> Borrower shall pay upon demand **all expenses, including attorney's fees, court costs, appraisal fees and all other fees and expenses**, incurred by the Bank in obtaining or enforcing any of its rights under this Agreement, the Note or the Security Documents.

(Id. at B025) (emphasis added).

The Guaranty of Bugshan and SWEC to plaintiff for the loan provided:

> [T]he undersigned hereby unconditionally guarantees the punctual payment when due of 50% of all obligations of the Borrower to you now or hereafter existing "Obligations" **together with interest thereon** and any and all expenses incurred by you in enforcing your rights under this Guaranty.

(Id. at ex. B) (emphasis added).

SWEC made monthly $650,000 payments to BS&W for the repayment of plaintiff's loan. (D.I. 21 at 7) SWEC filed for bankruptcy on June 2, 2000, at which time debtor allegedly owed SAMBA approximately $6 million. (D.I. 11 at 3) Anticipating SWEC's petition for bankruptcy, SAMBA demanded payment of $6,728,594 by SWEC on May 31, 2000. (Id.; Bank. D.I. 1) This amount reflected $6,725,000 in principal and $3549 of interest.

SAMBA never received payment from SWEC. On its bankruptcy petition, SWEC listed the amount owed to SAMBA as $6,728,594.

Plaintiff moved the court for an order that Shaw assumed SWEC's debt to SAMBA by operation of the APA and Sale of Assumption Order. (Bank. D.I. 29) In granting plaintiff's motion (D.I. 11), the court awarded SAMBA its requested $6,728,594 in damages on May 4, 2005.

## III. DISCUSSION

### A. Prejudgment Interest

SAMBA asserts that it is entitled to prejudgment interest on the loan principal of $6,725,000 for which SWEC agreed to be responsible, calculated from SAMBA's date of demand, May 31, 2000.[3] (D.I. 21 at 4) SAMBA argues that it is entitled to prejudgment interest under Delaware law as a matter of right. (Id. at 15-16) SAMBA states that "[i]t is beyond dispute that both the Guaranty and the [Credit Agreement] provide that interest is to be paid, but neither document explicitly provides the applicable interest rate." (D.I. 21 at 16-17) According to SAMBA, the Delaware legal rate as of May 31, 2000, or 11%, must be applied. (Id. at 17) In the alternative, SAMBA argues that the rate SAMBA provided in its interrogatory responses in this

---

[3]If the court awards prejudgment interest, the interest should be applied to the entirety of the judgment, or $6,728,594, and not the outstanding $6,725,000 owed by SWEC under the loan.

case, 7.375% compounded daily, should apply.[4]

In opposition, Shaw argues that Saudi Arabian law governs the Credit Agreement, the Guaranty, and the Payment Letter. (D.I. 26 at 4-6) Shaw states that "BS&W's obligation to SAMBA ultimately arose under and is determined by the Credit Agreement, and SWEC's obligation, which is derivative of that, arises primarily under the Payment Letter." (Id. at 4) The Credit Agreement contains a choice of law provision which provides that Saudi Arabian law governs the agreement. (D.I. 26 at ex. C at B025) The Payment Letter contains no choice of law provision, however, Shaw argues that the Payment Letter is governed by Saudi Arabian law because that agreement was executed in Saudi Arabia and payment from SWEC to SAMBA was to occur in Saudi Arabia. (D.I. 26 at 4) Shaw claims that Islamic law forbids collection of interest.[5] (Id. at 4-5) Even though the Guaranty states that it is governed by New York law, Shaw argues that "its provisions are entirely derivative" of the Credit Agreement, thus, the prohibition against awards of interest under Saudi law equally

---

[4]SAMBA states the 7.375% rate was in reference to the Ras Tanura Contract and not the Credit Agreement (D.I. 29 at 3), but submits that this rate may be used as the default alternative to the 11% Delaware rate.

[5]SAMBA offers the Declaration of Mohammed Saleh Mohammed Al-Motlaq in support of its counter position that Saudi law does not prohibit prejudgment interest because banking institutions are not subject to a strict interpretation of Islamic law. (D.I. 29 at 12-13; D.I. 31)

applies to the Guaranty. (Id. at 5-6)

### 1. The Guaranty Controls the Award of Prejudgment Interest

As discussed previously, the Credit Agreement created a contractual relationship between BS&W and SAMBA. The obligation for SWEC to repay SAMBA did not arise out of the Credit Agreement, as SWEC and Bugshan were not parties to that agreement. The court's prior ruling did not address whether the obligation of SWEC for the loan arose out of the Guaranty, Payment Letter, or both. The court also did not have occasion to evaluate whether the Payment Letter is independent of the Guaranty. The court was asked to evaluate whether either agreement was assumed by defendant Shaw. In its analysis, the court expressly stated that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral." (D.I. 11 at 15) (citing Financeamerica Private Brands, Inc. v. Harvey E. Hall, Inc., 380 A.2d 1377, 1379 (Del. Super. 1977); Jones Motor Co. v. Teledyne, Inc., 690 F. Supp. 310, 313 (D. Del. 1988)). The court held that since neither obligation was contested,[6] "the Guaranty and Payment Letter are contracts that were assumed by defendant

[6]As explained in more detail in the court's prior ruling, debtor never contested plaintiff's cure claim to its debts under the Guaranty and Payment letter, and never listed either agreement on its schedules of Assumed, Excluded, Completed, or Rejected contracts in its bankruptcy proceeding. (D.I. 11 at 7-10, 16)

Shaw."[7] (D.I. 11 at 16)

It is not disputed that the Guaranty obligated SWEC to repay the loan to plaintiff, and that the court has held that defendant Shaw assumed SWEC's obligation. It is also not disputed that the Guaranty states that SWEC's obligation, "together with interest thereon and any and all expenses incurred by you in enforcing your rights under this Guaranty," are recoverable by SAMBA. The issue of whether prejudgment interest may be awarded can be analyzed solely under the terms of the Guaranty,[8] without resolving whether the Payment Letter also created a separate debt obligation.[9]

---

[7]The court noted that counsel's representations to the court, that contracts not identified on the schedules would be assumed contracts, were "of great significance" to its holding. (D.I. 11 at 16)

[8]In its response to plaintiff's current motion, Shaw argues that the Guaranty is "entirely derivative" of the Credit Agreement. (D.I. 26 at 5) This position is entirely inconsistent with the court's prior statement that a guaranty is an independent agreement and, therefore, the law governing the Credit Agreement, namely Islamic law, does not apply to the Guaranty or Payment Letter. Thus, the court need not resolve the issue of whether Islamic law does in fact prohibit an award of prejudgment interest as defendants assert. SAMBA also submits that defendants waived any defense that an award of prejudgment interest would be illegal, because defendants failed to affirmatively plead its illegality defense as required by Fed. R. Civ. P. 8, and failed to raise the issue in any prior papers or at oral argument. (D.I. 29 at 12) The court need not address these arguments since Saudi Arabian law does not apply to the Guaranty or Payment Letter.

[9]It is nevertheless notable that the Payment Letter does not provide for any remedies and does not contain a choice of law provision. Defendants suggest that "to the extent SAMBA's claim

**2. Choice of Law**

The Guaranty states that it is governed by New York law.[10] SAMBA argues that its complaint in this matter arose under the Bankruptcy Code, which contains no provision governing prejudgment interest. (D.I. 29 at 2) SAMBA concludes that the court should turn to Delaware law as instructive and ignore the parties' choice of New York law, as "none of the parties, nor any aspect of either the BS&W loan documents, the loan transactions thereunder, SWEC's Guaranty or the Payment letter, has any connection or contact with New York." (D.I. 29 at 4-5)

---

is predicated on the Payment Letter . . . the substantive law of Saudi Arabia - which a Delaware court would apply - would not permit the application of prejudgment interest." (D.I. 26 at 5) The Payment Letter is a memo-style document to SAMBA, which states its "Subject" is "Re-scheduling of Bugshan Stone & Webster (BSW) loan facility." (D.I. 26 at ex. D) The Payment Letter does not contain a choice of law provision and does not conflict in this regard with the Guaranty. The body of the document contains the division of payment between Bugshan and SWEC, and requests advisement of whether the terms are acceptable "in order to finalize the arrangement." (Id.) It is highly likely that the reason that the Payment Letter does not contain any other standard contract provisions is because the parties did not intend for the Payment Letter to be a complete representation of BS&W's obligations, only an addendum to the Guaranty. As the court resolves the issue of prejudgment interest based on the Guaranty alone, the court withholds ruling on the legal effect of the Payment Letter.

[10]New York's General Obligations Law Section 5-1401 specifically contemplates situations where neither contracting party has significant contacts to New York. That law provides that parties to an agreement concerning a transaction exceeding $250,000 may agree that New York law applies "whether or not such contract, agreement or undertaking bears a reasonable relation to this state." N.Y. C.P.L.R. § 5-1401(1) (McKinney 2006).

The New York legal interest rate is 9% per annum.[11] N.Y. C.P.L.R. § 5004 (McKinney 2006). That rate must be calculated on a simple interest basis. See Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 90 (2d Cir. 1998) (citations omitted).

The Delaware legal interest rate is 5% over the Federal Reserve discount rate. 6 Del. Code § 2301 (2006); See U.S. v. Star Brite Construction Co., 848 F. Supp. 1161, 1169 (D. Del. 1994). The Federal Reserve discount rate was 6% in May 2000 (D.I. 16 at ¶12 and ex. E), bringing the Delaware legal rate to 11%.

A federal court in a diversity case must apply the conflict of laws rules of the state in which it is sitting. See Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941). Delaware choice of law rules rely on Restatement (Second) of Conflicts of Law § 187 for the proposition that "the parties' choice of law, as expressed in their agreement, will be upheld unless the state whose law would control in the absence of a

---

[11]New York law provides with respect to the award of interest in breach of contract cases:

> Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

NY CPLR § 5001(a) (McKinney's 2006).

choice has a materially greater interest in the subject matter." Hionis Intern. Enterprises, Inc. v. Tandy Corp., 867 F. Supp. 268, 271 (D. Del. 1994) (citing Rosenmiller v. Bordes, 607 A.2d 465, 468 (Del. Ch. 1991)). Under Delaware law, express choice of law provisions are generally given effect. Id. (citing A.I.C. Ltd. v. Mapco Petroleum Inc., 711 F. Supp. 1230, 1237 (D. Del.1989)).

Because SWEC was a Delaware corporation, and its bankruptcy proceeded in Delaware, Delaware has some, albeit de minimus, interest in the resolution of the current conflict. The court, however, declines to disturb the choice of law of the parties based on such limited connections to Delaware. In other words, the court does not find that Delaware has a "**materially** greater" interest in the subject matter than New York in this case. In view of this determination, the court also notes that the application of New York's prejudgment interest rate is more equitable than the 11% rate due under Delaware law.

**B. Costs & Attorneys Fees**

SAMBA submits that it is entitled to attorneys' fees, costs, and other legal expenses under the Credit Agreement and the Guaranty. (D.I. 29 at 18-22) As discussed previously, the court's prior ruling establishes that the Guaranty is a separate agreement from the Credit Agreement (D.I. 11 at 16), and the Credit Agreement created the debt obligation of the BS&W joint

venture to plaintiffs, not the obligation of SWEC (and by assumption, defendant Shaw) to plaintiffs on behalf of BS&W.

The Guaranty expressly provides for "any and all expenses incurred [by SAMBA] in enforcing [SAMBA's] rights under this Guaranty." (D.I. 26 at ex. B, B20) SAMBA has pointed to caselaw interpreting similar provisions ("any and all expenses") to include attorneys' fees. See Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516, 525 & n.3 (7th Cir. 1995) (guaranty provision for payment and "any and all expenses which may be incurred by [bank] in collecting all or any of the Obligations and/or in enforcing any rights hereunder" held to "undoubtedly also contemplate[] attorneys' fees") (citing Boulevard Bank Nat'l Ass'n v. Philips Medical Sys. Int'l B.V., 15 F.3d 1419, 1426 (7th Cir. 1994) (guaranty provision for "collection costs" held to include attorneys' fees)).

Defendants interpret this cited provision of the Guaranty as specifically **excluding** attorneys' fees as those fees are not

specifically named.[12] (D.I. 26 at 9) Shaw argues that if attorneys' fees are awarded, they should be limited to those fees incurred while prosecuting the action to recover against defendants, excluding those fees incurred in defending itself in the bankruptcy preference action or other actions.[13] (D.I. 26 at 10-11)

The attorneys' fees listed by SAMBA in its motion are

---

[12] In support, Shaw cites the unpublished Chancery Court opinion of Active Asset Recovery, Inc. v. Real Estate Asset Recovery Services, Inc., which held that a contract provision to pay "direct costs" was held not to include "media overhead", where overhead was never clearly identified. No. Civ. A. 15478, 1999 WL 743479, *11 (Del. Ch. Sept. 10, 1999). The Active Asset Recovery court stated:

> To the contrary, the reasonableness of Holod's and Holland's belief that media overhead was not included in the term "direct costs" is demonstrated by the contractual terms AMS itself proposed, which never clearly identify "overhead"-i.e., a percentage of AMS's existing fixed costs-as one of the components of direct cost chargeable to the Partnership . . . Overhead is not an obscure term; AMS's failure to use it expressly speaks volumes. *Cf.* Arthur L. Corbin, 3 *Corbin on Contracts* § 552 at 206 (1960) (explaining that under the rule of *expressio unius est exclusio alteris,* "If one subject is specifically named, or if several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded").

Id.

[13] Specifically, defendants reference the "Saudi Aramco" action, which is an adversary proceeding filed by SAMBA to recover moneys owed by BS&W under an Assignment of Contract Proceeds. (D.I. 21 at 13-15) That action is ongoing.

$985,663.56.[14] (D.I. 21 at 23) The court finds Shaw's authority distinguishable on its facts, as that decision involved the interpretation of the scope of the term "direct costs" as related to moneys due under a service agreement for media, goods and services, not the collection of litigation expenses incurred in enforcing rights under a contract. Active Asset Recovery, Inc., 1999 WL 743479 at *11. In comparison, the Uniroyal Goodrich Tire Co. court interpreted the same "any and all expenses [in enforcing rights]" language present in the Guaranty in this case to include attorneys' fees. 63 F.3d 525 & n.3. The court is persuaded that attorneys' fees and costs were contemplated under the language of the Guaranty and awards SAMBA its costs and fees incurred in obtaining the judgment (D.I. 11), as well as $20,750.00 in costs and fees incurred in connection with the present motion for assessment of damages (D.I. 21 at 23, sec. IV(3)(c)). It is not clear that SAMBA's asserted costs and fees "incurred in obtaining or enforcing its rights under the Credit Agreement" (D.I. 21 at 23, sec. IV (3)(b)) are limited to SAMBA's costs and fees incurred in obtaining the judgment and not, for example, inclusive of costs incurred by SAMBA in the Saudi Aramco action. SAMBA is directed to submit to Shaw, within 30 days, an

---

[14]This amount represents $1,927,982.56 in fees and expenses "SAMBA incurred in obtaining or enforcing its rights under the Credit Agreement," an estimated $20,750.00 in fees and costs directly related to the present motion, less $1,000,000 already recovered from SWEC in the Preference Action. (D.I. 21 at 23)

itemized account of its costs and expenses specifically identifying what portion of its $985,663.56 of asserted costs were incurred in connection with obtaining judgment in this case.[15] Should a dispute arise regarding plaintiff's costs, defendants shall, within ten days of receipt of plaintiff's accounting, advise the court of the specific nature of the dispute.[16] Plaintiff will thereupon have ten days to respond.

**C. Post-Judgment Interest**

Post-judgment interest may be awarded pursuant to 28 U.S.C. § 1961 from the date of judgment, May 4, 2005. SAMBA asserts that it is entitled to an award of post-judgment interest, beginning May 5, 2005 through the payment date, at 3.33%.[17]

---

[15]To ensure that defendants are not penalized for the time allotted by the court for plaintiff to clarify its submission, the number of days plaintiff takes to provide its accounting shall be credited against the amount payable by defendants in the calculation of post-judgment interest.

[16]If a dispute is not brought to the court's attention within the allotted ten day period, defendants shall pay the costs identified by plaintiff in its accounting as being incurred in connection with obtaining judgment in this case. Post-judgment interest will not accrue between the date of defendants' submission to the court and the date of the court's resolution of the dispute.

[17]28 U.S.C. § 1961(a) provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." Plaintiff's exhibit demonstrates that the 3.33% value represents the 1-year Treasury interest rate for the week ending April 29, 2005, in accordance with the statute. (D.I. 16 at ¶14, ex. G)

(D.I. 21 at 22 & D.I. 16 at ¶14, ex. G) SAMBA claims that post-judgment interest should apply to the **sum** of: (a) the debt amount of $6,725,000.00;[18] (b) the accumulated prejudgment interest (according to SAMBA, the Delaware 11% rate on the amount of (a)); and (c) SAMBA's net expenses, totaling $985,663.56. (D.I. 21 at 22).

Defendants contest an award of prejudgment interest and SAMBA's attorneys' fees connected to enforcement of the Credit Agreement, but otherwise does not contest that post-judgment interest may be awarded at the 3.33% applicable rate. The court awards SAMBA post-judgment interest at the rate of 3.33% from May 5, 2005 through the date of payment. Post-judgment interest applies to the initial judgment of $6,728,594, plus prejudgment interest on that amount through and including May 4, 2005 at the rate of 9% per annum in accordance with this opinion. N.Y. C.P.L.R. § 5003 (McKinney 2006). Post-judgment interest at the rate of 3.33% shall also be applied to SAMBA's costs and expenses in accordance with this opinion. (Id.)

**V. CONCLUSION**

For the aforementioned reasons, plaintiff's motion for assessment of damages is granted. An appropriate order shall follow.

---

[18]As noted previously, the base amount should likely be the total amount of the court's judgment, or $6,728,594, and not the original loan balance due.