**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:                                                )
                                                       )       Chapter 11
STONE & WEBSTER, INCORPORATED, *et al.*,               )
                                                       )       Case No. 00-02142 (PJW)
                                                       )       Jointly Administered
                            Debtors,                   )       Adv. No. 01-7766 (PJW)
                                                       )
_____              )
                                                       )
SAUDI AMERICAN BANK                                     )
                                                       )
                            Plaintiff,                 )
                                                       )
                        -against-                      )       1:04-cv-00834-SLR
                                                       )
THE SHAW GROUP INC. and                                )       JURY TRIAL DEMANDED
SWINC ACQUISITION THREE, INC.,                         )
and STONE & WEBSTER ENGINEERING                        )
CORPORATION, *et. al.*                                 )
                                                       )
                            Defendants                 )
_____              )

## NOTICE OF APPEAL OF THE SHAW GROUP INC.

Notice is hereby given that defendant The Shaw Group Inc. ("Shaw") hereby appeals to

the United States Court of Appeals for the Third Circuit from the final order entered on February

13, 2007, and any and all parts thereof and orders leading thereto, including the May 3, 2005

Order of the Court (D.I. 12), the May 4, 2005 Judgment (D.I. 13), and the November 8, 2006

Amended Order (D.I. 40).

Shaw previously appealed the May 4th judgment to the United States Court of Appeals

for the Third Circuit (the "Court of Appeals") on May 26, 2005. (D.I. 24). Saudi American

Bank ("SAMBA") moved to dismiss the appeal on the grounds that this Court had yet to issue a

final judgment on SAMBA's request for interest and attorneys' fees. The Court of Appeals

entered an order on February 7, 2006 denying SAMBA's motion to dismiss and remanding the

case to this Court for clarification regarding damages. (*See* D.I. 33). On March 27, 2006, the clerk for the Court of Appeals filed the February 7th order with this Court and noted that the appeal was terminated. (*Id.*). The clerk for the Court of Appeals has since confirmed that the appeal was closed on March 27, 2006. Accordingly, Shaw is filing a new notice of appeal although it believes that the Court of Appeals' prior order did not in fact terminate the appeal.

Copies of the following documents are filed herewith: (1) May 3, 2005 Memorandum Opinion of the Court (D.I. 11); (2) May 3, 2005 Order of the Court (D.I. 12); (3) May 4, 2005 Judgment (D.I. 13); (4) February 7, 2006 Order of the United States Court of Appeals for the Third Circuit (D.I. 33); (5) November 8, 2006 Amended Memorandum Opinion of the Court (D.I. 37); (6) November 8, 2006 Amended Order (D.I. 38); (7) February 13, 2007 Memorandum Opinion of the Court (D.I. 55); and (8) February 13, 2007 Order of the Court (D.I. 56).

ASHBY & GEDDES

/s/ *Catherine A. Strickler*

Stephen E. Jenkins (I.D. No. 2152)
Catherine A. Strickler (I.D. No. 4310)
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sjenkins@ashby-geddes.com
cstrickler@ashby-geddes.com

Dated: March 14, 2007          *Attorneys for The Shaw Group, Inc.*
178254.1

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STONE & WEBSTER, INC. et al., | ) Bk. No. 00-2142(PJW) |
| | ) Jointly Administered |
| Debtors. | ) |
| ———————————————————— | ) |
| | ) |
| SAUDI AMERICAN BANK, | ) Adv. No. 01-7766(PJW) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 04-834-SLR |
| | ) |
| SHAW GROUP, INC., SWINC | ) |
| ACQUISITION THREE, INC., and | ) |
| SWE&C LIQUIDATING TRUSTEE, | ) |
| | ) |
| Defendants. | ) |

---

Francis A. Monaco, Esquire and Kevin J. Mangan, Esquire of Walsh Monzack & Monaco, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: John C. Hutchins, Esquire, Daniel E. Rosenfeld, Esquire and Amy Beth Abbott, Esquire of Kirkpatrick & Lockhart L.L.P., Boston, Massachusetts.

Gregory Alan Taylor, Esquire, Stephen E. Jenkins, Esquire, Christopher S. Sontchi, Esquire and Liza H. Meltzer, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendants Shaw Group, Inc. and SWINC Acquisition Three.

Adam G. Landis, Esquire of Landis, Rath & Cobb, L.L.P., Wilmington, Delaware. Counsel for Defendant SWE&C Liquidating Trustee.

---

MEMORANDUM OPINION

Dated: May 3, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

## I.   INTRODUCTION

On June 2, 2000, debtor Stone & Webster, Inc. ("debtor")[1]

filed a voluntary petition for relief under chapter 11, title 11

of the United States Code.  On October 18, 2001, plaintiff Saudi

American Bank ("SAMBA") filed an adversary action against

defendants Shaw Group, Inc. ("Shaw"), SWINC Acquisition Three,

Inc. and SWE&C Liquidating Trustee (collectively "defendants") in

the United States Bankruptcy Court for the District of Delaware

("the bankruptcy court").  (D.I. 1)[2]  Plaintiff alleged that,

under an Asset Purchase Agreement ("the APA"), defendants assumed

a debt owed to plaintiff by Stone & Webster Engineering

Corporation ("SWEC"), a subsidiary of debtor.  (Id.)  On June 1,

2004, defendants moved to withdraw the adversary proceeding from

the bankruptcy court.  (D.I. 75)  This court granted the motion

on September 13, 2004.  (D.I. 88)  The court has jurisdiction

over actions arising out of chapter 11 of the bankruptcy code

pursuant to 28 U.S.C. § 1334(a).  Presently before the court are

plaintiff's and defendants' motions for summary judgment.  (D.I.

29, 47)[3]  For the reasons set forth below, the court grants

---

[1] Although there are multiple named debtors, for ease of
reference this order shall refer to a single "debtor."

[2] Unless otherwise noted, the docket items (i.e., D.I. __)
will be from the bankruptcy court's docket for this case.

[3] There are several motions which are currently pending
before the court.  While this memorandum opinion will focus on
plaintiff's and defendants' cross motions for summary judgment,

plaintiff's motion for summary judgment (D.I. 47) and denies

defendants' motion for summary judgment (D.I. 29).

## II.  BACKGROUND

On May 31, 1980, SWEC and Abdullah Said Bugshan & Bros.

("Bugshan"), a Saudi Arabian business enterprise, formed a joint

venture called Bugshan Stone & Webster ("BSW") under the laws of

Saudi Arabia.  (D.I. 1 at 5)  BSW was owned in equal shares by

SWEC and Bugshan.  (Id.)  In the mid 1990s, BSW entered a $130

million contract with Saudi Arabian American Oil Company

("Aramco") to upgrade a large oil refinery at Ras Tanura in Saudi

Arabia (the "Ras Tanura Contract").  (D.I. 31 at A-173)  In an

attempt to induce plaintiff to grant credit to BSW, Bugshan and

SWEC each agreed to issue guaranties to plaintiff for 50% of any

loans plaintiff made to BSW.  (D.I. 1, ex. A; D.I. 49 at A95-A96,

A125)  On October 11, 1994, SWEC delivered a letter guarantying

payment of 50% of all obligations owed to plaintiff by BSW, up to

thirty five million dollars (the "Guaranty").  (D.I. 1, ex. A)

In a letter dated July 10, 1997, plaintiff approved a loan for

$35 million "to finance mobilization & working capital

---

it will also resolve several other pending motions.  Most notably
this order will address:  (1) plaintiff's motion for leave to
file an amended complaint (D.I. 8); (2) plaintiff's motion for
consolidation or dismissal (D.I. 9); (3) defendants' motion for
summary judgment (D.I. 29); (4) plaintiff's motion for summary
judgment (D.I. 47); and (5) plaintiff's motion to strike the
declaration of James P. Carroll (D.I. 48).  Because debtor Stone
& Webster, Inc. has been terminated from the present matter, its
motion for summary judgment (D.I. 11) is denied as moot.

requirements of Saudi Aramco Cont[r]act [No.] 65004/00 (IK)."[4] (D.I. 31 at A-168)  Unfortunately, BSW ran into difficulties on the Ras Tanura project and was unable to repay plaintiff the outstanding amount of the loan when the project was completed. In late 1998, pursuant to their guaranties, SWEC and Bugshan each agreed to repay one-half of the outstanding Ras Tanura Contract loan at a rate of $650,000 per month (the "Payment Letter"). (D.I. 49 at A67, A127)

By June 2000, debtor was operating its businesses and managing its properties pursuant to 11 U.S.C. §§ 1107(a) and 1108. At the time of debtor's chapter 11 filing, SWEC allegedly owed plaintiff approximately $6 million. (D.I. 49 at A69)  On July 6 and 7, 2000, substantially all of debtor's assets were sold to defendant Shaw through an auction sale (the "Auction Sale"). (D.I. 49 at A131-A291)

On July 7 and 12, 2000, a hearing for approval of the Auction Sale (the "Sale Hearing") was conducted.[5] (D.I. 50 at A497-A648)  At the Sale Hearing, counsel for debtor represented that debtor had

sent out a notice of sale . . . that said, essentially, if

---

[4] Contract No. 65004/00 (IK) was BSW's name for the contract to upgrade Aramco's Ras Tanura facility. (D.I. 31 at A-131, A-170)

[5] At the time of the Sale Hearing, the United States District Court for the District of Delaware was hearing bankruptcy cases pursuant to 28 U.S.C. § 1334(a).

you don't see your name on this list, or this schedule of
contracts, which is the, what I like to call the excluded
contracts, then your contract is being assumed.

. . .

Sometimes, Your Honor, in purchase contracts, schedules are
merely informative and not necessarily per se material to
the deal.  That is not the nature of this agreement.  This
agreement revolves, in terms of its economics, around three
schedules, or let's say two schedules, and whether or not
your contract is on one of those two schedules.  And those
two schedules are the schedule for rejected contracts and
the schedule for completed contracts.  If they are not on
those schedules, in essence, your contract is an assumed
contract, and the economic impact to you as a stakeholder is
dependent upon whether you are on those two lists . . . .

(D.I. 50 at A518-A529) (emphasis added)

On July 13, 2000, an order (the "Sale and Assumption Order")

regarding the Auction Sale was entered.  (D.I. 49 at A1-A36)   In

the Sale and Assumption Order, the court stated:

[A]ll rights and remedies of any non-debtor party or Shaw
under any of the Assumed Contracts (the "Rights and
Remedies") are fully preserved and shall be enforceable
after the Closing against Shaw or the non-debtor party
unless such Rights and Remedies are or were expressly waived
in a separate agreement or on the record of the Auction.

(D.I. 49 at A18-A19)   The court also stated that

[t]he terms and provisions of the [APA] and this Sale Order
shall be binding in all respects upon, and shall inure to
the benefit of, the [debtor], [its] estates, and [its]
creditors, Shaw, and its respective affiliates, successors
and assigns, and any affected third parties including, but
not limited to, all persons asserting Interests in the
Assets to be sold to Shaw pursuant to the [APA] . . . .

(D.I. 49 at A26)   Finally, the court stated that the APA could

not be modified without further order unless "such modification,

amendment, or supplement does not have a material adverse effect

4

on the [debtor's] estates."  (D.I. 49 at A27)

On July 14, 2000, debtor and defendant Shaw entered into the APA whereby Shaw purchased a substantial portion of debtor's assets and assumed many of its liabilities.  (D.I. 50 at A861-A969)  On the same date, the court entered an order approving the APA.

Section 2.02 of the APA, titled "Excluded Assets," excludes a number of assets from those being acquired by defendant Shaw.  (D.I. 31 at A-240)  Subsection (b) defines as "Excluded Assets" all "Completed Contracts" of debtor.  Section 1.01 of the APA defines "Completed Contracts" as contracts of debtor, "including those specifically set forth on Schedule 2.02(b), under which substantially all of the contractual work effort of [debtor] has been completed, even if such Contracts have continuing warranty obligations, administrative matters or work related to warranty or other claims[.]"  (Id. at A-229)  Schedule 2.02(b) does not include any reference to the Guaranty, the Payment Letter, or the underlying Ras Tanura Contract.  (Id. at A-306)

Subsection (e) of Section 2.02 of the APA defines as "Excluded Assets" all the "Special Project Claims".  (Id. at A-241)  Section 1.01 of the APA defines "Special Project Claims" as "any and all claims under the project agreements set forth on Schedule 2.02(e) to the extent not reflected on the March 31

Balance Sheet[.]"[6]  (Id. at A-237)  Schedule 2.02(e) lists the

"Ras Tanura, Saudi Arabia, Refinery Upgrade Project" as one of

the "Special Project Claims."  (D.I. 50 at A979)  Schedule

2.02(e) also specifically identifies a "Contract for Construction

dated as of June 28, 1994 by and between Saudi Arabian Oil

Company ("Saudi Aramco")' and [BSW] (designated by Saudi Aramco as

Contract No. 65004/00) []" as a "Special Project Claim".  (Id.)

Finally, Schedule 2.02(e) identifies "[o]ne or more potential

claims for payment under a series of Letters of Credit issued by

[plaintiff] and involving materials supplied under a number of

purchase orders issued by [BSW] . . . for materials incorporated

into the [Ras Tanura Refinery Upgrade Project]" as "Special

Project Claims".  (Id.)

    Section 2.03 of the APA states that "[Shaw] shall assume the

Assumed Liabilities[]" as of the closing date.  (Id. at A887)

Section 1.01 of the APA defines "Assumed Liabilities" as "all

liabilities and obligations of [debtor] set forth on Schedule

2.03 as of the Closing Date . . . ."  (Id. at A872)  Schedule

2.03 is the "List of Assumed Liabilities".  (Id. at A957)

Paragraph three of Schedule 2.03 provides that "[l]iabilities

_____

    [6] Although the APA defines "Special Project Claims" as any
and all claims set forth on Schedule 2.02(e), the Execution Copy
of the APA did not include a Schedule 2.02(e).  Rather, Schedule
2.02(e) was added to the APA by debtor and defendant Shaw
subsequent to this court's approval of the Execution Copy of the
APA.  (D.I. 51 at 42; D.I. 57 at 14 n.3)

under [debtor's] outstanding bank indebtedness, including amounts

outstanding and pursuant to existing standby letters of credit[]"

are "Assumed Liabilities." (Id.) Section 3.17 of the APA states

that Schedule 3.17(a)(ix) is "a true, complete and correct list"

of "any bond, indenture, note, loan or credit agreement . . . or

other Contract relating to the borrowing of money or to the

direct or indirect guarant[y] or assumption of obligations of any

other Person for borrowed money." (Id. at A897) Schedule

3.17(a)(ix) lists: (1) a guaranty by BSW to plaintiff (id. at

A983); (2) a letter of guaranty dated September 1, 1992 from SWEC

to plaintiff regarding BSW securing credit facilities (id. at

A984); and (3) a letter of guaranty dated October 19, 1992

whereby SWEC guaranteed plaintiff the repayment of 40 million

Saudi Riyals (id.). Defendant Shaw admits that Schedule

3.17(a)(ix) lists a guaranty by SWEC for BSW's borrowing from

plaintiff. (D.I. 49 at A91) Defendant Shaw assumes that the

guaranty listed on Schedule 3.17(a)(ix) incorporates the Guaranty

by which SWEC guaranteed 50% of BSW's obligations to plaintiff up

to $35 million. (Id. at A91-A92) Defendant Shaw admits that

Schedule 3.17(a)(ix) lists contractual liabilities disclosed to

defendant Shaw by debtor. (D.I. 49 at A91)

Section 2.04 of the APA, captioned "Excluded Liabilities,"

states that "[u]nder no circumstances shall [defendant Shaw]

assume or be obligated to pay . . . any of the Excluded

7

Liabilities, including the following liabilities, which shall be and remain liabilities of [debtor]:  . . . (c) liabilities or obligations associated with any Excluded Assets; . . . (e) liabilities or obligations under the Assumed Contracts that are not Assumed Liabilities and liabilities or obligations arising under the Rejected Contracts or the Completed Contracts[.]" (D.I. 31 at A-241)

On July 18, 2001, the court entered an order establishing a cure claim procedure.  (D.I. 49 at A293-A307)  The cure claim procedure defined "cure claims" as "any and all liquidated monetary claims[7] arising or accruing on or before July 14, 2000 under the Assumed Contracts and actually known by the non-[debtor] party to an Assumed Contract."  (Id. at A294)  The cure claim procedure also required debtor to file a list of all Assumed Contracts and an amended list of all Excluded Contracts. (Id. at A305)  According to the cure claim procedure, a cure claim had to be filed by August 25, 2000.  (Id. at A299)

On July 21, 2000, debtor filed an Assumed Contract List, an Excluded Contract List, and an Amended Excluded Contract List. (D.I. 50 at A649-A660)  Neither the Guaranty nor the Payment

---

[7] "Liquidated monetary claims" relate to "money due and owing or allegedly due and owing by the [debtor] under the Assumed Contracts, but does not include any claims by the non-[debtor] party for any defective work (whether latent or otherwise) by the [debtor] or [its] subcontractors or under any warranty provisions of the Assumed Contract."  (D.I. 49 at A294-A295)

8

Letter was included on any of those lists. On August 4, 2000, debtor filed a Second Amended Excluded Contract List, and a Second Amended Assumed Contract List. (D.I. 50 at A661-A668) The Second Amended Assumed Contract List includes a contract with Aramco Services Co. and two contracts with plaintiff. (D.I. 50 at A666, A668)

On August 24, 2000, plaintiff filed a statement of cure claim against SWEC, alleging that SWEC owed outstanding financial obligations to plaintiff. (D.I. 49 at A52-A85) Plaintiff attached the Guaranty and the Payment Letter as exhibits to its cure claim. (Id. at A56, A67) Defendant Shaw failed to pay or contest plaintiff's cure claim.

On December 28, 2000, the court entered an order approving a letter agreement, dated December 27, 2000, which confirmed the terms of the APA. (D.I. 50 at A857-A860) Pursuant to this letter agreement and order, certain additional projects were to be treated as Completed Contracts under the APA and Schedule 2.02(b). (D.I. 50 at A670) Neither the Guaranty nor the Payment Letter were added to the list of Completed Contracts. (Id.) Debtor also stated that the additional completed contracts "constitute the only completed contracts or substantially completed contracts of which [debtor has] actual knowledge as not being listed on Schedule 2.02(b) to the Disclosure Schedules (collectively with Schedule 2.02(b), the 'Completed Contracts

9

List')."  (Id.)  Neither the letter agreement nor the order sought to amend the Schedule of Rejected Contracts.

On August 1, 2001, debtor commenced a preference action against plaintiff to avoid and recover certain preferential transfers, to disallow plaintiff's claims, to estimate plaintiff's claims at $0, and to reduce plaintiff's claims to an amount reflected on the debtor's books and records (the "Preference Action").  Plaintiff filed its answer and affirmative defenses on October 18, 2001.

On August 1, 2002, plaintiff commenced the instant adversary proceeding.  (D.I. 1)  Plaintiff's complaint alleged that, under the APA, defendant Shaw assumed the $6,728,529 debt owed to plaintiff by SWEC.  In the alternative, plaintiff claimed that "[u]nless [defendant] Shaw assume[d] its obligation to pay [plaintiff] . . . SWEC is obligated to pay [plaintiff] . . . ." (D.I. 1 at 12)

On January 2, 2002, defendants filed an answer to plaintiff's adversary proceeding complaint.  (D.I. 5)  Plaintiff filed a motion for leave to file an amended complaint on January 7, 2002.[8]  (D.I. 8)  That same day, plaintiff filed a motion seeking to consolidate the Preference Action and the instant

_____

[8] The court denies plaintiff's motion for leave to file an amended complaint (D.I. 8), as amending the complaint will further delay this case, which lingered in the bankruptcy court for several years before it was withdrawn to this court.

10

litigation.[9]  (D.I. 9)  On August 13, 2002, defendant Shaw filed

a motion for summary judgment.[10]  (D.I. 29)  On October 18, 2002,

plaintiff filed its motion for summary judgment.  (D.I. 47)

III. STANDARD OF REVIEW

     A court shall grant summary judgment only if "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The moving party bears the burden of proving that no

genuine issue of material fact exists.  See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).

"Facts that could alter the outcome are 'material,' and disputes

are 'genuine' if evidence exists from which a rational person

could conclude that the position of the person with the burden of

_____

     [9] The court denies plaintiff's motion to consolidate.  (D.I.
9)  Federal Rule of Civil Procedure 42(a) provides this court
with authority to consolidate "actions involving a common
question of law or fact . . . pending before the court."
Decisions to consolidate cases are at the discretion of the
district court, but often courts balance considerations of
efficiency, expense and fairness.  See United States v. Dentsply
Int'l, Inc., 190 F.R.D. 140, 142-43 (D. Del. 1999).  Because the
Preference Action and this litigation stem from different factual
circumstances, consolidation is not appropriate.
     The court also denies plaintiff's motion to dismiss the
preference action (D.I. 9), as the preference action is not
pending in this court.

     [10] The court grants plaintiff's motion to strike the
declaration of James P. Carroll submitted in support of
defendants' motion for summary judgment.  (D.I. 48)

11

proof on the disputed issue is correct." <u>Horowitz v. Fed. Kemper</u> <u>Life Assurance Co.</u>, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." <u>Pa. Coal Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. <u>See Anderson v. Liberty</u> <u>Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. <u>See Celotex</u> <u>Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

IV.  DISCUSSION[11]

Construction of contract language is a question of law.  See
Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616
A.2d 1192, 1195 (Del. 1992).  The primary consideration in
interpreting a contract is to "attempt to fulfill, to the extent
possible, the reasonable shared expectations of the parties at
the time they contracted."  See Comrie v. Enterasys Networks,
Inc., 837 A.2d 1, 13 (Del. Ch. 2003).  In ascertaining intent,
Delaware courts adhere to the "objective" theory of contracts.
See Haft v. Haft, 671 A.2d 413, 417 (Del. Ch. 1995).  Under this
approach, a contract's "construction should be that which would
be understood by an objective reasonable third party."  R.E.
Haight & Assocs. v. W.B. Venables & Sons, Inc., C.A. No. 94C-11-
023, 1996 WL 658969, at *3 (Del. Super. Oct. 30, 1996) (quoting
Demetree v. Commonwealth Trust Co., No. 14354, 1996 WL 494910, at
*4 (Del. Ch. Aug. 27, 1996)).  Thus,

> [w]here parties have entered into an unambiguous integrated
> written contract, the contract's construction should be that
> which would be understood by an objective reasonable third
> party.  An inquiry into the subjective unexpressed intent or
> understanding of the individual parties [to the contract] is
> neither necessary nor appropriate where the words of the

---

[11] In the case at bar, plaintiff asserts that defendant Shaw
assumed a debt owed to plaintiff by SWEC through operation of the
Guaranty and Payment Letter.  Because there is no dispute that
plaintiff has standing to enforce these contracts if they were
assumed by defendant Shaw pursuant to the Sale and Assumption
Order and Sections 2.03 and 3.17 of the APA, there can be no
dispute that plaintiff has standing to bring the issue for
resolution before this court.

contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

Demetree, 1996 WL 494910, at *4 (citations omitted); accord Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."). The court, therefore, must determine whether the contractual language in dispute, when read in the context of the entire contract, is ambiguous.

Ambiguity exists only when a contractual provision is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Rhone-Poulenc, 616 A.2d at 1196; accord SI Mgmt. L.P. v. Wininger, 707 A.2d 37, 42 (Del. 1998). Contractual language "is not rendered ambiguous simply because the parties do not agree upon its proper construction." Id.; see also City Investing Co. Liquidating Trust v. Cont'l Cas. Co., 624 A.2d 1191, 1198 (Del. 1993) (finding contract language is not ambiguous "simply because the parties in litigation differ concerning its meaning."). However, inconsistent contractual provisions may create ambiguity in a contract. Fraternal Order of Police v. City of Fairmont, 468 S.E.2d 712, 717 (W. Va. 1996) ("Contract language usually is considered ambiguous where an agreement's terms are inconsistent

14

on their face . . . ."); <u>Weber v. Tillman</u>, 913 P.2d 84, 96 (Kan. 1996) ("To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."); <u>Franklin v. White Egret Condo., Inc.</u>, 358 So. 2d 1084 (Fla. Dist. Ct. App. 1977), <u>aff'd</u>, 379 So. 2d 346 (Fla. 1979) (finding "two sections [of a disputed contract] are inconsistent, and inherently ambiguous."). When a contract is ambiguous, it raises "factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties." <u>Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.</u>, 702 A.2d 1228, 1230 (Del. 1997). If "the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide." <u>In re Columbia Gas Sys.</u>, 50 F.3d 233 (3d Cir. 1995).

The question of whether defendant Shaw assumed the Guaranty and Payment Letter must be considered in light of the fundamental premise that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral."[12] <u>Financeamerica Private Brands,</u>

_____

[12] Given the very clear case law establishing that a guaranty and the underlying contract are separate contracts, the court rejects defendant Shaw's argument that the contract at issue is the Ras Tanura Contract.

Inc. v. Harvey E. Hall, Inc., 380 A.2d 1377, 1379 (Del. Super.
1977); see also Jones Motor Co. v. Teledyne, Inc., 690 F. Supp.
310, 313 (D. Del. 1988). Therefore, the issue presented by the
parties is whether the Guaranty and Payment Letter were
unambiguously assumed or rejected under the APA.

The court concludes that the Guaranty and Payment Letter
were assumed under the APA. First, neither the Guaranty nor the
Payment Letter fall within the definition of an "Excluded Asset"
either as a "Completed Contract" or as a "Special Project Claim",
as defined in Section 2.02 of the APA and the schedules related
thereto. Second, Section 1.01 of the APA defines an "Assumed
Contract" as any contract that is not specifically identified as
a "Rejected Contract" or a "Completed Contract". Sections 1.01
and 2.03 and Schedule 2.03 of the APA define the scope of
"Assumed Liabilities" as including "outstanding bank
indebtedness". The record indicates that Schedule 3.17, listing
those contracts which relate to such outstanding bank
indebtedness as guaranties, includes at least an indirect
reference to the Guaranty and Payment Letter. Defendant failed
to pay or contest plaintiff's cure claim. Finally, and of great
significance, are the representations made to this court by
counsel for the debtor, that if contracts were not identified on
the schedules listing rejected and completed contracts, then the
contract would be deemed an assumed contract.

16

**V.    CONCLUSION**

For all of these reasons, the court concludes that the Guaranty and Payment Letter are contracts that were assumed by defendant Shaw by operation of the APA and the Sale and Assumption Order.  Therefore, plaintiff's motion for summary judgment shall be granted.  An appropriate order shall issue.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STONE & WEBSTER, INC. et al., | ) Bk. No. 00-2142(PJW) |
| | ) Jointly Administered |
| Debtors. | ) |
| ———————————————— | ) |
| | ) |
| SAUDI AMERICAN BANK, | ) Adv. No. 01-7766(PJW) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 04-834-SLR |
| | ) |
| SHAW GROUP, INC., SWINC | ) |
| ACQUISITION THREE, INC., and | ) |
| SWE&C LIQUIDATING TRUSTEE, | ) |
| | ) |
| Defendants. | ) |

O R D E R

At Wilmington this 3rd day of May, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1.    Defendants' motion for summary judgment (D.I. 29) is denied.

2.    Plaintiff's motion for summary judgment (D.I. 47) is granted.

3.    The Clerk of Court is directed to enter judgment in favor of plaintiff and against defendants.

——————————————————
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STONE & WEBSTER, INC. et al., | ) Bk. No. 00-2142(PJW) |
| | ) Jointly Administered |
| Debtors. | ) |

| | |
|---|---|
| SAUDI AMERICAN BANK, | ) Adv. No. 01-7766(PJW) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 04-834-SLR |
| | ) |
| SHAW GROUP INC., SWINC | ) |
| ACQUISITION THREE, INC., and | ) |
| SWE&C LIQUIDATING TRUSTEE, | ) |
| | ) |
| Defendants. | ) |

**JUDGMENT IN A CIVIL CASE**

For reasons stated in the court's memorandum opinion
and order of May 3, 2005;

IT IS ORDERED AND ADJUDGED that judgment be and is
hereby entered in favor of plaintiff Saudi American Bank and
against defendants Shaw Group, Inc., SWINC Acquisition Three,
Inc., and SWE&C Liquidating Trustee.

_____
United States District Judge

Dated: May 4, 2005

_____
(By) Deputy Clerk

# EXHIBIT 3

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

February 7, 2006
# B-59

No.  <u>05-2717</u>

IN RE: STONE & WEBSTER, INCORPORATED, et al, Debtor

SAUDI AMERICAN BANK
v.
SHAW GROUP INC., et al

Shaw Group, Inc., <u>Appellant</u>

(District of Delaware - DC No. 04-cv-00834)

**PRESENT:**  RENDELL, AMBRO and BECKER, <u>Circuit Judges</u>

1)    Motion by Appellee Saudi American Bank to Dismiss Appeal for Lack
of Jurisdiction.

2)    Response by Appellant in opposition to above.

3)    Reply by Appellee to Appellant's Response in Opposition.

Carolyn Hicks, Case Manager
267-299-4926

**O R D E R**

The foregoing motion by Appellee Saudi American Bank to dismiss appeal for lack of
jurisdiction is denied.  The case is remanded to the District Court for clarification
regarding damages.

By the Court,

/s/ Thomas L. Ambro, Circuit Judge

Dated: March 27, 2006

IN RE: STONE & WEBSTER, INCORPORATED, et al

Page 2

CH/cc: Stephen E. Jenkins, Esq.
       Christopher S. Sontchi, Esq.
       Catherine A. Strickler, Esq.
       Amy B. Abbott, Esq.
       Francis A. Monaco Jr., Esq.
       Daniel E. Rosenfeld, Esq.

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ———————————— | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

Francis A. Monaco, Esquire and Kevin J. Mangan, Esquire of Walsh Monzack & Monaco, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: John C. Hutchins, Esquire, Daniel E. Rosenfeld, Esquire and Amy Beth Abbott, Esquire of Kirkpatrick & Lockhart L.L.P., Boston, Massachusetts.

**Gregory Alan Taylor, Esquire, and Stephen E. Jenkins, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendants Shaw Group, Inc. and SWINC Acquisition Three.

Adam G. Landis, Esquire of Landis, Rath & Cobb, L.L.P., Wilmington, Delaware. Counsel for Defendant SWE&C Liquidating Trustee.

**AMENDED MEMORANDUM OPINION

Dated: November 8, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On June 2, 2000, debtor Stone & Webster, Inc. ("debtor")[1]
filed a voluntary petition for relief under chapter 11, title 11
of the United States Code.  On October 18, 2001, plaintiff Saudi
American Bank ("SAMBA") filed an adversary action against
defendants Shaw Group, Inc. ("Shaw"), SWINC Acquisition Three,
Inc. and SWE&C Liquidating Trustee (collectively "defendants") in
the United States Bankruptcy Court for the District of Delaware
("the bankruptcy court").  (Bank. D.I. 1)[2]  Plaintiff alleged
that, under an Asset Purchase Agreement ("the APA"), defendants
assumed a debt owed to plaintiff by Stone & Webster Engineering
Corporation ("SWEC"), a subsidiary of debtor.  (Id.)

The adversary proceeding was withdrawn from bankruptcy court
on September 13, 2004.  (Bank. D.I. 88)  Plaintiff and defendants
filed motions for summary judgment.  The court granted
plaintiff's motion for summary judgment (Bank. D.I. 47) and
denied defendants' motion for summary judgment (Bank. D.I. 29).
(D.I. 11)  Defendant Shaw appealed (D.I. 24) and the case was
remanded for clarification on the issue of damages.  (D.I. 30)
Presently before the court is plaintiff's motion for assessment
of damages.  (D.I. 14)  The court has jurisdiction over actions

---

[1] Although there were multiple named debtors, for ease of
reference this order shall refer to a single "debtor."

[2] References to "Bank. D.I." refer to the docket in the
bankruptcy Court for adversary proceeding number 01-7766.

arising out of chapter 11 of the bankruptcy code pursuant to 28
U.S.C. § 1334(a).

## II.   BACKGROUND

The court recited many of the pertinent facts in its
memorandum opinion accompanying its order granting summary
judgment to plaintiff SAMBA (D.I. 11), and the most pertinent
facts related to the present motion for assessment of damages are
summarized below.

In 1980, a joint venture called Bugshan Stone & Webster
("BS&W") was created under the laws of Saudi Arabia.  BS&W was
owned in equal shares by SWEC, a subsidiary of Stone & Webster,
Inc., and Abdullah Said Bugshan & Bros. ("Bugshan").  BS&W
entered into a $130 million contract in the mid-1990s to upgrade
a large oil refinery at Ras Tanura in Saudi Arabia (the "Ras
Tanura Contract").  In an effort to induce plaintiff to grant
credit to BS&W, Bugshan and SWEC executed a Guaranty wherein each
party guaranteed 50% of all obligations to plaintiff bank from
BS&W.  (D.I. 26 at ex. B)  Plaintiff granted $35 million of
credit to BS&W by agreement on January 22, 1998 (the "Credit
Agreement").  (Id. at ex. C)  A contract was signed by Bugshan
and SWEC on December 22, 1998 (the "Payment Letter") which
specified that Bugshan and SWEC were each obligated to repay half
of the loan balance to plaintiff, for a total of $650,000 by each
party per month.  (Id. at ex. D)  The court previously determined

2

that defendant Shaw assumed the obligations of the Guaranty and
Payment Letter when it acquired SWEC.  (D.I. 11 at 17)

The Credit Agreement between plaintiff and BS&W stated:

> Borrower shall pay commission on the unpaid principal
> balance outstanding . . . The commission rate shall be
> determined by the Bank and subject to change from time
> to time.  Borrower shall be deemed to have agreed to
> the commission rate as determined by the Bank . . .

(D.I. 26 at ex. C, B024).  The Credit Agreement further states:

> Borrower shall pay upon demand **all expenses, including
> attorney's fees, court costs, appraisal fees and all
> other fees and expenses,** incurred by the Bank in
> obtaining or enforcing any of its rights under this
> Agreement, the Note or the Security Documents.

(Id. at B025) (emphasis added).

The Guaranty of Bugshan and SWEC to plaintiff for the loan
provided:

> [T]he undersigned hereby unconditionally guarantees the
> punctual payment when due of 50% of all obligations of
> the Borrower to you now or hereafter existing
> "Obligations" **together with interest thereon** and any
> and all expenses incurred by you in enforcing your
> rights under this Guaranty.

(Id. at ex. B) (emphasis added).

SWEC made monthly $650,000 payments to BS&W for the
repayment of plaintiff's loan.  (D.I. 21 at 7)  SWEC filed for
bankruptcy on June 2, 2000, at which time debtor allegedly owed
SAMBA approximately $6 million.  (D.I. 11 at 3)  Anticipating
SWEC's petition for bankruptcy, SAMBA demanded payment of
$6,728,594 by SWEC on May 31, 2000.  (Id.; Bank. D.I. 1)  This
amount reflected $6,725,000 in principal and $3549 of interest.

3

SAMBA never received payment from SWEC.  On its bankruptcy petition, SWEC listed the amount owed to SAMBA as $6,728,594.

Plaintiff moved the court for an order that Shaw assumed SWEC's debt to SAMBA by operation of the APA and Sale of Assumption Order.  (Bank. D.I. 29)  In granting plaintiff's motion (D.I. 11), the court awarded SAMBA its requested $6,728,594 in damages on May 4, 2005.

## III.  DISCUSSION

### A.  Prejudgment Interest

SAMBA asserts that it is entitled to prejudgment interest on the loan principal of $6,725,000 for which SWEC agreed to be responsible, calculated from SAMBA's date of demand, May 31, 2000.[3]  (D.I. 21 at 4)  SAMBA argues that it is entitled to prejudgment interest under Delaware law as a matter of right.  (Id. at 15-16)  SAMBA states that "[i]t is beyond dispute that both the Guaranty and the [Credit Agreement] provide that interest is to be paid, but neither document explicitly provides the applicable interest rate."  (D.I. 21 at 16-17)  According to SAMBA, the Delaware legal rate as of May 31, 2000, or 11%, must be applied.  (Id. at 17)  In the alternative, SAMBA argues that the rate SAMBA provided in its interrogatory responses in this

---

[3]If the court awards prejudgment interest, the interest should be applied to the entirety of the judgment, or $6,728,594, and not the outstanding $6,725,000 owed by SWEC under the loan.

4

case, 7.375% compounded daily, should apply.[4]

In opposition, Shaw argues that Saudi Arabian law governs the Credit Agreement, the Guaranty, and the Payment Letter. (D.I. 26 at 4-6)  Shaw states that "BS&W's obligation to SAMBA ultimately arose under and is determined by the Credit Agreement, and SWEC's obligation, which is derivative of that, arises primarily under the Payment Letter."  (Id. at 4)  The Credit Agreement contains a choice of law provision which provides that Saudi Arabian law governs the agreement.  (D.I. 26 at ex. C at B025)  The Payment Letter contains no choice of law provision, however, Shaw argues that the Payment Letter is governed by Saudi Arabian law because that agreement was executed in Saudi Arabia and payment from SWEC to SAMBA was to occur in Saudi Arabia. (D.I. 26 at 4)  Shaw claims that Islamic law forbids collection of interest.[5]  (Id. at 4-5)  Even though the Guaranty states that it is governed by New York law, Shaw argues that "its provisions are entirely derivative" of the Credit Agreement, thus, the prohibition against awards of interest under Saudi law equally

_____

[4]SAMBA states the 7.375% rate was in reference to the Ras Tanura Contract and not the Credit Agreement (D.I. 29 at 3), but submits that this rate may be used as the default alternative to the 11% Delaware rate.

[5]SAMBA offers the Declaration of Mohammed Saleh Mohammed Al-Motlaq in support of its counter position that Saudi law does not prohibit prejudgment interest because banking institutions are not subject to a strict interpretation of Islamic law.  (D.I. 29 at 12-13;  D.I. 31)

applies to the Guaranty.  (<u>Id.</u> at 5-6)

### 1.   The Guaranty Controls the Award of Prejudgment Interest

As discussed previously, the Credit Agreement created a
contractual relationship between BS&W and SAMBA.  The obligation
for SWEC to repay SAMBA did not arise out of the Credit
Agreement, as SWEC and Bugshan were not parties to that
agreement.  The court's prior ruling did not address whether the
obligation of SWEC for the loan arose out of the Guaranty,
Payment Letter, or both.  The court also did not have occasion to
evaluate whether the Payment Letter is independent of the
Guaranty.  The court was asked to evaluate whether either
agreement was assumed by defendant Shaw.  In its analysis, the
court expressly stated that a guaranty "is a separate contract
involving duties and responsibilities which are different from
the basic contract to which it is collateral."  (D.I. 11 at 15)
(citing <u>Financeamerica Private Brands, Inc. v. Harvey E. Hall,
Inc.</u>, 380 A.2d 1377, 1379 (Del. Super. 1977); <u>Jones Motor Co. v.
Teledyne, Inc.</u>, 690 F. Supp. 310, 313 (D. Del. 1988)).  The court
held that since neither obligation was contested,[6] "the Guaranty
and Payment Letter are contracts that were assumed by defendant

---

[6]As explained in more detail in the court's prior ruling,
debtor never contested plaintiff's cure claim to its debts under
the Guaranty and Payment letter, and never listed either
agreement on its schedules of Assumed, Excluded, Completed, or
Rejected contracts in its bankruptcy proceeding.  (D.I. 11 at 7-
10, 16)

Shaw."[7]  (D.I. 11 at 16)

It is not disputed that the Guaranty obligated SWEC to repay the loan to plaintiff, and that the court has held that defendant Shaw assumed SWEC's obligation.  It is also not disputed that the Guaranty states that SWEC's obligation, "together with interest thereon and any and all expenses incurred by you in enforcing your rights under this Guaranty," are recoverable by SAMBA.  The issue of whether prejudgment interest may be awarded can be analyzed solely under the terms of the Guaranty,[8] without resolving whether the Payment Letter also created a separate debt obligation.[9]

----

[7]The court noted that counsel's representations to the court, that contracts not identified on the schedules would be assumed contracts, were "of great significance" to its holding. (D.I. 11 at 16)

[8]In its response to plaintiff's current motion, Shaw argues that the Guaranty is "entirely derivative" of the Credit Agreement.  (D.I. 26 at 5)  This position is entirely inconsistent with the court's prior statement that a guaranty is an independent agreement and, therefore, the law governing the Credit Agreement, namely Islamic law, does not apply to the Guaranty or Payment Letter.  Thus, the court need not resolve the issue of whether Islamic law does in fact prohibit an award of prejudgment interest as defendants assert.  SAMBA also submits that defendants waived any defense that an award of prejudgment interest would be illegal, because defendants failed to affirmatively plead its illegality defense as required by Fed. R. Civ. P. 8, and failed to raise the issue in any prior papers or at oral argument.  (D.I. 29 at 12)  The court need not address these arguments since Saudi Arabian law does not apply to the Guaranty or Payment Letter.

[9]It is nevertheless notable that the Payment Letter does not provide for any remedies and does not contain a choice of law provision.  Defendants suggest that "to the extent SAMBA's claim

7

### 2.  Choice of Law

The Guaranty states that it is governed by New York law.[10]
SAMBA argues that its complaint in this matter arose under the
Bankruptcy Code, which contains no provision governing
prejudgment interest.  (D.I. 29 at 2)  SAMBA concludes that the
court should turn to Delaware law as instructive and ignore the
parties' choice of New York law, as "none of the parties, nor any
aspect of either the BS&W loan documents, the loan transactions
thereunder, SWEC's Guaranty or the Payment letter, has any
connection or contact with New York."  (D.I. 29 at 4-5)

---

is predicated on the Payment Letter . . . the substantive law of
Saudi Arabia — which a Delaware court would apply — would not
permit the application of prejudgment interest."  (D.I. 26 at 5)
The Payment Letter is a memo-style document to SAMBA, which
states its "Subject" is "Re-scheduling of Bugshan Stone & Webster
(BSW) loan facility."  (D.I. 26 at ex. D)  The Payment Letter
does not contain a choice of law provision and does not conflict
in this regard with the Guaranty.  The body of the document
contains the division of payment between Bugshan and SWEC, and
requests advisement of whether the terms are acceptable "in order
to finalize the arrangement."  (Id.)  It is highly likely that
the reason that the Payment Letter does not contain any other
standard contract provisions is because the parties did not
intend for the Payment Letter to be a complete representation of
BS&W's obligations, only an addendum to the Guaranty.  As the
court resolves the issue of prejudgment interest based on the
Guaranty alone, the court withholds ruling on the legal effect of
the Payment Letter.

[10]New York's General Obligations Law Section 5-1401
specifically contemplates situations where neither contracting
party has significant contacts to New York.  That law provides
that parties to a agreement concerning a transaction exceeding
$250,000 may agree that New York law applies "whether or not such
contract, agreement or undertaking bears a reasonable relation to
this state."  N.Y. C.P.L.R. § 5-1401(1) (McKinney 2006).

8

The New York legal interest rate is 9% per annum.[11]  N.Y.

C.P.L.R. § 5004 (McKinney 2006).  That rate must be calculated on

a simple interest basis.  See Marfia v. T.C. Ziraat Bankasi, 147

F.3d 83, 90 (2d Cir. 1998) (citations omitted).

The Delaware legal interest rate is 5% over the Federal

Reserve discount rate.  6 DEL. CODE § 2301 (2006); See U.S. v.

Star Brite Construction Co., 848 F. Supp. 1161, 1169 (D. Del.

1994).  The Federal Reserve discount rate was 6% in May 2000

(D.I. 16 at ¶12 and ex. E), bringing the Delaware legal rate to

11%.

A federal court in a diversity case must apply the conflict

of laws rules of the state in which it is sitting.  See Klaxon

Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941).

Delaware choice of law rules rely on Restatement (Second) of

Conflicts of Law § 187 for the proposition that "the parties'

choice of law, as expressed in their agreement, will be upheld

unless the state whose law would control in the absence of a

---

[11]New York law provides with respect to the award of
interest in breach of contract cases:

> Interest shall be recovered upon a sum awarded because
> of a breach of performance of a contract, or because of
> an act or omission depriving or otherwise interfering
> with title to, or possession or enjoyment of, property,
> except that in an action of an equitable nature,
> interest and the rate and date from which it shall be
> computed shall be in the court's discretion.

NY CPLR § 5001(a) (McKinney's 2006).

choice has a materially greater interest in the subject matter."
Hionis Intern. Enterprises, Inc. v. Tandy Corp., 867 F. Supp.
268, 271 (D. Del. 1994) (citing Rosenmiller v. Bordes, 607 A.2d
465, 468 (Del. Ch. 1991)). Under Delaware law, express choice of
law provisions are generally given effect. Id. (citing A.I.C.
Ltd. v. Mapco Petroleum Inc., 711 F. Supp. 1230, 1237 (D.
Del.1989)).

Because SWEC was a Delaware corporation, and its bankruptcy
proceeded in Delaware, Delaware has some, albeit de minimus,
interest in the resolution of the current conflict. The court,
however, declines to disturb the choice of law of the parties
based on such limited connections to Delaware. In other words,
the court does not find that Delaware has a "**materially** greater"
interest in the subject matter than New York in this case. In
view of this determination, the court also notes that the
application of New York's prejudgment interest rate is more
equitable than the 11% rate due under Delaware law.

**B.  Costs & Attorneys Fees**

SAMBA submits that it is entitled to attorneys' fees, costs,
and other legal expenses under the Credit Agreement and the
Guaranty. (D.I. 29 at 18-22)  As discussed previously, the
court's prior ruling establishes that the Guaranty is a separate
agreement from the Credit Agreement (D.I. 11 at 16), and the
Credit Agreement created the debt obligation of the BS&W joint

10

venture to plaintiffs, not the obligation of SWEC (and by assumption, defendant Shaw) to plaintiffs on behalf of BS&W.

The Guaranty expressly provides for "any and all expenses incurred [by SAMBA] in enforcing [SAMBA's] rights under this Guaranty." (D.I. 26 at ex. B, B20)  SAMBA has pointed to caselaw interpreting similar provisions ("any and all expenses") to include attorneys' fees.  See Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516, 525 & n.3 (7th Cir. 1995) (guaranty provision for payment and "any and all expenses which may be incurred by [bank] in collecting all or any of the Obligations and/or in enforcing any rights hereunder" held to "undoubtedly also contemplate[] attorneys' fees") (citing Boulevard Bank Nat'l Ass'n v. Philips Medical Sys. Int'l B.V., 15 F.3d 1419, 1426 (7th Cir. 1994) (guaranty provision for "collection costs" held to include attorneys' fees)).

Defendants interpret this cited provision of the Guaranty as specifically **excluding** attorneys' fees as those fees are not

specifically named.[12]   (D.I. 26 at 9)   Shaw argues that if

attorneys' fees are awarded, they should be limited to those fees

incurred while prosecuting the action to recover against

defendants, excluding those fees incurred in defending itself in

the bankruptcy preference action or other actions.[13]   (D.I. 26 at

10-11)

The attorneys' fees listed by SAMBA in its motion are

---

[12]In support, Shaw cites the unpublished Chancery Court
opinion of Active Asset Recovery, Inc. v. Real Estate Asset
Recovery Services, Inc., which held that a contract provision to
pay "direct costs" was held not to include "media overhead",
where overhead was never clearly identified.   No. Civ. A. 15478,
1999 WL 743479, *11 (Del. Ch. Sept. 10, 1999).   The Active Asset
Recovery court stated:

> To the contrary, the reasonableness of Holod's and
> Holland's belief that media overhead was not included
> in the term "direct costs" is demonstrated by the
> contractual terms AMS itself proposed, which never
> clearly identify "overhead"-i.e., a percentage of AMS's
> existing fixed costs-as one of the components of direct
> cost chargeable to the Partnership . . . Overhead is
> not an obscure term; AMS's failure to use it expressly
> speaks volumes.   Cf. Arthur L. Corbin, 3 Corbin on
> Contracts § 552 at 206 (1960) (explaining that under
> the rule of expressio unius est exclusio alteris, "If
> one subject is specifically named, or if several
> subjects of a larger class are specifically enumerated,
> and there are no general words to show that other
> subjects of that class are included, it may reasonably
> be inferred that the subjects not specifically named
> were intended to be excluded").

Id.

[13]Specifically, defendants reference the "Saudi Aramco"
action, which is an adversary proceeding filed by SAMBA to
recover moneys owed by BS&W under an Assignment of Contract
Proceeds.   (D.I. 21 at 13-15)   That action is ongoing.

$985,663.56.[14]  (D.I. 21 at 23)  The court finds Shaw's authority distinguishable on its facts, as that decision involved the interpretation of the scope of the term "direct costs" as related to moneys due under a service agreement for media, goods and services, not the collection of litigation expenses incurred in enforcing rights under a contract.  <u>Active Asset Recovery, Inc.</u>, 1999 WL 743479 at *11.  In comparison, the <u>Uniroyal Goodrich Tire Co.</u> court interpreted the same "any and all expenses [in enforcing rights]" language present in the Guaranty in this case to include attorneys' fees.  63 F.3d 525 & n.3.  The court is persuaded that attorneys' fees and costs were contemplated under the language of the Guaranty and awards SAMBA its costs and fees incurred in obtaining the judgment (D.I. 11), as well as $20,750.00 in costs and fees incurred in connection with the present motion for assessment of damages (D.I. 21 at 23, sec. IV(3)(c)).  It is not clear that SAMBA's asserted costs and fees "incurred in obtaining or enforcing its rights under the Credit Agreement" (D.I. 21 at 23, sec. IV (3)(b)) are limited to SAMBA's costs and fees incurred in obtaining the judgment and not, for example, inclusive of costs incurred by SAMBA in the Saudi Aramco action.  SAMBA is directed to submit to Shaw, within 30 days, an

---

[14]This amount represents $1,927,982.56 in fees and expenses "SAMBA incurred in obtaining or enforcing its rights under the Credit Agreement," an estimated $20,750.00 in fees and costs directly related to the present motion, less $1,000,000 already recovered from SWEC in the Preference Action.  (D.I. 21 at 23)

itemized account of its costs and expenses specifically identifying what portion of its $985,663.56 of asserted costs were incurred in connection with obtaining judgment in this case.[15]  Should a dispute arise regarding plaintiff's costs, defendants shall, within ten days of receipt of plaintiff's accounting, advise the court of the specific nature of the dispute.[16]  Plaintiff will thereupon have ten days to respond.

C.   **Post-Judgment Interest**

Post-judgment interest may be awarded pursuant to 28 U.S.C. § 1961 from the date of judgment, May 4, 2005.  SAMBA asserts that it is entitled to an award of post-judgment interest, beginning May 5, 2005 through the payment date, at 3.33%.[17]

---

[15]To ensure that defendants are not penalized for the time allotted by the court for plaintiff to clarify its submission, the number of days plaintiff takes to provide its accounting shall be credited against the amount payable by defendants in the calculation of post-judgment interest.

[16]If a dispute is not brought to the court's attention within the allotted ten day period, defendants shall pay the costs identified by plaintiff in its accounting as being incurred in connection with obtaining judgment in this case.  Post-judgment interest will not accrue between the date of defendants' submission to the court and the date of the court's resolution of the dispute.

[17]28 U.S.C. § 1961(a) provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."  Plaintiff's exhibit demonstrates that the 3.33% value represents the 1-year Treasury interest rate for the week ending April 29, 2005, in accordance with the statute.  (D.I. 16 at ¶14, ex. G)

14

(D.I. 21 at 22 & D.I. 16 at ¶14, ex. G)  SAMBA claims that post-judgment interest should apply to the sum of:  (a) the debt amount of $6,725,000.00;[18] (b) the accumulated prejudgment interest (according to SAMBA, the Delaware 11% rate on the amount of (a)); and (c) SAMBA's net expenses, totaling $985,663.56. (D.I. 21 at 22).

Defendants contest an award of prejudgment interest and SAMBA's attorneys' fees connected to enforcement of the Credit Agreement, but otherwise does not contest that post-judgment interest may be awarded at the 3.33% applicable rate.  The court awards SAMBA post-judgment interest at the rate of 3.33% from May 5, 2005 through the date of payment.  Post-judgment interest applies to the initial judgment of $6,728,594, plus prejudgment interest on that amount through and including May 4, 2005 at the rate of 9% per annum in accordance with this opinion.  N.Y. C.P.L.R. § 5003 (McKinney 2006).  Post-judgment interest at the rate of 3.33% shall also be applied to SAMBA's costs and expenses in accordance with this opinion. (Id.)

V.  **CONCLUSION**

For the aforementioned reasons, plaintiff's motion for assessment of damages is granted.  An appropriate order shall follow.

---

[18]As noted previously, the base amount should likely be the total amount of the court's judgment, or $6,728,594, and not the original loan balance due.

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ———————————————— | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

**\*\*A M E N D E D   O R D E R**

At Wilmington this 8th day of November, 2006 consistent with
the memorandum opinion issued this same date;

IT IS ORDERED that:

1.  Plaintiff's motion for assessment of damages (D.I. 14)
is granted;

2.  On or before **November 20, 2006**, plaintiff shall submit
to defendant Shaw an itemized account of its costs and expenses
specifically incurred in connection with obtaining judgment in
this case.

a.  Should defendant dispute the accounting, on or
before **December 8, 2006**, defendant shall advise the court of the

specific nature of the disputed figures.  Failure to timely respond shall be deemed a waiver of any objections to plaintiff's accounting.

 b.  Plaintiff may file a responsive paper on or before **December 18, 2006.**

 3.  Defendant will pay to plaintiff the following damages:

 a.  **The initial judgment of $6,728,594 plus prejudgment interest on that amount at a rate of 9% in accordance with N.Y. C.P.L.R. § 5004 calculated from May 31, 2000 through and including May 4, 2005;

 b.  The costs and expenses identified pursuant to ¶2;

 c.  **The $20,750 in costs and expenses incurred in connection with the instant motion;

 d.  Post-judgment interest on the above amounts at the rate of 3.33% from May 5, 2005 through the date of payment, except that post-judgment interest will not accrue as to the ¶2 costs and expenses between the date of this order and either November 20, 2006 (if defendant does not dispute the ¶2 accounting) or the date of the court's order resolving the parties' dispute over the ¶2 accounting.

_____
United States District Judge

EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:                              )  Chapter 11
                                    )
STONE & WEBSTER, INC. et al.,       )  Bk. No. 00-2142(PJW)
                                    )  Jointly Administered
        Debtors.                    )
                                    )
_____ )
                                    )
SAUDI AMERICAN BANK,                )  Adv. No. 01-7766(PJW)
                                    )
        Plaintiff,                  )
                                    )
    v.                              )  Civ. No. 04-834-SLR
                                    )
SHAW GROUP, INC., SWINC             )
ACQUISITION THREE, INC., and        )
SWE&C LIQUIDATING TRUSTEE,          )
                                    )
        Defendants.                 )


**O R D E R**

At Wilmington this 13th day of February, 2007, consistent
with the memorandum opinion issued this same date;

IT IS ORDERED that:

1.  Defendant Shaw shall pay plaintiff $345,714.50 in fees.

2.  Section 3(a) of the court's order of November 8, 2006 is
amended to reflect the initial judgment of $6,728,549.


_____
United States District Judge

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INC. et al., | ) | Bk. No. 00-2142(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| SAUDI AMERICAN BANK, | ) | Adv. No. 01-7766(PJW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-834-SLR |
| | ) | |
| SHAW GROUP, INC., SWINC | ) | |
| ACQUISITION THREE, INC., and | ) | |
| SWE&C LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

Francis A. Monaco, Jr., Esquire and Kevin Mangan, Esquire of
Monzack & Monaco, P.A., Wilmington, Delaware. Counsel for
Plaintiff. Of Counsel: John C. Hutchins, Esquire, Daniel E.
Rosenfeld, Esquire and Amy B. Abbott, Esquire of Kirkpatrick &
Lockhart Nicholson Graham L.L.P., Boston, Massachusetts.

Stephen E. Jenkins, Esquire, and Catherine A. Strickler, Esquire
of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendant
Shaw Group, Inc.

**MEMORANDUM OPINION**

Dated: February 13, 2007
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On June 2, 2000, debtor Stone & Webster, Inc. filed a
voluntary petition for relief under chapter 11, title 11 of the
United States Code.  On October 18, 2001, plaintiff Saudi
American Bank ("plaintiff") filed an adversary proceeding (Adv.
No. 01-7766) against defendants Shaw Group, Inc. ("Shaw"), SWINC
Acquisition Three, Inc. and SWE&C Liquidating Trustee
(collectively "defendants") in the United States Bankruptcy Court
for the District of Delaware (the "bankruptcy court").  (Bank.
D.I. 1)[1]  In this action, referred to by the parties as the
"recovery action," plaintiff alleged that, under an Asset
Purchase Agreement ("the APA"), defendants assumed a debt owed to
plaintiff by Stone & Webster Engineering Corporation ("SWEC"), a
subsidiary of Stone & Webster.  (Id.)  The adversary proceeding
was withdrawn from bankruptcy court on September 13, 2004.
(Bank. D.I. 88)  Plaintiff and defendants filed motions for
summary judgment.  The court granted plaintiff's motion for
summary judgment (Bank. D.I. 47) and denied defendants' motion
for summary judgment (Bank. D.I. 29).  (D.I. 11)  Defendant Shaw
appealed (D.I. 24) and the case was remanded for clarification on
the issue of damages.  (D.I. 33)

The court issued its amended memorandum opinion regarding

---

[1]References to "Bank. D.I." refer to the docket in the
bankruptcy court for Adv. No. 01-7766.

damages on November 8, 2006.  (D.I. 39)  In its accompanying
order, the court required plaintiff to submit to defendant Shaw
an itemized account of its costs and expenses, and set a schedule
for submissions regarding any disputes regarding plaintiff's
accounting.  (D.I. 40)  Plaintiff submitted its itemization of
fees and costs on November 20, 2006 (D.I. 41), and a revised
itemization on November 21, 2006 (D.I. 51).  Defendant Shaw filed
its response in opposition on December 7, 2006.  (D.I. 52)
Plaintiff filed its responsive paper on December 12, 2006.  (D.I.
54)  The court has jurisdiction over actions arising out of
chapter 11 of the bankruptcy code pursuant to 28 U.S.C. §
1334(a).

## II.  BACKGROUND

The court recited many of the pertinent facts in its
memorandum opinion accompanying its order granting summary
judgment to plaintiff (D.I. 11) and memorandum opinion
accompanying its order on damages.  (D.I. 39)  The most pertinent
facts related to the present motion for assessment of damages are
summarized below.

In 1980, a joint venture called Bugshan Stone & Webster
("BS&W") was created under the laws of Saudi Arabia.  BS&W was
owned in equal shares by SWEC and Abdullah Said Bugshan & Bros.
("Bugshan").  BS&W entered into a $130 million contract in the
mid-1990s to upgrade a large oil refinery at Ras Tanura in Saudi

2

Arabia.  In an effort to induce plaintiff to grant credit to BS&W, Bugshan and SWEC executed a "Guaranty" wherein each party guaranteed 50% of all obligations to plaintiff bank from BS&W. (D.I. 26, ex. B)  Plaintiff granted $35 million of credit to BS&W by agreement on January 22, 1998.  (Id., ex. C)  A contract was signed by Bugshan and SWEC on December 22, 1998 (the "Payment Letter") which specified that Bugshan and SWEC were each obligated to repay half of the loan balance to plaintiff, with each party paying $650,000 per month.  (Id., ex. D)  The court previously determined that defendant Shaw assumed the obligations of the Guaranty and Payment Letter when it acquired SWEC.  (D.I. 11 at 17)

SWEC made monthly $650,000 payments to BS&W for the repayment of plaintiff's loan.  (D.I. 21 at 7)  SWEC filed for bankruptcy on June 2, 2000, at which time it owed plaintiff $6,728,549.  (D.I. 11 at 3; Adv. No. 00-2142, D.I. 49 at A69) This amount reflected $6,725,000 in unpaid principal and $3549 of interest.  (Id.)  Anticipating SWEC's petition for bankruptcy, plaintiff demanded payment on May 31, 2000.  (Id.; Bank. D.I. 1) Plaintiff never received payment from SWEC.  In its bankruptcy petition, SWEC listed the total debt owed plaintiff.

Plaintiff moved the court for an order that Shaw assumed SWEC's debt through its acquisition of SWEC.  (Bank. D.I. 29) The court granted plaintiff's motion (D.I. 11), and subsequently

awarded plaintiff $6,728,549 in damages,[2] prejudgment interest, post-judgment interest, and $20,750 in costs, as well as the fees and costs incurred by plaintiff which were "specifically incurred in connection with obtaining judgment in this case." (D.I. 39, 40) The current dispute arises as the result of plaintiff's accounting of said expenses. (D.I. 41)

## III. DISCUSSION

### A. Other Actions Involving the Parties

Several actions have been commenced and litigated by the parties: (1) a preference action (Adv. No. 01-1120); (2) the "Saudi Aramco" action (Adv. No. 02-3963), initiated by Stone & Webster and SWEC, in which plaintiff filed a motion to intervene; and (3) the instant recovery action. Prior to the withdrawal of the recovery action to this court, the recovery action and the preference action identified above (the "preference action") were consolidated for purposes of discovery. (D.I. 21 at 10)

The preference action was initiated on August 1, 2001 by Stone & Webster and its subsidiaries, including SWEC (collectively, "the debtors"), to recover alleged preferential transfers made by SWEC to plaintiff in March and April of 2000 totaling $975,000. (Adv. No. 01-1120, D.I. 1) The preference

---

[2]The court incorrectly awarded plaintiff $6,728,594, rather than the $6,728,549 sought by plaintiff. The court hereby amends its order (D.I. 40) to reflect the $6,728,549 sought by plaintiff, irrespective of interest.

4

action was scheduled for trial on May 14, 2003.  Prior to that
date, the parties executed an agreement whereby the preference
action was settled and SWEC paid plaintiff $1 million.[3]  (Id.,
D.I. 119, ex. A)  An order dismissing the preference action was
issued by the bankruptcy court on May 25, 2004.  (Id., D.I. 120)
Plaintiff states that it applied this $1 million "to the
attorneys' fees it had incurred to that time, including fees
related to the [r]ecovery [a]ction."  (D.I. 51 at 4-5)

The Saudi Aramco action was filed in bankruptcy court on May
31, 2002 by the debtors against the Saudi Arabian Oil Company for
declaratory judgment, indemnification, breach of contract and
turnover of estate property.  (Adv. No. 02-3963, D.I. 1)
Plaintiff filed a motion to intervene on November 7, 2002.  (Id.,
D.I. 19)  Through the Saudi Aramco action, plaintiff sought an
alternative source of payment from BS&W for the 1998 loan.  (D.I.
51 at 5)  The bankruptcy court denied plaintiff's motion to
intervene on May 1, 2006.[4]  (Adv. No. 02-3963, D.I. 47, 50)

**B.  Plaintiff's Accounting**

Plaintiff's itemization totals $2,124,641.30 in fees and

_____

[3]The agreement also stated that plaintiff retains a general,
unsecured claim for $2.5 million against SWEC.  (Adv. No. 01-
1121, D.I. 119, ex. A)

[4]Plaintiff has appealed this decision to district court.
(Adv. No. 02-3963, D.I. 58)

$194,122.75[5] in costs.  (D.I. 51 at 7-9)  Plaintiff claims that the fees could only be isolated into distinct fee groups (corresponding to the preference and recovery actions, the recovery action alone, and the Saudi Aramco action) "in **very** limited circumstances," such as when the preference action was dismissed, or filings in the recovery action which did not relate to discovery.  (D.I. 51 at 7) (emphasis in original)  To further complicate matters, plaintiff admits that fees listed in its "preference and recovery actions" group - by far the fee group including the largest chunk of attorneys' fees (at $1,553,254.25)- include "[l]egal fees that are related to multiple matters . . . (e.g. Saudi Aramco and [r]ecovery)." (Id.)  Plaintiff also has identified fees incurred in the Saudi Aramco action or recovery action alone.[6]  (Id. at 8)  Plaintiff also itemized three additional fees:  (1) $274.50 in fees billed by plaintiff's counsel; (2) $5.884.05 in fees billed by Clifford Chance; and (3) $15,334.00 in fees billed by Judge Francis G.

---

[5]In its first non-"revised" filing (November 20, 2006), plaintiff's costs totaled $192.961.11.  (D.I. 41)  The additional $1,161.64 corresponds to "[c]osts to be billed by [plaintiff's counsel Kirkpatrick & Lockhart Nicholson Graham LLP ("K&L")] (as of 11.20/06)".  (D.I. 51 at 9)

[6]Plaintiff submitted with its original accounting four affidavits in support.  (D.I.s 42-45)  A revised version of one of the affidavits was subsequently filed with four additional exhibits, containing attorney invoices.  (D.I.s 46-50)  All of plaintiff's exhibits are color-coded to designate fees incurred in either the preference and recovery actions, the recovery action, or the Saudi Aramco action.

6

Conrad.  (D.I. 51 at 8)  It is unclear as to what particular
actions these other fees correspond.  Finally, plaintiff has
listed its costs billed by its two law firms and specifically
relating to travel, which are not broken down by action.[7]  (Id.
at 9)

     C.  Analysis

     In its memorandum opinion, the court specifically stated
that plaintiff could recover only those costs and fees incurred
in obtaining the judgment in this case, in other words, those
fees and expense incurred in enforcing its rights under the
Guaranty.  (D.I. 39)  Plaintiff apparently takes issue with the
court on this point, arguing instead that "the [r]ecovery,
[p]reference, and Saudi Aramco [a]ctions are [all] recoverable in
this proceeding . . . [because they] are so intertwined that, in
the vast majority of instances, it would be both impracticable
and unjust to allocate [plaintiff's] fees and costs to one action
at the exclusion of the other related actions."  (D.I. 51 at 3)
Plaintiff then goes on at length to explain why the recovery,
preference and Saudi Aramco actions are related.  (See D.I. 51 at
6-9)

     Although the court does not dispute that these actions are

-------------------

     [7]These costs are $151,445.99 in costs billed by K&L, the
$1,161.64 additional in K&L costs discussed supra, $4,584.12 in
costs billed by counsel Monzack & Monaco, P.A., and $36,931.00 in
"travel expenses," which are not attributed to either K&L or M&M
specifically.

related to the same universe of facts, the court decided in
plaintiff's favor in the instant litigation based on the legal
consequences flowing from the Guaranty, and concluded that only
those fees and expenses related to enforcing plaintiff's rights
under that instrument should be awarded.[8] After reviewing the
record, therefore, defendant Shaw shall pay plaintiff
$345,714.50, the amount identified by plaintiff as its fees
attributable solely to the recovery action. (D.I. 51 at 8)
Defendant Shaw shall not be responsible for any of plaintiff's
itemized costs, insofar as these costs have not been clearly
correlated to any particular action. See Rode v. Dellarciprete,
892 F.2d 1177, 1183 (3d Cir. 1990) ("The party seeking attorneys'

--------------------------------------------------

[8]Given that plaintiff's motion to intervene in the Saudi
Aramco action was denied, the court cannot fathom how any fees
and expenses in that litigation could possibly be so
"intertwined" with the litigation at bar as to justify allocating
said expenses to defendant Shaw.
    The court finds that the issues presented in the preference
action - whether SWEC made preferential payments to plaintiff in
March and April 2000 - differs significantly from those presented
in the instant recovery action - whether plaintiff could
rightfully recover from Shaw the money owed by SWEC pursuant to
the Guaranty. Further, the settlement agreement specifically
provides that it is not intended to have, nor does it have, "any
effect with respect to [plaintiff's] action against Shaw in
connection with [plaintiff's] Cure Claim" "or any of the claims
or causes of action asserted" in the instant adversary
proceeding. (Adv. No. 01-1120, D.I. 199, ex. A) For these
reasons, the court declines to make Shaw responsible for the fees
and expenses related to the preference action. By the same
reasoning, the court grants plaintiff's request that the $1
million it recovered in the preference action "be allocated first
to the non-recoverable fees and expenses, with only the balance
being used to reduce Shaw's liability for the fees and expenses
found to be recoverable from Shaw." (D.I. 51 at 7)

8

fees has the burden to prove that its request is reasonable.").

## IV.   CONCLUSION

For the aforementioned reasons, the court finds that defendant Shaw shall pay plaintiff $345,714.50 in fees, pursuant to its previous memorandum opinion and order.   (D.I.s 39, 40)   An order shall follow.

9